A I believe--

Q --amount of force--

A I believe--

Q --are we--

A I believe--

Q --talking about--

A --your example of--

Q --if you can quanta it?

A --swinging the child by the heels and causing an impact with a wall or a floor certainly would be able to inflict these injuries. Possibly some force less than that would be able to inflict these injuries. But no trivial injury. A slap or a short distance fall--And we've already talked about that--would be expected to cause these injuries.

Q In a child this age, ordinarily aren't most fractures the green stick variety?

A I can't answer that. I don't really know what a green stick--

Q Well--

A --variety is. I have heard that term used--applied to extremities of the--

Q Yeah.

A --sorry--fractures of the extremities, but not really with respect to the skull.

Q But this is a--really a--an enormous amount of fracture, is it not?

A Yeah, it's a large fracture.

Q Is it the sort of injury that one might--might see in an automobile accident--

A Yes.

Q --unrestrained, unseat-belted person?

A By all means. We see fractures like this in severe vehicular impacts.

THE COURT: Can we keep this recess reasonably brief?

MR. MCDOWELL: Yes.

THE COURT: Where do you need to go? We have a jury room here. Is that--

MR. MCDOWELL: That's fine.

THE COURT: --sufficient? And there's no other access to the jury room. All right, we'll take a short recess. And if you can make it as abbreviated as you--as you can--

MR. MCDOWELL: Yes.

THE COURT: --recognizing--

MR. MCDOWELL: Thank you, judge.

THE COURT: --you have some territory to cover. Okay, we'll take a recess.

(At 2:50 p.m., court recessed)

(At 3:07 p.m., court reconvened)

MR. MCDOWELL: Thank you.

RECROSS EXAMINATION

BY MR. MCDOWELL:

Q Doctor, there's just one other thing that came to mind I wanted to ask you. You're going to do the retinal testing, you indicated, at a later date, correct, and then submit a report in regard to that?

A Yes.

Q Would--Would an increase or decrease--a rapid increase or decrease in blood pressure cause a retinal disruption?

A No.

Q No. Shouldn't have any--

A No.

Q --affect at all? Okay. It would just be--What you expect to see is because of some kind of--

A Injury.

Q Injury?

A Yes.

Q Okay. And you--When would you do that?

A I will probably be doing that during the coming week.

Q In the coming week?

A Yes.

Q Okay. And then you'll, of course, file your report there and it'll be forwarded to the prosecutor's office?

A Yes.

Q Thank you, doctor.

MR. MCDOWELL: That's all I have.

THE WITNESS: It will actually become part of the report

that you have right here, which is in its rough form right now.

MR. MCDOWELL: Okay.

THE COURT: And how long do you think it'll take before that's typed up? We sometimes waited many weeks between the dictation of the report and its delivery.

THE WITNESS: Yeah. I should probably not say anything less than two weeks. Two weeks for the final report.

THE COURT: Okay. Then we could expect it then--

THE WITNESS: Yeah.

MR. CHERRY: No further questions. Call Dr. Robert Page.

THE COURT: May this witness be excused?

MR. CHERRY: (No verbal response)

THE COURT: Thank you, sir.

THE WITNESS: Thank you.

(At 3:08 p.m., witness excused)

THE CLERK: Raise your right hand, sir. Do you solemnly swear or affirm, under penalty of perjury, the testimony you will give in the matter now before the Court will be the truth, the whole truth, and nothing but the truth?

MR. PAGE: Yes.

THE CLERK: You may have a seat.

ROBERT PAGE

called by the People at 3:09 p.m., sworn by the clerk, testified:

DIRECT EXAMINATION

BY MR. CHERRY:

Q State your name please.

A Robert Page.

Q Spell your last name.

A P-a-g-e.

Q You currently employed?

A Yes.

Q By whom?

A I have two employment's. I'm a pediatrician in private practice, I'm also employed by Bronson Hospital.

Q As a pediatrician in private practice, do you hold a medical degree?

A Yes.

Q Is that an MD?

A Yes.

Q From where?

A Michigan State University.

Q And when did you receive that?

A 1984.

Q And you're also employed by Bronson Hospital?

A Yes.

Q In what capacity?

A I'm a--I work the intensive care unit during the evening hours, about five to seven evenings a week--a month. Five to

seven evenings a month.

Q Okay. Dr. Page, you are--you are a practicing pediatrician?

A Right.

Q And you're licensed by the State of Michigan?

A Yes.

Q And you work at Bronson. When you work at Bronson, do you work in the inten--in the pediatric intensive care unit?

A Yes, I do.

Q Are you a Pediatric Intensivist?

A I've not been trained as a pediatric intensivist. I've had training in pediatric intensive care medicine.

Q Right. But you're--basically you're a pediatric physician, working in the intensive care unit at Bronson Hospital?

A Correct.

Q Were you--Were you working in that capacity as a pediatrician at Bronson Hospital in connection with the intensive care unit on or about the late evening hours of May the 8th, 1995--I'm sorry, 1998?

A Yes.

Q In the later evening hours, closer to ten o'clock, did you have an occasion to admit into the hospital an eight month old infant by the name of David Mcbain?

A Yes.

Q Showing you what has been marked as People's proposed Exhibit Number One, can you identify the person depicted in that

photograph?

A Yes, that's David.

Q Okay. When you first saw David, can you tell us under what--under what circumstances it was that you came to see him?

A We had--I ordered a--what's called a pediatric call-down to the inten--to the emergency room, and so the trauma service, ER service and pediatric intensive care service was down in the emergency room on his arrival--

Q How--

A --from Lakeland.

