Q Posturing?

A Yes.

Q What does that mean?

A When--

Q First of all, tell us what you observed.

A Well, I observed the patient was doing what's called decorticate posturing, where the baby would point its fist in towards its leg--towards its body and was laying flat, but maybe move arms a little bit more like this. It's an unconscious response to a brain injury that I've been trained to recognize. It was decorticate decerebrate posturing, it's too different types--

THE COURT: Oops.

THE WITNESS: --of posturing.

THE COURT: We need to get that spelled, please.

THE WITNESS: Okay, I'll try that. Decorticate. D-e-c-o-r-t-i-c-a-t-e. And decerebrate, I--that wasn't present, that was just the other type. I could spell that if you want. D-e-c-e-r-e--I think it's, b-e-r-i-t-a. B-r-a-t-e.

THE COURT: If you--

THE WITNESS: Excuse me.

THE COURT: --find out later, the spelling, could you give the recorder a call and--

THE WITNESS: Absolutely.

BY MR. CHERRY:

Q Did you--Did you tell Lakeland--Did you tell Lakeland Hospital, the emergency, that you had what you believed to be a closed head injury in this child?

A Yes, I did.

Q Did you tell them what you--your opinion as to the condition of this baby?

A Well, I believe I told the nurse that answered the phone. I said, I thought the patient was dying, because the patient's pulse had dropped into the sixties, which is very low for an infant; and the posturing going on; the patient was not breathing on its own. Couldn't get any--Couldn't even get a blood pressure because you can't--couldn't feel a pulse. You can't--You don't usually use a neck for a pulse point on a child because they don't have a neck. So you would feel it out here on the arm. So if you can't feel circulation out here on the arm, that means that all the--everything's clamped off the peripheral areas and all the blood has been shunted to the main areas to try to give the baby energy.

Q So it was your impression that this baby was dying at this time?

A Yes, it was.

Q Did you--Did Lakeland Hospital decide what to do with the child that they communicated to you?

A They did not communicate to me. I found out what they decided to do after I arrived at the hospital.

Q And what was that?

A They had called for a helicopter from Bronson.

Q Was the trip--the transport to the hospital in the Chickaming ambulance, was it--was there any unusual events that occurred during that trip?

A No.

Q I mean, there was no accidents, the baby wasn't dropped, or anything of that nature which would have acerbated any existing injury?

A No.

Q What happened after you got to Lakeland emergency room?

A We come into the main emergency room, their trauma area, and they take over the care. We assist them in helping with the care and describe what we know up to that point, and just pretty much tell them the story like I'm telling you now.

Q Were you--Were you there when the helicopter crew came in and took the baby?

A Yes.

Q During this process--I mean, I assume that after the Chickaming ambulance brought the child to the hospital, the child was further stabilized by emergency room doctors?

A Correct.

Q Would that be Dr. Carlson; one of them?

A Yes, it would.

Q Were there--Was David Flick at the scene at the time?

A In the hospital?

Q Yes.

A He was in the emer--in the main treatment room for a little bit and then I think they--someone actually escorted him out into a hallway. But he was in the hos--the emergency room the entire time.

Q As a matter of fact, wasn't he in the hos--in the ambulance with you in trip from Chickaming township to the hos--to the hospital?

A Yes. In the front seat.

Q Okay. Did you have any further conversations with him at that time or did you hear--overhear any further conversations with him and anybody else?

A At the--At the hospital, they were still trying--they wanted to get consent to fly the child to Bronson and they needed the parent of the child to do it. And I said there wasn't a parent here, that I'd ask William Jackson to go get the mother and that's when Mr. Flick said that, Oh, I'm the father of the child.

Q Okay. I mean, do you know whether or not the defendant is the biological father of the child, is--did anybody tell you that or did he tell you that?

A He told me at the time that--when I looked at him and I--`cause I was confused at that point `cause he had already told me he wasn't--he said that, "Well, I'm not the father of the

child but I have been the father for the child."

Q Okay. Now, in addition to having contact with the defendant in this case, David Flick, and Dr. Carlson, and the emergency room personnel at Lakeland hospital, did you cause or did you have a conversation with any other official?

A Other than I spoke to the helicopter crew when they were there trying--just verifying some--the information Dr. Carlson was giving them, kind of adding color to the facts he had given.

Q Okay. Did you speak with any non-medical personnel?

A I spoke to Officer Hopke--

Q Officer--

A --of the Chickaming--

Q --Hopke. All right, who's he with?

A He's with the Chickaming Township Police Department.

Q How is it that you came to speak to Officer Hopke?

A When were enroute to the hospital, I--after calling the hospital and telling them the condition of the child, I was constantly suspicious. I didn't--the facts to me were not matching up.

Q What facts weren't matching up as far as you were concerned?

A Falling out of a bed. I've had patients fall out of bed in the past many times. I never had a patient this--in this bad a shape. I didn't know what was--understand what had caused this kind of injury, and I knew--it was suspicious to me. Also I said--suspected to Officer Hopke to come to the scene.

