331

219434

STATE OF MICHIGAN
IN THE BERRIEN COUNTY TRIAL COURT -- CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

ORIGINAL

vs.

Case No. 98-402012-FC-H

DAVID PAUL FLICK,

Defendant.

FILED
JUN 21 2006
CLERK'S OFFICE
DETROIT

VIDEO JURY TRIAL - VOLUME V OF V

BEFORE THE HONORABLE JOHN T. HAMMOND

Saint Joseph, Michigan - February 22, 1999

RECEIVED
00 SEP 26 PM 12:28

APPEARANCES:

For the People: JAMES A. CHERRY (P28131)
Assistant Prosecuting Attorney
Berrien County Courthouse
St. Joseph, Michigan 49085
(616) 983-7111

For the Defendant: ROBERT U. McDOWELL (P17384)
320 Main Street
St. Joseph, Michigan 49085
(616) 983-0656

Transcribed by: Transcripts Unlimited, Inc.
Firm ID: 008345
3617 Lincoln Pines Street
St. Joseph, Michigan 49085
(616) 429-6541
FAX: (616) 428-3466
trans@parrett.net

FILED
OCT 14 1999
M. LOUISE STINE
BERRIEN COUNTY CLERK

TABLE OF CONTENTS - VOLUME X


| WITNESSES: PEOPLE: | PAGE |
|---|---|
| NONE | |
| **WITNESSES: DEFENDANT:** | |
| DAVID GUY FLICK | |
| DIRECT EXAMINATION BY MR. McDOWELL | 1202 |
| CROSS-EXAMINATION BY MR. CHERRY | 1224 |
| REDIRECT EXAMINATION BY MR. McDOWELL | 1246 |
| RECROSS-EXAMINATION MR. CHERRY | 1248 |
| JOHN McBAIN | |
| DIRECT EXAMINATION BY MR. McDOWELL | 1249 |
| CROSS-EXAMINATION MR. CHERRY | 1266 |
| REDIRECT EXAMINATION BY MR. McDOWELL | 1277 |
| CAROL GREENE | |
| DIRECT EXAMINATION BY MR. McDOWELL | 1279 |
| CROSS-EXAMINATION MR. CHERRY | 1299 |
| JULIE MYERS | |
| DIRECT EXAMINATION BY MR. McDOWELL | 1320 |
| CROSS-EXAMINATION MR. CHERRY | 1324 |
| KEN SMEADER | |
| DIRECT EXAMINATION BY MR. McDOWELL | 1328 |
| CROSS-EXAMINATION MR. CHERRY | 1331 |

TABLE OF CONTENTS - VOLUME X - Con't.


| WITNESSES: DEFENDANT - Con't.: | PAGE |
|---|---|
| DAVID PAUL FLICK | |
| DIRECT EXAMINATION BY MR. McDOWELL | 1339 |
| CROSS-EXAMINATION MR. CHERRY | 1406 |
| REDIRECT EXAMINATION BY MR. McDOWELL | 1431 |
| **REBUTTAL WITNESSES: PEOPLE:** | |
| TODD HOPKE | |
| DIRECT EXAMINATION MR. CHERRY | 1439 |
| CROSS-EXAMINATION BY MR. McDOWELL | 1440 |
| Closing Argument by Mr. Cherry | 1450 |
| Closing Argument by Mr. McDowell | 1466 |
| Rebuttal Argument by Mr. Cherry | 1490 |
| Jury Instructions | 1493 |
| Verdict of Jury | 1518 |

| EXHIBITS: | IDENTIFIED | RECEIVED |
|---|---|---|
| People's Exhibit 15 | 1308 | |
| People's Exhibit 16 | 1309 | 1441 |
| Defense Exhibit G | VOL III 874 | 1435 |
| Defense Exhibit M | 1292 | |
| Defense Exhibit N | 1292 | |

TABLE OF CONTENTS - VOLUME X - Con't.


| WITNESSES: DEFENDANT - Con't.: | PAGE |
|---|---|
| DAVID PAUL FLICK | |
| DIRECT EXAMINATION BY MR. McDOWELL | 1339 |
| CROSS-EXAMINATION MR. CHERRY | 1406 |
| REDIRECT EXAMINATION BY MR. McDOWELL | 1431 |
| **REBUTTAL WITNESSES: PEOPLE:** | |
| TODD HOPKE | |
| DIRECT EXAMINATION MR. CHERRY | 1439 |
| CROSS-EXAMINATION BY MR. McDOWELL | 1440 |
| Closing Argument by Mr. Cherry | 1450 |
| Closing Argument by Mr. McDowell | 1466 |
| Rebuttal Argument by Mr. Cherry | 1490 |
| Jury Instructions | 1493 |
| Verdict of Jury | 1518 |

| EXHIBITS: | IDENTIFIED | RECEIVED |
|---|---|---|
| People's Exhibit 15 | 1308 | |
| People's Exhibit 16 | 1309 | 1441 |
| Defense Exhibit G | VOL III 874 | 1435 |
| Defense Exhibit M | 1292 | |
| Defense Exhibit N | 1292 | |




TRANSCRIPTS UNLIMITED, INC.

FORM SMI-25 PENGAD/INDY 1-800-631-6989

St. Joseph, Michigan

Monday, February 22, 1999 -- 8:50 a.m.

THE COURT OFFICER: Hear ye, hear ye, hear ye. Trial Court's Criminal Division for the County of Berrien and the State of Michigan is now session. The Honorable John T Hammond presiding. Please be seated.

This is a continuation of File Number 98-402012-FC, The People of the State of Michigan versus David Paul Flick.

THE COURT: Glad you were able to join us, Mr. McDowell.

MR. McDOWELL: Judge, I apologize, I thought it was 9:00.

THE COURT: Well, the rest of us were here --

MR. McDOWELL: I know. I apologize.

THE COURT: -- including one juror who is apparently quite ill, I understand has a high fever.

THE COURT OFFICER: He has a very high fever. She looks very pale.

THE COURT: And that's -- is it the last one in the last row?

THE COURT OFFICER: April Ott.

THE COURT: And I don't think we want her contaminating all the rest of the jurors besides the affect that it might have on her. Any objection to excusing her?

Tape 99B-0021-A, 2-22-99, 8:51





FORM SMI-25 PENGAD/INDY 1-800-631-6989

MR. CHERRY: Well, that's why we have two alternatives, so under the circumstances, I guess I can't object.

