the preliminary examination and then I think your counsel and I agree that you could -- you could talk to your son, true?

A. True.

Q. And when you talked to your son, now being aware that David McBain died -- obviously you knew that, but now being aware that there were numerous contusions about his body, that there was -- was a -- a point of high severity blunt force impact here and on his right side and on his left side and, I think -- did you even see the picture of the skull fracture from one side to the other?

A. (No audible response).

Q. When you -- when you knew all that, --

THE COURT: I didn't hear the answer?

THE WITNESS: Yes.

THE COURT: You have to -- the record here is being made by -- is that recording and if you just nod your head, we don't here you.

THE WITNESS: Okay.

BY MR. CHERRY (continuing):

Q. Mr. Flick, after knowing all that, you talked to your son?

A. Yes.

Q. Did he ever tell you at that time, that something happened other than he baby falling off the waterbed or perhaps the dog jumping on the baby's stomach?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No.

Q. Not up until -- even up until the time of the last trial in October, isn't that a fair statement?

A. Will you repeat the question, please?

Q. Yes. Up until the time of the last trial, you really had no idea that there was more to this story?

A. I knew in July that there was more to this story.

Q. How did you know that?

A. Through David's attorney.

Q. And apparently that came from what attorney, Attorney McDowell -- the counselor?

A. Yes.

Q. So, in July -- now, up until July, knowing what you saw, you believed your son was telling the truth?

A. Yes, I did. We --

Q. And it must have been devastating for you to hear that now there -- apparently he's claiming there was something else, that he dropped this baby?

A. We -- I think all of us kind of us felt there was something missing from the whole story and this kind of just fit -- fit for everything. David --

Q. Kind of fit for everything, didn't it?

A. David never -- we never discussed the thing -- anything over the phones 'cause we thought our phones were being tapped. Heck, when we went to visit him at the jail, we felt that --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

we were passing notes back and forth between the bulletproof glass. I just -- we were so paranoid about everything.

Q. Well, let me -- let me go back just a little bit. After you heard, apparently through Mr. McDowell and perhaps through McDonald, that what really happened here is that David was reaching into a crib and that the baby fell out of his arms and hit it's head on the floor. And then -- and then -- and then on his rush to get out of the house, he ran into the door with the baby's head. Now, you said you were relieved because this fit -- is that what you just said?

A. I believe I just said that.

Q. Okay. And it fit because now you can think to yourself, I suppose, that explains the three areas of blunt force trauma on the head. The baby fell out of the bed, the baby fell out of his arms, the baby hit the door, true? I mean, that -- that must have gone through your mind?

A. No.

Q. It didn't? It explains -- you -- you have to admit that -- that perhaps in your own mind, a fall from one's arms might explain fracture, I mean, in your own mind?

A. Have -- have you seen the house on Minnick Road?

Q. I'm sorry?

A. Have you seen the house on Minnick Road, the hard floors?

Q. I've seen pictures and the jury has seen pictures, yes.

A. But you have actually have not been there?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. No, I -- I have not. But let me ask you question, all right? There was no question in your mind that you believed your son, David Flick, initially when he told you the baby fell off the waterbed and caused this injury that resulted in death to that child, true?

A. True.

Q. And you also believed him when he told you -- when he added to the story by saying, well, what really happened here, is the baby fell out of my arms and I also hit the baby's head on the door. You believe that as you sit there today -- is that a fair statement?

A. I believed David the first time and I believe David at this point in time.

Q. And actually you refuse -- you refuse to admit that there maybe even more to the story then you've heard thus far from your son, is that a fair statement as well?

A. After the first story?

Q. No, right now. You -- you refuse to admit to yourself that there could be more to this story than what you've heard from your son so far?

A. I don't believe there is more to the story.

MR. CHERRY: May I have just a moment? No further questions.

THE COURT: Redirect.

REDIRECT EXAMINATION





FORM SMI-25 PENGAD/INDY 1-800-631-6989

BY MR. McDOWELL:

Q. You said when you talked to David at the hospital and -- he was down on himself, correct?

A. He was -- he was down.

Q. But you said he was down on himself, didn't you?

A. (No audible response).

Q. What led you to believe that?

A. I don't really know. I didn't know because he's feeling bad because the baby was in his care. I -- I don't really know, Mr. McDowell.

Q. Did -- as far as you know he never had that first aid course?

A. No.

Q. He told you he tried to do CPR on the baby, right?

A. Yes.

Q. Did he tell you how he did it?

A. Yes.

Q. The adult way?

A. Yes.

Q. That's -- how -- how do you do it on a baby -- don't you do it in a different way?

A. Two fingers.

Q. On the chest?

A. Yes.

Q. Do you breath into the mouth at the same time?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Mouth -- mouth and nose.
Q. Mouth to mouth and pushing on the chest?
A. It's mouth -- mouth to nose with a child that small and just two fingers on the chest.
Q. So you testified here, it was July of '98 when you found out there was a change in his story as to what happened that night?
A. Correct.
Q. You were out to the house on Minnick and looked around a couple times, were you not?
A. Yes.
Q. Okay. Were you checking to see where the bed was and things of that nature?
A. Yes.
Q. Distances involved, correct?
A. Correct.
Q. Okay. And that was shortly af -- around the time of the prelim or shortly after the prelim?
A. After the prelim.
Q. And in fact, you made a videotape out there, did you not?
A. Yes.
Q. Was that in conjunction with John Behnke?
A. Yes, it was.

MR. McDOWELL: That's all.

RECROSS-EXAMINATION





FORM SMI-25 PENGAD/INDY 1-800-631-6989

BY MR. CHERRY:
Q. Are you familiar as a fire chief of shaken baby syndrome?
A. No.
Q. Do you know if CPR works on shaken baby syndrome?
A. I'm sorry?
Q. Do you know if CPR works on shaken baby syndrome?
A. I know -- I know now, if CPR is not done correctly, it could cause it could have caused some type of hemorrhage to the eyes.
Q. Nothing further, Mr. Flick.

