here.

Q. Okay. When you look at those pictures, do they fairly and accurately portray how you and your grandson looked back when they were taken?

A. Yeah, it looks like the pictures I have, except they're darker.

Q. You have them?

A. These are darker in color.

Q. Do you have your pictures?

A. Yeah. I have my --

Q. With you?

A. -- pictures.

Q. Would you take they out and see if they match the ones --

A. I never took them out of my purse.

Q. The pictures -- you removed two pictures and they got a blue sticker on the back looks like a court sticker, right?

A. Yes. You used them the last time.

Q. Okay.

A. They're much lighter.

Q. These are the same?

A. They're the same pictures except for mine are lighter, 'cause mine are that -- the original pictures.

Q. Okay.

MR. McDOWELL: Record should indicate these two Exhibit's are M and N --





FORM SM-25 PENGAD/INDY 1-800-631-6989

BY MR. McDOWELL (continuing):

Q. And those are your notes on the back?

A. Yes.

Q. All right.

A. I wrote those the day that the nurse gave them to me and I wrote down the day they were taken.

Q. You knew at the time they took these that he was prob -- this was May 9th, right?

A. This picture here was the last picture that was taken of him that I was allowed to hold him, because they took the life support off. I was the -- one of last and David and Tina held him just before that -- just after this. I was the last besides Da -- Tina and David -- each one of us got to hold him ten minutes before they took the life support off of him.

Q. Okay.

MR. McDOWELL: I'm going to move to admit M and N at this time, your honor.

THE WITNESS: That was my last picture with him.

THE COURT: Relieve to withdraw, I take it?

MR. McDOWELL: Yes, I believe she wants the pictures and I've got some copies, but these are better quality than my copies.

MR. CHERRY: No objection.

THE COURT: No objection. Admitted.



FORM SMI-25 PENGAD/INDY 1-800-631-6989

(At 11:10 a.m., Defense Exhibit M and Exhibit N admitted)

MR. McDOWELL: May I exhibit them to the jury, your Honor.

THE COURT: They have been admitted, you may exhibit them.

BY MR. McDOWELL (continuing):

Q. So, that was the last picture, right?

A. Yes.

Q. And then we know from another witness that testified that he survived for a period of time and then life sup -- after life support was withdrawn and then he was pronounced dead, right?

A. Yeah, his heart continued beating between 15 and 20 minutes after they took life support off of him.

Q. Did you ever see David Flick do anything in handling of little David that you became suspicious of or that you thought that he was improper or he was trying to do anything --

A. No, if he was doing something wrong that I didn't think was right, I told him. Same as Tina, if she wasn't -- wasn't handling him proper or wasn't feeding him proper or whatever she was doing, I'd tell her, that's not how you do it.

Q. Did they take your advice?

A. Yeah, usually they did. David was real exceptionally good





FORM SMI-25 PENGAD/INDY 1-800-631-6989

with him. He -- he was better, actually at first, than what Tina was handling him --

Q. Was he --

A. With him being around the baby, 'cause she was so young and inexperienced and -- and he got up in the night with Tina -- when Tina got up in the night to take -- to feed the baby, he got up with the baby too. He'd change him for her and help her.

Q. As far as you knew up at the hospital, the only injury -- or the only mechanism of injury, is the word we've been using here, was the baby fell off the bed, correct?

A. Right --

Q. You've --

A. -- and the dog jumped on his stomach.

Q. You've heard that, right?

A. Yes --

Q. Were you told --

A. -- that's what I was told from the start.

Q. Were you told that by Tina or David or who?

A. Tina at first that he fell off the bed. At the hospital, it was both of them telling me he fell off the bed and the dog -- dog jumped on his stomach -- on his chest and knocked him down.

Q. Did there --

A. David told me that.



TRANSCRIPTS UNLIMITED, INC.

FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Okay. Did there come a time later, Mrs. Greene, when you heard there was something additional that happened to the child?
A. Yes. When I came for court down here.
Q. The last time?
A. The last time.
Q. Okay.
A. I told -- I was told that there was an addition -- that he'd added on to his testimony.
Q. And -- but, he didn't tell you himself?
A. No, he didn't.
Q. Okay. Have you discussed the day of May 8th with David since then?
A. I haven't talked to David since the baby's burial and they took him away.
Q. Okay. But you've seen him in --
A. Other than in the court. He said, hi, how are you doing --
Q. Okay.
A. -- Friday and today --
Q. Fine.
A. -- that's all.
Q. I -- I was going to ask you something, you -- you indicated to me you had a traffic mishap on your way up here?
A. Yes, I did. Not on my way up, it happened last Sunday night.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Are you okay right now?
A. I have a severe head problem. I -- I've hit my head in a couple places and I've got swelling in my skull.
Q. You're taking medication now?
A. Yeah.
Q. All right. Does that affect your memory of -- of --
A. The --
Q. -- what happened?
A. -- the bump itself -- the swelling and that fluid -- I can't -- I have blank spots yet -- a few blank spots and some things come back and forth.
Q. Are you in better condition today than you were on Friday?
A. Yeah.
Q. All right. And your recollection of these events, you don't believe, is affected by the medication you're taking?
A. I wouldn't remember it if -- if it affected me.
Q. All right.
A. The little stuff that -- if I recall something that can't be taken away. It's something that's there. If it's blank, it's blank, I wouldn't remember it.
Q. Did -- let me ask you this. You went -- when you went to the hospital, did you see David -- David Flick's parents there? Or mom and dad, I should put it that way.
A. I was told -- I never met them at the time, but I was told there was two -- two people sitting outside on the couch in



FORM SMI-25 PENGAD/INDY 1-800-631-6989

the hallway outside of the -- the waiting room. And Tina says, "That's Dave's mom and dad." And I said, "Oh, yeah." And -- and she says, "That's Dave's mom and step dad."

