A. Right side, right above his eye.
Q. You have to speak up.
A. On his right side, right above his eye.
Q. Is that the only injury you ever saw?
A. Except for this one, yes, and needle marks.
Q. Okay. So there was some needle marks, but you know what caused those, right?
A. Yes.
Q. And there was one on his abdomen?
A. Yes.
Q. You never saw any marks on his buttocks?
A. I don't recall looking, no.
Q. At his buttocks? When -- did -- when did you last change the diaper of David before he went to the hos -- hospital?
A. I believe it was before I started to leave for my dad's the second time.
Q. And did he have diaper rash?
A. He was just getting over it, it was just red.
Q. How -- was his -- did you have to change his diaper several times that day or just once?
A. No, the day -- the day before -- I mentioned this before, he had six bowel movements that day and diarrhea and I didn't know exactly if it's what he ate or whatever, but he just -- that's how he got the diaper rash.
Q. But on this day, the 8th, he wasn't so bad --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No.
Q. -- as far that? Okay. Now, obviously when he was disconnected from the life support, you had talked to Doctor Meyers and Doctor Page and they told you it was an injury that caused death, correct?
A. Yes.
Q. Did you -- who did you ever tell next about dropping -- the baby having fallen from your hands?
A. I told my friend, Al.
Q. Why would you tell Al?
A. Because nobody knew but me.
Q. Nobody else knew -- you hadn't told Tina, right?
A. No.
Q. You didn't tell Farhat, right?
A. No.
Q. Didn't tell Hopke?
A. No.
Q. Didn't tell Doctor Carlson?
A. No, I didn't.
Q. You didn't tell the nurse either, did you?
A. No, I didn't.
Q. And Page never really asked you, right?
A. No, he didn't.
Q. So you tell your friend, Al, right?
A. (No audible response).





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. He's the first one that knew other than -- than you?
A. Yes.
Q. And you told him because he was your friend?
A. Because nobody knew, I didn't know what to do.
Q. Cant' hear you.
A. They said he was going to be okay. I didn't know he was going to die.
Q. Well, after he's dead then, you tell Al instead of Tina, right?
A. Yes.
Q. Why would you do that?
A. 'Cause I didn't know how to tell her. How am I suppose to say something like that?
Q. Were you afraid of her?
A. I didn't know what happened at the hospital -- I didn't know.
Q. Okay. At -- granted you didn't know he was going to die when he went into the hospital, did you?
A. No, I didn't.
Q. As far as 11:30 went, and up 'til 2:30, you thought he was okay, right?
A. Yes.
Q. But then he takes a turn for the worse --

THE COURT: Excuse me.

BY MR. McDOWELL (continuing):

FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. -- and actually dies and you tell Al --
A. Yes.
Q. -- instead of Tina, right?
A. Yes.
Q. Did you -- okay. And does Al say he's going to do anything for you?
MR. CHERRY: Objection. Calls for hearsay.
BY MR. McDOWELL (continuing):
Q. What, if anything else did you discuss with Al?
A. We discussed, how am I suppose to tell her, when do I tell her. And he said, I don't think you should do it.
Q. He said what?
A. I don't think you should do it at all within the next few days because of what occurred as far as being David's death.
Q. And did you agree not to do that?
A. Yes.
Q. To withhold the information?
A. Yes, I did.
Q. And then what happened -- you were back home and you made the funeral arrangements, right?
A. Yes.
Q. And did -- how was Tina's condition when you were making those arrangements -- was she still upset?
A. Yes.
Q. Were you upset?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Yes.
Q. And then you had -- you went to the funeral, you had the funeral, you went to the gravesite apparently and then you were stopped by the police afterwards, correct?
A. Yes.
Q. And you were arrested?
A. Yes.
Q. You heard the testimony of the officer's and your dad, is that about the way it happened?
A. Yes.
Q. Did you know you were going to be arrested that day?
A. No, I didn't.
Q. Did you know there was a mur -- murder warrant out for you before?
A. No, I didn't.
Q. Then you are -- what day is it you are arrested -- you probably remember, don't you?
A. May 13th.
Q. You're taken to the State Police Post and then directly to the jail?
A. Yes.
Q. While you were at the State Police Post did they -- they tried to interview you apparently?
A. They tried, yes.
Q. What did you say -- who -- who -- who asked you -- what did





FORM SMI-25 PENGAD/INDY 1-800-631-6989

they ask you about the case?
A. What did they ask me?
Q. Yeah. Did you -- let me ask you first. Who was there? Was Chief Stormont there?
A. Yes.
Q. Was Hopke there?
A. Yes.
Q. Was a Detective Shaffer there?
A. Yes.
Q. Okay. And so you're at the State Police Post. Where do you go?
A. Where do I go?
Q. Yeah. At the Post?
A. Into a room.
Q. And are you in there by yourself?
A. Yes -- not -- no, Chief Stormont was with me at first.
Q. Did you ever tell Stormont, hey, Chief, what happened here was this, that and the other or didn't you make any statement to him?
A. No. I wanted to speak with my father first.
Q. Did you tell the police that?
A. Yes, I did.
Q. You had no problem with Chief Stormont?
A. No, I don't.
Q. Okay. Still don't, right?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No, I don't.
Q. Okay. Did they let you talk to your dad?
A. No they didn't.
Q. Who was in charge at that point, was it the Chief or was it --
A. I believe it was Lieutenant Shaf -- Sergeant Shafer.
Q. So you told them you wanted to talk to your dad and they didn't want you to?
A. Yes.
Q. So you couldn't talk to him?
A. Yes.
Q. Okay. This picture here, Exhibit P, previously identified as a picture of Tina and David, correct -- little David? That look familiar to you?
A. Yes.
Q. When was that picture taken?
A. In California.
Q. Did you have that with you on the day you were arrested?
A. Yes.
Q. What happened to it then?
A. They ripped it out of my hand and threw it on the floor -- it's on camera.
Q. Were you upset that day?
A. Very, yes.
Q. Were you --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. I just left my son's funeral.
Q. You got the picture back, though -- they gave -- the police gave it to your parents?
A. Yes.
Q. And you went to jail, right?
A. Yes.
Q. And you appeared before the judge sometime after that?
A. Yes.
Q. And you stayed in jail from -- lets see, May 19th up 'til December sometime?
A. Yes.
Q. Since then you've been -- oops -- since then you've been released, right?
A. Yes.
Q. You're in the custody of your father so to speak?
A. Yes, I am.
Q. And you're working?
A. Yes, I am.
Q. Okay. Let me ask you this, David. Anytime at the funeral or whenever, did you ever tell Tina what really happened?
A. No, I didn't.
Q. You told Al Newell and then he died, right?
A. Yes.
Q. Who was the next person you told the whole -- rest of the

