Jury's gone.

Counsel, before the trial started, I had distributed to you the proposed final jury instructions, any errors, omissions or objections?

MR. CHERRY: I'm satisfied with the instructions.

MR. McDOWELL: No, Judge, they're the same one's you gave at the last trial and --

THE COURT: Well, I updated the date on it, but that's all.

MR. McDOWELL: Yes, that's true and I went over them with my client -- they're all the same. We wanted the Court to instruct on accident as it is in CJI 7.2, defensive accident not knowing consequences of act. I have just taken it out of the book, I got that here.

THE COURT: 7.2?

MR. McDOWELL: Yes. 7.2.

THE COURT: This instruction is designed for use when the defendant acknowledges the act was voluntary, but the consequences unintended.

The instructions already require the prosecuting attorney to approve -- to prove beyond a reasonable doubt that not only did the defendant cause the death of David McBain, but second, that the defendant had one of three states of mind, that he intended to kill, or he intended to do great bodily harm to David McBain or he knowingly created





FORM SM-25 PENGAD/INDY 1-800-631-6989

a very high risk of death or great bodily harm knowing that death or such harm was the likely result of his actions. This puts an affirmative duty on the prosecutor to expressly disprove accident.

A person can cause death without being liable for criminal consequences. If I, for instance, or you, flick on a light switch intending to turn on lights, not realizing that somebody is down the basement working on the wiring and in the process of turning on the basement lights, I fry somebody -- I shouldn't use such language, probably -- caused the death of somebody, it's unfortunate, it's tragic, but it's unintentional, and it's not murder, manslaughter, or anything else -- it's not criminal at all.

The defense is entirely at -- within its rights to argue that, but I do not feel that this instruction is necessary and the defendant's position has been all along that if he caused the death -- I don't think that was really actually admitted by the defendant, but if he caused the death that it was inadvertent, accidental, and not rising to the level of negligence sufficient to manslaughter. I thinks that been the defendant's position all along, either before he changed his story in the last trial or after.

So, I think there's certainly no question you could argue that. Matter of fact, you'd be guilty of negligence if you didn't argue that, but I don't think it's necessary





FORM SM-25 PENGAD/INDY 1-800-631-6989

that that instruction be given.

Okay. Anything else?

MR. McDOWELL: No, we're satisfied, if you would ask the client, Judge, I think he's satisfied too. We've had them and gone over them. As I said they're the same ones we had last time except for the date.

THE COURT: Well, I gave them to you again at the start of the trial before jury --

MR. McDOWELL: Yes, you did give them to us on Tuesday --

THE COURT: -- before the jury was even called in and I've heard nothing in the meantime. Obviously you want the lesser included charge?

MR. McDOWELL: Yes.

THE COURT: Certainly. All right. How long do you folks want to argue?

MR. McDOWELL: Half hour.

MR. CHERRY: Forty minutes.

MR. McDOWELL: That's fine. I'll -- I'll do whatever.

THE COURT: I can't -- well, I guess I can cut you down below that, but I'm not going to, I don't think it'd be appropriate. In view of the duration of the case, the number of witnesses, all the verbiage that's come in -- most of which, of course, is irrelevant to the case, but nevertheless, I can't hold either of you for less than 40





FORM SMI-25 PENGAD/INDY 1-800-631-6989

minutes. I'll tell the jury that's the expected duration and let them be the timekeeper. But unless you go wildly over that, I'm not going to cut you off. I might remind you of time, but I'm not going to cut you off short. This is too important a case. However, if the jury knows how long you're suppose to be, watch it if you go over late, they -- they sometimes hold that against you.

We will take a brief recess and when the jury comes back, expect to start arguments.

MR. CHERRY: May counsel and I approach the bench for a moment?

THE COURT: Sure.

(From 3:04 p.m. to 3:08 p.m., off record bench conference)

THE COURT: All right, we'll recess. Court is recessed.

(At 3:08 p.m., court recessed; tape changed)

(At 3:23 p.m., court reconvened)

THE COURT OFFICER: Court will resume. Please be seated.

THE COURT: I understand that both counsel and the defendant have come to agreement on something. And who will state this agreement?

MR. McDOWELL: I can, Judge. It came to our attention earlier that Mr. Sullivan, who's the gentleman older -- not





FORM SM-25 PENGAD/INDY 1-800-631-6989

older, I mean, he's my age with glasses in the back, has to be somewhere.

THE COURT: Seat three.

MR. McDOWELL: Three. And he wanted --

THE COURT: Juror Number 24.

MR. McDOWELL: He wanted guarantees we'd be finished, you know, and all this, which we couldn't do, and the Court told him that. But we will stipulate at this point that he can be excused, and then we'll be down to just the 12 because he's got to be in Washington DC, or something, tomorrow. And that way we won't be under any constraint of having to keep these people here tonight, unless the Court orders it.

THE COURT: Well --

MR. McDOWELL: Or let them deliberate tomorrow because that always creates --

THE COURT: I'd want to keep them for a while, but obviously we're not going to go through the whole night.

MR. McDOWELL: Okay.

THE COURT: Is it agreed by you that he may be excused at this time?

MR. McDOWELL: Yes.

THE COURT: Mr. Cherry?

MR. CHERRY: Yes. And I would suggest that he be excused immediately as opposed to having him sit through





FORM SM-25 PENGAD/INDY 1-800-631-6989

closing arguments.

THE COURT: Well, why -- yes, so why make him sit down for any longer.

And Mr. Flick, you understand what your attorney has said with regard to this?

THE DEFENDANT: Yes, sir, I do.

THE COURT: And does that represent your present decision?

THE DEFENDANT: Yes, sir.

THE COURT: You understand that once he's released you can't change your mind?

THE DEFENDANT: Yes, sir, I do.

THE COURT: Okay. All right. I propose to do that immediately before you start the argument.

We all ready?

MR. McDOWELL: Yes.

THE COURT OFFICER: Your Honor, how do you want me to handle that? Let him out the back door now or --

MR. McDOWELL: No.

MR. CHERRY: I think, Judge, I think you should bring them all in and just to say that he's been excused because of his --

THE COURT: Well --

MR. CHERRY: -- potential conflict.

MR. McDOWELL: I'd prefer it --





FORM SMI-25 PENGAD/INDY 1-800-631-6989

THE COURT: -- I'll just -- he's been excused. I don't want to get into why.

MR. McDOWELL: I'd prefer it if you'd bring them in and say it so they all know. Okay.

THE COURT: We don't need to keep secrets along that line.

Okay. Bring them all in.

THE COURT OFFICER: All rise, please.

(At 3:25 p.m., jury enters)

THE COURT OFFICER: Court will resume. Please be seated.

THE COURT: All right. In a moment the attorneys will commence their arguments.

But, in the meantime, because our proceedings today took about three hours longer than expected and because we don't want any jurors deciding this case who are under inordinate time pressure, by agreement of all concerned, that is to say both attorneys and the defendant, Mr. Sullivan will be excused at this point in time.

THE COURT OFFICER: Mr. Sullivan, could you (indistinct).