Q Excuse me. How did you know he was coming?

A The emergency room physician at Lakeland called me.

Q Called you directly?

A Called me directly.

Q And you had a conversation with whom?

A I don't remember his name.

Q Would it be Dr. Carlson?

A Yeah, I'm--

Q Can you tell us what information you had from the emergency room doctor here at Lakeland Hospital?

A Yes. He called me prior to him seeing the patient and told me that there was a patient that they have a story that had fallen off a bed, had suffered a severe head injury, and was be--would be coming to their emergency room and he would like to admit the child to Bronson.

Q Now, was it your impression that he was on the phone to you even before that child had arrived at Lakeland Hospital?

A Yes.

Q Okay. And-- So what did you say to him?

A I said, We'll be happy to accept the transport. I will get the helicopter on standby and I will order a pediatric call-down.

Q Okay. Now--

A I did not want the patient admitted directly to the intensive care unit, I wanted the patient to come through our emergency room.

Q I see. And did you put a helicopter on standby?

A Yes.

Q Was it--Was that helicopter eventually dispatched to Lakeland Hospital?

A Yes.

Q To pick up the person you've identified as David Mcbain?

A Yes.

Q When you first saw David Mcbain that night, do you recall what time it was?

A Around 10:30--

Q Okay.

A --in the evening.

Q And under what circumstances did you see David Mcbain?

A David came in on a cervical spine board.

Q On a what?

A He was--He was--His head was mobilized. He was on a straight board to come in--to prevent any type of movement, because we did--we're not sure what type of injury David sustained.

Q Okay.

A And so, he was--came in from the helicopter into the pediatric intensive care room.

Q And as the--

A I mean the--

Q --as the--

A --trauma room.

Q --pediatric physician on call that night, or at least working at that hospital, what did you do with respect to David Mcbain; can you tell us that?

A Sure. There--You have to realize too, there's probably about 20 people in this room, and there was a trauma surgeon, an emergency room physician, and myself, and with our ancillary staff all there. So when David came in the first thing to establish was the airway, and so we re-intubated him immediately to establish IV access, which we did that, to establish oxygenation, monitor vital signs, get fluids going, get a full catheter in, get chest x-ray, get him down for a CT scan.

Q In a nutshell, what was the condition of David Mcbain, this eight month old infant, at the time that you first saw him?

A Critical.

Q Critical? What happened then; you said a CT scan?

A CT scan.

Q Can you tell us what happened then?

A Yes. David went down for the CT scan, and I did not go down to the CT scan. The--We had three other admissions that night. So David was just one of four admissions that I did have that night.

Q Okay.

A And--But the trauma surgeon and resident and my resident, who was working with me that night, went down to the CT scan with David. And from David's--the CT scan was performed, he went back to the emergency room to get his cervical spine cleared, because he was still on the board, and so they went back for further x-rays in the emer--in the emergency room.

Q Okay. So he comes in, there's an initial evaluation, he's on the cervical board, he goes to the CAT scan, which is the CT that you eluded to, comes back to the emergency room and is taken off the cervical--

A He wasn't--

Q --board.

A --taken off the board then.

Q Oh.

A He had just had the x-rays performed.

Q Okay. At some point and time it became obvious that he didn't

need the cervical board?

A Right.

Q Okay. Then what happened then after--after the CAT scan and after taken off the cervical board?

A So while he was downstairs, the--I asked my resident what did the CT showed. It showed three fractures. A occipital fracture and biparietal fractures and--but did not show evidence of hemorrhage, edema--

Q Edema being?

A Swelling.

Q Swelling of the brain?

A Um-hum.

Q Okay. So as a result--Now, did you actually read the CT yourself?

A No, I did not.

Q When you first saw David Mcbain, were you--did you see any injuries about the head from an external examination?

A Saw bruising.

Q Can you tell us what the bruising was?

A There was a bruise right frontal parietal area. I saw a bruise about the same si--on the opposite. And I think from the head standpoint that was the extent of the bruising.

Q Now, these pictures were taken somewhat later and the condition of the baby is a little different because his head is shaved. But I'm showing you exhibit--People's Exhibits

Number One, Two and Three. Can you tell us, the bruising that you observed about the head of David Mcbain, was it consistent with what is shown in these photographs?

A Yes, there was that bruise below the right eye, too.

Q And you're referring to Exhibit Number One?

A Right.

Q How about Exhibit Number Two and Three, did you notice those at the time?

A We only saw part of this bruise. We--He was--He had hair, so we only saw part of it.

Q So, after the CAT scan and after initial evaluation, what happened to David Mcbain then?

A Then he was down in the emergency room and he came up to our unit, roughly, oh, gosh, 1:30, upstairs, maybe--

Q That's to intensive--

A --one--

Q --care?

A To intensive care. Maybe one o'clock.

Q Okay.

A At that time, he was--he was re-evaluated and stabilized. We had clearance then to take him off the C-spine board. The nurses took him off, got vital signs, and re-established--he--re-established just stable condition.

Q Up until this point and time, did you or did any other physician order any medication for David Mcbain?

A There's--There was medication ordered for David as far as, he had sedation, medications ordered, pain medications ordered.

Q Okay.

A He had decadron ordered earlier on.

Q What's decadron?

A That's an anti-inflammatory medication.

Q For what part of the body?

A It's a generalized anti-inflammatory.

Q Is decadron ordered for brain injury?

A It can be. It's not always, but it can be.

Q Okay. And do you know who ordered that?

A Dr. Taggett.