He had not been dispatched to the scene. So when we were enroute to the hospital, I called the sheriff's department on the phone and asked them to come to the hospital.

Q So you called--you called Hopke--or, the sheriff's department to contact Hopke from the hospital?

A Correct.

Q You didn't use the radio in the ambulance, for--

A I use--

Q --example--

A --a cell phone in the--in the ambulance.

Q When you used--When you called Berrien County Sheriff dispatch to contact Hopke, do you know, did David Flick hear you during that conversation?

A I don't know. It's possible. He could have. I was trying to speak quietly. But it's entirely possible I'd speak loud enough for him to hear me.

Q You just asked Hopke to come to the hospital?

A I told them to have the on-duty Chickaming officer come to the hospital. I knew it was Officer Hopke. But, to come to the hospital because there was--I was suspicious about something--

Q Okay.

A --that had occurred.

Q Did Hopke come to the hospital?

A Yes, he did.

Q Did you explain your suspicions to him?

A Yes, I did.

Q And do you--did you see Officer Hopke talk to David Flick?

A Yes, I did.

Q And then you left the emergency room?

A After the patient was flown away in the helicopter, yes, I did.

Q Okay.

MR. CHERRY: May I have just a moment?

THE COURT: Yeah.

MR. CHERRY: Nothing further.

(Witness attempts to leave stand)

THE COURT: Wait a minute. The other attorney gets to ask questions.

THE WITNESS: No, I'm just shifting position.

THE COURT: Okay. Don't leave.

CROSS-EXAMINATION

BY MR. MCDOWELL:

Q When you see David at the home, he is holding the child upright, is that correct?

A That's correct.

Q And then your question to him is, What happened, or What--What caused this, and he said, the child fell on--off the bed about four hours ago?

A I'd heard this--the falling off the bed part earlier than that. I just said, You--The baby fell off the bed? And he

said, "Yeah." And I asked when, and he said, "Four hours ago."

Q And he said, But I don't think that's what caused it?

A Yes. Caused--

Q Okay.

A --this.

Q Caused this. Referring to the present condition of the child?

A That's what I--

Q He told you that the child after the fall off the bed was okay for a while?

A He--

Q Or did you not go into all that?

A He did not--He did not--

Q Okay.

A --elaborate.

THE COURT: He did not what?

MR. MCDOWELL: Elaborate.

THE WITNESS: Elaborate.

BY MR. MCDOWELL:

Q But he said it was four hours before. But he said, this, indicating the present condition he thought was caused by the dog?

A That's what he told me.

Q And you didn't find any apparent injury on the child?

A I didn't find anything that I thought would--

Q Okay. And he indicated to you the dog jumped on the stomach of the child?

A On the abdomen, that's--

Q Abdomen. And he said it was just a few minutes before that that the child stopped breathing?

A He said that it had happened fifteen minutes before the difficulty breathing had started.

Q Would that fifteen minutes be consistent with what you saw on the child's condition when you got there?

A Well--

Q The difficulty in breathing, and all that?

A It wouldn't be, not with a dog jumping on it, no, `cause that wasn't consistent at all--

Q Well, with--

A --in my opinion.

Q --with an event about fifteen minutes before? Or, can you tell that?

A I couldn't tell you that from what I saw.

Q Okay. That was basically your conversation with him, right, other than establishing who the--where the mom was and who the dad may be and you wanted somebody to authorize that flight?

A I didn't want somebody to auth-- I wanted somebody to come to the hospital with me with this child. I just--

Q Okay.

A I was there present when someone else was asking for the

helicopter permission. That was at the hospital. On scene, I asked him--when he said he wanted to leave, I said, no, you--I need you to come with me.

Q `Cause you couldn't admit the baby by yourself? Well, I--

A Well--

Q --guess you could.

A --I could. I mean, we could come up on a baby alone, but that's unusual.

Q Did you note David's mental state at the time when you saw him with the baby, was he excited?

A He was nervous. That was the impression I got, you know, nervous.

Q He--

A Upset. Nervous.

Q Did he tell you that he tried to use CPR on the child or anything like that?

A No.

Q You didn't have any conversation like that?

A He didn't make any statement to that--anything like that.

Q Okay. You didn't actually question him, like, Did you try CPR, Did you try the Heimlich Maneuver, Did you try--

A I saw what he was doing, which was not CPR. As a mat--When I saw the position he was holding him and the patient was not breathing, I need to lay the baby down so it would breath.

Q What posi--I mean, how was he holding him?

A I mean, I can get on the floor and demonstrate. I mean, it's feet--the baby's bottom is on the floor, the legs pretty much in front of it, not straight out, but pretty much in front. He's holding the child's torso like this, and the head's--the baby's head is over like this, not controlled, just slumped over like that. And then I could see the color of the head when I looked at it, a purplish grayish color, which would indicate to me the patient is not getting oxygen.

Q Okay.

A So that's when I--that's when I laid the baby down. At least if it was going to breath on its own--When I did lay it down, there was attempts to breath, but it was not res--it was not having respiration's, it was not in and out, getting oxygen.

Q That's when you used that device?

A Yeah. The ambu bag. To ventilate the child.