MR. McDOWELL: I guess I can't object. I don't want her getting the rest of them sick either.

THE COURT: She has a very high fever and I would have liked to have excused her 20 minutes ago. Today is 2/22. All right.

MR. CHERRY: It might -- Judge, it might be a good idea just to bring in -- bring her in by herself for just a moment just to -- to question her to make sure she is, in fact, ill in your opinion, and then let her go?

MR. McDOWELL: I concur with that, Judge.

THE COURT: Oh, all right. Ask her if she could step in, please?

THE COURT OFFICER: Please, step up.

THE COURT: Well, or she can sit if she wants. How are you doing, ma'am? I understand that you're -- you'll have to be in front of the podium there so we can hear you. Yeah. I understand that you're got a fever?

JUROR NUMBER 38: Yes. I took Tylenol so, it's coming down a little bit, but --

THE COURT: Well, okay. Are you too ill to make it today, is that it, or --

JUROR NUMBER 38: I -- I probably could. It's just hard to think, you know, when you have a --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

THE COURT: Yeah.

JUROR NUMBER 38: -- high temperature.

THE COURT: What kind of bug you got? Do you know?

JUROR NUMBER 38: I don't -- I think it's some sort of flu. My four month old son has it and my husband has it, so we're all stuck, you know?

THE COURT: I hope the rest of the jurors don't get it?

JUROR NUMBER 38: Yeah.

THE COURT: All right. The reason for our delay is that we didn't have all the lawyers, but now that we have all the lawyers here -- gentlemen, is there any questions you want to ask this juror or may we excuse her?

MR. CHERRY: Ms. Hodge, how do you -- I mean, you don't look -- you look a little pale, I mean, how do you feel? Do you think you can continue on or -- or would you prefer to be excused?

JUROR NUMBER 38: I'd prefer to be excused, but if I have to, I can.

MR. CHERRY: So -- I'll -- Judge, under the circumstances, I'll defer to Mr. McDowell.

MR. McDOWELL: Miss, we're probably going to have testimony this morning, then we'll probably argue this afternoon and get instructions and you'll go and deliberate. So, you won't be sitting in here all day I don't think. Would that be better than --



FORM SM-25 PENGAD/INDY 1-800-631-6989

JUROR NUMBER 38: Yeah.

MR. McDOWELL: When did you take the Tylenol?

JUROR NUMBER 38: This -- this morning. I don't know, 7:00, 8:00 -- I think it was 7:00, 'cause I got up then.

MR. McDOWELL: Let me ask you this if -- if you don't mind. If you were the -- the defendant, David Flick, and you feel as though you would -- do right now, do you think he should keep you on the jury --

MR. CHERRY: Judge, I would have to object to that.

MR. McDOWELL: Well, I mean, I don't know what her state of mind is. She says the temperature's coming down.

MR. CHERRY: Well, her state of mind is not important right now. What's important is how she's feels and whether --

THE COURT: It's her health, that's what we're talking about here. And besides that the jury room is a confined cramped quarters and I'm concerned about if she's got the flu giving it to all the other jurors.

JUROR NUMBER 38: That was my concern too, but I didn't want to --

THE COURT: Is there any objection to excusing this juror? She has shown up, so she's not just trying to duck out because she wanted to sleep in, she's here, she made it in.

Tape 99B-0021-A, 2-22-99, 8:55





FORM SMI-25 PENGAD/INDY 1-800-631-6989

MR. CHERRY: Under the circumstances, I have no objection.

MR. McDOWELL: Judge, she -- we believe she is being honest, so, we don't have any objection.

THE COURT: Okay. She's excused with our thanks.

JUROR NUMBER 38: Okay. Thank you.

THE COURT: Don't -- don't sneeze at anybody in there.

JUROR NUMBER 38: I'll -- I'll try not to, I don't want to get anybody sick. Thanks.

(At 8:55 a.m., Juror Number 38 excused)

THE COURT: We can move that chair out of the way, now.

THE COURT OFFICER: Bring in the jurors?

THE COURT: Yes. But move her chair out of the way.

MR. McDOWELL: Would you wait a second, Max? I want to make sure my witness is here.

THE COURT: Let her get her stuff and get out of there without waiting for anybody else.

THE COURT OFFICER: She'll go around the back.

THE COURT: Okay.

Yeah. Let's go off. Thank you.

(At 8:56 a.m., off record)

(At 8:58 a.m., back on record)

THE COURT OFFICER: Court will resume. Please be seated.

THE COURT: Okay.





FORM SM-25 PENGAD/INDY 1-800-631-6989

MR. McDOWELL: I'm going to call Mr. Flick, please.

THE COURT: Call your next witness.

MR. McDOWELL: Step right in front of the lady and raise your right hand.

THE COURT CLERK: Right up here.

Do you solemnly swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. FLICK: I do.

DAVID GUY FLICK

called by the Defense at 8:58 a.m., sworn by the Court Clerk, testified:

DIRECT EXAMINATION

BY MR. McDOWELL:

Q. Would you state your name, please?

A. David Guy Flick.

Q. And where do you live?

A. 215 South Marshall in New Buffalo.

Q. Okay. And are you related to David Flick, the defendant?

A. Yes.

Q. How is that?

A. I'm his father.

Q. What is your business or occupation, Mr. Flick?

A. I have a small lawn and home care business, plus, I'm employed by the Village and Township of Three Oaks as the





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Fire Chief.