MR. McDOWELL: I don't have anything further, your Honor.

THE COURT: You may be excused.

(At 9:58 a.m., witness excused)

THE COURT CLERK: Please raise your right hand.

Do you solemnly swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. McBAIN: I do.

JOHN McBAIN

called by the Defense at 9:59 a.m., sworn by the Court Clerk, testified:

DIRECT EXAMINATION

BY MR. McDOWELL:
Q. State your name, please.





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. John McBain.
Q. Spell your last name for the record.
A. M-C-B-A-I-N.
Q. And where do you live, Mr. McBain?
A. In Sawyer.
Q. And do you have a daughter named Tina McBain?
A. I do.
Q. How old's Tina?
A. Eighteen.
Q. And do you know the def -- defendant in this case, David Flick?
A. Oh, yes.
Q. What do you do for a living?
A. I drive truck.
Q. How long have you been doing that?
A. Thirty some years.
Q. How was it that you came to meet David Flick?
A. My daughter brought him over and said she had a boyfriend and this was him.
Q. Okay. Remember when that was?
A. Shoot, somewhere in '98, I'm thinking.
Q. So they were obviously romantically involved, correct?
A. At that time, yes.
Q. Okay.

Tape 99B-0021-A, 2-22-99, 10:00





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes, they were.
Q. Did there come a time when you discovered that Tina was pregnant?
A. Yes, there was.
Q. All right. And she was only 16 then?
A. That's true.
Q. Sixteen, right?
A. Yes.
Q. Okay. And how'd you find that out?
A. Well, I kind heard a little through the grapevine and then she came over, brought her mother and told me.
Q. David was not the dad, was he -- David --
A. No, he wasn't.
Q. -- Flick. Did there come a time after that when -- Tina's mother -- what's Tina's mother's name?
A. Carol.
Q. Okay. And you were married to her at the -- at one time, correct?
A. Yes, I was.
Q. And then she's now remarried to somebody named Greene?
A. Yes.
Q. Okay. Did you become aware of the fact that they were living together, Tina and David at what used to be you and Carol's house?
A. Yes, I did.



FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Okay. And were you aware of when Tina had the baby?
A. Oh, yeah. I was -- I was there after -- right after the baby was born.
Q. Okay. Was David there -- David Flick?
A. Not when I was that day, he'd had been in and out of the hospital though. He was there.
Q. And were you there when -- were you aware that the baby stayed in the hospital a couple of days and then was brought home afterwards?
A. Oh, yes.
Q. Now, let me ask you this. Did you see Tina and David and the baby together after that at different times?
A. Couple of times, yes.
Q. Was there anything unusual about them, the way they were handling the baby or anything?
A. No, not a thing.
Q. Do you have any doubts about either Tina or David being able to handle an infant?
A. No. Just knowing they were young people and having a child and listening to their plans -- I mean, it's -- it was going to be difficult, but no doubts. They had plenty of backing.
Q. Did you back them?
A. Oh, yes.
Q. You did -- did you know the Flick family before Tina brought David home and said this is my boyfriend?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No.
Q. Okay. Did you know the Fick -- the Flick family before you went up to Bronson?
A. No, I didn't.
Q. So you never had any get togethers and you weren't friends, correct?
A. No, not at all.
Q. Was David -- little David McBain, that's him in the picture on the monitor, correct?
A. Oh, yeah.
Q. Was that your first grandchild?
A. No.
Q. You have others?
A. I have others.
Q. Did you have occasion to see David toddling around and doing various things that kids that age do?
A. Oh, yes.
Q. Was he an active child?
A. Very.
Q. Okay.
A. He was precocious as anything I'd ever seen.
Q. Did you ever see any bruises or injuries or anything in regard to that child leave you to believe that he wasn't receiving proper care from Tina or David Flick?
A. No.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Didn't give you any stop and wait, hey, what -- what are they doing?
A. Never.
Q. Were you aware of an injury that happened on May 8th, 1998?
A. I was.
Q. How'd you become aware of that, Mr. McBain?
A. Well, I got paged in my truck that evening.
Q. Okay. And what happened after you got the page?
A. I called home and talked to my wife, called the hospital here in Saint Joe and then went home and got in the car and headed for Kalamazoo.
Q. When you -- you remember what time it was you got there, Mr. McBain?
A. Shoot, 10:30, 11:00, I don't know, somewhere around there.
Q. What was going on then as far as little David?
A. When I got there --

MR. CHERRY: Excuse me, counsel. You --

THE WITNESS: -- excuse me. By the time I got to the hospital --

MR. CHERRY: Excuse me just a moment. For foundation, you said 10:30 or 11:00, when was that?

BY MR. McDOWELL (continuing):
Q. Do you know how -- was it closer to 10:30, or 11:00 or do you know at this time?
A. I -- I -- I couldn't say. After I heard, -- I'm -- most I





FORM SMI-25 PENGAD/INDY 1-800-631-6989

could say between -- well, I know left out of Sawyer around 10:30 --

Q. Okay.

A. -- and it didn't take me 15 out of Kalamazoo, so --

MR. CHERRY: Is this 10:30 p.m. on the day.

THE WITNESS: P.m.

BY MR. McDOWELL (continuing):

Q. May 8.

A. Yes, May 8th.

MR. CHERRY: Thank you.

THE WITNESS: On a Friday that I was -- I was at Pri-Mart over here fueling my truck, headed for home and it took me about 45 minutes of making phone calls and talking to people before I -- I made the decision of what to do.

BY MR. McDOWELL (continuing):

Q. So you decided to go, correct?

A. Right then.

Q. When you got to the hospital, what'd you see?

A. We went into the -- I got there and we were in the -- the waiting room or reception room, whatever you care to call it, and Pastor Clare came in and he was talking to us all -- I had met him before at another young person's accident up there. He started telling us this and that and then we went down to the emergency room.