Q. So that's the first time you ever met --

A. I hadn't met them at that time even --

Q. Okay.

A. -- until we were up by the -- the intensive care room -- outside the intensive care room, we were talking and then they had walked up and asked how the baby were and I was introduced then.

Q. That was your first meeting?

A. That was my first time meeting Donna and her husband, I don't even know his name.

Q. You can't say you were a friend of theirs before this happened?

A. No.

Q. No. Okay. That's all I have. Thank you, Mrs. Greene.

CROSS-EXAMINATION

BY MR. CHERRY:

Q. Mrs. Greene, where -- where did you have this accident?

A. Up in Tennessee.

Q. In Tennessee -- in your truck?

A. In my pickup truck.

Q. Oh, in your pickup truck. This accident happened, when, Friday?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No. It happened on Sunday?
Q. Sunday. Last --
A. Evening. A week ago.
Q. Yesterday?
A. A week ago.
Q. A week ago. Was this like a head on collision or what?
A. Par -- no, it was to avoid a collision. It was a semi --
Q. Yeah?
A. -- and a -- a wrecker truck and I went in the ditch. I tried to hit the driveway of a car wash in my truck -- I've only had my truck since December.
Q. So what'd you do, hit your head on the windshield?
A. I don't know what I hit. The -- the windshield's not broke, there's no signs -- I have no idea. I hit the top and it's been swollen from here back and the whole back on this side's swollen.
Q. Did you have a fracture?
A. It's a concussion.
Q. A concussion, but it's -- it's -- a concussion is like when your rain rattles -- brain rattles around a little bit. But --
A. They said it was a severe --
Q. -- did you actually have a skull fracture?
A. Pardon?

Tape 99B-0021-A, 2-22-99, 11:16





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Did you actually have a skull fracture?
A. No, I didn't have no skull fractures.
Q. So, you're still feeling the effects of that a week after the accident --
A. I had a whiplash also.
Q. -- eight days. And you're taking medication?
A. Yes.
Q. You're -- you're fracture -- well, you didn't have a fracture, like from one side of the head --
A. No.
Q. -- to the other, did you or anything like that?
A. If I did, I wouldn't be here.
Q. That's right, you probably wouldn't be here. So, you lost control of your car, you didn't actually get into a collision, but went into a ditch and you hit your head?
A. Yeah.
Q. And you got a concussion but no fracture?
A. Right.
Q. Probably if you had hit that semi head on, you might have got a fracture, right?
A. I would be dead if that semi -- 'cause he was coming behind me and would of went over the top of me if I had not of cut the truck -- he was in -- in the dark with no headlights on, driving at night time -- a big black truck in the -- in the black of the nights with no lights. And had I not looked in





FORM SMI-25 PENGAD/INDY 1-800-631-6989

my mirror and saw him flying in a 45 mile speed limit, he was going about 65 or 70.

Q. Mrs. Greene --

A. The only thing I could see is get out of the front of him, 'cause he was going to run over me and my daughter.

Q. Well, I guess you're fortunate that you didn't get a --

A. Yes, I am.

Q. -- fractured skull, right?

A. I had the Lord at my side.

Q. Yes, you did.

A. I sure did.

Q. You live on Minnick Road?

A. Pardon?

Q. You live on Minnick Road --

A. I did.

Q. -- or you did, right?

A. Right.

Q. And Tina was your daughter and she was 16 years old -- we'll just cut through some of this basic stuff. Long story short, Tina's 16, she's pregnant, she meets this guy over here, right?

A. Yes.

Q. At first you didn't like him?

A. I did not like him at all at first.

Q. How come?



FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. 'Cause he was a drinker. I --
Q. He was a drunk?
A. -- I lived in an abusive home with -- with an alcoholic and my -- me and my kids were abused. I didn't like a drunk or a drinker. I would not even date a guy after I divorced her dad because I -- the first thing I'd ask is, do you drink. I would not date a drinker.
Q. Well, so, that's why you didn't like David Flick, initially?
A. Right, because he was a drunk.
Q. Well --
A. He was as drinker and a drunk when I first met him.
Q. And then you said but he -- but after the baby was born, he just changed -- he just changed his whole personality --
A. Before the baby was born, he -- when he -- he started falling in love with Tina, he started slowing up on his drinking and by the time the baby was born, he didn't hardly drink afterwards at all.
Q. Well, how often would he drink afterwards?
A. How often?
Q. Yeah.
A. Around May, hard -- he hardly drank at all, maybe a beer.
Q. Okay.
A. -- and I didn't really want the beer in my house, but he -- he would drink a beer occasionally. He'd bring a beer home with him and drink it at home.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. So, you saw this -- you saw this transformation in David from about -- just before the time that little David -- little David McBain, your grandson, -- this picture here -- you remember this picture, right?
A. I took it.
Q. He -- he looked pretty healthy then, right?
A. I have several others just like that in California that --
Q. In fact --
A. -- I took.
Q. This was taken at six months, 18 days, according to the notation on the back, is that about right?
A. That's probably right. It was March 24th, if I'm not mistaken, 'cause it's was a day after my daughter's birthday and we arrived in California on the 23rd on her birthday.
Q. Okay. And after this baby's birth, was David Flick in the delivery room?
A. Pardon?
Q. Was David Flick in the delivery room when David McBain was born?
A. He was in the delivery room when he was born, yes, I have it on video camera. I can --
Q. And this was a big day --
A. -- prove it.
Q. -- for him, right?
A. Huh?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. This was a big day for David Flick?
A. Oh, yes.
Q. Changed his life?
A. Yeah.
Q. After that he went -- I mean, he was living at Minnick Road -- you know there's some testimony -- I think, he testified that for the -- for the next three months, he was with that baby day and night?
A. He was with him a lot. I don't -- I can't say it was day and night, but he was with him a lot. And while I was there, he was there a lot with him and him and Tina took him when they went places together and everything.
Q. And -- and you -- you just never saw him abuse that baby in any way?
A. No.
Q. And suddenly on May the 8th, when you get the this call that little David was in the hospital because he fell from a bed, you didn't really give it a second thought, did you?
A. I asked him at the hospital, what happened to the baby and they got upset with me for asking him, but, I said, I want to know what happened to the baby -- you know, he said, he fell off the waterbed. I says -- that --
Q. So, you wanted to know that, right?
A. I wanted to know how -- how he got hurt -- I wasn't really filled in on the whole thing -- the ordeal of what happened,