Tape 99B-0021-A, 2-22-99, 2:10





FORM SMI-25 PENGAD/INDY 1-800-631-6989

days events to?

A. Marilyn McDonald.

Q. And how'd you know her?

A. She was my counselor.

Q. Did she counsel you the whole time you were in jail?

A. Yes.

Q. When did you tell her, do you remember?

A. I believe it was June.

Q. Why did you decide to tell her as opposed to your mom and dad or --

A. Because Tina needed to know.

Q. Because Tina still, as far as you knew, believed that the child fell off the waterbed and that wasn't the truth, was it?

A. Not all of it, no.

Q. I mean, that wasn't the -- the whole story, right?

A. Right.

Q. And what'd you ask Marilyn to do, if anything?

A. I asked her to tell Tina.

Q. Did she agree to do that?

A. Yeah -- not at first, no.

Q. Did she not want to get involved?

A. Not at first, she didn't.

Q. Did she tell you that?

A. Yes.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Do you remember when -- when -- when was the first -- you said the first time you told her was -- you thought it was in June?
A. Yes.
Q. Remember that day when you told Marilyn McDonald?
A. Yes.
Q. How was your condition at that point?
A. What was my condition?
Q. Yeah, your mental or physical condition?
A. I -- I was -- it as bad.
Q. Were you on medication?
A. Yes.
Q. Did the jail send you over to Riverwood?
A. Yes.
Q. Did that help?
A. Little bit, yes.
Q. But you -- outside of Al, was Marilyn the first one you told -- Marilyn McDonald?
A. Yes.
Q. And you asked her to break the news to Tina, right?
A. Yes.
Q. Did she do that?
A. Yes.
Q. Then did you -- how'd you talk to Tina then after this?
A. I called her.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. How'd you reach her?
A. I think she sent some kind of me -- of message through the mail or something for me to call her.
Q. And you did?
A. Yes, I did.
Q. And what if anything, did you say to her or what did she say to you?
A. I didn't get a chance to say anything. She just had every right to do what she did. She told me that -- that I should -- that she should of been the first one to know and I agree with that and I always will and I'm sorry.
Q. You're no longer romantically involved with Tina?
A. No, we're not.
Q. She was angry with you for not telling her the truth?
A. She had every right to be, yes.
Q. When you say, she had every right to be, is that 'cause you didn't tell her right away?
A. Yes.
Q. David, this picture here, you're holding the baby and in here your right hand is on his left buttock, right?
A. Yes.
Q. And your right hand's around the buttocks, correct -- by his thighs?
A. Yes.
Q. And you've got the baby -- he has some support to his back



FORM SM-25 PENGAD/INDY 1-800-631-6989

there, doesn't he?
A. Yes.
Q. Had you ever discussed with Tina how to hold the baby?
A. Yes.
Q. What'd she say to you?
A. She just didn't care for the way I held him.
Q. Is it that way there?
A. Yes.
Q. And that's the way you held him when he fell by the crib?
A. Yes.
Q. In hindsight, you could have laid him out in the living room and gone in and got the rattle, right?
A. Yes.
Q. Why'd you want to see your dad out at the State Police Post?
A. Because they had a Second Degree Murder warrant out on me and I wanted to know what to do. I needed to tell the truth -- I didn't know how to come about it.
Q. When did you tell your parents?
A. Through you -- it was a time -- I don't recall, actually -- July.
Q. So, all your parents, Tina, everybody you know, Pastor Smeader, you didn't tell anybody 'til you told -- well, you told Al, he died then you told Marilyn, right?
A. Yes.

MR. McDOWELL: Could I have one second?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

BY MR. McDOWELL (continuing):

Q. You said little David was under the heating lamp there at the hospital?

A. Yes.

Q. You saw that right?

A. Yes, I did.

Q. Was he in there when Officer Hopke took some pictures -- did you know that or didn't you know that?

A. Under the light?

Q. Yeah.

A. That's a different light.

Q. That's a different light?

A. That's a jaundice light.

Q. So there was a heat light and a jaundice light -- two separate lights?

A. Yes.

Q. Why was he under the jaundice light, do you know that?

A. Yeah, they stuck him under there to take pictures with -- supposedly the ones that they had sitting right there, yes.

Q. Was that in a different room or in the same room?

A. Same room.

Q. And you've looked at the difference between a jaundice light and a regular light?

A. Yes.

Q. What's the difference?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. The one throws off heat, the other one throws out yellowness on you --
Q. Yellowness?
A. It's like a yellow light. Yes.
Q. So you think that the bruises depicted on, at least on one picture were worse than they really were?
A. No, I don't think they were there.
Q. Okay. At least on the butt, you hadn't seen those, had you?
A. They weren't there.
Q. Was there -- was there diaper rash still on the baby when you still saw him?
A. Yes, there was but not that bad. I've seen those pictures.
Q. On May 8th or May 9th, did you have any reason for wanting to harm that baby?
A. No.
Q. That's all.

MR. McDOWELL: Thank you.