(At 3:26 p.m., Juror Number 24 excused)

THE COURT: Okay. At this point, each of the attorneys has the right to argue their case to you. The prosecutor gets to give the opening argument, the defense attorney gets





FORM SM-25 PENGAD/INDY 1-800-631-6989

to give his argument and prosecutor may, if he's reserved time for it, withhold a portion of his time to use to answer any new matter that the defense attorney has brought up during argument.

Each of the attorneys has indicated that they do not need more than 40 minutes to argue their case. And because of the duration of the case, the importance of the case, and the number of witnesses I cannot say that that's an unreasonable request by either attorney. So, therefore, each of the attorneys has 40 minutes to argue and you can keep track of the clock over there as well as I can.

The prosecutor gets to divide his. The defense attorney does not. The total time, however, for each attorney is the same. We will now commence the arguments, commencing with Mr. Cherry.

MR. CHERRY: Ladies and gentlemen, this is the time that the Court gives me to give what's called a closing argument and that's exactly what it is. And it's an argument based upon the facts. If I misconstrue or if I misstate some of the evidence that I'm about to argue to you, please cl -- you know, correct it when you deliberate in this case, because it's not intentional. You have to bear in mind, too, that my argument and the argument of Mr. McDowell is not evidence in this case. The only evidence

Tape 99B-0022-A, 2-22-99, 3:28



FORM SMI-25 PENGAD/INDY 1-800-631-6989

that you're entitled to consider in this case is the testimony, the actual testimony that came from the witnesses, and the exhibits that have been admitted into evidence.

Now, this is what, the fifth day of this trial? Four days last week and today and you've seen a trial first hand and you've seen it all except for the arguments and the instructions and the deliberations and all 12 of you will be deliberating this case.

A trial, you may have heard on television on the O.J. Simpson case, but it's the truth, a trial is essentially -- it is a search for the truth. That's what we want to know in this case. Where is the truth of this matter? What really happened to David McBain on May the 8th, 1998?

And in this search for the truth you are the judges of the facts. When you decide this case today those will be the facts of this case from here on out. The Judge is going to give you some rules to apply, some law that you will apply to this. But, you are the judges of the fact. And when you judge fact and apply it to law you have to be able to assess the credibility of the witnesses. In every case there's always questions of assessment. You have to be able to make judgments about whether people are telling the truth.

In the voir dire of this case I asked you how many





FORM SM-25 PENGAD/INDY 1-800-631-6989

people believe just because somebody raises his hand to tell the truth that automatically that person is going to tell the truth. And I made a point, sometimes people perceive things differently. They don't intentionally lie but they perceive things differently. Sometimes witnesses see things that they don't and they testify. They're not intentionally lying, but they're misperceiving what's happening. Sometimes people tell the truth and they out and out lie. And they may have bias. There's a reason why they lie and it may be to escape punishment. You have to determine, in this case, where the truth actually is.

This is a case, ladies and gentlemen, and I've told you before and I'll tell you again, the defendant is charged with the offense of Second Degree Murder. He is not charged with First Degree Murder that requires premeditation and deliberation, that thinking out in advance and thinking about how this would affect my life if I pull this off. He is not charged with First Degree Murder. He is charged with Second Degree Murder. And you are entitled to consider in the instructions today the lesser included offense of Involuntary Manslaughter. That is a killing of David McBain, that baby, because of an act of gross negligence.

I submit to you on this record, ladies and gentlemen, on the evidence that you've heard in this case this is not a case of Involuntary Manslaughter. We're not talking about





FORM SMI-25 PENGAD/INDY 1-800-631-6989

an act of gross negligence by the defendant that resulted in David McBain's death, based on this evidence.

You are looking at a series of acts that caused a massive head injury and brain sheer to David McBain that was fatal at the time that it was inflicted. This is no accident. This is not gross negligence. The evidence in this case should convince you beyond a reasonable doubt that this is a matter of second degree murder, in that he killed David McBain and that he knowingly created a very high risk of death or great bodily harm, knowing that death or great bodily harm would be the result of his actions. That is Second Degree Murder.

This case opened up with the testimony of Doctor Palutke. For purposes of this argument let me shift that to the last and let's open up as it started, on May the 8th, 1998 at this home on Minnick Road, 14021 Minnick Road, at about 8:15 that man, David Flick, showed up at the home of Bill Jackson where Erin answered the door. He had Baby McBain in his arms. Erin knew instantly that this baby was not in good shape. William, who has no specialized treatment knew instantly that this baby was on death's door. They immediately called 9-1-1. Bill asked or was told what happened to this baby? And the defendant responds, "He fell off a bed." An 18 inch high waterbed. He's over there at Bill Jackson's house, this baby is limp in his arms, his





FORM SMI-25 PENGAD/INDY 1-800-631-6989

arms are hanging down like this, his head is back, he's barely breathing, and he says, "This baby fell off a waterbed."

Two paramedics arrive at the scene, Brenda Kenreich and William Farhat. And when they arrive they look to their right, they go into the house and they see the defendant down on the floor, holding this baby out in front of him? He's not cuddling this baby, he's not crying about this baby, he's holding this baby out sitting on the floor? A loving gesture to this baby who is barely breathing at this time? And these paramedics know and they've told you that he was within moments of dying. They ventilated him. They established an interosseous line. They stabilized him. They called ahead to the hospital, essentially said, "We've got a severe injury here, a severe head injury, we need a med-evac to Bronson Hospital. Arrange it. And, oh by the way", while in the ambulance, "call the police. This is a suspicious injury."

And why did Bill Farhat say it was suspicious? Because when he walked in to William Jackson's home at about 8:26 that morning, or that night, on May the 8th and saw this baby on the floor and saw that head drooping and knew he wasn't breathing and heard the explanation, the story, the claim of the defendant, that this baby fell off a bed, it did not have the ring of truth.



FORM SMI-25 PENGAD/INDY 1-800-631-6989

And, in fact, even the defendant admits today it was not the truth.

Bill Farhat and Brenda Kenreich knew that that baby would not have sustained the kind of injury that was manifesting itself in his actions at that time, because he fell off a waterbed or because a dog jumped on his stomach?

And Officer Hopke met that ambulance at Lakeland Hospital and that man over there, David Flick, heard Farhat call it in, get a cop there, there's a suspicious injury here. We need to talk about this. And Flick told that cop the baby fell off the bed. And at the hospital, at Lakeland Hospital, after that baby was transferred there from the care of Doctor Carlson to the care of Doctor Tagett, the emergency room trauma physician at Bronson Hospital, who testified that this baby was essentially, and I use the phrase loosely, toast when he came into that trauma room. He maintained his story.

And Doctor Page, my recollection is Doctor Page talked to him, talked to the family, admitted this kid, saw that first CAT scan, talked to this family, and he told you, in Doctor Page's opinion, he told you this kid was in highly critical condition and would probably die. And he told you that he talked to the family, including that man over there, and he told that man over there that the injuries suffered by this baby is inconsistent with the explanation that you



FORM SMI-25 PENGAD/INDY 1-800-631-6989

have given us. This baby did not get these injuries by falling off an 18-inch high waterbed.

And still David Flick did not come forward with what he now wants you to believe is the truth. The truth that he somehow dropped this baby out of his arms? And through that long night of May the 8th and May the 9th, up through about 3:30 when doctors thought that this baby was herniating, that the pressure was growing on his brain, that it was pushing down on his brain stem, and his pulse goes up and his respiration goes up, and he herniates, the brain herniates. What they thought was a herniation and this baby comes out of that, essentially, brain dead.