Q Dr. Taggett at Lakeland Hospital?

A No. Our trauma surgeon.

Q Okay. Trauma surgeon. What happened then after David was admitted into intensive care, did his condition remain the same or did it deteriorate?

A It deteriorated. I--At that point David was stabilized, again I'm not sure on the time, between the one and two o'clock period. I'd went to another admission. David was--I got called that David had a rapid deterioration. His equals became unequal and nonresponsive. He had a rapid rise and elevation of his blood pressure and a rapid elevation of his heart rate.

Q Okay.

A And to me that showed me that he was in rapid deterioration and I ordered Mannitol then.

Q You ordered Mannitol then. Now, what is Mannitol; can you tell us that?

A Mannitol is an asthmatic diuretic to help with relieving fluid so he would diuresis or pee that fluid out that could cause some cerebral swelling.

Q Is that--Is that a way of treating a defuse--defuse brain injury?

A Yes, it is.

Q Okay. And what kind of dosage did you give David at that time?

A One gram per kilo.

Q Is that considered high or medium or low?

A I would say it's--you know, it's in the normal range.

Q Was a neurosurgeon also called in at this time?

A Neurosurgeon was called right then.

Q What would his name be?

A Dr. Meyer.

Q Okay. What else was done--

THE COURT: How do you spell Meyer?

THE WITNESS: M-e-y-e-r.

BY MR. CHERRY:

Q Was there anything else done in the treatment--

A Dr. Meyer thought that this--I told him the story and he

thought it might be representing seizure activity and so also had me order some Dilantin.

Q Okay. Was a subsequent CAT scan--

A And then--

Q --performed--

A --also we ordered a CT scan--

Q About what time?

A --right then. 2:15-2:30.

Q Did you see that CAT scan yourself?

A Yes, I did.

Q And did you interpret it yourself or was it--

A The radiologist--

Q --interpreted for you?

A --was still there and he interpreted the CT scan.

Q What was your impression of your patient, David Mcbain, at that time, at the time of the second CAT scan?

A Very, very critical. Very grave.

Q In what--In what sense?

A He had a--Before David had had some spontaneous movement. He would withdraw to pain. He would--He'd have some just spontaneous movement. And at that point, once that event occurred, he had no movement, whatsoever.

Q Once what event occurred?

A The rapid rise in his heart rate, the rapid high blood pressure, the unequal pupils.

Q And this--And this occurred approximately at one or 1:30 a.m.?
A Yes. I--I'd have to review the records, but I--it's about that time.
Q Following the second CAT scan that was performed on David Mcbain, can you tell us what else happened or what other course of treatment was embarked upon? If any.
A Well, Dr. Meyer was in at that time. He's the neurosurgeon. And we evaluated the CT scans, and he felt that there was nothing else that would be able to be helpful to David at that point.
Q Dr. Page, was an EEG done on this particular patient?
A From what I understand, I-- My shift ended at eight o'clock in the morning.
Q Okay.
A And so, I understand they did that the next morning.
Q Up until the time that you left at eight o'clock, do you know whether an EEG had been performed on David Mcbain?
A It had not been performed by that time.
Q And have you had an occasion to read those records from Bronson Hospital?
A Yes.
Q What time was an EEG performed, if it was?
A I believe around 10:30.
Q Okay. And do you know what the result of that EEG was?
A Showed no wave form.

Q No wave form. Can you tell us what that means?

A Basically brain dead.

Q Brain dead. Now, at the time that this EEG was performed, was David Mcbain, did he still have a pulse, did he still have a heartbeat?

A Yes, he did.

Q Was he still breathing?

A The ventilator was breathing for him.

Q I see. So had he been taken off the ventilator at, say, eight o'clock in the morning when you left, what would have been the likely and natural result of that action?

A In my opinion, my guess is that he would have died.

Q Okay.

A He would not have had any spontaneous breath.

Q When you say the EEG was flat, is that the same to say as he was brain dead at that time?

A Yes.

Q When you left at eight o'clock in the morning, did you have an opinion as to the condition of David Mcbain?

A Yes.

Q Was he--What was your opinion with respect to EEG activity and brain activity at that time?

A Well, my opinion would of, if there was anything, it'd be minimal.

Q Okay. I showed you the autopsies in this case--or, some of

the autopsy photos.

A Yes.

Q And I'm showing you what has been--showing you what has been marked as People's proposed--admitted as People's Exhibit Number Four. Can you look at that please and tell me, have you seen that autopsy photograph before?

A Just prior to today. I mean, prior to coming in here.

Q If I told you that--If I was to identify that as a autopsy photograph of David Mcbain, as a pediatrician, do you have any impression about the size of that fracture?

A I can't tell from the--you know, from size and everything. But it's massive.

Q If I told you the previous testimony was approximately six inches long--

A Well--

Q --do you have--as a pediatrician, are you familiar with head injuries in infants?

A Yes.

Q Do--Are infants more susceptible to head injuries than, say, seven or eight or nine year old children?

A More susceptible? What do you mean by that?

Q Well, I guess--I guess I need to know, if you can tell me, based upon your experience as a pediatrician, the amount of force that might be necessary to cause an injury like that.

A A lot of force.

Q Well--

A Massive force.

Q --can you give me an example?

A Very forceful blunt impact. Smashing. That's a forceful injury to cause that.

Q Well, I mean, I--for example, a fall off an 18 inch high waterbed, would that--onto a hardwood floor, could that cause such an injury?

A Definitely not.

Q What if the child was 29 inches high, standing on a waterbed when he fell?

A No.