Q So the position he had the child in was not correct for--if you're going to administer first aid, say?

A Yeah. It had no treatment--ben--beneficiary treatment of any kind.

Q And the head was actually hanging down?

A Hanging down limp, yes.

Q And the child pro--probably was unconscious at that point as far as you could--

A Yes, it was.

Q Okay. While you were on your way to the hospital, did you

tell the ambulance driver--did you tell the driver to go slowly?

A Slow down just briefly so I could get the inter osseous IV started, yes.

Q Okay.

A Then once that was started, then to speed back up.

Q All right. And you had some conversation, but you don't know--with the sheriff's department, you don't know if David Flick heard you?

A No, I couldn't say.

Q Okay. You weren't trying to hide anything at that point?

A Well, I was trying to be quiet because it was suspicious to me. I didn't know what was going on. I didn't know how this occurred. He was the only person there that said anything that identify with the child. I didn't want--You know, I didn't want to tell--tip him off to the fact that I was calling for the police to come by. I wanted them to question him and find out what was going on.

Q Was that--That's in your township? Is--

A Yes, it is.

Q --that location in your township?

A Yes, it is.

Q But you wanted the sheriff's department to get involved in the case?

A No. The sheriff's department is our dispatch.

Q Oh, they're your dispatch.

A Um-hum. And so--

Q Okay.

A --I had them contact--

Q I was just--

A --Officer--

Q --wondering why--

A --Hopke.

Q --you wouldn't do it yourself. But they're your dispatch.

A I don't have a common radio frequency to talk to Officer Hopke. We have entirely different wave lengths between the ambulance and the police department.

Q Okay. Further complicate things, I guess. So it was necessary to use the regular phone?

A I used the cell phone. Rather than using the radio, I used the cell phone.

Q All right. I get it. Okay. And David remained at the hospital at least until Hopke came and talked to him, correct?

A Yes.

Q All right. Okay. You didn't know David before this?

A No. I'd never met him.

Q Okay. That's all I have. Thank you.

THE COURT: You have anything else?

MR. CHERRY: No further questions.

THE COURT: Can you give us the name of this device to

get a lot of fluids into the body here?

THE WITNESS: Oh, interosseous?

THE COURT: Spelled?

THE WITNESS: That's another tough one. Inter is obviously, i-n--

THE COURT: Obviously.

THE WITNESS: --t-e-r. Osseous is, O-s-s-e-u-o--it's e-o-u-s. Is how it's spelled.

MR. CHERRY: I think that's right.

THE COURT: And--Oh. When you--What's the name of this breathing device.

THE WITNESS: Well, there's different terms for it. It's a--

THE COURT: Well, what did you use--

THE WITNESS: --bag--

THE COURT: --I want--

THE WITNESS: --valve mask. A ambu bag.

THE COURT: A--

THE WITNESS: Bag valve mask would probably be a better description of it.

THE COURT: Well, it--But she's got to put in the--

THE WITNESS: Okay.

THE COURT: --transcript--

THE WITNESS: Ambu is--

THE COURT: --what you said.

THE WITNESS: --A-m-b-u bag.

THE COURT: And did that change the baby's color?

THE WITNESS: No.

THE COURT: It remained grayish blue?

THE WITNESS: Yeah. It was very little--very little change.

THE COURT: Anything else?

REDIRECT EXAMINATION

BY MR. CHERRY:

Q Did the baby, the entire time that you were with it, ever regain consciousness?

A No, it did not.

MR. CHERRY: Nothing further.

MR. MCDOWELL: I don't have anything further.

MR. CHERRY: Call Todd Hopke.

THE COURT: Thank you, sir.

(At 4:08 p.m., witness excused)

THE CLERK: Raise your right hand, sir. Do you solemnly swear or affirm, under penalty of perjury, the testimony you will give in the matter now before the Court will be the truth, the whole truth, and nothing but the truth?

MR. HOPKE: I do.

THE CLERK: You may have a seat.

MR. CHERRY: Do you have a report there?

THE WITNESS: Yes, I do.

MR. CHERRY: Can I see it for just a second?

THE WITNESS: Sure.

TODD HOPKE

called by the People at 4:09 p.m., sworn by the clerk, testified:

DIRECT EXAMINATION

BY MR. CHERRY:

Q State your name, please.

A Todd Hopke.

Q Spell your last name.

A H-o-p-k-e.

Q Are you currently employed?

A Yes.

Q In what capacity?

A Patrolman with the Chickaming Township Police Department.

Q Were you so employed by that township on or about May the 8th, 1998?

A Yes, I was.

Q Directing your attention to that day, at about 8:23 in the evening, were you on duty and working?

A Yes, I was.

Q Did you--Were you advised via radio to go to any particular location?

A I was advised to go to Lakeland Hospital in Saint Joe.

Q Okay. Were you advised first to go to Minnick Road, by any

chance?

A No, I wasn't.

Q So you went directly from your patrol area to Lakeland Hospital?

A That's correct.

Q Did you know why you were asked to go there?

A I was advised there was an injured child there.