Q. How long have you been with the Township and Village of Three Oaks?

A. I've been in the fire service 22 years, Fire Chief, 15 years.

Q. I assume the fire chief is in charge of the rest of the people on the fire department, correct?

A. Correct.

Q. How did you get to become fire chief? Is it elected or appointed or how does the work?

A. Well, years ago, it was elected. Within the last six years, now you're appointed --

Q. Okay.

A. -- by the fire board.

Q. Let me ask you this. Do you have any additional training certificates in regard to your occupation?

A. In -- in the fire service?

Q. Yes.

A. Yes, I have several.

Q. What are they involved with?

A. A number of them are for arson investigation, fire training, HAZMAT, HAZMAT awareness operations. I had once taken a class over at Macon County -- Macon County Criminal -- College, Criminal Justice System for arson investigation and interviewing.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. So, you run into investigations -- although primarily you're in the fire prevention and fire putting out business, you run into arson investigations, correct?
A. Yes.
Q. Do you have to conduct those?
A. We work with the fire marshal.
Q. And the fire marshal's a division of the State Police?
A. Correct.
Q. Now, let me ask you this. Did you make a statement in this case to Officer Hopke?
A. Yes, I did.
Q. When was that, do you remember?
A. It was May 11th, 1997.
Q. How did that --
A. '98.
Q. -- come about that you talked to Off -- did you know Officer Hopke before that?
A. I knew of Todd, yes.
Q. Okay. And how did it come about that you made a statement?
A. He came to my office at the fire station.
Q. Okay. And were you working at that point -- on duty?
A. Yes.
Q. Did you know he was coming?
A. I was made aware of it by the Three Oaks Police Chief, yes.
Q. And when he came over to talk to you, who was present during





FORM SM-25 PENGAD/INDY 1-800-631-6989

that conversation?
A. Nobody.
Q. Well, you were there, right?
A. Well, yes.
Q. And Todd Hopke?
A. Correct.
Q. Okay. And did you tell him what you knew of the events of that evening?
A. Yes, I did.
Q. All right. And did you have occasion to see the police report afterwards?
A. Yes, I did.
Q. And did you see a statement in there from you?
A. I'd seen a statement that was missing.
Q. When -- when was that, do you recall when you first saw that?
A. After we had finally gotten the final police report. I believe that was in June.
Q. And did you have occasion to review that with me?
A. Yes.
Q. Okay. And thereafter, did you ask me to do something?
A. Yes, I asked you to put a letter together requesting the Chikaming Police Department to check their notes because there was some missing material out of this police report.
Q. What in specific were you concerned with?





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. There was two items, one was that, I believe, in the police report, that I had not seen my grandson or little Dave that -- that evening, which I did. Second, was that I had offered to baby-sit -- or we, I should say, my wis -- my wife and I had offered to baby-sit that evening of May the 8th.
Q. All right. I'll get to that in a minute. Then afterwards did -- let me show you Exhibit X, to be a letter identified by Officer Hopke and ask you whether you saw that before?
A. I'd say, Mr. McDowell, that's the first time I've seen this.
Q. Okay. Did we discuss the letter?
A. Yes, we did.
Q. And what is that letter?
A. Basically, it was a response from Chikaming Police.
Q. Officer Hopke, correct?
A. Yes. Yes.
Q. When Officer -- and -- and he says in the letter that you never said that, correct?
A. Correct.
Q. And you take issue with that, correct?
A. Yes, I do.
Q. When he took you're statement, Mr. Flick, how did he do it -- I mean, you sit down, what happened?
A. Well, I'm at my desk and he's across the desk and he's just jotting down notes as we're discussing -- or his questions,



FORM SM-25 PENGAD/INDY 1-800-631-6989

I'm answering them and he's jotting them down.
Q. And this is May 13th or --
A. Eleventh.
Q. On May 11th, did you know the prosecutor's theory here, that -- about the shaken baby syndrome and the cranial blows to the head or did you know any of that stuff?
A. No.
Q. Had the preliminary hearing taken place yet?
A. No.
Q. Now, -- so, he took notes and then wrote down presume -- you thought what you said, correct?
A. Correct.
Q. Did he have any kind of recording device?
A. No.
Q. Was he on duty -- Hopke?
A. He was not in uniform. He was -- looked like civilian clothes, but he did have is badge on.
Q. You've seen the Chikaming police officers and police cars, haven't you?
A. Yes.
Q. They have a recording device right in them, right?
A. I'm sorry?
Q. Don't they have a recording device right in them?
A. I'm assuming they do. Three Oaks does, I --
Q. But this wasn't recorded and as you know -- well, maybe you





FORM SMI-25 PENGAD/INDY 1-800-631-6989

don't know, you weren't in here. You don't know what happened to Officer Hopke's notes of your conversation, right?

A. I do know what happened to Officer Hopke's notes?

Q. He told you?

A. At the last trial.

Q. There about, he shredded them, correct?

A. He shredded them.

Q. All right. Now, let me ask you this. Did your son David ever work for you in your other business?

A. Yes, he did.

Q. And do you recall back when he -- right about the time that baby David was born -- do you recall back in those dates?

A. September.

Q. Okay. Did you notice any change or not in David, your son?

A. Change as far as --

Q. In his attitude, work or whatever?

A. He was very -- he was more responsible person, like he was becoming a -- a father, an adult. He took care as to being home on time -- again, to reiterate being more responsible -- a responsible person I was very proud of.

Q. Okay. You had -- he left your wife's home fairly early and dropped out of high school, right?

A. Yes, he did.

Q. Your ex-wife. You weren't too happy with that I would





FORM SMI-25 PENGAD/INDY 1-800-631-6989

assume?

A. No, I wasn't.

Q. Okay.

A. I wasn't happy at all.

Q. All right. How many times had you seen little David, the baby?

A. How many times?

Q. Yeah. Total? Do you know?

A. Total, no.

Q. Once a week? Once a month?

A. Probably once every couple weeks.

Q. Did you ever notice any bruises on the baby?

A. No, I did not.

Q. Never -- did you see him -- did you see the baby in the presence of your son, David and Tina or just David or what?

A. Both.

Q. Did you ever notice anything about how they were taking care of that baby that led you to believe that it wasn't proper or they didn't know what they were doing or anything like that?

A. No.

Q. Did you ever have the occasion to baby-sit that child in your house?

A. Yes, Liz and I did -- my wife, Elizabeth.

Q. Both of you?



FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes.
Q. All right. And your wife, Elizabeth, she has a daughter we understand, is that correct?
A. We have -- she has two daughters.
Q. And did you of those daughters baby-sit?
A. Yes, Jackie.
Q. Okay. Jackie?
A. Jackie Fox.
Q. Okay. Now, I'm going to ask you about the date of May 8th, say from around 5:00. Did you have occasion to come in contact with your son, David?
A. Yes.
Q. About what time was that you first saw him or what happened?
A. On May 8th, Dave and little Dave came over around -- between 7:00 and 8:00 and Dave came in, we greeted each other and he wanted to know if Jackie was at home -- my step-daughter. And I told him that Jackie was playing softball up in Bangor -- Jackie plays for New Buffalo -- she did play for New Buffalo at that time, and that she probably wouldn't be back until around 9:00. I had assumed that he was looking for her to baby-sit. So, we just basically started how our days -- our day went, how did my day go, how did his day go. He kind of fussed around -- basically -- fussed around and I says -- well, I made the offer, I -- I knew Liz was coming home around 8:00 'cause I had just spoken with her and to my





FORM SMI-25 PENGAD/INDY 1-800-631-6989

knowledge, we didn't really have any plans, so I told Dave, if you can't find a sitter, I says, bring little Dave back, I says, but call before you do.