Q. When you got to the emergency room, did you see little David



FORM SMI-25 PENGAD/INDY 1-800-631-6989

or --
A. Oh, yes.
Q. -- David Flick or Tina?
A. Well, David Flick was with us.
Q. Okay.
A. He was with us -- there was myself, Tina, Dave and my step daughter, Julie.
Q. Her last name's Julie --
A. Meyers.
Q. -- Meyers?
A. Yes.
Q. What happened then?
A. We got to ER, David was -- was there. He was on the examining table and we were told this and that, but then -- when -- when we walked in, there was no one there, just us and he was -- he was starting to move a little bit and just protest or whatever. And then we were standing there and my boy -- my boy, David -- son came in about that time and I was just looking at David, my grandson, and looking around and thinking, my gosh. Then I saw the admission form, Doctor Page had admitted him. It was laying there, then here came Doctor Page and Dave and Tina were right up there with the baby.
Q. Had you ever met Doctor Page before?
A. No.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. What happened when Doctor Page came in?

A. Well, he started telling us this and that and just one thing after the other -- well, there's some head trauma and this and that and well, here's what I think and so on and so forth and the kids were asking him -- of course, they were pretty cut up about everything that was going on and worried about the baby and Julie and my boy, David, and I were standing toward the door but finally I got a word in. I asked Doctor Page about three times and got his attention and said, what's his prognosis, he says, well, I think the child ought to be home in -- between ten and 14 days. He said the -- the swelling in the brain -- there is some, but there wasn't a whole lot. I asked him why they hadn't put a shunt or stint or whatever in -- if he needed one of those for pressure. He said, well, no, he said, they didn't feel they needed one, the drugs seemed to be working.

Q. So you asked him if he needed a brain stint or monitor?

A. Yeah, I remember asking him if -- if one had been thought of and --

Q. How'd you know to ask that?

A. Because last time I was up at the hospital, when a lady friend of mine, her husband had died from here in town. Same situation, he was 16, had a head on collision out here -- not his fault, but be that as it may and just more or less SOB that -- and horrendous brain accidents, you do





FORM SMI-25 PENGAD/INDY 1-800-631-6989

attempt to relieve pressure. My son, David, his -- his boy, David, had to have one put in his skull when he was young, due to the malformation of the skull to save his life.

Q. So you knew about two people that they used the brain monitor on?

A. Yes, I did.

Q. When you asked Doctor Page, did you ask him had a neurologist been called or did you know to ask --

A. No, I didn't -- I didn't at that time. I assumed he was the only physician and if anything needed to be done, they'd do it.

Q. How'd you feel after he said, well, we'll keep him here ten to 14 days and be released?

A. Pretty damn happy.

Q. Okay. And you saw the baby, at least he was moving around, right?

A. He was starting to come out of the -- well, he had been sedated from the CAT Scan and all when they shoved him into that machine. They said, well, you know, being as active as he is, they had to sedate him rather heavily. So, he was starting to come out of it and looking pretty healthy and it just -- our -- our hopes were very high at that point in time.

Q. Did you see any injuries to your grandson?

A. No.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. No?

A. No.

Q. Could you -- did you get right up to him or were you observing him from aways?

A. Between three, three and a half, four feet.

Q. So you didn't see anything?

A. No.

Q. What happened after Doctor Page told you it'd be about 10, 14 days and he could be let go, what happened then -- what'd you do?

A. I thanked God for everything that was going on here. I thought it was pretty cool. We ended up going upstairs, they wanted to take some other x-rays and we went up to the pediatric intensive care unit and we got up there and shortly after then, David arrived and they put him in this -- this one section and hooked him all up and we all were there and the people there for you were just like family. I mean, it was -- the nurses bent over backwards to see to it that he was okay and that we were all taken care of. And we were all standing around just -- just thinking, you know this is really going to work out.

Q. So you thought you were in good hands at that point, right?

A. Yes.

Q. No reason to doubt it?

A. None.





FORM SM-25 PENGAD/INDY 1-800-631-6989

Q. Okay. Then what happened?

A. Well, it seemed like the -- the world took a turn for the worse and David did too. My son, Dave and I were standing there looking and -- well, all five of us were still there and suddenly the monitor just went haywire, blood pressure went up, the respiration, heartbeat, everything went through the ceiling. And I remember asking my boy, David, I says, I think we've got a minor malfunction and he said, yeah, I think so. I asked the nurse, I said, isn't there a problem here? She turned around and looked at it and got right on the phone to someone. Well, they had to find someone because there was nobody there, they were all on call. Finally, they tracked somebody down, authorized some medication.

Q. So they give them some medication? Did you see that?

A. Yeah.

Q. Do you know what they gave him or you didn't know?

A. I have no idea.

Q. What happened after he got some medication?

A. Nothing.

Q. Nothing? What'd you do?

A. Stood there a watched.

Q. Then what happened?

A. Well, over a course of probably half hour, an hour, the -- immediately upon receiving medication, of course -- I mean,