FORM SMI-25 PENGAD/INDY 1-800-631-6989

just that he fell off the bed and he was in the hospital with a broken head --
Q. Now, when we --
A. -- a concussion.
Q. Did you ask this question, what happened to the baby? Who'd you ask that question of?
A. I asked Tina on the phone when she called --
Q. Okay.
A. -- she said he fell off the bed --
Q. This is while you were in --
A. -- she was crying so hard, I couldn't get all the information.
Q. Yeah, this while you were in Tennessee?
A. Right.
Q. Okay. And who else did you ask?
A. And then when I got to the hospital, I asked David and Tina.
Q. David who?
A. David and my daughter, Tina?
Q. Did you talk directly to the defendant here?
A. I talked directly to Tina -- David.
Q. And you asked him what happened to that baby?
A. He said he fell off the waterbed.
Q. Okay.
A. Then he said later on that the -- the dog jumped on his chest off the couch.





FORM SM-25 PENGAD/INDY 1-800-631-6989

Q. Just -- just talk about the conversation you had with him while you were in Tennessee, okay?
A. Okay.
Q. So, you got into a pickup truck and you drove all the way up from Tennessee --
A. I didn't drive, my daughter-in-law drove.
Q. Okay. But you -- you left Tennessee at about what time?
A. I have no idea of any time consumption at that time, 'cause I was so upset.
Q. Well --
A. So, I can't give what time I got in the car, what time the call came in -- I can't tell you all that stuff.
Q. What time did you get to Kalamazoo?
A. Approximately 8:00 or 8:30 in the morning.
Q. So, if you got the call at, say, 10:30 or 11:00 at night on Friday, May the 8th and you left right away, you're -- you're talking about a nine hour drive from Tennessee, is that about right?
A. Probably, it took me eight hours to drive in this time.
Q. And when you -- when you got -- when you got tot the hospital -- Kalamazoo, did you learn -- did you know at that time that this baby probably wasn't going to make it -- your grandchild?
A. When I got there?
Q. Yes.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No, I did not know that.
Q. Well, did anybody tell you that at about 6:30, the doctor said this looked pretty grim --
A. No.
Q. -- that he wasn't probably going to make it?
A. No.
Q. Well, did you see -- you saw your grandson in the hospital room then, is that right?
A. Yes.
Q. And you said the nurse was trying to tell you that this was an abused baby?
A. Yes.
Q. Because -- and she was pointing out all these marks, is that right?
A. Um-hmm (affirmative).
Q. And you said, no, no, no, that's diaper rash?
A. Right, on his hind end, that was diaper rash.
THE COURT: I believe it would be 15. Fifteen.
(At 11:23 a.m., People's Exhibit 15 marked)
BY MR. CHERRY (continuing):
Q. Mrs. Greene, I am going to show you has been marked as People's Proposed Exhibit number 15. Is that what the diaper rash looked on that baby when you saw that baby at the nurse's --
A. That wasn't there --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. -- on that night --
A. -- not like that -- that was not bruised like that or whatever is that's a bruise. Right around his little anus and across, he had little bit of brown spot and he had little bit on the edge. No, it wasn't that --
Q. Now, when was it that you saw this baby?
A. What are these white stripes here -- why does it have stripes?
Q. Just -- just answer the question -- I'm asking you -- I'm directing your attention, actually, to the diaper rash itself, okay?
A. Yeah.
Q. Do you see who -- what looks like a diaper rash on there?
A. Um-hmm (affirmative).
Q. Okay. Is that the way it looked when you were talking to the nurse and the nurse was saying, well, Mrs. Greene, this really -- really looks like child abuse to me and you said, no, no, no that's just diaper rash?
A. No, it did not look like that at the time.
Q. It did not?
A. No.

(At 11:23 a.m., People's Exhibit 16 marked)

BY MR. McDOWELL (continuing):
Q. Well, all right. Let me show you People's Proposed Exhibit --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. It had --

Q. -- Number 16 --

A. It had brown there.

Q. -- would you look at this, please? Does that look more like the diaper rash that you saw?

A. No. That wasn't even there -- that -- all of that showing there was not there. It had a little bit right on -- of -- spots. The rest of them did not have those bruising on them.

Q. Mrs. Greene, there's a notation on that photograph, isn't there? It says 06:50?

MR. McDOWELL: Well, I'm going to object --

BY MR. CHERRY (continuing):

Q. Is that what that says?

A. No.

MR. McDOWELL: I'm going to object if he's trying to get the picture in if she says it didn't look that way.

MR. CHERRY: Well, Judge, --

THE COURT: Well, wait a minute --

THE WITNESS: Six -- it says 06:05.

MR. CHERRY: These -- these photographs are not being offered as substance of evidence, they are being offered as a visual. And the jury, I believe, can give --

THE WITNESS: But he wasn't even yellow like that.

MR. CHERRY: Mrs. Greene, please --



FORM SMI-25 PENGAD/INDY 1-800-631-6989

THE COURT: Wait a minute, wait a minute. We can't have two people talking at once.

MR. CHERRY: Judge, --

THE COURT: Counsel. (Judge motions counsel to bench)

(From 11:25 a.m. to 11:26 a.m., off record bench conference)

BY MR. CHERRY (continuing):

Q. All right, Mrs. Greene, so I guess your testimony is -- is his diaper rash, that you saw, did not look like this in Exhibit Num -- Proposed Exhibit Number 15 and it didn't look like this is Proposed Exhibit 16, is that what you're telling me?