CROSS-EXAMINATION

BY MR. CHERRY:
Q. Seems like the circumstances are out to get you, Mr. Flick, doesn't it?
A. I'm sorry. Can you --
Q. I mean, all -- all these pictures at the hospital showing the baby under various kinds of light to show out bruises that didn't exist -- is that what you're claiming here?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Per everybody's testimony, everybody's seen them.
Q. Is that what you're claiming here?
A. Yes.
Q. You saw all the bruises on the baby at the autopsy -- are you saying they didn't exist?
A. The autopsy 64 hours after his death, yes.
Q. Well, all right. Let me show you this Mr. Flick, Proposed Exhibit 16, does that picture adequately reflect the -- the rash on the baby?
A. I ain't looking at that, I'm sorry.
Q. Look at Exhibit 16, Mr. Flick.

THE WITNESS: Judge, do I have to look at that?

THE COURT: You took the stand -- take a look at the exhibit.

BY MR. CHERRY (continuing):

Q. Does that picture adequately reflect the diaper rash on that baby?
A. Those marks were not there, sir.
Q. What about this, Mr. Flick? Do those picture -- does that picture accur -- adequately des -- describe the -- the -- the diaper rash on that baby?
A. No, sir.

THE COURT: What proposed exhibit?

MR. CHERRY: Proposed 15 and 16.

BY MR. CHERRY (continuing):





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Seems to me, Mr. Flick, you have kind of a selective memory of what happened on May the 8th, don't you?
A. (No audible response).
Q. Let me ask you this. You lied to Tina about what happened to that baby?
A. I didn't lie, no.
Q. You didn't tell her the truth, did you?
A. The whole truth, yes, sir.
Q. You didn't tell her the whole truth, did you?
A. No, sir.
Q. And now you want this jury to believe that you're telling the whole truth now?
A. It's the truth, Cherry.
Q. It is? Well, let's just explore the whole truth, Mr. Flick. Because you started out May the 8th after work with a few bucks in your pocket from Mr. Malone, didn't you?
A. Yes sir, I did.
Q. Got paid that day?
A. Yes, sir.
Q. And when you got done after you dropped Tina off at work, you eventually made it up to your friend, Al Newell's house, didn't you?
A. Yes, sir.
Q. And why were you going up there to see him?
A. Because I always went to go see Al.



FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Wanted to party a little bit?
A. I don't -- we -- we don't party. We're not like that.
Q. That's right. I forgot. You're a reformed guy, right, right after the baby's birth?
A. Yes.
Q. Don't drink anymore, right?
A. No, I don't.
Q. Course you were going to go to Solo Mio that night to have a couple drinks right?
A. Yes.
Q. So I guess you do drink a little?
A. Beer and liquor's a big difference, yes.
Q. Okay. Never more than one a week though?
A. Nope.
Q. But on -- tonight -- tonight on May 8th, you were going to have a couple at Solo Mio, fair -- fair statement?
A. That was just a statement.
Q. Well, what did you intend to do?
A. What did I intend to do?
Q. Did you intend to have a couple drinks at Solo Mio that night?
A. Yes, I did.
Q. So more than one?
A. Yes.
Q. And you went to Al Newell's house to see him?





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. Yes.
Q. As a matter of fact, so that we understand this, first you went to the gas station after dropping her off -- Tina, that must have been about 4:00, right?
A. Yes, sir.
Q. And then you went up to Saint Joe. How long did it take you to get up to Saint Joe?
A. Thirty minutes.
Q. So that's about 4:30 and you go to Al Newell's house and he's not there and you go to Kerwin's house and she's not there and you go to Taco Bell and you get some food and then you got back to Al Newell's house and you're previous testimony was that you waited there for 30 to 45 minutes, is that about right?
A. Yes, sir.
Q. And then you came home and the baby was crying and that's when you say the baby fell off the bed?
A. Yes, sir.
Q. And the dog jumped on the baby?
A. Yes, sir.
Q. And Mr. Flick, I think you said in each of those cases, that baby wasn't hurt was it?
A. No, sir.
Q. When that baby fell off the bed, it didn't hurt that baby didn't it?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. Not that can be seen.
Q. Yeah, well, didn't seem to be hurt, did it -- cried for a little while and it was okay?
A. Yes.
Q. And when that dog jumped off the bed, that didn't do anything to that baby -- baby didn't even cry, did it?
A. No, sir, he didn't.
Q. And then you said, you went to your dad's house and you said that this happened between 6:30 and 7:30, is that about right?
A. Yes, sir.
Q. Could it have been later?
A. It could have been I don't recall exact times.
Q. Do you remember what he said?
A. What my father said?
Q. Yeah.
A. Yes, I do.
Q. What did he say?
A. He said -- well, we just talked about the normal father and son conversation and we got into where my sister was at --
Q. So what time did he say you got over there that night?
A. He said between 7:00 and 8:00, I believe.
Q. And then after that, you stopped by your mom's home, that's on Warren Woods Road, right?
A. Yes.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Is that 8000 War -- Warren Woods Road?
A. Yes.
Q. And then you stopped and you talked to the Schroeters?
A. Yes.
Q. And do you recall what the Schroeder's said, I think their testimony was -- Mrs. Schroeder said it was between 4:00 and 5:00 and Mr. Schroeder said it was between 4:00 and 6:00 that you stopped by there?
A. Yes.
Q. So, what's right -- what's more accurate here? If you were at your dad's between 7:30 and 8:00 you couldn't possibly have stopped at Schroeder's between 4:00 and 5:00, isn't --
A. I don't recall --
Q. Isn't that a fact, Mr. Flick
A. I don't recall exact times, at all.
Q. Well, okay. They will. But you're testimony is that after you went to your dad's, you went to your mother's and then you went to Schroeder's?
A. Yes.
Q. And then you went home?
A. Yes.
Q. And then it must have been somewhere about 8:00, 10:00 p.m. on May the 8th David McBain's day turned bad, didn't it?
A. Both of our days, yes.
Q. Yeah, both of our days. Because that's when you claim now