And when Meyer confronts them and Fain talks to them, Doctor Fain, and Doctor Higgins who saw massive amounts of retinal hemorrhage in this child's pupils in the early afternoon of May the 9th. And they tell Mr. Flick, in essence, this injury is not consistent with what you've told us. Does he come forward and say I dropped this baby from my arms or this baby fell out of my arms? Does he say that? No.

And this baby dies and is buried a few days later and he talks to Tina, his girlfriend, Tina, the mother of David McBain. He has an opportunity to tell her at that time that I dropped this baby and he does not. He has an opportunity to tell this McDonald woman, the counselor, and he does not.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

He has an opportunity he tells you and he tells you I do. I tell my good friend, Al Newell. And I told him the very next day, the day after David died I went and I told Al Newell what really happened in this case. Unfortunately Al Newell died a week later so we can't ask him what David Flick told him about the accident of David McBain, can we?

And the evidence in this case is that first week in July he sees this McDonald, this counselor, that brings him through all these sessions, gets him up close to the edge, she knows, she knows that there's more to this story here. He is just yelling out to tell the whole story and session after session she gets him closer until there's this final, cathartic movement. And he explains everything to McDonald. And he breaks down and he cries and he says, "I really dropped that baby, my son, I really dropped him. And I just couldn't tell Tina." And coincidentally that conversation occurred some, what, five or six weeks after that man said through a Preliminary Examination and heard the testimony of Doctor Palutke. And when Palutke talked about a head -- a skull fracture that went from one side of the head to the other, when Doctor Palutke talked about nine or ten or 11 areas of trauma on this child's body, including three major areas of blunt force trauma to the head and to the two sides of the skull, all separate. And he tells McDonald then, for the first time, I dropped this baby. And, oh, by the way,





FORM SMI-25 PENGAD/INDY 1-800-631-6989

when I was running out of the door I hit that baby's head on the door. What do you know? Now we've got a fact for every medical fact on the record, don't we? Got the baby falling out of the bed. Well, maybe that caused a little bruise on his head that the jury will be, in this case. Got the dog jumping off the couch, why we've got that mark on the baby's abdomen, don't we? Maybe the jury will buy that. But, wait a minute, Palutke says that his testimony at the Preliminary Examination there's three areas of blunt force trauma, causing a six inch fracture, with the attendant brain injury that causes death. Nobody's going to buy that he fell off a bed and caused this injury. I need to come up with something else. I dropped the baby. I dropped him as I was reaching into that crib and then after I gave him CPR and, you know what, those jurors will believe that this little CPR I did on this baby also caused the retinal hemorrhage. That will explain the retinal hemorrhage. I still need another -- I still need another bruise on his head. I've only got two so far. I picked him up and when I went to kick that door I smashed his head into that door. That should just about cover it. They'll buy that.

And so the question is, will you buy that? Will you?

Ladies and gentlemen, if this man was half the man and the father that he would lead you to believe and if he really dropped that child, number one, number one, he would





FORM SMI-25 PENGAD/INDY 1-800-631-6989

not have produced that injury from dropping that child. He would not have caused the massive retinal hemorrhage that Doctor Higgins saw at that hospital. He would not have caused brain sheet in that baby. It simply wouldn't have happened.

But, in some far stretch of your imagination, if you believe that he dropped that baby and if he loved that baby and if he cared for the baby as his own, wouldn't you think that the first thing that would go through his mind would be to tell the people, the medical people, what really happened so that they would know the history and could treat this baby? Instead of, in the two minutes between dropping that baby as he claims and going over to Bill Jackson's house he was afraid of what Tina would think? He was afraid of what the Jackson's might think? He was afraid of, as McDonald says, taking the fall in this case? Was he concerned in the first two minutes after this baby was dropped, if he was dropped that way, was he concerned for the baby? Or was he concerned for himself? And if he was concerned for himself, you ask yourself this question. If he would lie and not tell the whole truth to Tina, after being questioned by the authorities, after being questioned the paramedics, after being questioned by the doctors, after that baby dying and having nothing to lose, why didn't he take Tina in his arms and say, "Tina, I'm sorry I lied to you. I didn't want to





FORM SMI-25 PENGAD/INDY 1-800-631-6989

admit that I dropped that baby, but that baby fell out of my arms"?

If he was afraid to tell her that, do you think he would be more afraid to tell the truth and the whole truth, if that truth involved more than simply dropping that baby out of one's arms? If that truth included a scenario where he wanted to go out that night, he'd just been paid, he'd been down to his father's house, couldn't get Jackie to baby sit, stopped by his mother's house in Warren Woods, then by the Schroeder's and they said between 4:00 and 5:00 and 4:00 and 6:00, not later. And then he goes, what, up to Al Newell's house? He goes to Newell's house and waits there and he's not there and he goes to Kerwin's house, the girlfriend of Al Newell, and she's not there and he's still got the baby there, in his car. So he goes to Taco Bell and he gets food and he goes back to Al Newell's house and he waits for 45 minutes while he eats his Taco bell food. Then he goes back to Kerwin's house and then finally he goes back to his own house? You think David Flick wants to party?

This is a guy who had this renaissance. This is the guy who reformed himself upon David McBain's death -- I'm sorry, birth, on September the 8th, 1997. This is the guy who quit drinking. This is the guy who now has a purpose in his life. He wants to be a family man. "I don't drink anymore", he says. "I'm not a bartender." "That was no



FORM SM-25 PENGAD/INDY 1-800-631-6989

good for me." "I still have a couple beers now and then." And you know what, on the night of May the 8th that's exactly what he wanted to do. He wanted to go over to the Sole Mio Restaurant and have a couple beers. And Jackie wasn't available. And there's some dispute, but was his dad available?

Is it possible that David Flick didn't have anybody to hand him off to on May the 8th? The baby was crying, and he was upset, he was tired. And I don't know what happened. All I know, ladies and gentlemen, are the circumstances. All I can tell you and all I can show you are the circumstances of this case. I wasn't there. I don't know what happened to a baby that was eight months old on that day. I was not the witness. There was only one other witness besides the defendant and he ain't talking because he's dead.

And I talked to you about circumstantial evidence and how compelling it can be. The footprints in the snow, if you see footprints in freshly snow -- fallen snow you know that a man or a woman or a human being had just walked through that area. Or if you see a man coming through those doors right now, brushing the rain off his -- the water off his coat you may assume from the circumstances that it's raining outside.

These photographs, ladies and gentlemen, are the





FORM SM-25 PENGAD/INDY 1-800-631-6989

footprints in the snow. It's the rain on his coat. This baby suffered nine, ten, 11 bruises about his small body. Twenty-nine and half inches tall. Three areas of severe blunt force trauma on his head, according to Doctor Palutke, here, here, and here, starting or contributing to a biparietal skull fracture that ran from one side of his head to the other. This is one of those footprints in the snow.

This accident, this skull fracture, was not caused by falling out of a bed. It was not caused by a dug -- dog jumping off the couch onto his abdomen. It was not caused by dropping a baby from a height of five feet, seven feet onto his head, five foot, seven inches, onto the floor. And it was not caused by running into a door. Nor was it caused by a combination of those factors.