Q Well--So what kind of--what kind of--If you can, quantify it for me. Give me some example of what you think might cause that kind of injury in an eight month old infant?

A A fall from a two-story onto the head.

Q Onto the head?

A Um-hum.

Q Do you know what happened to David Mcbain the next day, that would be May the 10th--or, I'm sorry, May the 9th?

A As far as--I know that they removed him from life support.

Q Do you know when that happened?

A 10:30 that night.

Q And as a result of removing him from life support, based upon your review of the hospital records, can you tell us what

happened?

A He sustained--stopped breathing--

Q Stopped breathing. In--

A --and died.

Q In essence, his heartbeat stopped?

A His heartbeat stopped.

Q But to your--to your knowledge at least, from your information, David Mcbain was brain dead sometime in the early morning hours--well, at least by eight o'clock?

A Very, very good chance of that.

Q Can you think of anything that can or should have been done to save the life of David Mcbain?

A Prior to coming to our hospital?

Q Yes.

A Prior to coming to our hospital or--

Q Prior to coming to the Bronson Hospital.

A Anything that could have been done to help David out.

Q No, to save his life.

A To save his life. Not to have allowed an injury like that to have happened.

Q Is there anything that reasonably could have been done immediately following the infliction of such an injury to save his life? What--I mean, what could have been done?

A I don't believe anything.

Q Following a skull fracture of this magnitude?

A I don't believe anything could have been done.

Q Okay.

MR. CHERRY: Nothing further.

CROSS-EXAMINATION

BY MR. MCDOWELL:

Q Doctor, if a prior witness has testified in this matter that basically death was caused by the brain going haywire, if I could use those words, because of the trauma to the brain itself and things--related things of that nature-- And the reason I'm asking you this `cause, we asked him about mannitrol (sic), and I note it wasn't given until sometime after the child was in your custody, correct, at the hospital?

A I believe it was given maybe three hours after.

Q I can--I have the notes. Bronson Methodist Hospital. 5-9-98, looks like 0200--

A Okay.

Q --mannitrol (sic). Does that--

A It's--

Q --look correct?

A --Mannitol.

Q Mannitol.

A Mannitol.

Q M-a-n-n-i-t-o-l?

A Yes.

Q Is that about when he received it?

A I don't think so. Because what you're referring to here is a standing order and there was a order given earlier than that. Of course, I won't know--But there was one given sooner than that. Once I find the order, I will find that for you. Here we go. Here's--Here's where the first Mannitol was given, right then.

Q 2:30 a.m. on 5-9?

A And that would have been right.

Q Okay. And he'd been there since what time?

A 10:30 in the evening.

Q So it'd been four hours?

A Right.

Q Okay. In a brain injur--injury case is it not--well, I don't know--advisable I guess to use that as soon as possible?

A No, it's not.

Q It's not?

A No. You want to access the case and see what's the cause of the injury first. You do not what to give it par--or, if there's not edema taking place or if it's a spocal edema. Mannitol could be life-threatening used in the wrong situation.

Q As would the brain swelling be life-threatening if not treated correctly, correct?

A Yes, it would be.

Q Okay. So you wanted to assess him--

A Definitely--

Q --as I understand it?

A Um-hum.

Q Because if the parents were to say that--or, the parents, the mother and the stepfather were to say that they were told, oh, sometime around midnight it looks like, We've got him stabilized, a good prognosis, was that done in this case?

A No, it was not.

Q Okay. You said he was stabilized, though? David.

A His vital signs were stabilized, yes, that's true.

Q You did talk--Did you talk to the--

A Yes, I did.

Q You recognize David sitting here?

A Yes. Um-hum.

Q Okay. And you recognize the mom?

A Yes.

Q You saw her here today?

A Yes, I did.

Q Okay. You talked to him about his condition?

A Yes.

Q It got grave, as I understand it, at about the time when you left, right? Wait.

A He was grave before I left.

Q At eight--You said, at 8:00 a.m. your opinion was--And then I didn't--you trailed off, or I didn't catch it. What was it?

You--I guess you left about that time.

A I did leave at eight o'clock. But I felt that his condition was grave.

Q At 10:30 a.m. there's no brain wave activity?

A (No verbal response)

Q Okay. But at 8:00 a.m., it was grave, correct?

A And I felt that--well, I think I'm answering the question before.

Q You had him stabilized at 1:00 a.m., as it was your testimony, to the intensive care unit. Vital signs indicate he was in a stable condition, correct?

A Correct.

Q You gave him the decadron, which is an anti-inflammatory for the brain injury?

A He received that in the emergency room.

Q Okay. That would have been right after he got there?

A Yes.

Q So, sometime between 1:00 a.m., you get notice that his blood pressure is increasing; between 1:00 and 2:00 a.m., right?

A Right.

Q Blood pressure is rising?

A Must have been. If the Mannitol was given at 2:30, it must have been within the ten minutes prior to that. `Cause Mannitol is given immediately after his changing condition.

Q And they also gave him Dilantin `cause they thought it might

be some kind of a seizure--

A Right.

Q --correct? Okay. And it turns out it was not--Was there a seiz--Was it a seizure or not a seizure?

A I still---

Q Don't know?

A Um-um.

Q Okay. I have the records-- Mine say, Dr. T-o-s-i-o-u?

A Tosiou.

Q What would he be? Is he in the--

A It's Mary Margaret Tosiou. She's a resident, working the intensive care unit that month, and she was on that night with me.

Q Okay. She's a resident?

A Yes.

Q Physician?

A Yes.

Q And you're familiar with her report?