Q Did--Were you instructed via the radio to contact any person once you got to the hospital?

A Yes. Officer Farhat.

Q Okay. And when you arrived at that location do you know about what time it was?

A It was around nine o'clock, not--

Q Did you--

A --real sure--

Q --talk to Bill Farhat at that time?

A Yes, I did.

Q Did you have a conversation with him?

A Yes.

Q As a result of this conversation what did you do?

A Interviewed David Flick.

Q Do you see David Flick in the courtroom today?

A Yes, I do.

Q Can you point him out, please?

A (Indicating) He's sitting at the table here in the green

shirt.

MR. CHERRY: For the record, identification of the defendant, David Flick.

THE COURT: So noted.

BY MR. CHERRY:

Q After you talked to Bill Farhat, you went directly to talk to David Flick?

A I went into the treatment room and looked at what was going on in there and then I talked to Mr. Flick.

Q Where was--Where was--Was Mr. Flick in the treatment room as well?

A I don't recall. I believe he was outside the room.

Q Okay. Was he with any other person?

A No, he wasn't.

Q So he was alone and you were alone?

A That's correct.

Q Just the two of you were talking?

A That's correct.

Q Was he under arrest at the time?

A No, he was not.

Q Okay. So you had a conversation with him?

A Yes.

Q What was the nature of this conversation?

A I just wanted to find out basically what happened with the child.

Q And what did--what did you ask him, and what did he tell you?

A Well, he told me that he took his girlfriend to work at four o'clock at the Old Mill Restaurant in Union Pier where she works.

Q Is that four o'clock in the same day which is May the 8th?

A Yes.

Q Okay. Where--Did he say where the baby--First of all, when you talked to David Flick, did you ask him what relationship he was to the child David Mcbain?

A Said he was the mother's boyfriend.

Q Mother's boyfriend. Okay. So was that one of the first things you ask him?

A I believe so.

Q Okay. So he said he took his girlfriend, Tina Mcbain, to the restaurant at about four o'clock on May the 8th?

A That's correct.

Q Did he tell you where the baby was at the time he did this?

A He said the baby came along with him.

Q In the car?

A In the car.

Q Did he tell you what happened; did he actually drop Tina off?

A That's what he--He told me he dropped her off at work.

Q Okay. Then what did he tell you?

A He told me he drove to New Buffalo to his dad's house--

Q Did he tell you--

A --then--

Q Did he tell you why he drove there?

A No, he didn't.

Q Okay. Did he tell you how long he was in New Buffalo?

A No.

Q Then what did he tell you?

A He told me he drove to Taco Bell in--in Saint Joe.

Q Okay. Now, I mean, you're interviewing him because you want to know what happened, I assume, to David Mcbain, that eight month old baby?

A That's correct.

Q And, I mean, he knew that too as well, right?

A I would assume so, yes.

Q So he told you, after dropping mother off he went to New Buffalo and then he drove up to the Taco Bell in Saint Joe?

A Correct.

Q Did he tell you where he went after that?

A Back to his--I believe back to his dad's house.

Q And was the baby with him the entire time?

A Yes.

Q Okay. Now, after he drove to Taco Bell did he tell you that he went back to his dad's house or that he went back to his own home?

A I'm sorry. He went back to his own home. He arrived there about six o'clock--

Q Okay, so--

A --is what he told me.

Q --the scenario is, four o'clock, drop off mom at the restaurant, go down to New Buffalo, stayed an indeterminate amount of time, drove up to the Taco Bell, and then drove back to his home in--on Minnick Road?

A Correct.

Q Okay. Did he tell you, during this entire time, did anything unusual happen while the baby was in the car?

A No, nothing unusual.

Q Okay. So he returns home at about what time, according to him?

A According to him it was about six o'clock.

Q And what did he tell you--and what did he do with the baby when he returned him?

A Well, he put the baby on the waterbed in his bedroom.

Q Okay. And then what did he say?

A He said he went into the bathroom, and, when he was in the bathroom, he heard a thud.

Q A thud?

A A thud. Like a noise coming--

Q Okay.

A --from the bedroom.

Q Is that how he described it, as a thud?

A That's how he described it to me.

Q Did he come out of the bathroom?

A Well, he said he went into the--out of the bathroom back into the bedroom and found the baby laying on the floor facedown.

Q By the waterbed?

A On the floor by the waterbed, yes.

Q Was the baby crying at the time?

A He didn't mention if he was crying.

Q Did--What else did he--I mean, did he say anything about the condition of the baby after having fallen off the waterbed?

A Well, he said the baby was okay, the baby was breathing, and then he picked the baby back up and--

Q And the baby--did he--the baby seem okay to him at that time?

A He said the baby seemed okay.

Q Then what, what did he say?

A Said about a hour later he took the baby, went back to his dad's house.

Q Well, all right. He went down to New Buffalo. Is that where his dad lives?

A That's correct.

Q As far as you know?

A Yes.

Q Earlier, after having dropped the mother off at the restaurant and now he's going back to New Buffalo again. And this is sometime after six o'clock?

A Sometime after six.