Q. And what he'd say?

A. He said, okay.

Q. And you and Liz, your wife, had babysat him before -- little David?

A. Yes, we did.

Q. So that wasn't anything unusual you didn't think on that date, was there?

A. No.

Q. Did you -- when you were talking to David, your son, did you notice he was agitated or -- or seemed unusual?

A. Act -- no.

Q. Did you see little David, the baby?

A. I did, yes.

Q. Where was he?

A. I didn't get a close up look. Dave was -- little Dave was in the car seat in the car.

Q. And you say that was around 7:00?

A. Between 7:00 and 8:00, I'm guessing 'cause Liz came home shortly afterwards.

Q. Did you remain that -- at the house?

A. Yeah, we did.

Q. So you were there the rest of the night?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Um-hmm (affirmative).
Q. So you didn't know whether you were going to be -- have the baby dropped off with you or not, correct?
A. Correct.
Q. Okay. And that was okay with you?
A. Well, Dave was going to call.
Q. Okay. He never called, did he -- not about that, correct?
A. Right.
Q. You got another call didn't you?
A. Yes, we did.
Q. About when was the next call you got from David?
A. The next call was around 10:30 that night.
Q. And where was he calling you from?
A. He was calling from Lakeland Hospital.
Q. What'd he say?
A. Well, basically, he was very shook up, sounded like over the phone and all he said was the -- the baby had fell and him and Tina were -- the baby had fell and they were air lifting the baby to Bronson and Tina and him were -- were going to be heading up to Bronson Hospital.
Q. Did he say how serious it was or -- or you didn't know?
A. I didn't know. Actually, the conversation was pretty much short -- I -- I didn't know the seriousness of the injury, let's put it that way. I -- you know -- I guess I should of. Now that I think back about it because when you airlift





FORM SMI-25 PENGAD/INDY 1-800-631-6989

some -- a baby or someone to Bronson it should be more serious, but just -- I guess I just wasn't thinking. But anyway, I told Dave, I says, well, keep us posted and that was the end of that conversation at that time.

Q. Okay. So, he -- all you knew the baby was hurt -- they airlifted him up to Borgess. Did you then get another call back from David?

A. We did.

Q. What time was that?

A. Around 1:30.

Q. What was the content of that phone call?

A. David -- when he did call at 1:30, he said that the baby was stable, he had a fracture on the head and the hospital were -- was going to keep him for observation for two to three weeks and that Dave and Tina were going to go to the parent room, I believe it was, to get some rest.

Q. Okay. I assume, you probably were asleep when that call came in -- the 1:30 a.m. call or not yet?

A. No, we were up.

Q. You were still up?

A. Liz and I, we -- we didn't -- we didn't know if -- if we should head up there or -- or what or just --

Q. You weren't sure what to do?

A. No. So, we just kind of sit tight at home and waited for a phone call.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. So, David said they were going to catch some sleep 'cause the baby was stable and did have a fracture, but would only be there a couple weeks?
A. Right. I had asked David -- I wanted to know what happened -- how'd the baby end up with a fracture --
Q. Did he tell you anything?
A. He did, yeah.
Q. What did he say?
A. Dave said that the baby had fell -- he fell off the waterbed.
Q. Did you know how big -- how high the waterbed was or anything about that?
A. I know how high a waterbed is, I -- I have been in that house before -- I -- I know that they had some pretty hard floors in that house it's -- I believe it's white oak hard -- hard floors.
Q. What happened then after 1:30 -- next did you hear from David again?
A. Well, Liz and I, we went to sleep -- we didn't hear from David until 6:30 in the morning.
Q. So that would be five hours after the 1:30 call?
A. Um-hmm (affirmative).
Q. What happened in that phone call?
A. Dave called and he said that the baby was dying and I -- I'm just totally confused as to what had happened between 1:30





FORM SM-25 PENGAD/INDY 1-800-631-6989

and 6:30 and he sounded -- he was just crying. I -- I -- I don't understand. I wanted to ask him some questions, but I just says, we'll be up there and hung up the phone, Liz and I got dressed and we took up -- took off.

Q. Did you go directly to Bronson?

A. Yes, we did.

Q. What time did you get there?

A. Roughly an hour, hour and a half later.

Q. And when you got there, did you find out the condition of the baby?

A. Yes.

Q. Okay. Did you hear that from other people or what?

A. I heard that from John -- John McBain -- Tina's father.

Q. Okay. You knew it was very critical at that point?

A. Um-hmm (affirmative).

Q. And that he was probably dead or not?

A. No, I didn't know anything about that, I just heard that little Dave was dying and I -- I really didn't know why. At that time until I talked to John, John then informed me that there was some brain swelling --

Q. That he probably --

A. -- and the baby's system went haywire.

Q. Okay. Did you see the baby?

A. Yes.

Q. You saw these pictures that we've been showing around,





FORM SMI-25 PENGAD/INDY 1-800-631-6989

correct? I'll just show you A, B, C, D, and E and F, Polaroids taken by another, and ask you, is that the way the parties appeared when you got there?

A. Yes.

Q. Did you notice any injuries to the baby or didn't you get that close or what?

A. I did see an injury on the right side of the head -- up here.

Q. You've seen the prosecutor's picture, Exhibit 3 -- 3?

A. Yes.

Q. Does that show the bruise?

A. Um-hmm (affirmative).

Q. You have to say yes or no.

A. Yes, I'm sorry.

Q. Is that the only bruise you saw?

A. Yes.

Q. Okay. What'd you do after that -- you saw the baby?

A. I believe we -- after Liz and I walked out of the IC room -- ICU Room, we went down to the end of the hall and again, we're talking to the -- the fa -- the family's all starting to come in. That was the first time that I had met the Mc -- McBain family.