FORM SMI-25 PENGAD/INDY 1-800-631-6989

the monitor starting coming down, but the nurse came over and did a pupil test on him, that wasn't good.
Q. Did a what?
A. Pupil test with a flashlight.
Q. Okay.
A. That definitely was not good.
Q. You saw her do that?
A. I did.
Q. Did she tell you it wasn't good?
A. No, but I knew.
Q. Then what happened?
A. Then the monitor started coming back down. I stayed there probably, like I say, between a half hour and an hour. Then I decided, well, I'm going to go home and get my wife, take a nap, take a shower, and come back up Saturday morning and get a few hours sleep and I left.
Q. Had you been told anything -- what time did you leave there, do you know that?
A. I'm going to say somewhere around 3:00. I didn't get home 'til about 5:30, I stopped and had breakfast.
Q. When you left, did you have any reason to believe that David had suffered a non-survivable injury?
A. No.
Q. Had you talked to any doctor other than Doctor Page?
A. No, I hadn't.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. And Doctor Page apparently told you there was some -- some edema or brain swelling on the CAT Scan but it was under control?
A. He said initially, that there was minor brain swelling, it was nothing major and he assumed that at that point in time that the drugs would control it and bring it down.
Q. Had you known otherwise would you have left?
A. I don't think so.
Q. What -- you got home then about 5:30 you said?
A. 5:00, 5:30.
Q. What happened then?
A. The phone rang.
Q. Who was that?
A. My son, David. He said, I think you'd better --
Q. That's another David, now, what's his name?
A. Long.
Q. David Long, okay. He -- he was at the hospital too?
A. He was at the hospital. He came in with his truck from up north. He said, I think you better get back up here right now and I knew I'd never make it. So, fine, call Doctor Meyer, here's his phone number. So, I did. Doctor Meyer said the same thing, I might care to come right back up.
Q. You talked to Doctor Meyer?
A. I did.
Q. Oh, okay. He said to get back up there?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. He did. He said, it didn't look good, he did not expect the child to survive, that I might care to be there.
Q. Did you drive back up then?
A. Saturday morning after I got some sleep.
Q. Before Doctor Meyer told you that, did you have any reason to believe David was going to die?
A. No.
Q. When Meyer -- Doctor Meyer -- he testified here the other day -- the neurologist told you -- neurosurgeon told you to get back up, had -- had you signed anything in regard to this child?
A. Nope.
Q. Okay. They just called you?
A. I --
Q. Well, your son called you and then Doctor Meyer got on the phone?
A. Yes, David called me and I asked him, well, who was -- who was the attending, and he told me and I said, fine and dandy, do you have a phone number? He said call the hospital, they're waiting for you. I said, okay. So, I did and they hooked me right up with Doctor Meyer.
Q. When you looked at that admission slip when you first came into hospital, did you see who signed that?
A. Doctor Page.
Q. See any other names on there?



TRANSCRIPTS UNLIMITED, INC.

FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No. Well, it showed David, but -- as the patient, but it was Doctor Page signed it as the admitting physician.
Q. When Doctor Page told you that we had a -- a fracture and we're treating him and there's minimal -- minor brain swelling and he should be going home to ten to 12 days, who was present besides you and Doctor Page?
A. Dave Long, Julie Meyer, Dave Flick, Tina McBain and David McBain.
Q. He was -- little David?
A. Little David.
Q. And you're positive of that statement?
A. I'm positive.
Q. Do you know Doctor Page has said that he didn't say that?
A. Put it in stone.
Q. You had never met Page -- Doctor Page before that night, had you?
A. No, I hadn't.
Q. You have no axe to grind with him or anything?
A. None at all.
Q. Haven't -- I guess you've seen him since, maybe in court, right, but that's it?
A. Once.
Q. Is there anything about David Flick, with your knowledge of him, to lead you to believe that he would have intentionally injured that child?



FORM SM-25 PENGAD/INDY 1-800-631-6989

A. Not a thing.

MR. CHERRY: Well, objection. Calls for conclusion on his part.

MR. McDOWELL: Well, he's been with him for quite some period of time, saw him handle the child.

THE COURT: Basically, you're asking this witness to express an opinion as the guilt or innocence of the defendant, and those decisions are not to be made by the witness, or you or I, but by the jury. Objection sustained, jury will disregard that.

BY MR. McDOWELL (continuing):

Q. Did David ever tell you what happened to the child?

A. Yes, he did.

Q. What'd he tell you?

A. He said that he put the baby on the bed and he, I believe, he walked into the bathroom to take care of something and then had to come back and the baby had fallen off the bed. And then through the process after he picked the child up -- process of the day, everything seemed okay and later on as the day progressed, that he found the baby turning blue, choking, couldn't breath and he attempted to do what he could, find the proper help and everything that he did just -- it didn't seem to work out for whatever reason.

Q. Did you hear then later that David Flick said that in addition to falling off the bed, that he dropped the child?





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. Yes, I heard that later on.
Q. Did you ask him about that?
A. No, I didn't.
Q. Thank you.
MR. McDOWELL: That's all I have.

CROSS-EXAMINATION

BY MR. CHERRY:
Q. Mr. McBain, you're Tina's father?
A. I am.
Q. So, essentially, had they been married, David Flick would have been your son-in-law?
A. He would have.
Q. And there's no question that David McBain was your grandchild?
A. No. None.
Q. Okay.
A. No question.
Q. Now, when Tina and David Flick started living together, do you know where they were living?
A. At my old house on Minnick Road.
Q. When did they start living there?
A. I have no idea.
Q. Was it before the baby was born?
A. Oh, yes, yes.
Q. And his birthday is what?





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. His birthday was in November.
Q. Well, could it have been September the 8th --
A. I thought.
Q. -- 1997?
A. Yes. September.
Q. September the 8th.
A. Sorry.
Q. So they were living there on Minnick Road, at least, on September the 8th, 1997?
A. Yes.
Q. And did they live there continuously the whole time?
A. I really don't know, I wasn't over there checking on them.
Q. In fact, how many times did you see your grandson between the birth and his death, do you know?
A. Oh, I'd say probably six, seven, maybe, eight times.
Q. So roughly about once a month?
A. More or less.
Q. And when you saw the baby, was it always over on Minnick Road?
A. No. They'd bring him over to my house.
Q. As far as you know, they're -- they con -- continued to stay over on Minnick Road, they weren't living any place else that you know of?
A. No. No, they continued there to my knowledge.
Q. They weren't living with you and they weren't living --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No.

Q. -- with Mrs. Campbell and they weren't living with her --

A. Nope.

Q. -- father, David Flick --

A. No, they did not.

Q. -- is that right? Did you know the defendant prior to the time he was dating your daughter?

A. No, I didn't.

Q. How well did you get to know him after he started dating Tina?

A. Not real well, we had -- he had occasion when he'd come to the house and we'd talk and have a nice time there.

Q. Now, how many other grandchildren do you have?

A. Three.

Q. Three?

A. Um-hmm (affirmative).

Q. On May the 8th, you indicated that you got a call about 10:30 or 11:00?

A. No. It was earlier than that when I got paged, but by the time I got home and took care of what I had to do and make decisions, it was about 10:30 or so when I took off.