A. He was not yellow like that, he did not have all those spots on him like that, no.

Q. Do you recognize the person depicted in that photograph, Mrs. Greene?

A. It looks like it might be David -- it probably is, but I can't tell from --

MR. McDOWELL: Well, if she's guessing, then I -- I'd ask that the answer be stricken, Judge.

THE COURT: Well --

THE WITNESS: And at the same time --

THE COURT: -- she said she --

THE WITNESS: The baby was not blue and he was not yellow like this --



FORM SMI-25 PENGAD/INDY 1-800-631-6989

THE COURT: All right. She said that she cannot positively identify the child depicted in that picture.

BY MR. CHERRY (continuing):

Q. All right, Mrs. Greene, so the nurse says, you know, Mrs. Greene, this baby looks like it's been abused. And you said, no, no, no, this baby's not been abused, that's a diaper rash, isn't that right? Do you see this photograph, Mrs. Greene -- People's Exhibit 3? Baby didn't look like that either did it? Did it, Mrs. Greene? Do you see this here? Is this a diaper rash?

A. You have a glare on the TV set, I can't hardly see it.

THE COURT: Well --

BY MR. CHERRY (continuing):

Q. Is this -- let me show you the photograph.

THE COURT: Well, if she can't see, she's going to have to --

THE WITNESS: I can just see --

BY MR. CHERRY (continuing):

Q. Mrs. Greene, is that a diaper rash on his face?

A. No. But he did not look like that.

Q. Mrs. Greene, People's Exhibit Number 4, is this a diaper rash on the side of his head?

A. I can't see it.

THE COURT: She can't see it. She's -- you'll have to give her the picture probably.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

BY MR. CHERRY (continuing):

Q. Did you see that injury, Mrs. Greene, when that nurse was telling you this baby was abused?

A. No. He didn't have that.

Q. Didn't see that injury, did you? What about Exhibit 5, Mrs. Greene? And I'll show you this one, too. Did you see this bruise on the side of that baby's head? Do you doubt -- do you doubt that it existed?

A. I didn't see these bruises on him and I saw him without a shirt and everything. He didn't have his shirt or nothing on.

Q. Mrs. Greene, do you think those bruises occurred sometime after you saw that baby?

A. I don't know. All I can tell you what I saw.

Q. Will --

A. I can't -- I won't guess on what happened after, before or anything else. All I know is what my eyes saw. These were not on this baby --

Q. Mrs. Greene --

A. -- when I saw him.

Q. When you saw that baby, that baby was not asleep, was it? That baby was in a deep coma, if not, brain dead. Did you know that?

A. Not at the time, no, the --

Q. When did you subsequently find out?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. -- the nurse -- around noon time -- I'm guessing at the time, around noon, possibly 1:00 told us -- it wasn't the nurse, it was the doctor -- a lady doctor, took me and Tina into a room and told us he was brain dead.
Q. Mrs. Greene -- okay.
A. And she was going to run tests to find out for sure. She did not know for sure, they were going to run a -- a test to see if there was any brain activity.
Q. And that baby --
A. But at that point she said that she -- he was brain dead.
Q. And that baby was taken off from life support at about 9:45 that night, wasn't it?
A. (No audible response).
Q. Were you present when --
A. Yes.
Q. -- that baby was taken off life support?
A. I sure was.
Q. And it died ten minutes later?
A. About 15 minutes later.
Q. Now, Mrs. Greene, let me ask you a question. Did you ever stop to ask -- did you ever stop to think what caused this baby's death?
A. What do you mean?
Q. Did you ever stop to ask David McBain -- did you know that he was in custody of that child on May the 8th?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes, I knew -- I didn't know at that time, but I found out later on.
Q. And he fell off this 18 inch high waterbed that you're familiar with on Minnick Road, did you know that?
A. Yeah. They told me he fell off.
Q. Did you ask David how this injury could of occurred?
A. He said that he laid him in the bed and went to the bathroom.
Q. And you believed him?
A. Why shouldn't I -- I -- I would have no other reason to disbelief it.
Q. Did you ever see the skull fracture in this case, Mrs. Greene?
A. No, I didn't.
Q. You were just in an accident last Sunday. You're still feeling the effects of that injury and you just had a concussion, you didn't even have a skull fracture, did you?

MR. McDOWELL: Well, your Honor, he's going to ask her to give a medical opinion here I'm afraid. She can't -- she said what happened to her, now he's going to ask her why -- how come the baby didn't suffer the same thing, you know. It's way far out field.

THE COURT: I don't know what he's going to ask and if he asked the improper question, I'll depend upon you to object.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

BY MR. CHERRY (continuing):

Q. When you went to the hospital, you knew that that baby had a skull fracture -- they told you that didn't they?

A. They said that he had a skull fracture and he had -- he was in a coma.

Q. Yeah, and that baby vent -- eventually was taken off the ventilator and that baby died. Did you ever ask him what happened to that child, other than the fact that he fell off the bed?

A. Yeah, I asked him --

Q. And what did he say?

A. -- what happened to the baby. He fell off the waterbed.

Q. And when did you ask him that?

A. Right afterwards, when we were getting on the elevator to leave. I said, what happened to the baby, how did he fall? I wanted him to tell -- because -- I didn't know -- they didn't have the time to tell me everything 'cause everybody was too upset and concerned with the baby.