FORM SMI-25 PENGAD/INDY 1-800-631-6989

that you dropped that baby while you were reaching into his crib for a rattle?
A. I didn't drop him, he fell, sir.
Q. Yeah, from your arms, all five -- five foot -- how tall are you?
A. Five foot six.
Q. Five foot six, bending over. And I guess what you're telling us, Mr. McBain is when that baby was in you're arms and you were reaching --
MR. McDOWELL: Excuse me, counselor, Mr. Flick.
BY MR. CHERRY (continuing):
Q. -- Mr. Flick, you just couldn't restrain that baby -- he just popped right out of your arms and landed right on that hard floor?
A. Yes, sir.
Q. And you attempted to do CPR, gave that baby mouth to mouth resuscitation?
A. Yes, I did.
Q. You regarded yourself as the father of that baby?
A. Yes, very much so, yes.
Q. Yeah. And in your haste to get over to Mr. Jackson's house, you grabbed that baby and you happen to kick the door?
A. Yes.
Q. But you ran into the door with him instead and put him -- a knot on your own head, right?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. I didn't say that.
Q. Oh, I thought you did. Guess it's not important. And you went over to Bill Jackson's house -- now, Mr. Flick, it's pretty -- you understand, I think, when you -- if it's true, dropped that baby from your arms, that baby was in big trouble right off the bat?
A. No, he was not.
Q. He was not -- the baby wasn't moving, was he?
A. He -- every now and then he would come around, I testified to that.
Q. Baby wasn't breathing that well, was he -- was he?
A. No, he was not.
Q. You felt compelled to do CPR --
A. Yes.
Q. -- on this baby and you didn't know that this baby was in serious trouble?
A. I had no idea what was wrong with him -- I had no idea at all.
Q. Well, if you had no idea, then why didn't you just pick up the telephone and call 9-1-1 and say, I dropped my baby and he's not breathing very well, come and help me?
A. I exp -- as I explained to Mr. McDowell, I ran next door for help because I wanted help right away --
Q. Well --
A. -- for breathing.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. So you must of thought that this was a serious injury?
A. Yes, I did.
Q. Okay. When you got over there, you tell Bill Jackson -- when he looks at that baby and he knows instantly that baby's in trouble, you tell Bill Jackson that this baby fell off the waterbed?
A. Yes.
Q. You don't tell Bill Jackson that you dropped this baby from your arms while you're going into the crib?
A. No, I didn't.
Q. And from the time you dropped -- you claim that you dropped that baby from your arms, until the time that you arrived at William Jackson's house is about how long a period of time?
A. I'm sorry, can you repeat that question?
Q. From the time that you dropped that baby out of your arms or that you claim that you dropped that baby out of your arms until the time that you knocked on Bill Jackson's door -- next -- next door, how long a period of time is that?
A. From the time that he fell out of my arms, I would recall -- I would say, 2 minutes.
Q. Two minutes? And in that two minutes you know it's a serious injury?
A. Yes.
Q. True?
A. Yes.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. You know that this injury is producing, number one, he's not conscious -- do you know that?
A. Yes.
Q. You know that he's not breathing well?
A. Yes.
Q. You know he's limp?
A. Yes.
Q. You -- you're panicking because you want to get over there because you say Bill Jackson's got some medical knowledge that you want to exploit, is that true?
A. Yes.
Q. And in this two minutes, from the time that you drop him until the time you arrive at his door, you make a conscience decision that you're not going to tell the truth about what happened to that baby?
A. Our conversation was too brief. The paramedics walked in.
Q. The paramedics walked in?
A. Yes, sir.
Q. And the paramedics looked at that baby and they said, my God?
A. No, they didn't, sir.
Q. And when they looked at you and they asked you, Mr. Flick, what happened to this baby, you said, he fell off a bed?
A. They didn't ask me that, sir.
Q. Well, Mr. Flick, let me ask you this. This is your child.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

This child fell out of your arms. Immediately he was unconscious. You finally get some medical people there. Did you ever think, now's the time to tell them to -- what happened to this baby so they could treat it adequately? Did that ever run through your mind?
A. Yes, sir, it did.
Q. And you disregarded it totally?
A. They knew he had a head injury.
Q. So, how well did you love that baby if you disregarded it totally?
A. According to them, he wasn't that bad. You heard --
Q. You say you lied to Bill Farhat and you lied to Jackson and you lied to Tina because you didn't want to tell Tina that you dropped that baby?
A. I didn't lie about it.
Q. You didn't tell the whole truth. So, now you want us to believe you're telling the whole truth when you're -- when you're on the stand defending a murder case, you think you're more believable now?
A. It's the truth. I know you don't like it, but it's the truth, Mr. Cherry.
Q. Well, I'll tell you what, Mr. Flick, let's talk about the truth a little bit more. Because then you went to the hospital and you knew this baby was going to be med-evac -- in fact, in the ambulance you heard them say -- you heard





FORM SM-25 PENGAD/INDY 1-800-631-6989

Farhat say, this is a serious case, we need a med-evac and get the police there, this is a suspicious injury?
A. I did not hear that conversation, no, I heard the police -- it was two separate conversations.
Q. And you know -- you knew that the Hopke was going to be at the hospital or somebody from the police department, didn't you?
A. Yes, I did.
Q. And when he asked you about what happened, even -- even in the face of an accusation, you still didn't come out and say, I dropped the baby, did you?
A. He didn't ask me -- he asked me if I lost my temper.
Q. And you're still there telling Hopke that this baby fell off a bed, is that about right?
A. Yes.
Q. And when you go to the hospital -- at Bronson Hospital, again, you have an opportunity, don't you, to tell these people the truth just like you're telling these 13 jurors now about this baby falling out of your arms -- don't you think that if that was the truth that the medical people would like to know that?
A. Yes.
Q. And you didn't tell them, did you?
A. No, I didn't.
Q. So you tell us now again why you didn't tell them the truth?