This skull fracture, according to the medical testimony in this record, is comparable to that of a high speed, unrestrained automobile collision. This skull fracture is comparable to falling out of a con -- out of a treehouse onto a cement patio. This is not consistent with falling out of one's arms.

Doctor Fain looked into the eyes of this baby, he looked into the eyes of this baby and he saw massive retinal hemorrhage. The bleeding in the eye that is caused from the nerves and the blood vessels shaking and severing as the brain moves around in that skull cavity. And he told you





FORM SMI-25 PENGAD/INDY 1-800-631-6989

that retinal hemorrhage is (indistinct) caused by shaking of an infant. It is not only a violent shaking, but a repeated shaking.

And that's why I tell you, ladies and gentlemen, this is not a case of involuntary manslaughter. We are talking about a series of events here caused against this baby, ramming and stopping, and hitting him at least three times, here, here, here, causing a fracture and causing brain sheer. Killed this baby.

Doctor Fain testified in this trial and he came up with something new. And that's why I say a trial -- a trial is a search for the truth. Until we actually call the witnesses and examine them, sometimes we never know where this is going to go.

And I will confess -- I will confess when Doctor Palutke was on the stand, the pathologist, I got a little irritated with him. Because he kept talking about this autopsy of the brain and he kept saying, "I didn't see this much swelling in his brain." "I didn't see this massive affect." It was a little after 5:00 on Tuesday when he testified and he said, "I didn't see this -- this massive, downward pushing effect that I would have expected had he had severe swelling and edema." And I questioned him, and I said, "Well, it's hard to pick up in a baby, isn't it?" And he said, "Well, yes, it is." And I said, "Is it possible





FORM SMI-25 PENGAD/INDY 1-800-631-6989

that with administration of Mannitol that this could be reversed?" And he kind of hemmed and hawed and said, "Well, yes, I suppose it is." His testimony didn't really, really, really support that brain swelling and herniation hypothesis.

But those physicians knew that something terribly wrong -- was wrong with that child when he came in. And Doctor Fain came in here and he said, "You know, I looked at that first CAT scan that was taken at about 11:30 at night on May the 8th at Bronson Hospital, the one that Doctor Gardener looked at, and you know, I'm a pediatric neurologist, I didn't really see all that much swelling in there either. And, you know what? I looked at that second CAT scan that was ordered by Doctor Meyer at about 3:30 or so on the morning of the 9th, when this baby was in his hotel room and the respiration goes up and the pulse rate goes up and you know what Doctor Fain says? I didn't see all that much edema and swelling in that CAT scan either. But you know what I did see? I did see evidence of brain sheer. I did see evidence of massive, retinal hemorrhage."

Question: "Doctor Fain, can this retinal hemorrhage be caused by doing CPR on a baby?"

Answer: "Only to a very minimal degree. Nothing to the extent that I saw in David McBain when I looked into his eyes on the afternoon of May the 9th."





FORM SMI-25 PENGAD/INDY 1-800-631-6989

Question: "Could it be caused by running with the baby?"

Answer: "No, it could not."

This is only caused one way, ladies and gentlemen. This is caused by rapid acceleration, sudden deceleration, and it has to be repeated. Could it be caused by a baby falling out of the defendant's arms? No, it could not.

These photographs are the footprints in the snow. These photographs of the injuries sustained by this baby are the circumstances that must compel you to reject what the defendant has said in this case. They must compel you to the conclusion that we have proven this case against him, Second Degree Murder, beyond a reasonable doubt.

There is all sorts of reasons for David Flick to minimize his involvement in this case. Nobody wants to admit, especially if you've done it, that you lost your temper with a baby, that you became frustrated with that baby, that maybe in a moment, a few seconds of blind anger, you took that baby and you threw him against a wall a couple of times or on the floor or whatever may have happened.

But, something like that happened in this case because here is the circumstantial evidence. This baby didn't fall off a bed and cause these injuries. He did not get jumped on by a dog and he didn't fall out of somebody's arms. And running that baby into a door didn't cause this. They're





FORM SMI-25 PENGAD/INDY 1-800-631-6989

all convenient arguments to try to dissuade you that we've proven our case.

The fact of the matter is, ladies and gentlemen, you ask yourself, given the conduct of this defendant, what he told the police, what he told the doctors, what he told his girlfriend, Tina, what he told his counselor when he learned about these things. Do you believe, now, that you're getting the whole truth?

THE COURT: Ten minutes.

Mr. McDowell?

MR. McDOWELL: Yes.

THE COURT: Your turn.

MR. McDOWELL: Ladies and gentlemen, Mr. Cherry makes a very good argument on behalf of his position, his theory of the case, footprints in the snow, whatever.

I would submit and because I'm the defendant, represent the defendant, we can only address you once, okay?

Now, Mr. Cherry will be able to get up when I sit down here and he can have the last word and there's nothing I can say about it. But, I would submit, ladies and gentlemen, if he brings up something new that I probably could respond to that if I were able to, but the rules don't allow us.

So, in that regard -- and as I said, he's an excellent attorney. We've tried many cases together. And, quite frankly, I wouldn't want to be cross-examined by him. And





FORM SM-25 PENGAD/INDY 1-800-631-6989

he does an excellent job.

But, ladies and gentlemen, he is -- and his statement to you here -- he is convinced that my client is a liar, apparently. Whatever he says he's disproved and so on and so forth. Well, if you're going to take that tact, ladies and gentlemen, let's look at the facts here.

David Flick would have to be a pretty intelligent guy, this high school drop out who had to struggle around and get his GED. So he has to make up some kind of a story sometime after May that would fit Doctor Palutke's testimony that he heard at the Prelim. All this, doing this while sitting in jail. He'd have to explain this bruise, this bruise, this over here, this on here, something on the eye he'd have to come up with something to cover all these bruises and make it sound credible so it could be believed by the jury. That's what Mr. Cherry's saying.

So, ladies and -- you heard David Flick testify. If you think he's that smart where he can come up with some kind of a story that's going to explain everything, well, I'm surprised. Runs through my mind Mr. Cherry said, if you're going to make up a story, make up a good one. Why not have that baby up there on a step ladder, and he fell off, hit his head. Or why not have the baby fall down the steps? Account for a lot of bruises that way. It's a long way down to that basement.



FORM SMI-25 PENGAD/INDY 1-800-631-6989

He didn't do that. He said what happened, okay? Whether you like it or not and whether I like it or not, that's what he said. And he said he began -- and he did tell his friend, Al Newell, about it. Nobody, I mean -- nobody's fault he's dead. He didn't tell anybody after that and he told Marilyn McDonald. You heard Ms. McDonald testify. You'll have to decide whether you believe what her interpretations were.

But, Mr. Cherry, when it gets right down to the end result says this man, David Flick, you saw him, you saw people that know him, you saw people he's known in the community, dealt with for years, all of a sudden goes crazy and takes this baby and slams his head into the wall, slams it into the floor, and whatever else he'd have you believe. This, of course, is not supported by any of the evidence he has other than there's some bruises on the baby.