A Somewhat.

Q Okay. Let me just show you that report and ask you whether you recognize it.

A Okay.

Q And it's attached again to the records provided by the hospital.

A Yes, I've seen this.

Q Okay. And that's her kind of a detailed rendition of complaints--

A This is her history and physical. So this was the first thing she would have seen when David was admitted.

Q Okay. And it references in there when you decided to give the Mannitol, correct?

A I don't know. Yes, it is in here.

Q Okay. You would stand by that report?

A I think so. Yes.

Q All right. You've not seen it necessary to correct it?

A Right. Not yet.

Q Your testimony is that the size fracture that you saw in the autopsy photo there would take a considerable amount of blunt force, correct?

A Yes.

Q In fact, you characterized it as a--like a drop from a two-story building or something?

A Yeah.

Q Okay.

A It's a guess.

Q You've seen--Have you seen fractures like that before?

A No.

Q You never saw one like that before?

A Um-hum.

Q So you're actually guessing, I guess is--

A Um-hum.

Q --what-- Okay. Thank you. You think it's more than a small amount of force, but, in fact, a large amount of force, but you're not sure exactly what--

A Exactly.

Q --is that fair? Okay. Thank you. I think that's all I have. Thank you, Dr. Page.

MR. CHERRY: I have no more questions.

THE COURT: Doctor, when you were first on the stand, you said that the child was brought in on a board. And I think you kind of swallowed the words there. And for the sake of the recorder who's going to have to type the transcript up and get it exactly right, what was the board that--

THE WITNESS: Well, it's--

THE COURT: --the patient--

THE WITNESS: --a cervical--

THE COURT: --was on?

THE WITNESS: --spine collar.

THE COURT: A what?

THE WITNESS: Cervical spine collar. To stabilize the neck, the cervical spine.

THE COURT: Collar or board?

THE WITNESS: Well, it's a board. The board comes underneath the back to allow for that stabilization.

THE COURT: Okay, well, I realize you probably don't

recall your testimony verbatim but, would you call that a--

THE WITNESS: Back board?

THE COURT: --C-spine or a cervical spine board?

THE WITNESS: Right. C-spine is--C stands for cervical spine.

THE COURT: Okay. Well, we had trouble hearing that--

THE WITNESS: I'm sorry.

THE COURT: --and it's a little tough on the recorder to try and type it up if she's guessing. Okay. Thanks.

Any other questions of this witness?

MR. CHERRY: None.

THE COURT: You may be excused.

MR. CHERRY: Thank you, Dr. Page.

THE COURT: He's excused.

(At 3:36 p.m., witness excused.

MR. CHERRY: Call Bob Mayberry.

THE CLERK: Raise your right hand, sir. Do you solemnly swear or affirm, under penalty of perjury, the testimony you will give in the matter now before the Court will be the truth, the whole truth, and nothing but the truth?

MR. MAYBERRY: I do.

THE CLERK: You may have seat.

ROBERT MAYBERRY

called by the People at 3:37 p.m., sworn by the clerk, testified:

DIRECT EXAMINATION

BY MR. CHERRY:

Q State your name.

A Robert Mayberry.

Q Spell your last name.

A M-a-y-b-e-r-r-y.

Q Are you currently employed?

A Yes, I am.

Q By whom?

A West Michigan Air Care.

Q In what capacity?

A I'm a flight nurse.

Q And how long you been a flight--flight nurse for that particular organization?

A A little over five years.

Q Now, in that organization are you--when you say you're a flight nurse, does that mean that you--what does that mean, exactly?

A I'm a registered nurse and my duties as a nurse are to fly in the helicopter and provide medical care.

Q Does that helicopter routinely or frequently make trips between Lakeland Hospital and Bronson Hospital?

A Yes.

Q Does it carry patients?

A Yes, it does.

Q Of all ages and sexes, and race, and everything else, right?

A Yes, it does.

Q Okay. So, you're not confined just simply to little children?

A No, I'm not.

Q And you've been doing this for about five years?

A Flight nurse is going to be over twelve.

Q Showing you what has been marked as People's Exhibit Number One and admitted. Do you recognize that person depicted in that photograph?

A I don't recognize him.

Q Okay. Well, let me ask you this. On or about May the 8th, 1998, did you have an occasion to pick up an eight month old infant at Lakeland Hospital and--

A Yes, I did.

Q --transport that infant to Bronson Hospital?

A Yes, I did.

Q About what time was that?

A About 9:45 in the morning, I believe. I can refer to my record.

Q Was that--Was that infant's name David Mcbain?

A Yes.

Q And although you don't recognize this photograph, I mean, did it look somewhat like this person?

A Yes.

Q Okay. Did you transport any other children on that day or the

subsequent days?

A No.

Q Can you tell us a little bit about how you got this call?

A We are typically on alert status in and around Bronson Hospital or Borgess Hospital. We're called on the radio. We respond in helicopter and then we fly to whoever request us.

Q And did you do that in this particular occasion?

A Yes, we did.

Q When you arrived at Lakeland Hospital here in Saint Joseph, Michigan, did you actually go into the hospital itself to retrieve David Mcbain?

A Yes, we did.

Q Can you tell us about that, what happened when you went in?

A In summary, we went in, there was an infant who reportedly had a head injury, was--had already been intubated and a interosseous or leg IV line was in place. We prepared the patient for transport in a routine manner.

Q How do you--What do you mean, prepared the patient for transport?

A We make sure the IVs are in place and the trachea tube's in the correct place, ventilations are taking place, and there's no other things that need to be done. We did have to place the patient on a small pediatric specific backboard to immobilize the patient and then secured them to our--(inaudible).