Q Did he tell you why he went down to New Buffalo a second time that day?

A He wanted to find somebody to baby-sit the baby for him.

Q David?

A David, yes.

Q Was he successful in finding somebody to baby-sit--

A No.

Q --David Mcbain?

A No, he wasn't.

Q Did he tell you, did he speak to anybody down there in New Buffalo when he went down there?

A He said he stopped at his dad's house. He didn't say if he spoke to anybody there.

Q Was he looking for anybody specific to baby-sit the baby?

A He didn't tell me that he was looking for anybody specific.

Q Okay. In any event, he didn't find anybody, according to him?

A That's correct.

Q Did he tell you where he went after attempting to find a baby-sitter down at his dad's house?

A He said he went back home after that.

Q Okay. What did he do with the baby-- By the way, was the baby with him when he went down to New Buffalo?

A The baby was with him, is what he told me.

Q And when he arrived back home after coming back from New Buffalo the second time, what did he do with the baby?

A He said he put the baby on the living room floor where the baby started to play.

Q Okay. Anything unusual happen according to him?

A Well, he mentioned that a dog jumped off a couch, landed on the baby's stomach.

Q Landed on his stomach. Now, prior to that time, did he say--did he tell you what the condition of the baby was, prior to the dog jumping off the couch and landing on his stomach?

A No.

Q At any point and time did he tell you that the baby seemed to act tired?

A Well, he mentioned the baby was a little tired, yes.

Q When did he--When did he mention that in relationship to the dog jumping off the couch?

A That would have been before the dog--

Q Okay.

A --jumped on the baby.

Q And after the dog jumped off the couch onto the baby's stomach, what did he say?

A Well, he said he gave the baby a bottle--or, half a bottle and the baby took the bottle and started spitting up whatever was in the bottle.

Q Okay. Then what?

A Well, he said a little while later the body--the baby's body just went limp, and--

Q Did he tell you how he tried to--what he did in response to that?

A Well, he said that he thought the baby was choking so he started patting the baby on the back.

Q Patting the baby?

A Patting him.

Q Okay.

A Yes.

Q And then?

A He said the baby started breathing not normally, and the baby would take a breath and not breath for another ten seconds, and take another breath.

Q Tell you anything else about the physical nature of the baby?

A Just that the baby had a real fast heart rate.

Q Fast heart rate?

A (No verbal response)

Q Okay. Now, so when we get this intermittent, not normal breathing and the fast heart rate, did David Flick tell you what he did with the kid--with the baby?

A No, he didn't.

Q But you know he ended up, what, next door at the Jackson house?

A Well, I found that out later after the interview that he took the baby next door.

Q Did you know why--Did he ever tell--Did David Flick ever tell

you why he went over to the Jackson house as oppose to calling a police from his own home?

A No, he never told me why, no.

Q Okay. I mean, if you know, do they have a phone at that house, at the house where he lives on Minnick Road?

A Yes, there is a phone there.

Q Okay. During this part of the interview--Now, listen to me--are you sure that you were alone with David Flick the entire time?

A As far as I can remember. I remember somebody from the hospital walked into the--into the room, then back out, but--

Q If you know, and I don't know, but, was Tina Mcbain, the mother of the child, ever present during any part of this interview?

A Not that I remember, no.

Q At this point in your conversation with David Flick, did anything unusual--did the interview continue on or did it stop?

A At this point the interview stopped.

Q Why?

A Because he was going to--I believe going to go to Kalamazoo where the baby was being taken.

Q David Flick?

A David Flick, yes.

Q Okay. Did you later come, in the course of your duties as a

police officer from Chickaming township, to actually interview, for example, Dr. Page at the hospital?

A Yes--

Q Did you--

A --I did.

Q --talk to him?

A Yes.

Q Did you talk to him via telephone?

A Yes.

Q Did you ever talk to him in person?

A Yes.

Q Okay. Did you also talk to a Dr. Meyer in connection with this case?

A Yes, I did.

Q Did you talk to any other doctors in connection with this case?

A Dr. Page and Dr. Meyer were the only doctors I spoke with.

Q And what time did that conversation occur?

A That would have probably been 4:30 a.m.

Q Would 3:45 a.m. be closer to it?

A 3:45 is about the time I left for Bronson.

Q Okay. That's when you drove to Bronson to talk to Dr. Page and Meyer?

A That's correct.

Q And you in fact did talk to them. And this is at about, did

you say, 4:30?

A It was probably 4:30 or so when I arrived there.

Q 4:30 a.m. on May the 9th.

A It would have been the 9th.

Q Okay.

MR. CHERRY: No further questions.

CROSS-EXAMINATION

BY MR. MCDOWELL:

Q Was your partner with you when you interviewed David Flick?

A I don't recall if he was in the--in the room or not. There was-- A couple people walked in and out. He may have walked in, then back out.

Q So basically he told you that he dropped the girlfriend off at work, went to his dad's house, came back home, was in the bathroom when he heard the thud, right?

A That's correct.

Q But he didn't think it was all that serious 'cause the baby seemed all right after the thud?

A Right.