Q. So you didn't know them before that date -- the McBain's?

A. No.

Q. You knew Tina?



FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Right.
Q. But you never met the parents?
A. No. I had seen and talked to Carol on the phone, but I had not personally met her.
Q. Did all of you stay there then?
A. Yes.
Q. Okay. Did -- did they disconnect the life support sometime after that?
A. Yes.
Q. You were there when that was done?
A. Yes.
Q. The baby was then pronounced dead, correct?
A. Correct.
Q. Was the -- all right. After the baby was pronounced dead, did everybody leave?
A. Pretty much so. John -- Mr. McBain and I were wondering what was going to happen from there. They advised us it was going to be sent up to Lansing, I thought they said -- the remains for an autopsy.
Q. So, David left and Tina left and you and Mr. McBain left -- everybody left?
A. Yes.
Q. Okay. And then there was, as I understand it, we won't have to go into all -- there was a visitation at the funeral home after that then there was funeral, correct?



FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Correct.
Q. Was the funeral about the -- I think they said the 18th or the 19th?
A. The --
Q. -- of May?
A. The funeral itself was the 13th.
Q. Thirteenth, okay. I guess the obvious question would be, after this happen and you knew the baby was dead, did you ask David any further what happened?
A. Yes, him and I did have a conversation.
Q. What did he say?
A. He just said the baby had fallen off the waterbed -- he went -- he went into somewhat of it a little better detail as to what had happened that night and he was really down on himself for not being able to -- to try to save the child. He said he was in the rest room and he had set the baby on the waterbed and he had heard a thud. The baby started crying, he took the baby into the living room. Somewhere along the line, I do not quite remember, but, I guess, but Angel, the dog, had jumped on -- had jumped on little Dave. And from that point on, Dave said he tried to feed the baby some formula and eventually had spit it up and he tried to do -- when the baby stopped crying, he tried to do CPR and unfortunately Dave didn't know how to do infant CPR. He did the adult CPR on an infant and that's -- you just don't do





FORM SMI-25 PENGAD/INDY 1-800-631-6989

that. He felt bad about that, because he --.
Q. Okay. Did he tell you he took the child to Jackson?
A. Yes.
Q. Did he tell you anything about hitting the head on the door at that -- in the initial talk you had with him -- you don't remember that?
A. I don't remember that.
Q. And then basically from the Jackson's on, as -- did -- were you -- did he tell you that the medics came and took the baby?
A. Yes.
Q. In the fire department, you treat emergencies do you not -- different times?
A. We run with the ambulance not all the time just at their request. The ambulance is not housed in our same station.
Q. Mr. Flick, let me ask this. Before this date were you aware of how far somebody would have to fall to cause a fracture, or didn't you know anything about it?
A. I don't know anything about that?
Q. Okay. You know first aid, don't you?
A. Basic.
Q. You attended the funeral and then went to the cemetery afterwards?
A. That's correct.
Q. Okay. On the way back from the cemetery, tell the -- the





FORM SMI-25 PENGAD/INDY 1-800-631-6989

jury what happened.

A. On the way back from the cemetery -- and I'm -- I am still frustrated on this, we had just got out of the cemetery, not even quarter of a mile down the road, a marked car pulled up behind us and turned it's lights on. Now, we were heading south back to Three Oaks and who was with me in the car was, my wife, my mother-in-law, Dave and Tina, we didn't have our seatbelts on and I -- I didn't -- I didn't think too much of it. Anyway, there was a car up ahead of us who, now that I think about it, had pulled into the driveway and was backing out of the driveway and had Three Oaks Road blocked. We were basically forced into a driveway and the squad car -- the marked car pulled in behind us and I get out and I want to know what the heck is going on. Again, I had assumed it was just a seatbelt -- not a citation, just a warning, but I look up and there's at least two or three unmarked cars, people getting out, no weapons were pulled, the officer in uniform wanted to -- I says, what's up -- it was Terry Cornwall -- I wanted to know what was up. He said we need to speak to David. And I says, well, what's this all about? He says, we just need to speak to David. I was basically, rushed -- pushed aside -- I'm not saying in that terminology, to push -- let me rephrase that, Mr. Cornwall -- Officer Cornwall had just walked right by me, open my van door and requested that David get out. David did get out,





FORM SM-25 PENGAD/INDY 1-800-631-6989

Chief Stormont then -- and Officer Hopke -- I requested that they hand -- get into the -- Chief Stormont's car -- unmarked car, which both of them did.

Q. Okay. You said they wanted to question him and so, they went along with them, right?

A. I was very upset, needless to say. That was --

Q. Because they came right after the cemetery?

A. That was the worst timing that -- that was very bad, I mean --

Q. You -- you went -- on the fire department, work with police, don't you?

A. Yes.

Q. You've known Chief Stormont for a long time, haven't you?

A. Yes, I known Jim real well.

Q. You don't have anything personal against Mr. -- Chief Stormont, do you?

A. No.

Q. So you felt that was unnec -- did they then go to the State Police Post?

A. Yes, they did.

Q. Did you go down there?

A. Yes. I -- that's another thing that disturbed me. And maybe when this is all over, you and I can sit down and discuss this. I don't understand this, but my son was on his way to the Post and of course, my reaction was to try



FORM SMI-25 PENGAD/INDY 1-800-631-6989

and follow behind him. I had pulled out and was heading north back down Three Oaks Road to try to go to Bridgman, so I eventually did, but I had the marked car -- Chikaming marked car in front of me. When we got out on Red Arrow Highway, the car stayed with me and then I had another unmarked behind me and another unmarked car on this side of me. I couldn't go anywhere. We were doing the speed limit, 50, 55 miles an hour. I wondered what the heck was going on, I wanted to get there.

Q. Did you get there?

A. Oh, I got there eventually, but I was so upset that -- you see, after the funeral we were suppose to go over to Mr. McBain's house and -- where everybody was suppose to gather afterwards and we were the last one's to leave the cemetery. Just now when I think about it, I -- I -- everything comes back to you in that cemetery, looking around, how sneaky the police were -- well, let's not go there, but, anyway I ended up calling John McBain on our cell phone and told him what the heck was going on and could he go to the Post. By the time I got to the Post, John had already been there or was there -- I believe he even beat David there, I'm not sure. And he was -- he was very upset --

Q. Did --

A. -- as was I.

Q. Did you get a chance to talk to your son at the State Police



TRANSCRIPTS UNLIMITED, INC.