Q. Well, okay. You got a pager, is that right?

A. Yes.

Q. And somebody typed in a number for you to call on your pager, is that how that works?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes, my wife called me and said, call home, so I did.
Q. Did you have a conversation with your wife?
A. Oh, yeah.
Q. That's --
A. That's Renee.
Q. All right. And you after -- after having a conversation with her, you went home, is that right?
A. No, I called Lakeland Hospital first and I talked to the triage doctor.
Q. Doctor?
A. That was Jim that I talked to down there. He told me that he couldn't say too much, but there had been an accident, there's some head trauma and they life flighted my grandson up to Bronson. I said, okay, thank you.
Q. Did you talk to David Flick while he was at Lakeland Hospital?
A. I never saw David.
Q. So, you went home and then you left immediately for Bronson Hospital and you got there at about what time?
A. Between 10:30 and 11:00, somewhere in there.
Q. When you went to Kalamazoo, you went to the waiting room and you said Pastor Clare was there?
A. Yes.
Q. And then you went to the emergency room and you saw the baby. Was David there -- David Flick?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes.
Q. Was Tina there?
A. Oh, yes.
Q. And when you saw the baby, apparently you asked the doctors, well, what about a monitor or a stint or whatever you called it, you're talking about an inner cranial pressure monitor, is that about right?
A. No, I was talking about the tube that would relieve pressure. Should any be building, I asked was that necessary.
Q. And -- and the reason -- the reason you knew you apparently knew this might be necessary is that a friend of yours was recently involved head on automobile collision, true?
A. A friend of mine and I've had other occasion to run into this situation similar to that.
Q. Sure, in fact, the words you used in connection with your testimony was horrendous brain injuries, true?
A. On the other person?
Q. Well -- well, you said horrendous brain injuries.
A. On -- possibly on Sage at the last -- I don't recall what --
Q. Did you assume at this time that you walked into this room and you saw that baby on a gurney or on a hospital bed, -- you said he was moving some?
A. Yes.
Q. Why -- why -- why did you assume that that baby needed some





FORM SMI-25 PENGAD-INDY 1-800-631-6989

sort of a stint or a tube or a monitor to relieve pressure in his head?
A. Well, normally that seems to be standard procedure when you have massive head trauma.
Q. Massive head -- did you know that he had massive head trauma at that time?
A. From what I had heard here at Lakeland, I had assumed that he had that at that point in time.
Q. Okay.
A. That is not what I heard up there from Doctor Page at the latter point in time.
Q. You were concerned enough when you went -- when you heard about this from Lakeland Hospital that he had massive head trauma, that you went up to Kalamazoo and you asked about this stint or the monitor or whatever it was --
A. Yes.
Q. -- to relieve pressure? Did you ask at that point, David, what happened?
A. No, I didn't.
Q. Why?
A. Because David came over and he said, "John, I'm sorry."
Q. Well, okay. "John, I'm sorry." Did you say, "Well, what are you sorry for?"
A. He started talking too, and telling me what went on.
Q. Okay. And what did he tell you?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Well, basically, that the child had been on the bed and fallen off and that later on through the day, everything seemed okay. They'd been over to his parents and the neighbors and up here in Saint Joe and everything was fine and dandy until later on in the day and then everything seemed to kind of fall apart.

Q. You got three grandchildren yourself -- how many children did you have?

A. Two.

Q. Two. So, you've had -- basic -- basically some experience with at least five different children or your own, in -- including David McBain -- that would be six, true?

A. Oh, yes.

Q. Now, when he told you -- you're assuming there's a massive head injury because you asked about the tube for relieving pressure, fair statement?

A. Fair.

Q. And at some point in time, David comes to you and says, the baby fell off a waterbed?

A. Um-hmm (affirmative).

Q. And you believed that?

A. Yes, I did.

Q. Did you ask him -- did you ever think about asking him how this could of happened just by a fall from -- did you see the waterbed, by the way, at their house?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Oh, yes.
Q. It's only 18 ½ inches high, isn't it?
A. Yeah.
Q. And you're assuming that this baby fell off this waterbed and caused a massive injury that needed a stint or a monitor or a relief valve, is that what you're telling us?
A. I assumed the baby fell off the bed and something happened that he needed the best care he could get. Lord knows he didn't receive it, he's not here.
Q. Do you know anything about shaken baby syndrome, Mr. McBain?
A. I've heard about it.
Q. And then you indicated that the baby was taken up to pediatric intensive care and you were getting good treatment up there from the nurses, they were bending over backwards and suddenly the bottom fell out of David McBain, is that true?
A. That's true.
Q. The monitors went haywire, brain activity increased or decreased or whatever it did, and the pupil test was not good, so, you knew at this point that there was some real problems, didn't you?
A. Yes, I did.
Q. And then at about -- after leaving at about 3:00, you talked to Doctor Meyer at about 5:30 or so and they told you to come back, that this baby was in dire shape --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. That's --
Q. -- was in real trouble, true?
A. Yes.
Q. Must have -- must have come as a shock for you realizing that when you left there -- or at least, when you talked to Doctor Page that this wasn't a problem, that this baby was coming home in 14 days or so and now suddenly to have this baby be essentially brain dead?
A. It bothered me quite a bit.
Q. And so when you went back there, did it ever run through your mind -- did you ever ask yourself, how could this happen from a fall from an 18 inch high waterbed?
A. No.
Q. Why not?
A. I asked myself how could it be that a child could enter an institution alive and be given a good prognosis and within four or five hours be told that the child had absolutely no option of living and we were going to unplug him.
Q. Sometimes when people go into hospitals, things are unforeseeable, isn't that true?
A. I have to assume so.
Q. And sometimes it is foreseeable, I suppose, that a doctor could make a misdiagnosis, isn't that true?
A. No doubt in my mind.
Q. So, if you went into the hospital, you would have to, maybe