Q. Yeah.

A. And when we were leaving --

Q. When -- when --

A. -- I asked him.

Q. -- people were all concerned with the baby, is that what you're saying?

A. Yes, we were concerned and worried about the baby --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. And you too?
A. -- and -- and grieving over the baby being in there and grieving over what was going to happen -- about them taking him off the life support and everything.
Q. Yeah.
A. I mean, it's not something that you normally do with your grandchild.
Q. Well, okay.
A. Or watch him lay there --
Q. Mrs. Greene, let me ask you this. You went through this whole summer time, you knew that David was arrested and charged with Second Degree Murder, didn't you?
A. Yes.
Q. Did you attend the preliminary examination in this matter?
A. Yes, I did.
Q. Do you remember -- remember when that was?
A. I'm not exactly sure, I think it was the end of May.
Q. May 26, 1998. Do you remember that?
A. Yes.
Q. Did you -- did you sit in that preliminary examination downstairs?
A. No, they wouldn't let me 'cause I was a witness.
Q. Okay. Well, you knew that there was a preliminary examination, didn't you?
A. Yep, I knew it was going on in there, I sat --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Now, when was it, exactly, that you heard that there was more to the story than just baby McBain falling off an 18 inch high waterbed?

A. I found that out when he -- they had the trial.

Q. The trial, in October, right?

A. Right.

Q. And then you found out, oh, there's more to the story than just falling off a bed, true?

A. Yeah.

Q. Then you heard that apparently the defendant claims that he dropped the baby out of his arms?

A. Right.

Q. So, prior to that time, Mrs. Greene, when all you knew is that this baby died because he fell out of a waterbed, you believed that?

A. Yeah, 'cause that's what the kid's said --

Q. That's what the kids said?

A. I had no reason to believe it, I -- like I said, I watched David with that baby, he never ever raised a hand to even spank that child nor did Tina.

Q. Did you ever hear that David -- yell at the baby, tell him to, shut the fuck up, did you ever hear him say that?

A. I heard him say, shut your damn mouth, one time. I told him, David, don't talk that way to that baby.

Q. And when did he do that?



FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. I don't recall when this took place. I know it was in -- probably when he was -- I mean, this is a wild guess, when he was about -- when he had the colic so bad. He had colic the first couple months of his life -- two or three months.
Q. I guess that -- I guess a baby that's one or two months would sure understand when somebody says, shut your damn mouth, right?
A. Oh, I don't think he -- the baby understood, but I think David said that because the baby was crying so much. I mean, he cried all the time and that's why the kids brought him to me because I was the only one who could quiet him down with his colic. I had colicky babies prior to that..
Q. Yeah, that's why the kids -- where were you on May the 8th?
A. I was in Tennessee.
Q. I guess they couldn't bring the kid to you on May the 8th?
A. I had him two weeks prior to that he -- they had the kid to me. I didn't go to them, they brought him to me.
Q. No further questions.

THE COURT: Anything further of this witness?

MR. McDOWELL: No, I don't think so. Thank you.

THE COURT: Okay, ma'am. You may be excused.

THE WITNESS: Thank you.

(At 11:34 a.m., witness excused)

THE COURT: Next?

THE COURT CLERK: Right up here, ma'am, and raise your



FORM SMI-25 PENGAD/INDY 1-800-631-6989

right hand.

Do you solemnly swear or affirm the testimony you are about to give, will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. MYERS: Yes, I do.

JULIE MYERS

called by the Defense at 11:35 a.m., sworn by the Court Clerk, testified:

DIRECT EXAMINATION

BY MR. McDOWELL:

Q. State your name, please.

A. Julie Ann Myers.

Q. How do you spell your last name?

A. M-Y-E-R-S.

Q. Where do you live?

A. Total address or just town?

Q. Town.

A. Kalamazoo, Michigan.

Q. And did you get a subpoena to come here?

A. Yes, I did.

Q. Let me ask you this. Do you know David Flick?

A. I know of him.

Q. Okay.

A. I don't know him real well personally.

Q. Did you have -- let me ask you this. Do you know John



FORM SMI-25 PENGAD/INDY 1-800-631-6989

McBain?

A. Yes, I do.

Q. And you were his step daughter I take it, is that --

A. Right.

Q. Okay. I got it right. Let me ask you this. Did you have occasion to be at Bronson Hospital on May 8th, early morning hours of May 9th of 1998?

A. I was there. I couldn't swear to you the date.

Q. What --

A. I don't have it written down

Q. Okay. Why'd you go there?

A. My mother called me -- I was living at Three Rivers at the time, she told me that Tina and David were on their way up to Bronson because baby David had an accident. And since I was the closest person, would I please run up there to be with them.

Q. Okay. Did you know Tina?

A. Yes, I did.

Q. And what time about did you get there?

A. I'm guessing somewhere around 10:30 or a little bit later. I had friends over, I wasn't really paying attention to the clock.

Q. And when you got there, what, if anything happened when you got to the hospital?

A. When I got there, I asked where everyone was -- there was a





FORM SM-25 PENGAD/INDY 1-800-631-6989

-- I believe a family room off to the side of the ER -- just a closed room where they were and I went in and talked to them. And there was a social worker there that did come in a couple time and was talking to them.

Q. Is them -- would them be Tina and David?

A. Right.

Q. Okay. Then what happened?

A. At some point in time John McBain showed up and I know there was a couple phone calls to California to Tina's sister.

Q. Did there come a time when the medical personnel came up to the group?

A. I believe a nurse or the social worker came into the room and told us that the doctor's wanted to see us. At which point, we all went into the -- one of the emergency room rooms where baby David was.

Q. Okay. And was there somebody that appeared to be a doctor in attention of the baby --

A. Yes.

Q. Taking care of the baby? Okay. Did you know him before that?

A. No, I did not.

Q. Did you then find out his name later?

A. I don't know his name.

Q. Okay. Was there a conversation -- you got to answer this yes or no, was there a conversation while you were present





FORM SMI-25 PENGAD/INDY 1-800-631-6989

between the doctor and the rest of the family?
A. Yes.
Q. And you heard that conversation, correct?
A. Yes.
Q. What did you -- what, if anything, did you hear the medical person say to the family?
A. That it was -- it was serious, there was some brain swelling, they had ran the tests that they could. At one point in time, baby David was kind of coming out of whatever they had used for sedative on him and they had to re-sedate him because he was moving around too much for them to be able to run the tests accurately. They said that he would have to stay in the hospital for a while for observation, mainly because he couldn't move because the injuries he had. They had to keep immobilized so he wouldn't cause any further damage.
Q. Okay. Did you hear anything to the effect that this is a non-survivable injury?
A. I did not hear that at all.
Q. This is a fatal injury, one administered to the child?
A. No, I -- their conclusions were exactly the opposite or what I took from them saying.
Q. Okay. Did you feel better after you heard that?
A. Yeah, I felt better enough that I went home, I got on my cell phone on the way out of the parking lot, I called my





FORM SMI-25 PENGAD/INDY 1-800-631-6989

mother, told them that it looked like everything was going to be okay, they'd know more in the morning.