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. Well, first of all, they never -- Doctor Page, which I stated a few minutes ago, never asked me. He said he was going to be home in two weeks -- two, three weeks. He said he was fine.
Q. Yeah.
A. He had only one fracture --
Q. Do you remember those doctors telling you that there were --
MR. McDOWELL: Objection.
THE COURT: We can't have you both talking at the same time.
BY MR. CHERRY (continuing):
Q. Go ahead finish, Mr. Flick.
A. I said, he only had one fracture from the first CAT Scan thing and then the -- three then --
Q. Okay.
A. -- I don't understand that --
Q. So are you --
A. I still don't understand that.
Q. Are you claiming, Mr. Flick, that something happened to this baby at the hospital -- is that what you're claiming?
A. Look at the size of that fracture.
Q. Exactly. Is that what you're claiming, Mr. Flick?
A. I'm saying he did not get that all from me. I'm not looking at that picture.
Q. Look at the picture, Mr. Flick.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No, I'm not looking at that picture, I'm sorry.
Q. You've seen it before, look at it again.
A. Sorry.
Q. Is that --

UNIDENTIFIED PERSON: You son of a bitch.

BY MR. CHERRY (continuing):
Q. -- is that the fracture --

THE COURT: Wait a minute.

BY MR. CHERRY (continuing):
Q. -- that you're claiming --

THE COURT: Counsel, we cannot have outbursts from the audience.

THE WITNESS: Don't make her --

THE COURT: We cannot have that happening. Whoever did that must be removed. We cannot have any outbursts from the audience for approval or disapproval. I would hate to have to invoke contempt powers, but I am quite willing. The jury will please -- and I know this is difficult, try to disregard any outbursts.

Now, I think the witness was in process of trying to answer the question. If you remember the question, go ahead with your answer.

THE WITNESS: I don't remember it.

THE COURT: Fine. We'll have to ask the question again.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

BY MR. CHERRY (continuing):

Q. Well, Mr. Flick, let me rephrase the question. Are you saying that that fracture could not have been caused by that baby's falling from your arms?

A. Yes, I am. They said brain swelling made it expand -- they testified to that -- the expert witness testified to that -- died from brain swelling -- we have the tape.

Q. So you had plenty of opportunity to tell people what happened, didn't you?

A. Yes, I did.

Q. And then, Mr. Flick, after it was determined that this, in fact, was a life threatening injury and after, in fact, this baby was taken off of life support, you had an opportunity to come clean, didn't you -- with Tina? You had an opportunity to say, Tina, I'm sorry, but I dropped that baby.

A. Her son just died, you think I'm going to tell her right then and there?

Q. Well, Mr. Flick, I thought you're son died, too.

A. I said, our son just died, you think I'm going to tell her right then and there?

Q. Well, why didn't you, Mr. Flick?

A. Because she's walking -- Jesus, she walking on ice here -- she had -- she couldn't speak, she couldn't eat for days, that's why our daughter died. I had no idea how to tell





FORM SMI-25 PENGAD/INDY 1-800-631-6989

her. Do you have any idea how I felt at that hospital and at that funeral home, sitting there while she falls down singing a song to him? I had no idea -- nobody knows the truth but me and Al.

Q. I guess nobody knows how --

A. No.

Q. -- you felt at that hospital except for you?

A. That's correct.

Q. And that's why we're trying to get to the truth, isn't it?

A. We've already gotten to the truth.

Q. So you tell me this, Mr. Flick, you didn't tell Tina, did you?

A. No, I did not.

Q. You didn't tell any doctors, did you?

A. No, I did not.

Q. You didn't tell your father, did you?

A. Not at that time, no.

Q. You didn't tell John McBain either?

A. No, I didn't.

Q. Or your mother?

A. No, I didn't.

Q. You didn't tell anybody.

A. No, I did not.

Q. You --

A. Except Al.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. You stuck with your story, that baby fell off the bed, didn't you?
A. Yes, I did.
Q. And now you're trying to tell us that the next day you told Al Newell the truth, that this baby fell out of your arms, is that what you're trying to tell us now?
A. Yes.
Q. And conveniently Al Newell died a week later, didn't he?
A. Don't talk about my friend like that, sir.
Q. Didn't he?
A. Don't --
Q. Did he die a week later?
A. Yes, he did.
Q. Okay. And unfortunately, we can't ask him about that conversation, can we?
A. I wish we could. I wish we could.
Q. And then you talked to Ms. McDonald, your counselor, is that true?
A. Yes.
Q. And finally after time after time after time of trying to get this hidden truth out of you, she finally got you to expose your true feelings that first weekend in July, is that right?
A. June. Yes.
Q. Okay. And you told her at that time, through the tears and





FORM SM-25 PENGAD/INDY 1-800-631-6989

through the crying that you really dropped that baby and please tell Tina?
A. That that baby fell, yes.
Q. Of course, you managed to do that the next day with Al Newell but it took a little time with Ms. McDonald, didn't it?
A. I don't know her.
Q. Now, the fact that you talked about Ms. McDonald -- the fact that you talked to her that first week in July, that had nothing to do with fact that you had sat through a preliminary examination, had it?
A. No, it didn't.
Q. You heard Doctor Palutke set -- testify in that first preliminary examination, didn't you?
A. Yes, I did.
Q. You heard him talk about all the bruises, didn't you?
A. Yes, I did.
Q. You heard him describe that fracture, didn't you?
A. Yes, I did.
Q. You heard three major areas of blunt force trauma in the head, didn't you?
A. Yes, I did. It all --
Q. I figured --
A. -- it all matches because it's true.
Q. It all matches 'cause it's true.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. You think --
Q. Well, let me ask --
A. -- I would make something like that up?
Q. -- you this, Mr. Flick. It's just as consistent isn't it that you wanted a couple drinks that night, that you had a baby that you couldn't hand off, is that true?
A. That I couldn't hand off?
Q. Somebody -- somebody said --
A. I had no reason to hand him off.
Q. Somebody said when you get mad at this baby you just hand him off.
A. That was my son, I named him after me.
Q. Tina named him after you, I thought?
A. We.
Q. On that particular night, on May the 8th, you wanted to go out and have some fun, didn't you?
A. Like I always do.
Q. Like you always do?
A. Yes.
Q. And you didn't have anybody to hand that baby off to, did you?
A. My father, yes, I did.
Q. Yeah. Part of the truth might be, Mr. Flick, that you got a little angry with him when he was crying --