Did you find anything in the house to support that? No. We saw a videotape. Swung around inside. Swung around outside. I mean, this is police work. They had permission to go in the house. He signs it. He's the murderer and he's going to let them go in there and search? I don't know. But that's what Mr. Cherry would have you believe.

He killed him for a beer or to go out and have a beer someplace? That's what he's saying. I mean, how ridiculous can you be? But, maybe that's the only explanation they





FORM SMI-25 PENGAD/INDY 1-800-631-6989

have. But that's what they want you to convict this man on, his -- his conclusion that these things must have happened because he couldn't get a baby sitter and he wanted a beer. Well, maybe Mr. Flick did drink a lot at one time and he quit. At least he convinced a lot of his friends that he wasn't drinking much, he had an occasional beer. But this night because of his desire for a drink, he smashes the baby that he loved. Doesn't make any sense.

I would submit, ladies and gentlemen, what happened is probably what he said. I mean, I wasn't there. Mr. Cherry wasn't there. All we know is what we see now.

Well, I'll get into this, but Mr. Cherry's talked about -- well, the other thing is he had to kill him because he didn't have a baby sitter. Well, we could dance around, we could probably argue to the next millennium. Did Mr. Flick, Senior, Fire Chief, respected member of the community, tell Hopke, I told him I was available to baby sit later that night, as we had done many times before, or is Mr. Flick coming in here compounding the situation by lying under oath? That's what they want you to believe. Why would he do that? Or did Hopke, who conveniently shreds his notes, of course we don't keep the notes, we've got a tape recorder, we don't use the tape recorder, either. Why? He knew he was taking a statement in a murder case. He goes over and talks to the dad and doesn't even bother to record





FORM SMI-25 PENGAD/INDY 1-800-631-6989

it. I don't know.

Mr. Cherry wants you to believe, apparently, that the dad's in -- in cahoots with the son to try and create some baby sitting, that a baby sitter was available.

I would submit, ladies and gentlemen, when we picked this jury the other day -- and this is not an easy case and I don't envy you for having to decide it -- we picked this jury the other day, everybody said you will consider the evidence as presented. But you all said you would require Mr. Cherry to convince you beyond a reasonable doubt of the defendant's guilt before you would ever vote for guilty, on any charge, even if a baby is dead.

You all said that we would require Mr. Cherry to carry his burden of proof. The burden of proof is at this table. Mr. Cherry happens to be sitting there, but at this table. They have to go forward. They bring the charge. They decide what they're going to charge the defendant with. They know the elements of the offense. They have to prove everything. Flick does not have to prove he's not guilty. It's the other way around. He has to prove everything, okay? The Judge will tell you you've got to judge the credibility of the witnesses by what you see and hear. That's fine. We all know this case was tried before. You had the advantage this time of having the defendant's testimony under oath at the first hearing, you had it under





FORM SMI-25 PENGAD/INDY 1-800-631-6989

oath today. Did you hear any substantial change? You know if there had been one Mr. Cherry would have been waving that transcript around in the defendant's face demanding to know why he changed his story. You didn't hear that, though, did you?

I think there's no question here some of the facts so I guess there are some things we can agree on. He took Tina to work on May 8th, 1998, at 4:00. He worked earlier in the day. He was going to watch the baby that night as he'd done many, many times in the past eight months. The first three months he had primarily control of the baby because he testified he's laid off. Tina was working. They're trying to -- I guess you could call them the working poor, trying to make ends meet. He stayed home with the baby, colicky baby, I suppose that's no fun. I've been fortunate and had to avoid that situation, but I know they cry and they cry and they cry. Whatever you do they don't seem to be satisfied. He took on that burden. You heard his mother-in-law to be say that, "Yeah, he did all right with the child." Well, in any event, this is the day, May 8th, he takes Tina to work, drops her off. So what does he do? Oh, this has got to -- then Mr. Cherry thinks there's something real sinister here. He goes over to see Al Newell and Al wasn't home. Wow. Then he goes to see the girlfriend and she wasn't home either. There's something afoot. This is





FORM SM-25 PENGAD/INDY 1-800-631-6989

Mr. Cherry. This is very unusual. They're not home. Well, he testified they're his best friends. He visited them all the time. They drop in on each other. What's so unusual about that? He goes to Taco Bell. Well, he gets a taco. The baby has a bottle. The baby's fine. The baby's in the car seat. He's out, maybe an hour, I don't know.

In any event, he comes back home then he said he's home and baby, he goes -- oh, he has to go to the bathroom. So he goes in there and while he's in the bathroom he hears the baby fall off the bed. Said he put the baby on the waterbed before and he'd never fallen off, didn't really think that much about it. You got the pictures, you can see it.

Is that a terribly outlandish act? I would say probably not. I mean, you know, we all have -- have been watching kids and they fall when you don't expect them to, but then when you look back on it, well, how -- how -- you can't raise them in a bubble.

In any event, he -- he falls. So he goes in and checks on him. He seems all right. Carried him around. I think he said then he put him in the living room and gave him a bottle. Then he said he was doing the dishes or something like that, his domestic chores. He then -- oh, after he picked him up from the -- from the bed he didn't see any apparent injury to the child. He calmed him down. He wasn't gasping for breath or anything. Didn't see any





FORM SMI-25 PENGAD/INDY 1-800-631-6989

blood. But, then he puts him on the floor in the living room with a bottle. He's on there. He said we got some new furniture. Dog got up on there. I shoved the dog off while I'm talking on the phone and the dog jumped, chain reaction, hits the baby, knocks the baby over. He said that he did tell the police about that. He said, "Yeah." But he said, "I didn't think that caused anything because the baby -- I pulled him right back up again. He's a tough little kid."

So then he says after that he puts the baby in the car, drives to his dad's house, talks to his dad, dad's -- actually he's looking for his sister, Jackie. Can't find Jackie. Jackie's playing softball in Bangor or something. So he told his dad he'd like him to baby sit, like Jackie to baby sit, and he said, "Well, if Jackie's not back and you can't find somebody, bring him back, we'll do it." No big deal. We do it all the time. Okay.

So, that's the conversation. He leaves, goes back apparently over to the mom's house, still got the baby with him, checks on -- sees the Schroeder's there. You know what they say. We've seen him. We've seen him handling the baby. He's fine. He loves the baby. He's proud of the baby. Brought the baby over the show us. This is the murderer. It's awfully strange taking this much interest in the baby, but in any event.