Q Pediatric specific backboard. Is that like a C-board? Is that what they call a C-board?

A They call it a backboard. This is a device made by Life Support products that's designed for children. And it has several straps in a device that holds the head in alignment.

Q At the time that you started the process of preparing this child for transport to Bronson Hospital did you have any idea what was wrong with this child?

A That the child had had--had suffered a head injury.

Q Is that the reason that it was placed on a backboard?

A Correct.

Q Okay. And I assume that you did, in fact, transport the child to Bronson Hospital?

A Correct.

Q In a helicopter?

A Correct.

Q Was the flight routine or was it--was there any unusual occurrences in this flight?

A There were no occurrences on this--

Q Was there any unusual wind conditions--

A No.

Q --or turbulence?

A No.

Q Anything happened to that child?

A No.

Q Any additional injuries inflicted?

A No.

Q Did you actually treat the child on the--on the flight?

A Yes.

Q In what sense did you treat the child?

A Well, we're in attendance of the child. There was little treatment to be done. We essentially carried on what had been done at the original institution.

Q And that's to stabilize the baby until it can get to the hospital?

A Right. We monitor vital signs.

Q Okay. Was it on a respirator at the time or was the child breathing on its own?

A It was on a respirator, bag valve respirator.

Q Okay. Anything else that you can think of?

A No, sir.

MR. CHERRY: No further questions.

CROSS-EXAMINATION

BY MR. MCDOWELL:

Q Were there--There's obviously the pilot, and then you're the nurse; is there another person in attendance?

A Yes, sir. That day there's four crew members. A single pilot, myself as a flight nurse, flight paramedic, and a flight physician on that day.

Q All right. Did--But you saw the child the entire time?

A Yes. I was in attendance. Yes.

Q And you were in attendance, that means you were right there with it?

A Yes.

Q Okay. And no medical procedures were done on the airplane?

A No.

Q Things were done here at Lakeland and then they were just continued till--

A Correct.

Q --you got to Bronson. And it was a without-incident flight, I guess?

A Yes.

Q As much as without incident it could be.

A Exactly.

Q And that was in the evening, correct?

A No. It should be the morning. I can refer to my record.

MR. CHERRY: It was in the evening.

THE WITNESS: It was in the evening?

BY MR. MCDOWELL:

Q Okay. If it--If your record said it was about nine o'clock in the evening, would that be--

A Yeah. I have the record with me.

Q All right. Do you have it with you?

A Yeah.

Q Well, you can look at it if you can't remember.

A I work all shifts, so.

Q Okay.

A Yeah, we arrived there at 21:28.

Q So that'd be 9:28?

A Right.

Q And you departed probably pretty soon after you arrived, right?

A Yeah. We departed there at 22:00, and that's ten o'clock.

Q So you were on the ground a half hour.

A Yeah.

Q Okay. All right, thank you. That's all I have, Mr. Mayberry.

MR. CHERRY: Nothing further. Thank you.

EXAMINATION

BY THE COURT:

Q Witness, when did you--since you have your records there, when did you get the call to go to Lakeland?

A The original call--The original call is not on this document. We departed at 21:12.

Q So it only took you, what, sixteen minutes to get here, here being the hospital--

A Right.

Q --and 32 minutes on the ground, and then, probably another 16 minutes back?

A Yeah. Nineteen. And that would be--usually it's quicker one way than the other because of the winds.

Q Well, yeah. So that it's an hour and seven minutes from the call to arriving at the hospital?

A Yes.

Q And the child already had IV, airway, and respirator functioning, and you maintained that?

A Correct.

Q And delivered him to the hospital?

A Correct.

THE COURT: Anything else?

REDIRECT EXAMINATION

BY MR. CHERRY:

Q Was the child conscious at the time you saw it?

A No.

MR. CHERRY: Nothing further.

MR. MCDOWELL: Nothing further.

MR. CHERRY: Call--

THE COURT: Witness excused.

(At 3:44 p.m., witness excused)

MR. CHERRY: --Bill Farhat.

THE CLERK: Raise your right hand, sir. Do you solemnly swear or affirm, under penalty of perjury, the testimony you will give in the matter now before the Court will be the truth, the whole truth, and nothing but the truth?

MR. FARHAT: I do.

THE CLERK: Have a seat.

WILLIAM FARHAT

called by the People at 3:44 p.m., sworn by the clerk, testified:

DIRECT EXAMINATION

BY MR. CHERRY:

Q State your name.

A William Farhat.

Q Spell your last name.

A F-a-r-h-a-t.

Q Are you currently employed?

A Yes, sir.

Q By whom?

A Township of Chickaming.

Q In what capacity?

A Title is a public safety officer.

Q Does a public safety officer entail the duties of both a police officer and an EMT?

A Yes, sir, it does.

Q And an EMT being what?

A Emergency Medical Technician.

Q Okay. Do you have training for that?

A Yes, sir, I--

Q How long have you been an EMT?

A Been a paramedic for six years. I was an EMT before that. So it's been seven and a half, eight years.

Q And how long you been working for Chickaming township?

A Since November of 1997.

Q As an EMT--Is there a difference between an EMT and a paramedic?

A Yes. A paramedic can do more advance procedures in the field when their working for an advance life support ambulance. Like, advance airways, IVs, drug therapy--

Q Okay--

A --things--

Q --so, we know you're an EMT, and we know you're a police officer; are you also a paramedic?

A Yes, I am.