Q But sometime then he noticed after the child's--he says, the dog jumps on the child's stomach, that the child looks tired, or seems listless or something?

A That's what I was told, yes.

Q Okay. And this was in response to your questions, correct?

A Correct.

Q Were you asking, well, what happened then, or, what happen, questions like that?

A That's correct.

Q And he was giving you a narrative?

A Correct.

Q Okay. Appeared to be cooperative with you at that time?

A Yes.

Q Okay.

A He was.

Q He said then after the dog jumped on him, he tried to give the baby a half a bottle and then he spit up and then he noted the trouble with the breathing after that, correct?

A That's correct.

Q He told you about some problem that the child had had with regards to his bowels the day before?

A Yes, he did.

Q But nothing of any significance, at least he--what you found out, correct?

A That's correct.

Q And then you talked with the doctors at Bronson the next day, as I understand it, is that right?

A That's right.

Q Okay. The defendant wasn't there then?

A Not when I originally talked to him. I think he showed up later.

Q And that's basically what you did on the case, what you've testified to here?

A That's correct.

Q You didn't actually go in the home, or did you? You must have gone in the home if you knew they had a phone.

A Yes, I did go in the home.

Q Take pictures, or anything of that nature?

A I took videotape.

Q Okay. Of the inside of the house?

A Of the inside of the house.

Q And you have that?

A I don't have that personally.

Q I mean, you do have it in your possession--or, the police have it in their possession--

A Yes--

Q --correct?

A --it's in the police possession.

Q And it shows the bed--bedroom?

A Yes.

Q There was nobody there at the house when you videotaped it? Don't know? Other--

A Yes.

Q --than police?

A No, there was Mrs. Green--Carol Green was at the house.

Q Okay. Who is she?

A That would be Tina Mcbain's mother.
Q So it's the grandmother of the baby?
A Correct.
Q Okay.
A She's the homeowner.
Q She was at the house when you did the videotaping?
A Yes.
Q Okay. And you're going to--you're going to keep the videotape, correct?

THE COURT: Couldn't hear you.

BY MR. MCDOWELL:

Q You're going to keep that videotape for the case?
A That's correct.
Q All right. That's all I have. Thank you, Officer Hopke.

REDIRECT EXAMINATION

BY MR. CHERRY:

Q To your knowledge, I mean, when you were in the house, did you have permission to be there?
A Yes. Had consent.
Q Did you hap--Did you happen to go into the room supposedly where this waterbed was located?
A Yes, I did.
Q Did you actually see the waterbed?
A Yes.
Q Let me show you what has been marked as People proposed

Exhibit Number Five, then I'm going to ask you if you can identify that particular waterbed.

A Yes, that's the waterbed.

Q Is that the waterbed? Is this the only waterbed in the house?

A I'm not sure if there's a waterbed in the other bedroom or not but--

Q Is this--Was this--Was this waterbed located in the baby's room as far as you can tell from the other furniture?

A Yes.

Q How high is that waterbed off the floor?

A About 18 inches.

Q It is?

MR. CHERRY: At this time I'd ask the Court to admit into evidence People's proposed Exhibit Five.

MR. MCDOWELL: No objection to Five.

THE COURT: Admitted.

MR. CHERRY: Nothing further of this witness.

MR. MCDOWELL: I don't have anything further.

THE COURT: May this witness be excused?

MR. CHERRY: Yes.

(At 4:25 p.m., witness excused)

MR. CHERRY: The People rest.

MR. MCDOWELL: We don't have any testimony to offer in the case, judge.

MR. CHERRY: Judge, at this time I'd ask the Court to

bind the defendant, David Paul Flick, over to the Circuit Court Division of this trial court for trial on the charge of second degree murder.

MR. MCDOWELL: Judge, just briefly. And I know you've got your notes and paid attention to the testimony here. The defendant gave his explanation to the authorities on the evening in question when asked what happened, and he gave his rendition, that he heard the thud and then later found the child on the floor.

Their testimony in regard to the criminal agency here which they allege, has to come, particularly from Dr. Waldemar Pawatke (sic). He testifies that he believes that it takes considerably more force to cause the fracture shown in Exhibit four than a fall from a eight inch bed, but he--

THE COURT: Or--Or--

MR. MCDOWELL: --wouldn't--

THE COURT: --eighteen inch--

MR. MCDOWELL: --say exactly--

THE COURT: --or--

MR. MCDOWELL: Eighteen inch. I'm sorry.

THE COURT: Or whatever.

MR. MCDOWELL: Eighteen inch. And I asked him to add the 29 inches on top of that for the height of the child if he were standing up when he fell and he said, no, he would think it would take considerably more force than that.

The defendant has denied involvement. Based upon the circumstances as you find them now, I suppose that you could infer that he intended to have this act, or, was he careless, negligent or grossly negligent, or whatever, in leaving the child on the bed and he did fall. Several things. So I would submit by the evidence of the charge they've brought, which is the second degree murder, and also of the manslaughter--

THE COURT: Well, there's been no suggestion of first degree.

MR. MCDOWELL: No. No, no.