FORM SMI-25 PENGAD/INDY 1-800-631-6989

Post?

A. No, I went in there and I -- I have great -- I have respect -- I have respect for the state, local police, but I'm slowing losing that. I -- I went in there requesting that -- to talk to my son and they acted real dumb about it, like, who am I and who's you're son and playing the little game. I said, well, I'm David Flick, I would like to speak to my son. And they says, that won't be possible right now. I says, okay.

Q. So you didn't get any word from him that he wanted to see you or anything like that?

A. No.

Q. Was he then transported up to Saint Joe to the jail?

A. That was my understanding.

Q. You testified before, back in October, correct?

A. Correct.

Q. Okay. And sometime after that in November, David was released to your custody?

A. You said --

Q. -- on bond?

A. Yeah -- yeah, late -- late November, yes.

Q. Okay. And he's lived with you since then?

A. Yes.

Q. Okay. And has he worked?

A. Yes.





FORM SM-25 PENGAD/INDY 1-800-631-6989

Q. Before that interview you had with Officer Hopke on that date, did you have any run-in's with Officer Hopke or did you even --
A. With Todd? No.
Q. Nothing?
A. No. I just -- I -- we went over this in the last trial, I guess I just don't understand, when we're doing an important investigation --

MR. CHERRY: Objection. He's not answering any question. He's offering information.

THE COURT: Sustained.

BY MR. McDOWELL (continuing):

Q. You didn't have any ill feelings with -- before this incident with Hopke, did you -- Officer Hopke?
A. No.
Q. That's all I have.

MR. McDOWELL: Thank you.

CROSS-EXAMINATION

BY MR. CHERRY:

Q. David Flick is your son, right?
A. That's right, Mr. Cherry.
Q. By Donna Campbell?
A. Yes.
Q. You said that after your son, David Flick, met Tina and Tina had David McBain -- right?



FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Correct.
Q. And after Tina had David, I think you said, either today or perhaps in that previous trial, that you saw a -- a drastic change in David to a more stable person, is that about right?
A. That's correct.
Q. Where was -- after -- do -- do you remember what this baby's birth date was?
A. September 8th.
Q. Nineteen --
A. Ninety-seven.
Q. Ninety-seven.
A. September 9th.
Q. And so on the day, basically, that this injury or injuries was incurred, he was eight months old to the day, right?
A. Yes.
Q. May 8th. After this baby's birth, do you know where your son was living?
A. Yes.
Q. Where?
A. On Minnick Road.
Q. Was he staying there continuously?
A. Yes.
Q. I mean, is that his house -- is that where he was staying?
Tape 99B-0021-A, 2-22-99, 9:29





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. That's not his house, but he was staying there.
Q. Was he -- was he staying with your -- at your mom's house, at all or your -- your ex-wife's house on Warren Woods Road by any chance?
A. On that date?
Q. Well, after the birth of the baby?
A. No.
Q. Say for the first three months or so?
A. Not to my knowledge, no.
Q. So to your knowledge, he resided continuously on Minnick Road?
A. Correct.
Q. On May the 8th, do you recall the first time that you saw your son that day?
A. Yes.
Q. About what time?
A. Again, between 7:00 and 8:00 in --
Q. Now, are you sure about the time -- could it have been earlier than that?
A. I could of, but I'm not -- I'm guessing it's between 7:00 and 8:00.
Q. And so when David came down at about 7:00 or 8:00, David parked his car and did he come into your house?
A. Yes, he did.
Q. You didn't go out to the car?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No, I did not.
Q. And you talked to him and David said, basically, he was looking for Jackie because he wanted a babysitter that night, is that about right?
A. That's about right.
Q. All right. Now, did you actually see the baby in the car?
A. Yes.
Q. How close were you?
A. Within 25 feet.
Q. Okay. He didn't actually pull the baby out and bring the baby to show you, did he?
A. No.
Q. Left the baby in the car?
A. No, he did not, which was not uncommon.
Q. But he left the baby in the car -- he didn't --
A. Right.
Q. He didn't bring the baby in to see you?
A. No.
Q. And you told him that Jackie was not available, that she was out playing soccer or some athletic event or something like that?
A. Correct.
Q. And did -- did you indicate to him, that she may be later to test -- to -- to baby-sit?
A. I did.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. And according to what you're telling us now, is what -- what you told your son, David Flick, at that time is, if you can't find a babysitter, you bring him back and we'll take care of him?
A. Could you repeat the question?
Q. Yes. According to what you're telling the jury today, at that conversation that you had with your son while David McBain was in the backseat of the car -- or in the car seat, he was there looking for Jackie and you said, well, Jackie's not available, if you need a babysitter later, you -- you call me and we'll take care of him?
A. Right. According to what I had said, that is what I had said, not --
Q. Well, okay. The fact of the matter is, on May the 11th, when Officer Hopke interviewed you, you told him that David came over and you told him that he was looking for Jackie, but in Officer Hopke's report, at least, there's no mention about you volunteering to say, take care of this baby later?
A. That's right.
Q. Is that right? And when you saw that report at some date after May the 11th, you disputed that and said, no, I volunteered to take care of him -- is that a fair statement?
A. That's a fair statement.
Q. Now when was it you saw Officer Hopke's report?
A. It was after the preliminary trial.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. After the preliminary hearing. And --
A. We --
Q. Did you sit through the preliminary hearing by -- by any chance?
A. Yeah, we did.
Q. That was downstairs?
A. Correct.
Q. And at that preliminary hearing, you heard the testimony of Doctor Palutke, the pathologist --
A. Right.
Q. And a Doctor Page? And after you heard the preliminary exam -- the preliminary hearing and the preliminary testimony and you saw Officer Hopke's report, you said, that's wrong, I did volunteer to take care of David that night, fair statement?
A. After the preliminary is when I seen the police report.
Q. Okay.
A. That was the only time the police report was available.
Q. And so then you alerted Mr. McDowell and you say, hey, I -- I offered to take care of the baby that night, fair statement?
A. This was in Mr. McDowell's office.
Q. Okay. And so after your son left that night between 7:00 and 8:00, he never came over again that night?
A. Correct, he did not.



FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. He was only there one time?
A. Right.
Q. Did he ever call for you -- did he ever call to see if he could bring the baby over?
A. No, he did not.
Q. Did he ever call Jackie, if you know, to see if Jackie could baby-sit?
A. To my knowledge, no, he did not.
Q. Okay. And in -- I think you said, you next heard -- the next thing you heard about anything here was 10:30 p.m. Friday night, May 8th and you said you got a call from your son, the defendant in this case, from Lakeland Hospital here in Saint Joe?
A. Correct.
Q. And what did he say to you at that time?
A. Basically that the baby had fell and they were airlifting him to Bronson Hospital.
Q. How long did this conversation last?
A. Maybe a minute.
Q. Okay. Now, you're a fire chief?
A. I am.
Q. You've had training in first aid, when he told you that the baby fell, and that they were airlifting the baby to Bronson Hospital -- I mean, in your work as a fire chief, you had to know, I think, that when you airlift somebody -- a baby to





FORM SMI-25 PENGAD/INDY 1-800-631-6989

another hospital that's a pretty serious injury?
A. Yes.
Q. So you had reason to believe that this was a serious injury, right Mr. Flick?
A. Yes, I wasn't thinking at the time.
Q. When -- when you're son called up and said the baby fell, did you ask him -- and -- and that he was being airlifted by helicopter to Bronson Hospital, did you ask him what happened to the baby?
A. I asked him what happened and he said the baby fell.
Q. Did you ask him what he meant by that?
A. No.
Q. And he didn't volunteer it?
A. No, David was very frantic.
Q. Did you ask him how the baby was?
A. No, I did not.
Q. Had he volunteered to you at that time that the baby fell off the waterbed?
A. No, he did not.
Q. Did he volunteer to you at that time that a dog jumped off the couch and maybe landed on his abdomen?
A. No, he did not.
Q. Did he tell you at that time that what really happened, according to him, did he tell you that he dropped the baby out of his arms?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No, he did not.

Q. Or did he mention the fact that he may have hit the baby's head on the way out of the house -- did he tell you any of those things?

A. No, he did not.

Q. Did he tell you, at that time -- at 10:30, that he actually took the baby over to Bill Jackson's house at about 8:15 that night?

A. No, he did not.

Q. Did he mention to you at that time, that when he took the baby over to Bill Jackson's house, that the baby was almost dead at that time?

A. No, he did not.

Q. And when he talked to you at 10:30, apparently from Lakeland Hospital, did he tell you at that time that Officer Hopke was up there and questioning him about how this could have happened to David McBain?

A. No, he did not.

Q. So, basically what your son told you is that baby fell and was being airlifted to Bronson Hospital. Now you must have been concerned about David McBain?

A. I would be lying if I said no.

Q. And then you were awakened at about, I think, 1:30?

A. We were awake.

Q. Okay. So you stayed awake?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes, sir.
Q. And you received -- you received, at that time, the -- another call from your son, the defendant in this case, is that right?
A. That's right.
Q. Now this time he's at Bronson Hospital?
A. Correct.
Q. And he tells you he's at Bronson and he says the baby had a fracture and he's stable?
A. That's correct.
Q. And he told you, at this time, that the baby fell off a waterbed?
A. Well, if we could back up a little bit?
Q. Sure.
A. The baby was stable, -- he had a fracture, the baby was stable and they were going to keep him for observation for two to three weeks.
Q. Well, two or three weeks for observation in the hospital is still a pretty serious injury, right?
A. Yes, it is.
Q. And when your son told you that the baby was stable and they were going to keep him, you must have been relieved?
A. Yes.
Q. Did you ask him then or did he tell you how this baby received this injury?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. I wanted to know what had happened.
Q. You -- you wanted to know?
A. Yes.
Q. Did you say, David, I want took now what happened to that baby -- what happened to that baby?
A. Well, after -- yes.
Q. What'd he tell you?
A. He said the baby had fallen off a waterbed and onto the floor.
Q. Now, you've -- have you been in their house on Minnick Road?
A. Yes.
Q. Have you seen that waterbed?
A. Yes.
Q. That waterbed's only 18 inches high, isn't it -- 18 1/2 inches high to be exact?
A. Yes, approximately.
Q. Right?
A. Approximately.
Q. And in -- in your capacity as a police chief, I mean, did that give any cause to think --
MR. McDOWELL: Fire chief.
BY MR. CHERRY (continuing):
Q. I'm sorry, fire chief. Did that give you any cause to think how -- how a fall from an 18 inch waterbed could of caused this ser -- serious of an injury?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. I -- I don't -- I don't know -- we didn't get into great discussion as to the position of little Dave.

Q. Okay. Let me ask you this, Mr. Flick. In your own mind, did you question, in your mind, how a fall from a waterbed could have caused an injury that would have put the baby in hospital, fractured his head and put him in the hospital for two to three weeks?

A. No. Again, if you let me finish the question. I don't know -- again, David -- little Dave was in the process of climbing up on everything. I don't know if little Dave had got to the head board, to the diaper bag or whatever, to the changing table or what and stood up and just went flying over or what, Mr. Cherry. Again, they have very, very hard oak floors in that complex. And no, I -- I --

Q. All right. Well, in any event, you knew the baby was going to be okay, according to David, right?

A. Yes.

Q. Now, Mr. Flick, at this time, you had not spoken to, I take it, Doctor Carlson at Lakeland Hospital, true?

A. No, we --

Q. Were --

A. -- were still on the phone.

Q. Were Doctor Page or -- or Doctor Tagett or Doctor Meyer or any of the docs at Bronson, fair statement?

A. Fair statement.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. And at -- and at 6:30 a.m., you apparently received another call from your son, David Flick, and he told you that the baby was dying?