FORM SM-25 PENGAD/INDY 1-800-631-6989

assume that somebody might make the wrong call with you with whatever was ailing you, would you agree with that?
A. I guess I'd have to.
Q. Now, when you found out that baby McBain was, in fact, brain dead, did you ever talk to that man right there -- did you know that he was in charge of that baby on May the 8th?
A. Yes, I did.
Q. This is your grandson, this is your daughter's child, this is not his child biologically, did you ever ask him what happened to this baby?
A. He told me what happened.
Q. Tell us again what he told you.
A. Baby had been on the waterbed -- he put the child on the waterbed --
Q. Did you ever see --
A. -- he turned around and he was in the bathroom and he came back out that the baby -- he had hear a little thump and the baby was on the floor.
Q. Mr. McBain, when you were at the hospital, you said you didn't see any injuries?
A. No.
Q. With respect to this photograph right there, do you recall seeing a bruise right about there?
A. No, I don't.

Tape 99B-0021-A, 2-22-99, 10:29





FORM SM-25 PENGAD/INDY 1-800-631-6989

Q. And while you were at the hospital, do you recall seeing a mark right about there?
A. No, I don't.
Q. Do you recall, Mr. McBain, seeing a bruise here?
A. No, I can't say I did.
Q. Do you recall seeing any other marks on this child's body?
A. He had a few bruises on him from just -- what I saw at the hospital, nothing to that magnitude.
Q. Did you see this bruise here --
A. No, I didn't, his head --.
Q. -- at the hospital?
A. -- his head was covered at the hospital.
Q. Did you see this bruise on the other side of his head, Mr. McBain?
A. No. That portion was covered also.
Q. Well, you didn't see these, so you don't know what actually happened. Let me ask you this. Had you seen these photographs, had you seen what condition that baby was in, would you have asked him what happened to this kid?
A. I probably would have.
Q. Would you be surprised to know that that man right there didn't tell you the full truth when he told you this baby fell off a waterbed?
A. I don't see where he didn't tell me the truth.
Q. Did you hear that, subsequently, he came out with the rest





FORM SMI-25 PENGAD/INDY 1-800-631-6989

of the story -- did you hear that?

A. Oh, yes.

Q. So you know, at least, after the last trial in October, that he now says that he dropped this baby on the floor?

A. Correct.

Q. And he now says that he ran this baby into door -- into a door in his haste to get out of the room?

A. That was in the outside kitchen door, which, if I hit it with my head, it would make -- I hung that door. It's almost two inches of solid core oak.

Q. Thank you very much, Mr. McBain.

THE COURT: Did you wish to examine?

MR. McDOWELL: Wait -- wait a second, Judge.

REDIRECT EXAMINATION

BY MR. McDOWELL:

Q. Did you recall seeing Mr. Flick, Senior at the hospital?

A. Yes, I did.

Q. Had you met him before that?

A. No, I hadn't.

Q. Did you and Mr. Flick, Senior have a conversation about your grandson's condition?

A. We talked about -- about the baby -- we talked about so many things --

MR. CHERRY: Well, objection. That call for hearsay.

THE WITNESS: I'm sure we talked about --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

MR. CHERRY: Objection. It calls for hearsay.

THE COURT: Wait a minute. When the lawyer says, objection, you stop talking.

THE WITNESS: Okay.

MR. McDOWELL: I thinks it's already been -- it's already in evidence, but --

THE COURT: Well --

BY MR. McDOWELL (continuing):

Q. Did you have a -- let me just -- I'm not going to go into --

THE COURT: The content of the conversation --

MR. McDOWELL: I won't go into the content.

BY MR. McDOWELL (continuing):

Q. Did you have a conversation with Mr. Flick after he arrived?

A. Oh, yes.

Q. That's all.

MR. McDOWELL: Thank you.

THE COURT: Anything else, Mr. Cherry?

MR. CHERRY: Nothing.

THE COURT: You may be excused, sir.

(At 10:32 a.m., witness excused)

THE COURT: I want to talk to you when Mr. McDowell gets back. Can you ask him to step back in? Counsel?

(At 10:33 a.m., off record bench conference)

THE COURT: We will take a short recess at this time And I'm used to saying ten minutes, but I usually manage to



FORM SMI-25 PENGAD/INDY 1-800-631-6989

take 15 myself, let's take 15 and mean it. And do not discuss the case, the testimony or the evidence or anything about it or the people involved. Avoid all contact with attorneys, parties and witnesses. Those of you who do not wish to go down -- in the charge of the custody of the Bailiff, may remain in the jury room.

THE COURT OFFICER: Court is recessed.

(At 10:34 a.m., court recessed)

(At 10:54 a.m., court reconvened)

THE COURT: Who's next?

MR. McDOWELL: Carol Greene.

THE COURT OFFICER: Court will resume. Please be seated.

THE COURT CLERK: Right up here ma'am.

Do you solemnly swear or affirm the testimony you are about to give, will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. GREENE: Yes, I do.

CAROL GREENE

called by the Defense at 10:54 a.m., sworn by the Court Clerk, testified:

DIRECT EXAMINATION

BY MR. McDOWELL:

Q. State your name, please.

A. Carol Greene.





FORM SM-25 PENGAD/INDY 1-800-631-6989

Q. And spell your last name for the record.
A. G-R-E-E-N-E.
Q. Okay. Where do you live, Mrs. Greene?
A. I live in Tennessee, Coswell.
Q. You here pursuant to a subpoena today?
A. Pardon?
Q. Did you get a subpoena to come here today?
A. Yes, I did.
Q. All right. Did -- were you known at one point as Carol McBain?
A. Yes, I was.
Q. You were married to John McBain?
A. Yes, I was.
Q. Okay. When you were married to John, where did you live -- where was the marital home?
A. On Minnick Road.
Q. What address, do you remember?
A. 14021 Minnick. We sold the house in November.
Q. That's in Sawyer, actually, I couldn't here you.

THE COURT: You'll have to speak up so the jurors can hear you.