Q. And John McBain and Tina and David were present when that was told to them by the doctor?

A. Yes.

Q. That's all.

MR. McDOWELL: Thank you.

CROSS-EXAMINATION

BY MR. CHERRY:

Q. Is it Julie Myers?

A. Yes.

Q. Ms. Myers, when you went to the hospital that day, did you see the baby?

A. When we got into the emergency room, yes.

Q. Okay. And you knew that that baby later, basically, had a real bad episode at about 3:30 in the morning, is this true -- true?

A. I don't --

Q. After you went home --

A. -- know anything specifically. I went home, I didn't hear anything until I got home from work the next day and there was a message from my mother on my machine.

Q. Now, when you were at the hospital on Saturday morning, May the 9th, did -- were actually able to see this baby?

A. Yes.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. How close did you get to it?
A. Close enough that I could have reached out and touched his leg.
Q. Now what time was it that you got there?
A. I'm guessing -- I'm guessing I left home about 10:30. I wasn't really looking. I got the phone call, I was more concerned with getting there --
Q. 10:30 at night on Friday?
A. Yes.
Q. Okay. Now, the next day, did you go to the hospital?
A. No, I did not.
Q. So, you don't know what condition the baby was in at the hospital other than what you had been told, is that right?
A. I know what I saw and then I -- everything after that would have been what I had been told.
Q. Did you see any posturing by the baby --
A. No.
Q. -- did you see him posturing? Did you see any movement by the baby?
A. I thought Tina said that he had moved, but I did not see it myself.
Q. Okay. And of course, the baby was sedated, right?
A. Correct.
Q. They told you that. They didn't tell you -- they didn't

Tape 99B-0021-A, 2-22-99, 11:41





FORM SMI-26 PENGAD/INDY 1-800-631-6989

tell you that at the time that this baby had suffered traumatic brain injury due to shaken baby syndrome, did they?

A. No, they did not.

Q. Do you know anything about shaken baby syndrome?

A. Only what I've heard in the news.

Q. So, you didn't know that at -- at the time, apparently? And they -- and they didn't tell you that at the time, apparently, --

A. No one mentioned that, no.

Q. -- is that true? Did you ever hear anything about retinal hemorrhage -- did they say anything about retinal hemorrhage when you were there?

A. They may have, but I don't recall anything specifically.

Q. Okay. At least one thing was certain, when you were at the hospital on Friday night, this baby looked to be in pretty serious condition, right?

A. The baby was sedated and wasn't moving. I -- it's hard to make a conclusion when they're sedated and you know they can't move.

Q. But you also knew that they were going to hold the baby there for at least two weeks in the hospital?

A. I didn't hear a specific time frame. I knew that he would be have -- he would have to stay there.

Q. Did you ask anybody at this time what happened to this baby?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No, I did not.
Q. Didn't cross your mind?
A. Everyone was upset when I had walked in, you know, I had been told that he'd been hurt.
Q. So you don't know what happened to this baby? Did you ever talk to David Flick over here?
A. Him --
Q. Is this -- is this your --
A. Him and Tina were talking back and forth.
Q. Well, did you hear David Flick come up with an explanation of what happened to this baby?
A. The only thing I recall hearing that night was, he fell.
Q. He fell. He didn't say from where?
A. I couldn't swear to you whether he did or not because obviously, I've heard that story several times since then and I can't swear to you if I heard that that night.
Q. No further questions.

MR. McDOWELL: I have nothing further. May she be excused?

THE COURT: Thank you, ma'am.

THE WITNESS: Thank you.

THE COURT: You may be excused.

(At 11:43 a.m., witness excused)

THE COURT CLERK: Raise your right hand.

Do you solemnly swear or affirm the testimony you are





FORM SMI-25 PENGAD/INDY 1-800-631-6989

about to give, will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. SMEADER: Yes.

THE COURT CLERK: Thank you. You may have a seat.

KEN SMEADER

called by the Defense at 11:43 a.m., sworn by the Court Clerk, testified:

DIRECT EXAMINATION

BY MR. McDOWELL:

Q. State your name, please.

A. Ken Smeader.

Q. And your business or occupation?

A. Pastor.

Q. Do you have an association or did you have an association with Bronson Hospital?

A. Yes.

Q. How did -- what was your arrangement there?

A. Well, I just do some Chaplin work there and -- and that sort of stuff.

Q. Did you have occasion to be on call or on duty, as such, on the evening of May 8th and the early morning hours of May 9th, 1998?

A. Well, actually, I was -- I had just got done visiting a family of ours that had a small child in the hospital on the same floor that young David had come to and that's how I had





FORM SMI-25 PENGAD/INDY 1-800-631-6989

come in contact with the Flick family.
Q. Did you have occasion then to meet David Flick?
A. Yes.
Q. And did you meet Tina McBain?
A. Sure did.
Q. Okay. They -- you've never seen them before that?
A. No, --
Q. Okay.
A. -- never met them before.
Q. Your job at that point is to counsel people that have relatives in the hospital?
A. Yes.
Q. Probably the sick people, too, if they're conscience?
A. Yes.
Q. All right. You had -- when you first met David, did you make an appear -- did you make an observation as to his appearance?
A. Baby David?
Q. No, David, the defendant?
A. I'm sorry. Sure, I mean, it was obvious that he and Tina, both, were very distraught over the situation with their -- with their baby.
Q. Did you see the baby yourself?
A. Yeah.
Q. Okay. And how long did you stay at the hospital when you





FORM SMI-25 PENGAD/INDY 1-800-631-6989

got there --

A. I got there about 2:00 in the afternoon and left approximately 10:15 that evening after David was pronounced dead and I had time with the family there -- so I was there about eight -- eight and a half hours.