Tape 99B-0021-A, 2-22-99, 2:36





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. No, sir, not at all
Q. -- beat his head against the floor --
A. Never touched him in my --
Q. -- back and forth action
A. -- in his entire life. Never ever -- I swear to God, never ever have I except to slap on the hand.
Q. Well, --
A. And that is the truth, Mr. Cherry.
Q. There was this one time in November when you told him to shut the fuck up, remember that?
A. Big difference between verbal and physical ab -- abuse, in my opinion.
Q. You told him to shut his damn mouth, isn't that what Carol Greene just said?
A. I'm not going to deny saying that because I'm not going to lie, so I'm not going to say if I said it or not. I could very well have, yes.
Q. And this kid, when he was born, this was the light of your life that changed everything about you, isn't that right?
A. Yes, sir.
Q. Before that you were just a drunk?
A. I don't agree with that either, sir.
Q. Well, --
A. I worked --
Q. -- Carol Greene says her opinion about you changed?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. That's her opinion.

Q. You didn't want to become a bartender anymore didn't you?

A. No, sir, I didn't.

Q. You said, I think, when David was born you had a family?

A. Yeah.

Q. You met Tina and you fell in love with Tina and you were sick of partying and you wanted a family --

A. Yes, sir.

Q. -- is that right?

A. Yes, sir.

Q. Is that pretty accurate?

A. Very much so. Now it's gone.

Q. And it's also pretty accurate, Mr. Flick -- referring to page nine of your transcript that for the first three months of David's life you just kind of stayed there at home and took care of that baby day and night, is that right?

A. Yes, sir.

Q. In fact, questioned by Mr. McDowell --

MR. McDOWELL: Would you give me that page you were talking --

MR. CHERRY: Sure, page nine --

THE COURT: Page nine.

MR. CHERRY: -- line five.

BY MR. CHERRY (continuing):

Q. Question, did Tina work too? Answer, your answer, Mr.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Flick, for the first three months of David's life, yes she did and I didn't. Question, and you didn't? Answer, no, I was -- I took care of him day and night. Question, so from zero to three months, you were there all the time? Answer, when he was on his worst -- worst colicky stage, I watched him day and night. Is that accurate?

A. Yes, sir. This is all I have left, is his hospital band, that's it -- that's all I got left out of the family I had, that's it.

Q. You remember calling Trooper Michael Sites and Timothy Gean, G-E-A-N on October the 9th, 1997?

A. I'm sorry?

Q. Do you remember calling them to your house over there on Minnick Road and talking to them about an assault that apparently happened against you at the Club Meg Restaurant or Bar?

A. Yes, I do.

Q. That was on October the 9th --

MR. McDOWELL: Objection, your Honor. This is irrelevant.

MR. CHERRY: May the counsel and I approach the bench?

(From 2:38 p.m. to 2:40 p.m., off record bench conference)

BY MR. CHERRY (continuing):

Q. Mr. Flick --



TRANSCRIPTS UNLIMITED, INC.

FORM SMI-25 PENGAD/INDY 1-800-631-6989

THE COURT: All right. I've consulted with counsel at the bench and I have my ruling and proceed.

BY MR. CHERRY (continuing):

Q. You said that until two months before David was born you didn't have anything but maybe a beer a week, is that about right?

A. Yes.

Q. And you've also testified that for that first three months after he was born, you were home day and night just helping him out at his worst colicky stage, is that about right?

A. Yes.

Q. Except on October the 9th, 1997, is that right?

A. I don't recall where you're getting at, Mr. Cherry.

Q. Well, you remember calling Michael Sites and Trooper Timothy Gean over to your house?

A. I don't recall that.

Q. Do you remember reporting to them that there was an incident at the Club Meg in which a guy by the name of Forker, F-O-R-K-E-R, got into it with you at about 2:30 in the morning, do you recall that?

A. Yes, sir, I do.

Q. So you must have been out to the Club Med -- Meg at four -- 2:30 in the morning?

A. Yes, sir.

Q. And do you recall, at the time, Mr. Flick, you were





FORM SM-25 PENGAD/INDY 1-800-631-6989

considerably intoxicated?
A. No, sir.
Q. At, in fact, --
A. I remember --
Q. -- 5:49 a.m.?
A. 5:49 a.m.?
Q. 5:49 a.m., do you remember that --
A. No, sir.
Q. -- calling the police? Is that because you were intoxicated, Mr. Flick?
A. No, sir.
Q. Well, it says here they interviewed you and you appeared to be very intoxicated and abusive and used vulgar language, are they wrong when they put that in the report?

MR. McDOWELL: Well, Judge, he's putting the contents of the report --

THE COURT: Just a minute here, we're --

MR. CHERRY: It's impeachment, Judge.

THE COURT: -- technically -- you can ask him about what happened and then cross-examine him, but this is a collateral matter. It's aside from the main issue and extrinsic evidence cannot be read in. So, go -- go ahead, just ask your questions.

BY MR. CHERRY (continuing):
Q. Well, Mr. Flick, were you intoxicated that morning?





FORM SM-25 PENGAD/INDY 1-800-631-6989

A. I could have been.
Q. Could have been?
A. Yes.
Q. Did you use abusive language with them?
A. I don't recall what the conversation was about.
Q. Guess you weren't home taking care of your son, were you?
A. (No audible response).
Q. I'm sorry. I didn't hear an answer to that?
A. No, sir, I guess I was not that night.