He goes home after that. I think he'll tell you that





FORM SMI-25 PENGAD/INDY 1-800-631-6989

when he got home and I know Mr. Cherry's going to say, well, somebody said between 4:00 and 5:00 and somebody 5:00 to 7:00, I can't remember now, too much to go on. But in any event, he's home and he's decided he's going to take the child to the dad's house and from Sawyer to Union -- New Buffalo. And he says it's at this point he's gathering up the stuff. He gets up some of the stuff that he's going to need to have to take to the dad's house, but -- diaper bags, whatever you use, formula bottles. He gets out the car, he says, "Oh, I forgot the rattle, my child's favorite rattle." So he goes back in says, "I -- maybe I got the wrong arm." But in any event he's got the child in one hand, reaches in to get the rattle, lo and behold he flips out of his grasp, goes straight to the ground in the bedroom and strikes his head. What does David Flick do then? He said he panicked. He's not breathing. Never seen anything like that before. Takes him out into the living room, pats him, tries the CPR although he didn't know how to do CPR, had seen adult CPR done, but he hadn't done infant CPR. He takes him into the living room and thinks maybe he's choking on something so he does the CPR and he starts to revive. Then he turns him over and pats him on the back, didn't know whether he'd swallowed something. He said he threw up some of the formula. But, in any event, he's not getting a very good re -- reaction from the child so he takes him outside, lays him





FORM SMI-25 PENGAD/INDY 1-800-631-6989

on the ground out there, tries the fresh air, gets him outside, tries the CPR again. He says he -- I think he said he pushed on the chest. Okay. That becomes important when you get to the ophthalmologist's testimony. But, in any event, he pushes on the chest, picks the child up, still not breathing, goes over to Jackson's. Now, of course they said, "Well, he had a phone right there, why wouldn't you use your phone?" Well, he said he knew Mr. Jackson was involved in studying something. He thought maybe he could help. That's why he went over there. So he goes over there and what do they do? They call 9-1-1. Okay. David said he did not tell everything to Mr. Jackson. He didn't tell everything to the -- to the medics when they came. Why didn't you? He says I didn't want them to know how what had happened. Why? They'd tell. Tina would find out about it. So he doesn't tell them that. He just tells them, "No, I -- two things happened, rolled out of the waterbed and the dog jumped on him."

So then they take him to Lakeland, they do the x-ray, he talks to the doctor there. After he talks to the doctor there's some question, he says he's the father, not the father. He said, "Well, I didn't know if they'd treat him if I'm not the father." I think that's explainable. Then they want -- they tell him they're going to go to Bronson.

Tape 99B-0022-A, 2-22-99, 4:12





FORM SMI-25 PENGAD/INDY 1-800-631-6989

And about that time Tina arrives. She's very upset. They didn't even discuss this. They didn't know how bad he was or what. They take him up to Bronson.

Up to this point all we know is that he goes in there -- and I'll get into this medical stuff in a minute -- and he spends part of the day, part of the evening, he's disconnected, and that's it. So, it's a tragic circumstance for Tina, for David, for David Flick, Senior, his wife, John McBain, Carol, his former wife, they all lost their grandson. Oh, they have the funeral the next day or a few days later. The State Police arrest the defendant, take him to the Post, lock him in the defen -- detention room. He says I want to talk to my dad. "No, you can't talk to your dad." How are -- we've got the picture here. You're going to see a picture. Picture P is a picture of -- thank you -- a picture of Tina and David. He says, "I've got my picture. Now I'm under arrest. I've just come from the funeral." I would imagine he's probably pretty upset. "Hey, you can't have that picture, killer", words to that effect. Takes the picture away. Maybe he was mad. Maybe he called Shaffer a son-of-a-bitch or whatever he called him, I don't know. Maybe he had a right to.

Our position, ladies and gentlemen, the actions of David Flick were not criminal. The baby's having fallen from his grasp even though he was holding the baby the wrong



TRANSCRIPTS UNLIMITED, INC.

FORM SMI-25 PENGAD/INDY 1-800-631-6989

way was an accident and does not mean he intended to murder the baby or kill the baby. Certainly not gross negligence. You see people all the time walking around, especially after this case I've seen them, walking around, usually men, holding them with just one hand under there. It's bad, it's dangerous.

When Mr. Cherry says, Flick is a murderer, he murdered David, they've got several theories. And we wrote them on the board. They said either he did this act -- and I don't know what act we're claimed -- I guess they claim we -- we held the head and beat it on the wall and beat it on the floor, or something like that, that David Flick did in order to cause these injuries. But he said he did this with the intent to kill or the intent to do great bodily harm or he created a high risk of death or great bodily harm and he knew that was the likely result. That's what he has to prove for Second Degree Murder.

Now, the Judge is going to give you those instructions. I ask you to look at them very closely. And now we're not talking about what the defendant says, we're talking about what the prosecutor presents to show this.

We've got the baby out to Lakeland, we get him there to Bronson. Now, I would submit once we get him there, at Bronson, strange things begin to happen. We see Doctor Mark Tagett. He testified here, I believe, on Wednesday. Tall





FORM SMI-25 PENGAD/INDY 1-800-631-6989

man with glasses, vascular surgeon at Bronson, sees all the trauma patients first, he said. He said the child was turned over to Doctor Page, appeared to be a brain injury, is what he said. He said, "Someone had prescribed Decadron for brain swelling." And he said, "That doesn't even work." Says even though the record said he did it, he didn't do it, somebody else must have done it. Okay. Must have been Page. Of course, Page says, "No, it wasn't me. It must have been Tagett." Well, I don't know who prescribed it. It doesn't do anything. Why prescribe it? They -- and he suspected a brain injury from the -- what he saw. He testified that there is something that works, it's called Mannitol, but he didn't prescribe that in this case. He said, "When I saw that baby" -- now, ladies and gentlemen, you judge credibility of witnesses -- he saw that baby he says, "I knew he was toast." Toast. Okay? I told Page, "He's toast," only fit to -- to harvest his organs. That's what he said. I don't know, ladies and gentlemen, if that had been your child how you would feel about them talking about him that way, but that's probably -- or that's the cavalier attitude these two people had when they were discussing this baby. Toast. Couldn't do anything for him. This is what Tagett says. Page says he's the pediatrician on duty. He gets the patient at 11:30. He orders a CAT scan for -- for David. Says this reveals three skull





FORM SMI-25 PENGAD/INDY 1-800-631-6989

fractures. He gets the report back but there's no hemorrhage, bleeding, or edema, at least not a significant amount. He says, therefore, the baby was stabilized with a breathing device and fluids and put in the Intensive Care Unit.

So then, after that first test, we've got -- and I'll refer to this again -- a skull fracture. True. Doctor Palutke said, "90 percent chance you'd have brain swelling with that kind of a fracture. You've got to watch it." I said, "Doctor Palutke, is the fracture itself fatal?" "No, the fracture is not fatal. It will heal together and he can get out of the hospital. It's the brain swelling." So we go dance around brain swelling here for two or three days.

Doctor Page has the child up there, nurses are looking at him, so on and so forth. He said, "Well, the bad thing here in this case is the edema." Once the brain swelling or edema sets in you're in trouble. He said, "If there's no edema, when he's on the breathing device and that, the patient could last forever." So at 2:30 what happens? Well, we know, thank God, there's some non-medical people there. John McBain is standing there watching. He sees the monitor go up and go crazy. What -- what's going on, you know? It was fine before this. He calls the nurse, the nurse comes in. I don't know. They gave him a shot of something. In any event, they tell him, "Well, he's





FORM SM-25 PENGAD/INDY 1-800-631-6989

stabilized now." So he goes home. All right?

So then we know after this event there's a second CAT scan ordered. I think the testimony was that Page called Doctor Meyer and he says, "Give him another CAT scan. Give him Mannitol." That's done at 3:20 a.m. So now we've had this baby 11:30, 12:30, 1:30, 2:30, going on four hours. Have we given him anything for the edema? No. We've given him Decadron which doesn't do anything. So now they decide, wow, must have had a brain herniation. Let's try the Mannitol. You know, --

THE COURT: Twenty minutes.