Q Are there times that you change hats between an EMT and a paramedic?

A Yes.

Q When is that?

A Unless the choice calls for it. I mean, not only when I'm--depending on what shift I'm working, if I'm working a police day or an ambulance day. But also when I'm work--on a call--I'm a police officer and I come upon a call that's a medical nature, I kind of change hats there.

Q I guess my question is this. I mean, as a paramedic, you're involved in advance life support--

A Yes.

Q You--I mean, does that require the presence of an ambulance,

for example, on--

A Yes, it does.

Q --advance life support equipment?

A Yes, it does.

Q Okay. Now, back on May the 8th, 1998, at around 8:15 in the evening, were you on duty?

A No, I was not.

Q Were you in your car?

A Yes.

Q Did you overhear a dispatch from Berrien County?

A Yes, I did.

Q What was the nature of the dispatch?

A It started out as a priority one and became a priority one dis--one A dispatch for a child with difficulty breathing, an eight month old.

Q And where was that located?

A On Minnick Road.

Q Is that in Chickaming township?

A Yes, it is.

Q Berrien County, Michigan?

A Yes, sir.

Q How far was that from where you were when you heard--overheard that dispatch?

A Approximately five or six miles away.

Q Okay. Now, you weren't on duty?

A No.

Q Why--Did you go over there?

A Yes, I did.

Q Why?

A When the call came out the dispatcher said--they had to dispatch it twice in Berrien County because one of the radio tower is weak. The second time he said, upgraded the call to a priority one-A, it sounded like the child was worsening. So I figure, well, I could go by and help out if there was a--depending on how severely injured the child was.

Q And you were in your personal car at the time?

A Yes, sir.

Q Did you arrive at this location on Minnick Road?

A Yes, I did.

Q And when you got there did you sti--were you flagged down by anybody or did you see anybody?

A There was a teenage boy at the end of the driveway. He wasn't really flagging me down `cause I was in my personal vehicle, he didn't realize who I was.

Q Yeah. Did you stop?

A Yes, I did.

Q So you knew the address?

A Yes.

Q And when you stopped did you get out and ask him any questions?

A Yes, I did. I asked if he called for an ambulance.

Q And what was the response?

A He said, yes, that they called for an ambulance in the house.

Q Okay. When you arrived in your personal vehicle--I mean, were you in uniform at the time?

A No, I was not.

Q So you were in, like, civilian clothes?

A Correct.

Q When you arrived were there any ambulances at the scene at the time?

A They were just coming around the corner north of me. I could see them coming.

Q Okay. What did you do after you got there?

A I started walking to the door with the--I left my four-way flashers on so the ambulances could see where we were and I started walking up to the door with the boy who was at the end of the driveway and asked him some questions about what was going on.

Q Okay. Without getting into that, did you go into the house?

A Yes, I did.

Q When you went into the house did you go into the house in connection with any other ambulance personnel?

A Yes. EMT Brenda Kenreich of the Chickaming ambulance actually walked in the door first, and she was in uniform, so I figured I'll let her walk in the door first.

Q Do you know whose house this was?

A I found out later. I didn't know at the time.

Q Was--What was this person's name?

A William Jackson.

Q Okay. Do you know the defendant in this case, David Flick?

A Do I know him from previous experience?

Q Yeah.

A No, I--

Q Did you know him at that time?

A No, I had not met him before.

Q Did you see David Flick at the Jackson home when you walked in there on May the 8th?

A Yes, I did.

Q And where was he when you walked into that house?

A He was just to the right of the doorway on the floor holding the victim child in a sitting position.

Q Holding a child?

A Yes.

Q Okay. Showing you what has been marked and admitted as Exhibit Number One, is that a photograph of the child that David Flick was holding when you walked into that house on May the 8th?

A Yes, it is.

Q How was he holding the child?

A He was holding in a sitting position. The child's legs were

out in front of it, straight like this, holding the torso up, with the head slumped over this way.

Q Okay. What did you do when you saw that?

A Well, the child's face was a purplish gray color. I could tell right away that the patient didn't seem to be breathing. So I laid the baby right down and had one of the other MT's, Terry Germain, I asked him to give me a--just so I could start ventilation, give me an ambu bag, is what it's called, so I could start--

Q Is that--

A --the respiration--

Q Is that like so you can breath for the baby?

A Correct.

Q By pressing a bag?

A Um-hum.

Q Was the child conscious at the time that you saw this baby at about 8:15?

A No.

Q And tell me, what time was it, exactly, if you remember, that you walked into the house and saw that child?

A I couldn't tell you. I didn't look at my watch. I was too busy with the patient. I didn't know what time it was.

Q Okay. So you placed the child down on the floor, you got a ventilation bag for the child, and what else did you do at that time?

A Started asking questions. What was going on. Well, I assumed when I'd come to the scene that it sound like a medical problem, this baby having trouble breathing. Well, this appeared to be much worse than that. It wasn't what I expected to find in the house.

Q What questions did you ask?

A The boy that--when I was walking up to the driveway had said something about the baby may have fallen off a bed--

Q Okay.

A --so I wanted to verify that.

Q Okay, so when you got in, saw the baby, laid the baby down, started the ventilation, did you start an IV at the time?

A No. No.

Q Okay. So--I mean, what questions did you ask and who were you asking them of?

A I asked David Flick what had happened and I also kind of preface, I said, the baby fell off of a bed? And he said, "Yeah, probably about four hours ago." But that's not what he thought--he didn't think that was what had caused this.

Q Did he tell you what he thought caused this situation?

A Yes.

Q What did he say?