THE COURT: Okay.

MR. MCDOWELL: Just second degree and manslaughter, I guess are raised by what they have here. Of course you've not heard our testimony, and you can't--

THE COURT: I heard all you gave.

MR. MCDOWELL: --because, unfortunately, we didn't get the report until today, and Mr. Cherry, of course, gave it to me just as soon as he got it.

But I would submit, Your Honor, even in the facts, judge, most favorably to the prosecution, that there are some questions here as to the cause of the injury and whether or not David is the criminal agent responsible for that. Because of that, I don't think that--and I'll put this in my argument for bond also, that the proof is evident and the presumption great that's required by the court rule, statute or

constitution, whichever, and I would ask the Court to consider those in his request to bind over. And I'd also like to be heard on the issue of bond.

MR. CHERRY: Well, let me address both issues now, judge; the bind over as well as the bond issue. The Court should not make a mistake in this regard. We do not believe that the defendant carelessly or recklessly placed this child on a waterbed to fall 18 inches to a hard floor. It is our theory of the case that David Mcbain was fine when he was left in the custody of the defendant, David Flick, at about four o'clock that afternoon, that sometime during that four and a half hours between the time that they dropped off Tina Mcbain at the restaurant and the time that the police were called at about 8:23, this baby suffered at least three blunt force trauma to at least three different parts of this baby's head that caused a six-inch fracture, defuse brain damage, edema, and death. And I suggest to the Court that this wasn't caused because a baby fell off an 18 inch high waterbed or because some dog jumped on its abdomen later in the afternoon. This baby was in the care and the control and the custody of David Flick, it received what turned out to be life-ending injuries. And I'm asking the Court to bind it over on second degree murder.

And, as long as we're at it, I guess we might as well be arguing this. I think the presumption is great and I think

there is a high chance of conviction in this case, and I think therefore that the Court is justified in denying bond altogether for the defendant, and I'm going to so request.

THE COURT: Okay. You wish to be heard again?

MR. MCDOWELL: Well, I would submit, Your Honor, I--you know they're going to have to some--somewhere along the way come up with their inference of an intent to kill. We can show this gentlemen here has no prior violent behavior on his behalf, was entrusted with the baby, took care of the baby, was a good care--caregiver to--for the baby, has had him practically since birth, was present at the birth of the child--

THE COURT: Well, I don't know anything about that. That's not on the record.

MR. MCDOWELL: Well, I'm just saying that that is what's going to come about. I'd like to be heard--Do you want me to make a representation as to the question of bond?

THE COURT: Go ahead.

MR. MCDOWELL: Okay.

THE COURT: You have the floor. You're entitled to--

MR. MCDOWELL: Thank you.

THE COURT: --be heard.

MR. MCDOWELL: I don't want to jump from topic to topic. But--

THE COURT: Well--

MR. MCDOWELL: --he is--

THE COURT: --go right ahead.

MR. MCDOWELL: No, he's from the county. His parents both reside here. They are supporting him, as is his wife, the mother of the child. He's employed. He has had a brush with the law in the past, in fact, he had a couple. But if you look in the record, you'll see that there're not crimes of violence. One--Two were property crimes and one was a drug conviction, for which he completed his probation. So he's not virginal, as they would say, to the criminal system. However, by the same token, he's always shown up. He was on bond before and he came back. There's no reason to believe he's going to leave. His parents would be able to make a bond. I've discussed that with them. If the Court saw fit to set bond, they could make a bond, perhaps, in the area of $50,000 if it were a ten percent. If it's higher than that, I don't think they'll be able to make it. The mom works for an area dentist. The dad is connected with the Three Oaks Fire Department. So they have substantial--

THE COURT: The parents--

MR. MCDOWELL: --connection--

THE COURT: --of the defendant, you mean?

MR. MCDOWELL: Yes, of the defendant. And the mom, of course, is a young lady who's pres--she was present in court. I think she's still here. And--

THE COURT: I don't know who she is.

MR. MCDOWELL: --of course, they want to have no contact. Then I would submit, if the Court were to set a bond, they could put conditions on there and have no contact. If he were released on bond today, he'd go live with his dad. He would stay with his dad and comply with all orders of the Court. That, in a nutshell, would be--He is a painter--painter by trade, and he earns probably in the area of seven to eight dollars an hour, and he would be able to, of course, assist counsel in the preparation of his defense, and be at liberty until the case comes up for trial.

THE COURT: Okay. There are several issues here. Let's try to touch basis on all of them. First of all, there was a crime committed, by somebody, anybody. And, with regard to that, I am constrained by the reported decision of the Court of Appeals - while I happen to personally think is erroneous, nobody really cares about that - it's the law that I have to follow until that court or the Supreme Court changes its viewpoint. Under that view, the hurdle that the prosecutor's office has to surmount is very little. Matter of fact, it's not really a hurdle, it's hardly a crack on the sidewalk. Under that view, the jurisdiction of the circuit court requires only that, for that issue, there be some evidence that the crime was committed, and it's not required that the Court make a finding that the crime was committed. Now, that

really doesn't make a heck of a lot of difference here because I have no problem, no difficulty, and no qualms at all about finding that the crime in fact has been committed. I think the proofs on that are overwhelming. So, while that's a theoretical issue, this is really no case to fight that out because I can and do find, not only is there probable cause to believe a felony has been committed, I find that in fact a felony offense, to wit, murder in the second degree, has been committed.