A. Yes.

Q. A huge reversible of fortunes for -- for David McBain from 1:30 until 6:30?

A. Um-hmm (affirmative).

Q. Now, at this time, what else did he tell you -- exactly what did your son tell you at 6:30 a.m. on May the 9th?

A. Just that the baby was dying.

Q. Okay.

A. The conversation was very short, I says, we will be right up.

Q. Did you say, how could this happen?

A. At that point in time, no.

Q. And you were still under the impression, per what your son told you, that this baby had fallen off a waterbed?

A. Yes.

Q. Okay. So then you went up to Bronson Hospital with your wife?

A. Correct.

Q. And your wife's name?

A. Elizabeth.

Q. Elizabeth. What time did you get there about?

A. 7:30, 8:00.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Now at 7:30 or 8:00 -- I mean, your son -- apparently you talked to your son again?
A. No.
Q. Who did you talk to at 7:30, 8:00?
A. When we first got in there, we -- I guess, the main thing was to go see little Dave, so, we went into ICU and then Dave was -- had a book with him, that's the first time we had seen the baby. He had a bunch of monitors on him. Dave was pretty shook up and -- and he looked like heck. So, actually, the first person that I spoke with was John McBain.
Q. And then, at some other point after you talked to John McBain -- well, when you talked to John McBain, did you ask him if he knew anything about what happened to David McBain?
A. Yeah, I did. John -- John had said that it had something to do with the brain swelling and all his body functions just went haywire.
Q. His -- his body functions went haywire. Did he -- did he say that his -- his brain functions went haywire?
A. No, he didn't.
Q. When you saw the baby in Pediatric Intensive Care, you said you saw a bruise on the right side of his head -- about right up here on the forehead?
A. Right.
Q. At that time, did you examine the rest of David McBain --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

baby McBain's body?
A. Examine?
Q. Did you look?
A. We did see one other bruise.
Q. Where?
A. It was on one of the knees.
Q. Did you see any -- any bruises or marks on -- on the legs or the thighs or the abdomen or -- or the back -- did you see any of those?
A. No.
Q. Did you see, at that time, any bruise here on the left side of the chin?
A. At that time, no. I -- no.
Q. Did you see, at that time -- and I realize that baby McBain had a lot of hair. At that time, did you see -- did you see any swelling along the entire left side of the baby's head?
A. No, Mr. Cherry.
Q. Or on the right side of the baby's head?
A. No.
Q. And so now you knew for all intent purposes, I assume, at about -- between 6:30 a.m. on May the 9th and -- and when you got there and you talked to John McBain, that this baby was probably brain dead, is that a fair statement?
A. At 6:30?
Q. Well, when you talked to your son at 6:30, he told you the



FORM SMI-25 PENGAD/INDY 1-800-631-6989

baby was dying, right?

A. Correct.

Q. And then when you got to the hospital, you talked to P -- John McBain, did you learn for all intent and purposes, at some point, during the day on May the 9th, that the baby was brain dead?

A. On May the 9th later in the afternoon, yes.

Q. Okay. When is -- when is -- when is the first time on May the 9th that you actually became aware of the fact that this baby was not going to make it?

A. Oh, gosh. I'm going to say in the afternoon, somewhere between 4:00 and 6:00, I believe, it was late afternoon.

Q. So you know -- you knew that the baby was dying, was probably going to be taken off of life support and would probably die -- expire?

A. I didn't know the baby was actually going to be taken off life support until the two pastors started coming down the hall and -- actually, they were talking to David and Tina a lot and I'm a pretty educated person, I can figure out what's going to go on.

Q. Okay. At some point, in fact, at about 9:45 or thereabouts that evening, they took baby McBain off of life support -- off the ventilator. He quit breathing, his heart stopped about ten minutes later, true?

A. True.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Were you there at the time?
A. Yes.
Q. All right. Now, I guess my question is this, -- and maybe it's an unfair question and maybe it's not, but at some point in time, you had to want to know what happened to baby McBain that would have caused his death, when did that point come?
A. Well, if there was ever a point, I -- sometimes you just try to block things out.
Q. Did you confront -- did you ask your son what happened to this baby -- if not after the baby's death, before -- sometime before the funeral when you were with him?
A. With them making the funeral arrangements and them staying at our house.
Q. And didn't you ask, what happened to the baby -- did this really happen from -- from a fall from a waterbed?
A. David had confided in me and was telling me, you know -- there was never a good time at that point in time, because, first of all, he was so emotionally upset as was everybody else, especially Tina --
Q. Okay.
A. -- and he was trying to tell me bits and pieces.
Q. Mr. McBain, I guess, it is a fair statement and -- and I don't want to put any -- any words in your mouth, but at some point in time, between the baby's death and the baby's





FORM SMI-25 PENGAD/INDY 1-800-631-6989

funeral on May 13th, I believe, and you knew this baby was going up for an autopsy, true?

A. Yeah.

Q. Not to -- maybe not to Lansing, but possibly to Grand Rapids, but you knew that the baby was going to have an autopsy and up until the time of the funeral, you were -- you had -- you had been told by your son that the baby had fell off a waterbed and that maybe the dog jumped on his stomach, is that -- is that a fair statement?

A. That's pretty fair.

Q. And is it also a fair statement to say that you assumed that your son was telling you the truth?

A. I -- yes.

Q. And so after the funeral -- and you did know the results of the autopsy, did you?

A. At -- no.

Q. And up until the time of the funeral, at least, you saw no police reports?

A. That's correct.

Q. You had actually no idea what was perhaps going on behind the scenes with physicians and with the pathologist, the man who did the autopsy and with the police, is that true?

A. That's true.

Q. And so when suddenly a marked car, after the funeral, essentially pulls you over and there are some unmarked cars





FORM SMI-25 PENGAD/INDY 1-800-631-6989

and your son is taken into custody, you're justifiably angry, are you not?
A. I'm very angry.
Q. You're thinking, why are they doing this to my son -- in fact, you thought it was a seatbelt violation?
A. I did.
Q. But the police took your son, basically, into custody, not for a seatbelt violation, not for dropping your son -- or having your son -- having -- having David McBain fall off a waterbed, but for Second Degree Murder, did you find that out that day?
A. I found that out that day.
Q. After -- after you went to the police department -- the State Police Post. You've been in contact with your son after -- he was arrested by the police, he was lodged in the Berrien County Jail for some time?
A. Yes, seven months.
Q. And you attended the preliminary examination and you heard Doctor Palutke and you heard Doctor Page and you heard Officer Hopke and you heard paramedic Bill Farhat, true?
A. Yes.
Q. And you had an opportunity to talk to your son in the jail -- you weren't banned from contacting him were you?
A. At first I was.
Q. Okay. But not immediately -- maybe for a couple days after





FORM SMI-25 PENGAD/INDY 1-800-631-6989