BY MR. McDOWELL (continuing):
Q. You sold the house?
A. Yes, --
Q. Okay.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. -- we sold it in November of this year --
Q. All right.
A. -- this past year.
Q. And you know Tina McBain, correct?
A. She's my daughter.
Q. She's your daughter with John, correct? All right.
A. Yes.
Q. You just had the one child with John?
A. Yes.
Q. And that's Tina, correct?
A. Yes.
Q. Okay. And you know David McBain, correct?
A. Yes, --
Q. Okay.
A. -- he was my grandson.
Q. He was your grandson, right?
A. Yes, he was.
Q. All right. And you know David Flick?
A. Yes, I do.
Q. When did you first meet David?
A. When Tina was pregnant with the baby.
Q. Okay. And is David in the courtroom --
A. Yes, he is
Q. -- young David? Where is he?
A. There he is.





FORM SM-25 PENGAD/INDY 1-800-631-6989

Q. You first met him when Tina was pregnant?
A. Yeah, she was about -- almost three months pregnant -- probably around three months.
Q. And were you -- how did you come to meet David Flick? Let me ask you that?
A. When she brought him to the house.
Q. Okay. And was that an introduction of David to you?
A. Yes, it was.
Q. Okay.

MR. CHERRY: I'm sorry, you're going to have to speak up, I can't hear you.

THE WITNESS: Yes, it was.

MR. McDOWELL: Okay. Want me out of the way?

BY MR. McDOWELL (continuing):

Q. Did they -- was she introduced as the boyfriend -- was he introduced as the boyfriend?
A. At the time he was just a friend when she first met him, but -- I mean, she's -- she'd known him for a while she told me --
Q. Okay.
A. -- when she brought him to the house.
Q. Did that blossom into a romance?
A. Yes, it did.
Q. Okay. Now, your daughter was how old at that time?
A. Sixteen.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Was she still in high school?
A. Yeah, she was in high school 'til she had the baby.
Q. Did there come a time when they moved in together?
A. Yes.
Q. How -- when was that, do you remember?
A. Shortly after she was -- he was -- he started coming over and spending the night and everything -- shortly after that and I'd say -- I can't remember the exact time when he moved in, but it was before the baby was born -- couple months probably -- two, three months before he was born, I'm not sure.
Q. Did you approve of that relationship?
A. At first, no.
Q. 'Cause they're -- why?
A. Because I didn't like David.
Q. All right. And then afterwards, did you change your opinion?
A. Yes, I did.
Q. Okay. Now, do you remember about -- I'm sorry, was -- was little David born around the 8th of May of 1997?
A. No, he was born --
Q. September, I'm sorry, September 8th, 1997.
A. -- September the 8th '97.
Q. And where was -- where was the birth?
A. It was in Niles.



FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. And were you there at that time?
A. Yes, I was.
Q. Was David Flick there?
A. Yes, he sure was.
Q. Okay. And you have other grandchildren or -- no, you don't.
A. Yes, I have three others.
Q. Had you ever been at the birth of any of the other ones?
A. No --
Q. This --
A. -- he was the first one that I -- I was allowed to take part in on the pregnancy -- through her whole pregnancy, I got to talk to him in her stomach and feel her stomach and --
Q. So how --
A. -- watched -- watched everything, the whole birth.
Q. That was a -- a good experience for you wasn't it?
A. Yeah, I didn't get to watch my own. Mine was all C-sections --
Q. When you're --
A. -- C-sections, so I didn't get to watch any of own, so he was the first.
Q. When -- after little David was born, then he -- he came home to live at your house as I understand it?
A. Right. He was held in the hospital for a week 'cause he was -- he had some kind of virus they were checking for and two days after he was born I had lung surgery. So, when he was





FORM SMI-25 PENGAD/INDY 1-800-631-6989

released from the hospital, I was still in my hospital so she came from her hospital to the -- to the hospital over here in Benton Harbor and climbed into bed next to me and stuck him in my bed. So, right then, his -- his bonding was constantly with me.

Q. You had bonding with little David, right?

A. Oh, yes. I --

Q. Okay.

A. -- I couldn't do nothing else, except for hold him 'cause of having holes and drain holes and stuff, so --

Q. How long were you laid up with that, Ms. Greene?

A. Up 'til December.

Q. December of '9 --

A. Seven.

Q. Seven? Okay. And your occupation is what?

A. I'm a truck driver.

Q. You couldn't drive the truck with the lung --

A. No, --

Q. -- tubes?

A. -- I didn't drive it right away. I started back driving in -- in December --

Q. Okay.

A. -- as soon as I was able.

Q. Okay. How long have you been driving a truck?

A. Five years.





FORM SM-25 PENGAD/INDY 1-800-631-6989

Q. Do you go across country?
A. I did, but I don't anymore -- I don't drive at all now.
Q. So, you were still driving after the baby was born --
A. Yes.
Q. -- you were recuperated?
A. Yes.
Q. Okay. Did -- let me ask you this. Did you have occasion to observe the way in which your daughter Tina and David took care of little David?
A. Oh, yeah. I watched them in the house and everything.
Q. How did they take care of him?
A. They were good -- they were pretty good -- for -- for being young parents.

MR. CHERRY: Judge, excuse me. I can't hear the witness, she's dropping her voice.

MR. McDOWELL: Well, I'll ask the question.