Q. So you were there when the baby was pronounced dead?

A. Yes.

Q. After that, were you asked by the family to do something else?

A. Yes, I was contacted to do the funeral.

Q. Okay. And did you agree to do that?

A. Sure -- yes, I did.

Q. And have you stayed in contact with Tina and/or David Flick since then?

A. Tina, not as successfully as David. I've spent -- spent a lot of time with David over the last months while he was incarcerated and then in recent days since he's been out on bond.

Q. Okay. And has he sought counseling with you?

A. That's primarily what we do when we're together.

Q. Is it -- let see, how can I say this? Is it religious counseling as opposed to psychological or --

A. It would be a combination -- combination of both.

Q. All right. And he's continued to do that with you up 'til the present time?



FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes.

Q. Okay. Based upon your observations of David, both at the hospital and afterward, did it appear to you that he had feelings for little David?

MR. CHERRY: Objection. Calls for speculation on the part of this witness.

THE COURT: Your response?

MR. McDOWELL: Well, if he made observations and he -- he made statements to him that he did, or maybe he didn't say that.

THE COURT: Well, I think we're getting into hearsay here. Sustained.

BY MR. McDOWELL (continuing):

Q. Did -- when you got to the hospital, both Tina and David were distraught, correct?

A. Yes.

Q. All right. That's all. Thank you, Pastor.

CROSS-EXAMINATION

BY MR. CHERRY:

Q. Is it Reverend Smeader?

A. Yes.

Q. Reverend, are you a pastor of a church?

A. New Bridge, yes.

Q. Which one?

A. New Bridge.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. New Bridge?
A. New Bridge. It's a new church plant in the Kalamazoo area.
Q. And you met -- you met the defendant in this case, on May the 8th in the even -- the evening hours?
A. No, I met him -- would have been the -- I don't know the --
Q. May the 9th.
A. It would have been the -- the morning -- what was it, Saturday?
Q. Yeah. May --
A. Whatever that day was.
Q. May the 9th at about 2:00 in the afternoon?
A. 2:00 in the afternoon, yes.
Q. When -- and -- and when you met them, did you know what the condition of this little boy was?
A. I had no clue.
Q. Did you ever see this little boy?
A. Sure did. I mean, not prior to that moment -- to walking into the hospital.
Q. You don't recognize that photograph, do you?
A. I've seen that photograph since then.
Q. Okay. Do you recognize this photograph, by any chance?
A. Nope.
Q. Do you recognize this photograph by any chance?
A. No, I don't.
Q. How about this photograph, do you recognize that one?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Sure don't.
Q. This one?
A. Nope.
Q. How about this one?
A. No, sir.
Q. Reverend, you hadn't seen any of these photographs, obviously, because these photographs were taken later. Did you see that baby in that kind of condition at that time?
A. No, I didn't.
Q. Okay. So, you saw the photographs of -- did you see any photographs like this, of people holding --
A. Yes.
Q. -- tightly onto the baby?.
A. I was in the room when that was going on.
Q. You were kind of last rights thing, wasn't it?
A. Taking pictures, sure.
Q. Taking pictures of a baby that was about to be taken off of life support.
MR. CHERRY: May I see yours?
MR. McDOWELL: Sure.
BY MR. CHERRY (continuing):
Q. And here, again, in the defendant's Exhibit A, were you there when, I guess, that's David --
A. Yes.
Q. David Flick right there?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes.
Q. And Tina?
A. Um-hmm (affirmative).
Q. And this looks like her sister?
A. Yes, it is.
Q. And here's a picture of David Flick --
A. Her mother.
Q. -- and baby McBain playing with Ernie at the hospital?
A. Um-hmm (affirmative).
Q. And you were there -- and here's a couple more with David Flick?
A. Yes.
Q. Right?
A. Yep.
Q. And these photographs were taken just shortly before that baby was taken off the respirator?
A. Yes, that's true.
Q. Okay. Did you ever ask how this baby died back there at the hospital? I mean, you were with them, -- Reverend, you were with them from 2:00 in the afternoon until 10:15 at night. That's eight hours and 15 minutes, roughly. And during that period of time, did you ever discuss with him how such a terrible injury could have caused this death?
A. I probably didn't discuss it specifically. We did go into the discussion of the -- the accident that had occurred.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Well, --
A. Well, at least, at -- at that time -- what was being said.
Q. What did David Flick tell you -- that man right over there, what did he tell you about what happened to that baby?
A. You know, I have to be honest, I don't -- I don't recall getting into much detail, I think, I would have talked with the family members outside in the hall when I would take a break. I would primarily stood there and listened -- I was very quiet during that time trying to respond to the needs of the family at those moments. It wasn't -- I'll be honest, without getting involved, I heard nurses and doctors about some things, obviously, being that close to the situation.
Q. Okay.
A. But I tried to be -- stand back and be as objective as I could at that moment.
Q. So let me ask you this.
A. Yes.
Q. I mean, obviously, you kind of, like, hang out near the hospital for people in need?
A. Sure, right.
Q. Right, like this?
A. Yes.
Q. And under those kind of circumstances when a -- when a loved one dies, there's usually grief, is that true?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Oh, yes.

Q. And depending on the circumstances, sometimes people may appear to be what they're not, is that also true?

A. That could be true.

Q. Okay. Now, in this particular case, you said the defendant was distraught?

A. Yes.

Q. Did you know that the defendant had already spoken to a police officer by the time that he spoke to you?

A. I did not.

Q. Did you know that he had already spoken to a number of doctors who asked him what was going on in this case prior to the time that he spoke to you?