MR. CHERRY: No further questions.

THE COURT: The jury should understand that the last group of questions was for the purpose of impeaching the testimony of this witness on direct examination. It does, however, deal with a collateral matter and it's -- the guilt or innocence of this defendant is not to be based on that, it's only purpose is to bear upon what weighted credit you feel should be given to the testimony of the defendant.

Go on. Do you wish to examine?

MR. McDOWELL: Yes.

REDIRECT EXAMINATION

BY MR. McDOWELL:

Q. Could you have gone out on the night in question, May 9th?
A. Could I have?
Q. Yeah.
A. Yes. I very well could have.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Let me ask you this. Mr. Cherry asked if you had a -- a opportunity -- well, let me ask you. I'm sorry. That wasn't what I -- here -- when you were getting David ready to go down to the Solo Mia, is that right?
A. Solo Mio, yes.
Q. Okay. You said you had the -- some of his stuff in the car, correct?
A. Yes.
Q. Where -- what -- where were you going to take him?
A. To my father's house.
Q. And did you ever call your father at that time and say you're not coming?
A. No, I didn't.
Q. Okay. As far as you knew, he was available to sit, correct?
A. You're talking about when I was going --
Q. Yeah.
A. Okay. Yes.
Q. Even if Jackie was not home?
A. Either way I had a babysitter, yes.
Q. And how many times had your dad and his wife babysat for you?
A. Couple times a month throughout David's eight months.
Q. Could you have been in such a state of mind that you would of intentionally injured this child because you didn't want to have to take him to the bar?



FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. He was my son -- no, no.
Q. If there was nobody at your dad's house, could you of taken him into the bar -- or the restaurant --
A. Yes, it was a restaurant, it wasn't a bar.
Q. It's -- it's a restaurant where they serve alcohol too?
A. Yes.
Q. Had you ever been in there before?
A. Yes, with David.
Q. So, even if your dad weren't available to baby --
MR. CHERRY: Objection. He's leading his witness.
THE COURT: This is redirect, so, no leading.
BY MR. McDOWELL (continuing):
Q. So even if your dad were not available to baby-sit, you had the op -- the option to take David with you?
A. Yes.
MR. CHERRY: Leading -- leading.
BY MR. McDOWELL (continuing):
Q. Did you or did you not have the option to take David with you?
A. I had the option to take David with me if I had to, yes.
Q. Had you ever seen other babies in that restaurant?
A. I don't recall.
Q. Do you remember all the events of that evening?
A. I remember them -- well, except I left out during my testimony to you about going to my mother's house and going





FORM SMI-25 PENGAD/INDY 1-800-631-6989

to Schroeder's house.
Q. Okay. But that was before, right?
A. Yes.
Q. Okay. Do you remember everything from the time the baby fell from your hands?
A. Yes, I do.
Q. Do you remember things leading up to it?
A. Yes, I do.
Q. Did you have anything to drink that night?
A. No.
Q. Nothing at all?
A. Nothing at all -- no drugs, no alcohol, no nothing.
Q. So your mind was clear that night?
A. Yes.
Q. That's all I have.

MR. McDOWELL: Thank you.

MR. CHERRY: No further questions

THE COURT: You may step down.

(At 2:47 p.m., witness excused)

THE COURT: Any other witnesses?

MR. McDOWELL: No. I want to move as to some of the exhibits.

THE COURT: Okay.

MR. McDOWELL: My recollection, Judge, is that A, B, C, D, E, F, all the way through to N --



FORM SMI-25 PENGAD/INDY 1-800-631-6989

THE COURT: Well, I have A through F. I don't see G anyplace.

MR. McDOWELL: G, H, I were the blowups.

THE COURT: Well, H and I, I have. I don't have G. Do you -- does the Clerk have G?

THE COURT CLERK: (Indistinct).

MR. McDOWELL: G is the one of him -- the blow up of him holding the baby -- the Ernie doll and the child.

THE COURT: Well, H and I were admitted subject to being connected up, but in either my records or the Clerk's show that it was admitted. Are you offering it now?

MR. McDOWELL: I'll move that H and I admitted.

THE COURT: Okay. Well, they were admitted subject to being connected up, but --

MR. McDOWELL: Okay.

THE COURT: I've heard no challenge on those, so I'm considering them as admitted unless and until something more is said. But I don't have G. Are you moving G?

MR. McDOWELL: Yes.

THE COURT: Any objection to G?

MR. CHERRY: Which one is G?

MR. McDOWELL: This one.

MR. CHERRY: No objection.

THE COURT: Admitted.

(At 2:48 p.m., Defense Exhibit G admitted)





FORM SMI-25 PENGAD/INDY 1-800-631-6989

THE COURT: Okay. I have H, I, --

MR. McDOWELL: And I've got J, K, and L were admitted. J is the picture taken in front of the Playboy building.

THE COURT: Well, just a second here.

MR. CHERRY: No objection.

THE COURT: All right. No objection to J. What else you got there?

MR. McDOWELL: K and L were pictures of the crib previously identified by, I believe, Tina McBain and somebody else. I -- I've got them admitted, now.

THE COURT: Okay. J, K, and L, I have as admitted.

MR. McDOWELL: M and N are the --

THE COURT: M and N --

MR. McDOWELL: -- the originals and pictures that have to go back to Mrs. McBain

THE COURT: Yes, admitted with need to withdraw. P, Q, R, S are admitted. I show T was identified but not admitted.

MR. McDOWELL: T is the report of -- at Bronson that Doctor Tagett referred to. I'll move T at this time.

MR. CHERRY: Which one is this?

Same objection. These are -- these are medical records. I don't think they stand in -- in for themselves.

MR. McDOWELL: I submit, Judge, that Doctor Tagett --

THE COURT: Let me see it.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

MR. McDOWELL: -- that the record that was obtained and he brought it.