MR. McDOWELL: -- once the horse is out of the barn -- huh? Twenty? Thank you.

Once the horse is out of the barn what do we do? Give him a shot of something, see if we can reverse it. Okay. But at least they did that then.

Apparently the baby was stabilized after that but then Doctor Meyer gets down there. What does he find? He finds the baby suffered a brain herniation. He wasn't real surprised. He -- I asked him, I said, "Doctor, had you been -- were you on duty earlier?" He said, "Yes, I was on duty earlier." "Had you been called earlier, what would you have done?" He said, "I would have put him on a brain pressure monitor, in the head, to determine what the pressure is and given him Mannitol." Sounds logical. Those things work.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

But it wasn't done in this case until it was too late.

He's talking, yes, brain herniation can cause a death was the blow to the head and brain ter -- herniation.

Now, we got Doctor Gardener on there. Okay. He's retired now. He sees the one CAT scan. He misses it. He said, "I blew it. I agree. I blew it. There was brain swelling and I didn't see it."

We've got the report here marked Exhibit U. You'll see it. And then when he takes the second one he finds there is brain swelling. So then in an abundance of caution, of course this is after -- after the patient's died, he gives it to his partner to check, Dennis Burke. You've got his report here, too. He says the same brain swelling was there at 11:30 as there was at 3:20. This is W. Very interesting, ladies and gentlemen. He brought this to court with us. Hadn't seen this beforehand, but we got it now. So, there's a problem.

Gardener makes a mistake, Burke finally catches it. Of course, the patient is dead at that point. Meanwhile, the patient lays there three and a half hours, four hours, with nothing other than stabilized.

Meyer testified had he seen the CAT -- the first CAT scan earlier he would have placed the BOLT and done the medication but they didn't call him. He did testify in -- he did say that he testified earlier in the trial, in





FORM SMI-25 PENGAD/INDY 1-800-631-6989

October, that an earlier application of Mannitol may not have saved the child but would have helped. Okay? How do we know what would have saved him or would not save him, we don't know at this point.

He agreed with Doctor Page's statement that if there's no brain swelling the patient could be stabilized and go on forever.

We had Doctor Higgins, he's the ophthalmologist, he looked in the eyes. Okay? Younger guy here, he said it could be caused by -- he found retinal damage -- could be caused by Shaken Baby Syndrome, CPR, diabetes, or the fracture that the child had received. Those were all possibilities. He testified that Shaken Baby Syndrome was not the cause of death in this case. Okay. Thanks, Doctor Higgins.

Then we get Fain, the next guy. Fain is the Infant Pediatric Neurologist, okay. He says, "Yeah, I testified at that earlier trial." And he said he didn't find any brain activity. Recommended the child be taken off life support which is all obvious at that point, as he's had the brain herniation. But, in any event, he said that in the first trial, yes, I testified, but I went along with the testimony of the others that there was brain herniation but, really, that wasn't it. It was shearing. And he defined this as a tearing of cells in the brain and the separation. The baby



TRANSCRIPTS UNLIMITED, INC.

FORM SMI-25 PENGAD/INDY 1-800-631-6989

died of brain shearing. The first time we've ever heard brain shearing in this case. This has been going on since last May. Now we got brain shearing. Why? Well, I would submit, ladies and gentlemen, at this point you've got a real question whether those doctors were right and not prop -- properly treating that child for the brain edema, brain swelling. So now they say, "Oh, that wasn't it at all. This was shearing. And when shearing happens you don't recover. It's -- it's immediately fatal." He says it's fatal, you can't do anything about it.

Why would he do -- and then he says he didn't tell anybody until the 18th when he comes up the night before and decides he's going to testify to brain shearing. Why in the world would he do that? Well, we know he's in the same hospital with the other guys. He knows maybe these guys are going to be on the hook for improper diagnosis and treatment so I'll just solve the problem for her, I say it's sheared. There's nothing anybody could do. It doesn't make any difference whether it was edema, they gave him Mannitol or -- or just left him lay out in the waiting room. It doesn't make any difference.

I don't know. That will be your decision. But it's awful convenient. He comes in here now and he's going to bail out the hospital about how they handled this child.

The Judge is going to tell you as instructions if the





FORM SMI-25 PENGAD/INDY 1-800-631-6989

defendant starts a series of events that's going to cause death, it's not a defense that the cause of death was medical treatment or the wrong treatment. But, he'll tell you, and I ask you to read this with the other instructions, if you find the treatment was grossly erroneous or unskillful and injury may not, might not, have caused death it is a defense to murder or any lesser charge. I would submit that's exactly what happened in this case, ladies and gentlemen.

They can't defend what they didn't do with this child so now they're coming up with a new theory.

You didn't hear brain shearing during that opening statement Mr. Cherry made. Nope. All we heard was Shaken Baby Syndrome and/or brain injury due to trauma to the head. Now we've got a different ball game.

I think when you look at the testimony of Doctor Palutke he said -- and maybe Mr. Cherry was upset with him, it's getting late, so on, so forth -- that he found areas of trauma on the head, but he said whether it was -- what day it was caused on he couldn't tell for sure. He can't tell whether one blow caused the fracture or not, it's possible. More importantly, he said that fracture could have been caused by a fall from a 40 inch, only a 40 inch area, which he said would be a bassinet or changing table, that they had found fractures in children caused from that height. So, we





FORM SMI-25 PENGAD/INDY 1-800-631-6989

don't have him up on the third floor dropping the baby on his head, as Mr. Cherry would like you to believe. Their own witness is saying it could have been from as much as 40 inches. So, we've got from 40 inches to three stories you're going to have to deal with.

Now, he further said it could have been one blow that started this fracture and another blow increased it. He said he saw retinal bleeding but it could have been caused from the force of the fall and he was not able to say Shaken Baby Syndrome. We're getting one, two, three, four different opinions here as to cause of death.

I would submit, ladies and gentlemen, when you look at this case you have to decide whether Mr. Cherry has proven guilt beyond a reasonable doubt. Are we just getting up here, we're getting a shotgun approach. Well, maybe if the doctor says this, I'll say that. Or maybe if the doctor says this, we'll go with that theory. I don't know.

Time -- Judge, time is --

THE COURT: Twenty-seven and a half, used.

MR. McDOWELL: Almost done.

I guess the defendant told you that he quit drinking and all that kind of stuff and what he did then was, apparently, had some confrontation in the bar back in October or I don't know what month it was. And the record there will speak for itself. But, in any event, ladies and





FORM SMI-25 PENGAD/INDY 1-800-631-6989

gentlemen, he told you that he changed his way of operating after the baby was born.

I would submit, ladies and gentlemen, you're going to have to hear -- jud -- determine whether or not you believe Mr. Cherry proved his guilt beyond a reasonable doubt of any charge. You weigh what he says and what he believes how the injuries were caused with the people that were there.

Now, it's awful funny that the -- the mother, the grandmother, the grandfather, everybody's there, they see an injury to this side of the head. They don't see anything else. What they want you to do is hold this man responsible for every mark on that body. And he's been parading this around and flipping it up there on the screen through most of the trial, every mark on that body when we don't know how many people handled the baby. He was passed around when tho life support was on, when the life support was off.