A He said that a dog had jumped off the couch onto the baby's abdomen about 15 minutes before it having difficulty breathing. He thought that had caused it.

Q Did it have a ring of truth to you?

A I--When he said that, I immediately checked the baby's abdomen. He didn't have a shirt on, so I checked it's abdomen real quick. It was soft, not tender, didn't seem to have any obvious trauma to it, wasn't anything-- From my training, abdominal cavity, if there's any blood present in it, which would normally happen if a blunt trauma had occurred, it usually tightens up; and it was very soft and supple. And I didn't think that was the case. When had said that-- The four hour time frame for falling off of a bed, that would match with what I assumed was a closed head injury at that point, where, you know, it could have occurred and that may have made the patient unconscious. But I wouldn't--I didn't know at that time.

Q The child at that time was having trouble breathing. Do you remember asking David Flick when the troubled breathing started?

A He said three minutes before he'd called the ambulance.

Q And you overheard the call at about 8:15?

A Yeah. Correct.

Q Okay. So you--did you suspect a closed head injury at this time?

A What was presenting, the symptoms of the child would match a head injury of some type, and since there wasn't anything obvious, no obvious bleeding on the outside of the head or

anything, it would thus be a closed head injury rather than an open one.

Q You didn't see any other signs of trauma on the child, did you?

A I saw some bruising right here around the eye.

Q Okay.

A I saw that. But I didn't really do a close inspection of the child.

Q At that time did you see any bruise--bruising on either side of the head or on the back?

A No, I didn't inspect the head.

Q So what happened then? What did you do then? What's the next thing that happened?

A Well, at the same time the Chickaming ambulance arrived, the Advance Ambulance Medic One arrived. So as we're ventilating--I'm ventilating the patient, one of the other paramedics with Medic One was intubating the patient and also attempting to get an IV started, also attempting to get the baby into what's called a KED, a Kendrick Extrication Device. It's usually used to take people out of a car, but it's made to--also made to immobilize children. So if there'd--something had happened as we were trying to immobilize the child so there wouldn't be any movement--

Q So this--

A --to cause--

Q --baby was--

A --anymore injury.

Q --immobilized right at the scene?

A Correct.

Q On--Is that like a board?

A Yeah. It's a board that has flaps on it to wrap around legs and--

Q Okay.

A --head, and things like that.

Q Now--

THE COURT: Can you--

BY MR. CHERRY:

Q --what else happened--

THE COURT: --give us the spelling of that name, please?

THE WITNESS: Kendrick. K-e-n-d-r-i-c-k.

BY MR. CHERRY:

Q By the way, did you ask Mr. Flick if he--what connection he had with this child?

A I asked him is the--I asked him--I think I asked if the mother of the child was around, and he said, no. And I looked at him and asked if he was the father, and he said he was not, he was the boyfriend of the mother of the child.

Q During this process were you at all in touch with emergency room doctors at Lakeland Hospital?

A After we left the scene and once we were enroute to the

hospital, yes.

Q Okay. So let me back up a little bit. You placed--You placed the infant--or, the child, David Mcbain, on this board. Did you do anything else to treat the child?

A Not on scene, no.

Q Did--

A Enroute to--

Q --you have any fur--

A --the hospital--

Q Did you have any further conversations with the defendant in this case, David Flick?

A Yes, I did.

Q What else did you ask him?

A He wanted to go and get the baby's mother from work at the rest--this Old Run Mill Restaurant in Union Pier.

Q And what did you tell him?

A I told him no. I didn't even know the name of the baby at that point. I needed someone to come to the hospital with me to--

Q Okay.

A --help--

Q Did you insist that he accompany you to the hospital?

A He repeated his request. He said, well, he really wanted to go and get her. And I said, no, you have to come with us to the hospital.

Q Do you know if anybody in fact was asked to go and get the mother and bring her to the hospital?

A Yes, I do.

Q Who was that?

A William Jackson, the homeowner.

Q And this was William Jackson's house, is that right?

A Yes.

Q Okay. After--After that conversation with David Flick, what happened; what did you do then?

A As soon as the packaging, is what we call it, the immobilization of the child was done, we took the baby out to the ambulance and started transporting to the hospital.

Q Okay.

THE COURT: Which ambulance?

THE WITNESS: We actually transported it in Chickaming Township Ambulance.

BY MR. CHERRY:

Q Were you in attendance with this--with this baby all the way to the hospital?

A Yes, I was.

Q Were you, I'm going to use word, treating, but I don't think you were actually treating. Were you monitoring this baby's life-support and vital signs?

A Yes. And we did do one more treatment thing enroute to the hospital. Starting an IV through the patient's leg. That was

the only thing we did treatment-wise.

Q Is that an inner osseous IV?

A Correct.

Q Can you tell--Can you tell us what an inner osseous IV is?

A It's a--when you're unable to get an intravenous line, which is normally used, we use, starting an arm or the back of the hand. Children are unable to do that when they're in severe trauma situations. Their circulation has collapsed in the peripheral areas, legs and arms.

Q You--

A So we use that line. It's a needle that is meant to bore into the bone, into the bone marrow area of the leg, usually, to start--to get IV access, to get access to the circulation.

Q Once you gotten into the ambulance, were you in radio contact with the emergency room--

A Yes--

Q --the whole--

A --I was.

Q --time? Did you--What did you tell them with respect to this case?

A I told--(unintelligible)--a patient that was purported to have fallen off a bed, although I thought that the--I told them that the patient has not been conscious, does not have any respiration's at this time. I also told them that the patient was posturing.