And the point the prosecutor raised, no, this is not a manslaughter case. This is not an accident that occurred with or without some negligence or failure to act, due care, or something of the sort. The proofs establish here, and the testimony of the witnesses certainly makes it clear, that somebody bashed in the head of this kid; and the enormous amount of trauma inflicted upon this child, not just once, but a minimum of six bruises, a minimum of three blunt traumas, many times we hear, oh the child got hurt falling down the stairs. Again and again and again? Well, even a damn fool wouldn't believe that after a while. In this case we have enormous trauma on at least three occasions and it could not possibly have occurred by accident since there was no car driven into a bridge abutment or three foot thick oak tree at 60 miles an hour with unrestrained child. That would cause something like that. Or, being dropped out of the second

story window onto the driveway on its head, the other witness said. So, there's nothing like that to explain the enormity of these injuries.

Now, the second thing the prosecutor has to show is probable cause to believe this defendant did it. And there of course there is always some possibility of argument. It could be argued that some mysterious stranger walked into the house and beat up the child and left without anybody noticing at the time. I suppose that--that's theoretically possible, but, on that issue, the prosecutor doesn't have to prove it beyond a reasonable doubt at this stage. The prosecutor only has to show probable cause, and the prosecutor's office has done that, at the very least. This is not a close case. This is not a marginal case for bind over. This is an open and shut obvious, and I might add, very painfully apparent case where a bind over is absolutely essential. A judge who wouldn't bind over on this could expect to be reversed in very short order.

Now, the judge who heard the arraignment and reviewed the proofs at that juncture found that the proof was evident, presumption great, and that bond could be and should be denied. I don't know exactly what that judge heard at the time, but, based on what I heard at this time, I would make that same finding. I mention that because, where bond is denied, the time of trial becomes very pressing. And the defendant cannot simply be held in jail month after month

after month after month. If bail is denied, the case must be brought to trial, and I believe that's within 90 days, is it not, of the time that bail was denied? And that's way back on May 14th. So the clock started running then. And that is going to place a serious burden on the prosecutor's office, but that's their burden to bear. It'll be a burden on the court also trying to find a spot to fit it in. But, again, that's our problem.

I find that the defendant has to be and is bound over, and bond is absolutely denied under the provisions of Article One, Section 15 of the Michigan Constitution. The defendant is remanded to the custody of the sheriff to await further proceedings.

Is there anything else we must needs--

MR. MCDOWELL: I--I've--

THE COURT: --to deal with?

MR. MCDOWELL: --signed the demand for jury and plea of not guilty, which I think--

THE COURT: Oh, certainly.

MR. MCDOWELL: --has to go in the file. The defendant's also signed. Thank you, judge.

THE COURT: The defendant has waived the formal arraignment in open court, which helps to avoid any additional delay, and I appreciate that.

MR. MCDOWELL: Judge, since this case is most likely

going to be on your docket--Well, I don't know. I'm not sure how they're doing it now. I--It's essential that as soon as Mr. Cherry gets Dr. Palotke's (sic) final report that we get it.

MR. CHERRY: I will.

MR. MCDOWELL: `Cause I--

MR. CHERRY: I have--

THE COURT: Oh, absolutely.

MR. CHERRY: I have given him every report as soon as I've gotten it. I'll continue to do so. I'll pressure Dr. Palutke for that report and--

THE COURT: And that's why I tried to nudge him a little bit also--

MR. MCDOWELL: He was--

THE COURT: --because--

MR. MCDOWELL: --pretty indefinite even with the Court's questioning.

THE COURT: Well, he said he would get it dictated within one week. Well, dictated isn't going to help you. You need to have it in your hands--

MR. MCDOWELL: Right.

THE COURT: --and that's why I did poke him a little bit more on that subject and--

MR. CHERRY: Perhaps we can--Perhaps we can ask for a expedited transcript because this case is going to have to be

set within--about 80 days before--

THE COURT: You bet--

MR. CHERRY: --trial.

THE COURT: --you. You're under severe time pressure here.

MR. CHERRY: Thank you.

MR. MCDOWELL: Thank you, judge.

THE COURT: We'll try to get it out as soon as we can. That's why I was asking about the spelling of these things because that can make it very difficult for the recorder. Court's recessed.

(At 4:41 p.m., proceedings concluded)

STATE OF MICHIGAN)
)
COUNTY OF BERRIEN)

I certify that this transcript, consisting of 144 pages, is a complete, true and correct transcript of the proceedings and testimony taken in case 98402012, David Paul Flick, on Tuesday, May 26, 1998.

June 26, 1998

Vivian V. Burton
Vivian V. Burton, CER-3572
FIFTH DISTRICT COURT
Berrien County Courthouse
St. Joseph, MI 49085