BY MR. McDOWELL (continuing):
Q. How did it appear to you, how they were taking -- see that micr -- I'm sorry -- see that down by your right elbow?
A. Okay.
Q. If you speak that way, it should pick up all right. How did they appear to you they were taking care of the baby?
A. They -- they were doing good for young -- young kids that's never taken care of babies before.
Q. Did you give them any advice?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Well, if I saw they were doing something wrong, I'd tell them, don't do it that way, this is how you do it, and stuff like that when I was in the house.
Q. Did they seem receptive to your suggestions.
A. Yeah.
Q. Okay. So, you went away after the -- after you recovered from lung surgery and you were over the road in a truck?
A. Right.
Q. Okay. Did you ever take Tina or David with you?
A. Yeah, I took Tina -- David with me in the truck.
Q. Where'd you go? Do you remember?
A. I went to Minnesota.
Q. And he went with you?
A. Right.
Q. Okay.
A. He went with me.
Q. Was that just to keep you company --
A. No.
Q. -- or was he paid, or what?
A. He went with me to -- I was giving him instructions on how to drive -- I was trying to teaching him how to drive.
Q. Okay. He was interested in truck driving at that point?
A. Right. I -- I wanted him to have a better career for himself if he and Tina was talking about getting married and everything. And by then, they were into marriage in -- and



FORM SMI-25 PENGAD/INDY 1-800-631-6989

the fact that they were going to get married, if I'm -- if I'm cor -- if I remember correctly, in August or September, they had their wedding plans -- they were talking about getting married that following August or September -- the baby died in May.

Q. So, you were hoping you could get him interested in truck driving which pays better than --

A. Right. I wanted him to have a more secure -- more better paying job and he was interested in being outside and being his own boss and having his own type of work, so, I thought, you know, I could get him into something like that.

Q. Did -- were there other times that David stayed there with Tina while you were on the road?

A. Oh, yeah, he stayed with her.

Q. How often did you come back?

A. About every two weeks I was home. Sometimes on the weekends and -- and -- at first, and then it went to every two weeks 'cause they were sending me on city runs to Tennessee and to Georgia -- running back and forth at -- at a city run -- they transferred my run.

Q. When they were talking about marriage, were you in favor of that or not?

A. At the -- at the time they were talking about it, yeah, I was in favor about it.

Q. Okay.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. If you would of asked me when she was pregnant, I would of said no.
Q. Okay.
A. 'Cause I didn't like David, he was -- he was a drunk and -- and everything and I just didn't like him. I -- I didn't want that for my daughter.
Q. What happened to David that changed your --
A. He -- he almost totally gave up his drinking where he would have -- if he drank at all it was like a beer every now and then. Now, he just changed -- from the time that baby was born, I could see a big change in him when -- when David came out, he was just -- I -- I videotaped it. You -- you would not believe how nervous the kid was and he was so good for her, he gave her so much confidence and so much, you know, to -- to have that baby and everything and pulled her through it and everything.
Q. Do those things -- number one, he didn't drink much at all --
A. He -- he drank very little after the baby was born.
Q. Okay. Let me ask you this. Did David ever -- well, strike that. When did you find out about the fall?
A. About the baby falling?
Q. Right.
A. She -- Tina called me in Tennessee -- I had just gotten home and she called me in Tennessee and told -- was crying and





FORM SMI-25 PENGAD/INDY 1-800-631-6989

she -- and all she was hollering -- and I wasn't there at first when she called and she was hollering, my baby, my baby, mommy. And so I started calling around trying to reach her and I couldn't find out where she was at. I didn't know what was going on and then pretty soon, about a half an hour later she called me. And she was at the hospital and she said they were taking the baby by helicopter and she was crying. I couldn't hardly understand what she was saying, all she could say is he fell, he fell off the bed.

Q. After you got that news, what did you do, Mrs. Greene?

A. I started packing my stuff to head for -- for up here.

Q. And when you got here, where'd you go?

A. I went straight to Bronson 'cause she told me he was going there.

Q. When did you get to Bronson?

A. Probably between 8:00 and 8:30 in the morning. My -- my daug -- daughter-in-law, she brought me up. She drove 'cause I couldn't drive.

Q. 8:30 a.m., would that be on Saturday the 9th?

A. It was on the 9th.

Q. And when you got here, what kind of condition was little David in?

A. I -- he was laying in his bed, you know, under IV's and everything and he was just sleeping -- he wouldn't wake up.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. The prosecutor has a picture of -- some pictures here of David. I'll show you People's Exhibit 3. Did he look like that?
A. No.
Q. You didn't see those bruises?
A. No, I saw one little bruise right in here -- that I saw --
Q. Indicating under the eye?
A. I think it was right here on the cheekbone. If I remember correctly it was right around the cheekbone. I -- I don't even know what side it was on, I just remember seeing a small bruise there.
Q. That was the only bruise you saw?
A. No, I did see one right here on his rib, about the size of -- a little tiny bruise about the size of the end of your finger, if that big. And I think I saw one little tiny one on his back, if I can remember correctly and the nurse was trying to tell me that he had been abused. And she was turning him over and showing me different spots all over and just -- you know, and she's trying to tell me that his -- he had bruises on his bottom and she showed me that and I said, no, that's a diaper rash from two weeks ago when he was at my house. I treated that diaper rash -- it was like a burn and blisters at that time. And I, myself went and put medication and bought it for his hind end 'cause he was -- had a blister down there, like, from a diaper rash. He had





FORM SMI-25 PENGAD/INDY 1-800-631-6989

had the diarrhea and he had got real raw and it blistered him.

Q. So, the nurse is trying to tell you that the rear end is child abuse and --

A. Yeah.

Q. -- you knew it was diaper rash.

A. And I knew it was diaper rash and I looked at it and told her, look it's brown, it's not bruising, it's brown, it's a -- it's an old, you know, from two weeks ago, it was a bruise -- it wasn't a bruise, it was a burn, like a -- like a leftover of a healing of a blister or a -- you know -- it was kind of brown like a -- a burn.

(At 11:08 a.m. Defense Exhibit M and Defense Exhibit N marked)

BY MR. McDOWELL (continuing):

Q. Okay. Did -- so, you got a look at David when you arrived there and -- let me show you these copies of photographs I've marked M and N. Appears to be you with David, is that correct?

A. Yeah. I have the same pictures.

Q. Are they the pictures that you gave us?

A. It sure is.

Q. Okay. There's a date on the bottom of 10-29-98, but that -- that wasn't when the picture was taken, was it?

A. No, that's not when they were taken. That was when I was





FORM SMI-25 PENGAD/INDY 1-800-631-6989