A. I didn't know that information at the time.

Q. Did you know, at the time, that you were talking to him that he gave authorities information that this baby fell out -- off a waterbed?

A. I can't say that I honestly had heard that -- that at that point.

Q. Did he, at anytime, tell you that what really happened here was that he dropped this baby?

A. Not at that moment.

Q. And --

A. The situation didn't really afford for that --

Q. Yeah.





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. -- kind of information, but.
Q. And -- and in -- in the counseling sessions that you had since then, he certainly never came forward and said to you, Pastor, I really have to tell you, I really got mad at that baby and I banged that baby around. He's never said that either, has he?
A. No, he hasn't.
Q. So, the truth is, you really don't know what happened to that baby, true?
A. Yeah, I was definitely not there.
Q. Okay. Thank you.

MR. McDOWELL: I don't have anything further for him.

THE COURT: Thank you, sir. You are excused with our thanks.

(At 11:52 a.m., witness excused)

MR. McDOWELL: I have another witness. It's -- the defendant's going to be rather lengthy, I would assume. Whatever the Court's desire.

THE COURT: Well, it's ten of 12. Well, counsel --

(From 11:52 a.m. to 11:53 a.m., off record bench conference)

THE COURT: All right. The defense expects to call one more witness, that would be the defendant and since his testimony will probably take some time, let's take -- well, it's only nine minutes to 12:00 now. We'll take a recess at



FORM SMI-25 PENGAD/INDY 1-800-631-6989

this time for lunch. You think that you might be able to get back by 1:00 or is that really pushing it too much? Okay. Why don't we try for 1:00. If you're a little bit late, we'll certainly have to be understanding. If we get a couple minutes head start, it might help.

You will not discuss the case, testimony, evidence or anything about it or the people involved and avoid all contact with attorneys, parties, witnesses and be back as close to 1:00 as you can. If you're a few minutes late, we'll understand.

THE COURT OFFICER: Court is recessed.

(At 11:54 a.m., court recessed)

(At 1:07 p.m., court reconvened)

THE COURT: Are we ready? Ready?

THE COURT OFFICER: Court will resume. Please be seated.

MR. McDOWELL: We'll call David Flick next. Step to the Clerk.

THE COURT CLERK: Do you solemnly swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE DEFENDANT: Yes, I do.

DAVID PAUL FLICK

called by the Defense at 1:07 p.m., sworn by the Court Clerk, testified:





FORM SM-25 PENGAD/INDY 1-800-631-6989

DIRECT EXAMINATION

BY MR. McDOWELL:

Q. State your name, please.
A. David Paul Flick.
Q. And last name spelled, F-L-I-C-K?
A. Yes.
Q. Okay. And where do you live, David?
A. At 215 South Marshall, New Buffalo.
Q. You're going to have to speak up.
A. 215 South Marshall, New Buffalo.
Q. Okay. And who do you live there with?
A. My father.
Q. How old are you?
A. Twenty-three.
Q. What's your date of birth?
A. 9-13-75.
Q. Who's your mother?
A. Donna Campbell.
Q. Where did you go to grade school?
A. Chikaming and New Buffalo.
Q. And high school, did you graduate?
A. No, I did not.
Q. Do you have a GED?
A. Yes, I do.
Q. Okay. When did you get your GED?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. I believe it was 1994.
Q. When you were in high school, who did you live with -- which parent?
A. My mother.
Q. And do you have a sister also?
A. Yes, I do.
Q. Okay. And her name is what?
A. Dawn Flick.
Q. Is she older than you are?
A. Two years older, yes.
Q. Okay. Has she been here in the courtroom?
A. Yes.
Q. Okay. Did there come a time when you were 18 or thereabouts that you left home and went elsewhere?
A. Yes.
Q. When was that, do you remember?
A. A year -- I don't know.
Q. Well, what year were you in high school -- or would you have been?
A. 1993.
Q. And where'd you go?
A. To Trina Rogers' house.
Q. Is she a friend of yours?
A. Yes, she is.
Q. She testified here earlier?





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. Yes, she did.
Q. Why'd you go to live with Trina Rogers.
A. Basically she needed help raising her son and financially too, so --
Q. Were you boyfriend/girlfriend or no?
A. No, we were not.
Q. Okay. Just friends?
A. Yes.
Q. You remain friends still today, right?
A. Yes.
Q. Okay. How long did you live with Trina?
A. Six months to a year.
Q. Did you guys share expenses?
A. Yes, I did.
Q. After you moved in with Trina, what did you do for employment -- what did you do for money?
A. I was a painter and a bartender at nighttime.
Q. How did you learn to paint?
A. From my ex-brother-in-law, actually.
Q. And you also bartended?
A. Yes, I did.
Q. You had two jobs, right?
A. Yes.
Q. Where did bartend?
A. In Three Oaks at the Village Pump.



FORM SM-25 PENGAD/INDY 1-800-631-6989

Q. How long did you bartend for -- how many years or months?
A. It was on and off for about a year.
Q. You know Tina McBain, right?
A. Yes, I do.
Q. She was your fiancé at one point?
A. Yes, she was.
Q. When did you meet Tina, do you remember that?
A. When I was about 20.
Q. When you were 20?
A. Around there.
Q. Okay. She was younger than you, right?
A. Yes.
Q. When you first met her, did you date her or -- or not?
A. No, we were just friends at the beginning.
Q. Did she go to your high school or --
A. Yes, she did.
Q. She did?
A. Yes.
Q. Okay. Did there come a time that you started to date her romantically?
A. Yes.
Q. When was that?
A. When I was about 21 and she was 16.
Q. What were you doing at that point as far as employment, do you remember?





FORM SMI-25 PENGAD/INDY 1-800-631-6989