THE COURT: As I recall, what he said, was that he couldn't identify the handwriting on here and at the time, there seemed to be no basis of which to admit it. Has there -- has something happened since that I missed?

MR. McDOWELL: Well, it's been a while -- I do remember he said that he didn't recog -- no, he did recognize the -- I thought he did recognize the initials of the nurse -- RH.

THE COURT: Well --

MR. McDOWELL: Or TH. Well, I don't really care that much about that.

THE COURT: Exhibit T is not admitted.

MR. McDOWELL: U identified and having been brought to court by Doctor Gardener concerning his two radiology exams.

MR. CHERRY: No objection.

THE COURT: What -- what's the exhibit?

MR. McDOWELL: U.

THE COURT: I thought we had that already, but let's check here. U is admitted already. I have V is not admitted.

MR. McDOWELL: V, Judge, is a Lakeland radiology report. No, that was not -- that was marked, but I did not move to admit.

THE COURT: That was not admitted.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

MR. McDOWELL: W?

THE COURT: W's admitted.

MR. McDOWELL: Okay. And X, I think was admitted.

THE COURT: X was marked and identified --

MR. McDOWELL: I'll move --

THE COURT: -- but not admitted

MR. McDOWELL: I'll move letter X as identified by Officer Hopke as having been sent to me.

THE COURT: Show it to the prosecutor.

MR. CHERRY: No objection.

THE COURT: No objection, admitted.

(At 2:53 p.m., Defense Exhibit X admitted)

MR. McDOWELL: I think that's all the exhibits we had, is that correct?

THE COURT: I think that's everything we've disposed of one way or the other. All exhibits that were previously admitted conditionally, I'm going to consider as being admitted for all purposes unless there's some specific objection.

MR. McDOWELL: Thank you.

THE COURT: I hear no objection.

MR. McDOWELL: No objection.

THE COURT: All right.

MR. CHERRY: Does he rest?

MR. McDOWELL: Yes, I rest, Judge.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

MR. CHERRY: The People call Officer Todd Hopke, briefly.

THE COURT: Call for rebuttal?

THE COURT CLERK: Raise your right hand.

Do you solemnly swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. HOPKE: I do.

TODD HOPKE

called by the People for rebuttal at 2:53 p.m., sworn by the Court Clerk, testified:

DIRECT EXAMINATION

BY MR. CHERRY:

Q. You're still under oath, Off -- Officer Hopke?

THE COURT: He's been resworn.

BY MR. CHERRY (continuing):

Q. Okay. I'm showing you what would have been marked People's Proposed Exhibit 16. Will you look at that photograph, please, and tell me if you can identify that?

A. Yes, I can.

Q. What is that?

A. That's a photo I took of David McBain.

Q. When did you take that photograph?

A. May 9th of '98.

Q. What time?





FORM SMI-25 PENGAD/INDY 1-800-631-6989

A. About six -- five minutes after six in the morning.

Q. I realize that's a -- a Polaroid photograph, but what is that photograph depict, can you tell us that?

A. Well, it's -- depicts the backside of the -- the baby's body.

Q. For what purpose was that photograph taken?

A. A rash on the baby's buttocks.

Q. Diaper rash?

A. Diaper rash, yes.

Q. Does is accurately depict that diaper rash in this photograph?

A. Yes, it does.

MR. CHERRY: I'd ask the Court to admit it as People's Proposed Exhibit 16.

THE COURT: That's 16?

MR. McDOWELL: Sixteen, Judge.

THE COURT: Any objection?

MR. McDOWELL: Just one second, please.

CROSS-EXAMINATION

BY MR. McDOWELL:

Q. What light was illuminating this when you took it, Officer Hopke?

A. I believe there was a light over the bed.

Q. Do you know what kind of light that was?

A. No, I don't.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Q. Have you ever heard of a jaundice light?
A. No.
Q. So you wouldn't know a jaundice light from a regular florescent light?
A. No, I wouldn't.
Q. You took the pictures -- you took some polar -- in fact, you took a bunch of Polaroids, right?
A. I took several.
Q. Okay. And this was in -- you believed to be in your group?
A. Yes, it was.
Q. You can't see the head of the person here, can you?
A. Just a little bit of the backside of the head.
Q. Okay. But as far as you know, you believe that to be him -- David?
A. Yes.

MR. McDOWELL: I don't --

THE COURT: Anything else?

MR. CHERRY: No further questions.

MR. McDOWELL: I don't -- wait. I don't -- nothing further.

(At 2:56 p.m., witness excused)

THE COURT: Exhibit 16's admitted.

(At 2:56 p.m., People's Exhibit 16 admitted)

MR. CHERRY: I have no further -- no further witnesses.

THE COURT: Okay. Any cross-examination -- anything





FORM# SMI-25 PENGAD/INDY 1-800-631-6989

else of this witness?

MR. McDOWELL: No.

THE COURT: Okay. You rest?

MR. CHERRY: Yes.

THE COURT: All right. At -- at this point, ladies and gentlemen all of the evidence that's there's ever going to be in this case is now in. But that isn't the end of the case, each of the attorney's has the right to argue the case to you and following that, I have to give you jury instructions. All this involves a certain amount of additional sitting of which, I'm sure, you're quite familiar already, but we'll give you a little bit of a break before then. Do not, especially now, discuss the case, the testimony, the evidence or anything about it or the people involved and avoid all contact with the attorneys, parties, witnesses and any parties on any side. Those who wish to go down to our infamous snack bar, you may at their own risk, please and in the company of the Bailiff. Others will have to remain in the jury room. Court will take a brief recess.

THE COURT OFFICER: Court is recessed.

THE COURT: Counsel, if you would remain, I have something to discuss with you when the jury's out.

MR. McDOWELL: Wait here a minute.

(At 2:57 p.m., jury exits)

THE COURT: Okay. The -- let's go on the record.





FORM SMI-25 PENGAD/INDY 1-800-631-6989