Doctor Palutke -- now I can't remember exactly what -- he finds postmortem bruises after death. Well, we know somebody's not being careful. But, David Flick should be responsible for every mark on this toddler's body because we've charged him with murder and he must have done it because we've got circumstantial evidence. Well, ladies and gentlemen, look at the people who knew David Flick best and look what they had to say about him when you're trying to decide is he the murderer.





FORM SMI-25 PENGAD/INDY 1-800-631-6989

I'm not going to go through the testimony of those people. I think it's important. But I think when it comes right down to it, not one untoward act did he ever commit against this child except, as Mr. Cherry brought out here two or three times, he says, "Tell him to shut his damn mouth", or words to that effect which the defendant says, "Yeah, I did say that."

Does David Flick have a history of abusing this child? I submit no. And I would submit if Tina McBain ever had any indication that he was doing this, she would have booted him right out and called the police then.

I wish he would have told his parents and everybody the true story right at the beginning. He didn't. His parents wish he would have told it. He didn't do that. He decided, ill-advisedly, as far as I can see that he would try and pass this off so that it didn't come down to, oh, my God. Just what Tina told me would happen has happened.

When they left and they -- and they got -- and he testified to this, "the doctors are telling me he's going to be fine." So why is he going to change his story at that point? "Oh, he's going to be fine." Then, all of a sudden, he's dead. Just like that.

When he says he's holding the baby wrong, and I suppose -- I'm glad we got this photo dated because otherwise I suppose they'd be saying well, we must have taken this





FORM SMI-25 PENGAD/INDY 1-800-631-6989

afterward or got another child or something. We had this -- this photo from March. He's at the Playboy Mansion. He's holding the child the wrong way. No support on the back. He acknowledges it.

So I submit, ladies and gentlemen, our story is not something that's just been made up for trial. Ours is what happened. And ours is what -- and I'm sure Mr. Cherry will get up here and say, "Now you'll hear the rest of the story", like Paul Harvey. But the fact of the matter is he elected that night not to tell the whole story. Did he elect to not do that out of guilt or not?

You looked at the pictures and if he's the murderer, why is he sitting there holding the child at the end? If he's the murderer why does he take the -- the soon to be corpse over to Mr. Jackson and tell him, "Well, he fell off blah, blah, blah." Why didn't he just leave him on the floor and say, "I don't know. I was in the bathroom and the next thing I knew he hit his head. I'm not sure what happened." He doesn't do that.

He finally tells Marilyn McDonald. Of course, the prosecutor doesn't like the Marilyn McDonald testimony because that doesn't quite fit with what they think happened here. She says that she knew right from the beginning he wasn't telling the whole story, but he couldn't get it out with her. She said it wasn't until many sessions she got it





FORM SMI-25 PENGAD/INDY 1-800-631-6989

out of him. And she testified -- I don't know -- she had a thousand hours of experience and blah, blah, blah. I suppose that's what they're paid to do. They're to get to the truth and they -- I would submit that they did here.

I would submit, ladies and gentlemen, you've got a lot of questions to be answered in this case. I've given you some of them. The biggest one, why would a guy who's never done this kind of a thing with a child before do it on this date, not drunk, not under the influence of drugs, nothing? Apparently, for the lack of a baby sitter, which we contend he had a baby sitter, but Mr. Cherry's only argument is going to be for the lack of a baby sitter he went crazy and took the child and bashed him here, bashed him here, bashed him here, whatever he did with him. I submit that's just not what happened.

I guess when you get right down to it, ladies and gentlemen, you're going to have to determine whether or not you believe the family and that that knew David best or you're going to believe some doctors who -- I don't know, I -- they're going to start -- and this bothers me about this Fain guy, he changed the testimony -- he testified in the first murder trial and went along with brain herniation. He gets up here in the second murder trial, the night before he's going to testify, he looks at something and changes his testimony to brain shearing. I don't know. If this goes on





FORM SMI-25 PENGAD/INDY 1-800-631-6989

until, and you hope it doesn't, until next -- until next week, would he have different theory? But it sure bails out his buddies because they missed it, they didn't properly treat this child. Now he wants you to think, well, it would have been fatal anyway, so what's the difference? He's just toast. Toast.

I would submit, ladies and gentlemen, and you would wonder if that were your family and how they're talking about the family and how they're treating the family whether you would think you had proper medical treatment either.

Mr. Cherry is going to say I'm trying to blame the hospital. No, I'm not trying to blame the hospital. I'm just trying to point out that there are areas here of problems with this case and I ask you to do the only legitimate thing, the only honest thing to do here, is to find the defendant not guilty of any charge.

Thank you.

MR. CHERRY: Do you ever get the impression that people are trying to minimize the life of David McBain?

In the -- in the testimony that you heard in this trial did you hear anybody come to the defense of this baby from the family? Did you hear anybody question -- did you hear anybody question David Flick's story in this case? Did you hear anybody ask themselves any hard questions about the obvious, physical evidence in this case and wonder if this



FORM SMI-25 PENGAD/INDY 1-800-631-6989

accident could have really occurred as David Flick said it did, by dropping the baby?

Is there nobody to stand up for this kid? Certainly not the family. He's nothing more than a law suit against the hospital right now.

MR. McDOWELL: Your Honor, I'm going to object. The Court ruled that out --

THE COURT: Wait, wait, wait a minute.

MR. McDOWELL: -- when his witness eluded to it, and now he's got the whole family as a plaintiff against the hospital. I think that's not in evidence and I ask that it be stricken.

MR. CHERRY: It is in evidence. The People brought it up.

THE COURT: There was some discussion, at least by one of the witnesses, about contemplating a law suit. However, this matter here is the matter of The People of the State of Michigan versus this defendant. And it is the guilt or innocence of this defendant, not any civil suit, which is an issue.

Go ahead.

MR. CHERRY: You saw the family in this case. Do you see any real support for that baby from them? Not a bit. I'm sorry to say, not a bit. X

You know, the defendant in this case and his lawyer got





FORM SMI-25 PENGAD/INDY 1-800-631-6989

an answer for everything, don't they? He didn't come up with the true fact the first time, said the baby fell off the bed. Don't worry. Came up with the true fact later after he talked to Al Newell. Oh, forget Al Newell, he's dead. Came up with the true fact after he talked to Mc -- McDonald. You should believe that, ladies and gentlemen, this baby fell out of his arms. You should believe that. Never mind the fact that he's now on trial for murder and he's got a lot to lose now and he's got a lot to gain by making you believe that this baby fell out of his arms. And you know what, not only that, ladies and gentlemen, he didn't have anything to do with this. He didn't kill his baby, the hospital must have done it. They must have -- they must have done something -- they must have been grossly negligent in their treatment of that baby because that baby shouldn't have died from falling out of my arms.

You listen real carefully to this medical malpractice thing and they'll tell you if the hospital does something that is grossly negligent, it may be a defense but it's got to cause the baby's death. Nothing that hospital did in the course of treatment to that baby caused that death. That baby was essentially dead when it got there.

Ladies and gentlemen, something happened between that baby at 4:00 in the afternoon when he -- when the defendant took it from Tina. Because at 4:00 in the afternoon that





FORM SMI-25 PENGAD/INDY 1-800-631-6989