at least that David was injured while in defendant's care. However, the extent of the child's injuries were in dispute throughout both trials. All of the medical personnel that attended to David had inconsistent versions of what happened while at the hospital, what medication was administered, who ordered the medication, and who was in charge of David's care.

In Nelson v Hargett, 989 F.2d 847 (5th Cir 1993) the Court stated: [T]rial counsel's failure to investigate may constitute ineffective assistance of counsel, but defendant must allege with specificity what the investigation would have led to and how the outcome of the trial would have been different.

In this case the defendant offers the following facts to prove to this Court that, had counsel fully investigated the medical treatment, specifically the medications, and had this information been introduced to the jury, there is a reasonable probability that the outcome would have been different.

According to the medical records, during transport this child was given an excessive amount of Fentanyl, 30 mg, by the flight nurse, Robert Mayberry (Exhibit A). Robert Mayberry however testified that he administered 15 mcg (II 514-515).[1]

In addition, Fentanyl is contraindicated in children under the age of two; it is contraindicated in the use of patients with **head injury that might be susceptible to increased intracranial pressure.** Fentanyl also obscures the clinical course of patients with a head injury. This explains why the radiologist misread the initial CT scan. (See exhibit B)

---

[1] The five volumes of transcripts from Defendant's second trial are identified by Roman numeral in chronological order. The transcripts from Defendant's first trial are identified as "First Tr," followed by the transcript volume by Roman numeral and the relevant page number(s).

Upon arrival at Bronson Hospital, an unknown source administered David several medications. One of those potentially fatal medications was, again, Fentanyl. In the second trial, Dr. Tagett, an ER Trauma Surgeon, admitted that he had no idea that David was administered **ANY** medication by the flight nurse, but he ordered medication anyway (II 524, 527). The adverse reactions and warnings of this potentially fatal drug were never brought out during either trial do to trial counsel's failure to investigate (Exhibit B).

In the first trial, Dr. Robert Page, the attending Pediatrician, admitted that he did indeed order medication for David i.e., **FENTANYL, DECADRON, MANNITOL, VERSED** (First Tr II 497, 504, 515). Dr. Tagett also testified that Dr. Page ordered the medication, in the first trial (First Tr II 444). However, in the second trial their testimony changed.

Dr. Page denied ordering **ANY** medication for David, and, in fact, blamed it on the "ER people" (II 568-569, 603). Upon discovering the history of these medications and their correct use, it's apparent why the doctors denied ordering them. (Exhibit B,C,)

Furthermore, Versed, which is a central nervous system depressant the doctors used to sedate the child, has many adverse reactions, particularly with concomitant use of Fentanyl; versed is associated with increased intracranial pressure (See exhibit C). During trial four family members, David's mother, grandfather, the defendant, and the grandfather's step-daughter, all testified that Dr. Page told them that David was going to be okay, and that he would be able to come home in a few weeks (III 899, IV 990, V 1257, 1264, V 1323). Dr. Page however denied telling the family this (II 576, 600-601). A review of the use notes concerning Versed will show that Versed is only to be used in **NONCRITICAL** care settings only (Exhibit C). This fact not only substantiates the family's allegations,

but it also substantiates a reasonable probability that the doctors had something to hide.

Consequently, the medical treatment David received would lead a reasonable person to believe that he was not in critical condition, as the doctors in the second trial allege.

Although the defendant acknowledges that the jury was able to determine the issue of grossly erroneous medical treatment, being the jury instructions in this case did cover an instruction on grossly erroneous medical treatment, CJI2d 16.16 (Exhibit D), they did not hear any of the facts the defendant alleges in this issue. Trial counsel did touch on the issue of some of these medications. He did not however fully investigate the potential risk of these medications, which, if he had, it would have completely discredited the doctors' testimonies. Further, had counsel brought this information to the jury's attention, it is very likely that the jury would have arrived at a different verdict.

Trial counsel's failure to investigate these medications were outside the wide range of professionally competent counsel. Strickland v Washington, supra. Therefore, counsel's failure to investigate the medications properly denied the defendant his Sixth Amendment right to effective assistance of counsel. See US Const, Am VI; Const 1963, art 1, §§ 17, 20. Lord v Wood, 184 F.3d 1083 (9th Cir 1999).[2]

Counsel's knowledge of the erroneous medical treatment David received constituted a reasonable objective to properly investigate the medications he received. Here, counsel relied solely on the prosecution's investigative

---

2 Bean v Calderon, 163 F.3d 1073 (9th Cir 1998); Driscoll v Delo, 71 F.3d 701 (8th Cir 1995); Sparman v Edwards, 26 F.Supp 2d 450 (E.D.N.Y. 1997); Rogers v Israel, ~~supra~~. INFRA.

file, and completely undermined the defendant's chance of getting relief. Thomas v Lockhart, 738 F.2d 304 (8th Cir 1984).

If trial counsel had at hand the information of all the medications this eight-month-old baby received, there is a reasonable probability that, but for counsel's unprofessional conduct, the proceedings may have been different. Rogers v Israel, 746 F.2d 1288 (7th Cir 1984). Defense counsel's failure to investigate victim's medical records constituted ineffective assistance of counsel under Strickland. Cheung v Maddock, 32 F.Supp 2d 1150 (N.D. Cal. (1998).

During trial, Dr. Gardner, who was the initial radiologist who took the first and second CT scans, admitted that he misread the first CT scan (III 692-693, 697-698). Dr. Gardner said he was "influenced by his associate's report," Dr. Burke, the assisting radiologist who did a separate report that indeed showed generalized edema in the first CT scan (III 692, 697, 703-705). Dr. Gardner brought this report with him, and it was admitted into evidence by defense counsel and marked exhibit W (III 703).

Once David's condition deteriorated, Dr. Meyer, a neurosurgeon, was called in to look at him. This neurosurgeon was on call **all night** long, however, he was never called in during the initial four hours because the first CT scan was misdiagnosed. According to Dr. Meyer's testimony in the first trial, had the swelling been diagnosed properly, he would have ordered Mannitol, an anti-inflammatory medication used to reduce brain swelling, and he also would have placed an Intracranial Pressure Monitor in the child's head[3] (First Tr II 573). In the second trial however he denied ever

---

[3] An intracranial pressure monitor, also called a bolt, is a device that is inserted into a person's head to measure any excess pressure that might be in the brain.

testifying to that (II 644-646). Dr. Meyer also acknowledged the fact that the child was admitted to P.I.C.U. and left there for four hours with no treatment to bring down the swelling (First Tr II 575). In fact, the medications David was receiving while in P.I.C.U. cause intracranial pressure to increase i.e., Versed, Fentanyl. (See exhibit B,C) However, Dr. Meyer did testify that David was administered Decadron, which is a different anti-inflammatory medication, but he also admits it doesn't work (First tr II 575-576). In fact, several all the doctors admitted that Decadron doesn't work (II 545-546, II 604, II 647-648).

## II.A. DEFENSE COUNSEL'S FAILURE TO INVESTIGATE EXPERT'S OPINION, WHICH POSSIBLY COULD HAVE PROVIDED EXCULPATORY EVIDENCE, CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.

In defendant's first trial, Dr. Daniel R. Fain, a Pediatric Neurologist, testified that there was NO morphine given to David while at Bronson Hospital (First Tr III 688-690, 699-702). However, according to the medical records, morphine was indeed administered, and not simply noted in the medical records as Dr. Fain alleges. (Exhibit E). Furthermore, also in the first trial Dr. Fain also rendered an opinion that David died as a result of diffuse brain swelling:

Q. Did you see edema in the -- in the Cat scan?

A. Yes sir.

Q. So, that indicates there was brain swelling, correct?

A. Yes sir.

Q. Probably led to his death?

A. Yes sir.

Q. Is that what probably led to his death?

A. Brain swelling produced the herniation which led to the death. Yes sir. [First Tr III 693]

Dr. Fain rendered his **own personal** opinion that David died as a result of brain swelling. He did not render any opinion that brain shear caused death (First Tr III 697).

In the second trial Dr. Fain changed his opinion as to the cause of death. He now wanted the jury to believe that the child died as a result of shaken baby syndrome, or brain shear (III 746-747). Contrary to his testimony in the first trial, Dr. Fain stated that the child did not have brain herniation, nor did he die from that (III 751-753). Defense counsel pursued this inconsistent opinion as to the cause of death (III 753-765). Defense counsel asked the doctor when he arrived at this new cause of death:

Q. When was the first time you decided your opinion would be brain shearing rather than edema?

A. After reviewing the file that I had and looking at both Cat scans, which the first time that I ever saw the first Cat scan and compared it to the second was last night.

Q. So it was last night you decided it would be shearing?

A. It was last night that I decided that there was no evidence of herniation. [III 757-758]

This change in testimony is believed to be the reason as to why there was a significant change between trials. Dr. Fain's change in opinion rendered any mistakes the hospital made irrelevant. This fact also

substantiates a reasonable probability that the doctors had something to hide.

When Dr. Daniel Fain changed his testimony as to the cause of death defense counsel stopped the proceedings and argued that it was fundamentally unfair, and that the state's witness is changing his testimony, and he was not prepared to cross-examine Dr. Fain with his new findings:

> Judge, I'm going to discuss this with my client at recess. In light of Dr. Fain's testimony prior testimony was, of the witnesses, there's a brain herniation with edema cause of death. Cause of death as established by the coroner is blunt force trauma, intracranial brain injury. Now we have Fain coming in here saying the brain is, in fact, severed. Never said to anybody including Mr. Cherry until last night (III 775).
>
> When he comes in here the night before trial and he does -- we do have his report, there's no problems with that, and we're prepared to cross-examine him based on that report and then he says, "Well, last night I was looking at something. Now, I've changed." And now, we got the cause of death as we originally thought but a different cause of death. I would submit it catches, and probably MR. Cherry also, it catches me by surprise. He never filed an amended report. He never did this research ahead of time. We do discovery. We've got to provide what our witnesses are going to supply to the Court. Mr. Cherry gives me what his witnesses are going to say and then the guy changes his whole testimony. And I - - I submit, you know, if it weren't a murder case, okay. A murder case it -- it could be crucial. And I don't know at this point what to say other than I'll discuss it with my client over lunch and see what he has to say. We had Dr. Palutke here. Obviously, had I known that, I would have asked him about that. We had Dr. Meyer yesterday. I might have -- I would have asked him about that. Now they're gone (III 776-777).

The judge gave defense counsel the option of calling the pathologist over the phone and swearing him in and resolving the matter (III 778-779, 783-784). Defense counsel did not take any action as a result of this change in testimony.

Counsel's failure to take advantage of state's own scientific test, which possibly provided exculpatory evidence, constitutes ineffective assistance. House v Balkcom, 725 F.2d 608 (11th Cir 1984); Miller v Wainwright, 798 F.2d 426 (11th Cir 1986); Stephens v Kemp, 846 F.2d 642 (11th Cir 1988); Rogers v Israel, supra. Defense counsel

's failure to investigate his options and make a reasonable choice between them forecloses any "strategic decision" that might exists. Jackson v Herring, 42 F.3d 1350 (11th Cir 1995).

Furthermore, counsel's failure to investigate defendant's only plausible line of defense and defers to his client's wishes on defense strategy, where it was clear of client's lack of knowledge of or his ability to understand the law and facts constituted ineffective assistance. Alvord v Wainwright, 469 U.S. 956, 83 LEd2d 291, 105 S.Ct. 355 (1984). In addition, counsel cannot stand behind the shield of trial strategy for failure to interview readily available witnesses whose testimony would have been noncumulative and potentially aided the defense. Crisp v Duckworth, 743 F.2d 580, 584 (7th Cir 1984).

Where the cumulative effect of multiple errors acts to deny the defendant of a fair trial, the resulting conviction must be reversed. people v Malone, 180 Mich App 347 (1989); People v Skowronski, 61 Mich App 71, 77 (1975); Blackburn v Foltz, 828 F.2d 1177 (6th Cir 1987); Crisp v Duckworth, 743 F.2d 580 (7th Cir 1984).

Likewise, in Thomas v Calderon, 120 F.2d 1045 (9th Cir 1997) the Court found ineffective assistance of counsel where counsel failed to impeach jailhouse informants and to rebut the forensic evidence. Trial counsel's cumulative errors and admissions constituted ineffective assistance of counsel, which, in the interest of justice, required the granting of a new trial. See

U.S. v Kladouris, 739 F.Supp. 1221 (N.D. Ill 1990); Henry v Scully, 78 F.3d 51 (2nd Cir 1996); Washington v Smith, 48 F.Supp 2d 1149 (E.D. Wis 1999).

In Weekly v Jones, 56 F.3d 889 (8th Cir 1995) the Court found "a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland, and that the reasonable probability standard is not a sufficiency of evidence test." (citing) Kyles v Whitley, 115 S.Ct. 1555, 1566, 131 LEd2d 490 (1995). Id at 56 F.3d at 897.

Finally, it cannot be said in this case that the jury did not have reasonable doubt because of certain exhibits they requested during deliberations (X 1509). Two of the exhibits requested was the Cat scans, and most importantly, Burke's testimony. However, as the court stated, Dr. Burke did not testify; although his radiology report was admitted into evidence (III 703 exhibit W). The contents of that report were sufficiently described in this brief. Another exhibit requested was the pathologist's report. Consequently, all the exhibits requested can be related to Dr. Fain's change in testimony. Further, by the jury requesting the CT scans, pathologist's report, and Dr. Burke's testimony, it can be reasonably said that the jury had reasonable doubt.

In the case at bar the defendant offers a substantial amount of proof of medical malpractice, and its significance is great.

## ISSUE III.

**TRIAL COUNSEL'S FAILURE TO MOVE FOR A MISTRIAL OVER FAIN'S PREJUDICIAL AND CONTRADICTING TESTIMONY, CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL AND DENIED DEFENDANT A FAIR TRIAL.**

**STANDARD OF REVIEW.** In reviewing a claim of ineffective assistance of counsel, the reviewing court is to determine (1) whether counsel's performance was objectively unreasonable, and (2) whether the defendant was prejudiced by counsel's defective performance. People v Mitchell, 454 Mich 145, 164; 560 NW2d 600 (1997); People v Rockey, 237 Mich App 74, 76; NW2d 887 (1999).

An ineffective assistance claim based on allegations not supported by the record will not be reviewed where no motion for new trial, evidentiary hearing, or remand has been filed. People v Lawson, 124 Mich App 371 (1983). However, where the record contains enough detail concerning the alleged deficiencies in representation to permit resolution of the claim, an appellate court may address the issue. People v Johnson, 124 Mich App 80 (1983); People v Cicotte, 133 Mich App 630 (1984); People v Hunter, 141 Mich App 225 (1985); People v Armandarez, 188 Mich App 61 (1991).

The Defendant in this case had two trials. The first trial ended in a hung jury. At a subsequent hearing on Defendant's motion for bond, it was learned that the jurors were deadlocked between involuntary manslaughter and acquittal, with two (2) for outright acquittal, and ten (10) for conviction of the lesser offense of involuntary manslaughter (11/23/98 Tr, 4). Defense counsel argued that the jurors did not consider the murder charge, except in passing. Id. at 7.

Subsequently, the Defendant was tried a second time. However, when reviewing the doctors' testimonies from the first trial, and comparing them to the second trial, there is a substantial amount of inconsistencies. For example, Dr. Page's testimony substantially deviated

from his prior testimony. In the first trial Dr. Page admitted that he did order medication for David (First Tr II 497, 504, 515-516). Mary Tosiou, who was an emergency medicine resident, also corroborated the fact that Dr. Page ordered medication (First Tr II 481). Dr. Tosiou didn't testify in the second trial however. Dr. Tagett also testified that Dr. Page ordered medication for David (First Tr II 444). This medication is believed to have great significance in David's death.

In between trials it was also learned that a lawsuit was filed on the hospital by David's mother, Tina McBain (III 858-859). Ironically, in the second trial Dr. Page vigorously denied ordering any medication for David. In fact, several doctors' testimonies changed.

When defense counsel questioned Dr. Fain in the first trial as to the cause of David's death he rendered an opinion that David died as a result of brain swelling, an injury that is treatable:

Q. Did you see edema in the -- in the Cat scan?

A. Yes sir.

Q. So, that indicates there was brain swelling, correct?

A. Yes sir.

Q. Probably led to his death?

A. Yes sir.

Q. Is that what probably led to his death?

A. Brain swelling produced the herniation which led to the death. Yes sir. [First Tr III 693]

In the second trial Dr. Fain's testimony changed. His new opinion as to the cause of death was brain shear, an injury that is not treatable

(III 746-747). Dr.Fain's change in opinion did in fact have a substantial impact on the outcome of the trial. Furthermore, the day Dr. Fain came up with this new opinion is completely ludicrous:

> Q. When was the first time you decided your opinion would be brain shearing rather than edema?
>
> A. After reviewing the file that I had and looking at both Cat scans, which the first time that I ever saw the first Cat scan and compared it to the second was last night.
>
> Q. So it was last night you decided it would be shearing?
>
> A. It was last night that I decided that there was no evidence of herniation. [III 757-758]

Dr. Fain, a key witness for the state, suddenly changes his opinion as to the cause of death nine (9) months after the child's death. By Dr. Fain changing his opinion, he made any mistakes the hospital made irrelevant; there is no medical treatment for this new cause of death. Therefore, it did not matter that the CT scan was misread. It did not matter that this child was given medication that increases brain pressure. It did not matter that the child lied in P.I.C.U. for four hours with no medical treatment. And finally, it did not matter that Dr. Page failed to call the neurosurgeon in to attend to David, who was on call all night long.

After Dr. Fain's testimony, defense counsel stated his concerns to the court:

> When he comes in here the night before trial and he does -- we do have his report, there's no problems with that, and we're prepared to cross-examine him based on that report and then he says, "Well, last night I was looking at something. Now I've changed." And now, we got the cause of death as we originally thought but a different cause of death. I would submit it catches, and probably Mr. Cherry also, it catches me by surprise. He never filed an amended report. He never did this research ahead of time. We do discovery. We've got to provide what our witnesses are going to supply to the Court. Mr. Cherry gives me what his witnesses are going to say and then the guy changes his whole testimony. And I -- I submit, you know, if it weren't a murder case, okay. A murder case it -- it could be crucial. And I don't know at this point what to say other than I'll discuss it with my client over lunch and see what he has to say. We had Dr. Palutke here. Obviously, had I known that, I would have asked him about that. We had Dr. Meyer yesterday. I might have -- I would have asked him about that. Now they're gone (III 776-777).

Defense counsel and the Judge had a lengthy argument on this issue (III 774-784). Defense counsel had the chance to cross-examine the pathologist as the Court offered, however, he did not take advantage of this chance. Counsel also did not request a mistrial on the grounds that Fain's testimony so prejudiced the Defendant <u>Strickland v Washington</u>, 466 US 668; 104 S.Ct. 2052; 80 LEd2d 674 (1984).

Trial counsel's failure to move for a mistrial over Fain's change in testimony, which was extremely prejudicial, constituted ineffective assistance of counsel and deprived defendant of a fair trial. <u>People v Pickens</u>, 446 Mich 298, 338; 521 NW2d 797 (1994); <u>People v Tommolino</u>, 187 Mich App 14, 17; 466 NW2d 315 (1991); <u>Clark v Duckworth</u>, 906 F.2d 1174 (7th Cir 1990); Trial counsel's failure to move for a new trial based on discovery of new evidence, constitutes ineffective assistance of counsel. <u>House v Balkcom</u>, 725 F.2d 608 (11th Cir 1984).

Counsel's failure to move for a mistrial was unsound trial strategy,

People v Stanaway, 446 Mich 643, 687; 521 NW2d 557 (1994); People v Butler, 193 Mich App 63, 66-67; 483 NW2d 430 (1992), and denied the Defendant his Sixth Amendment right to effective assistance of counsel. See US Const, Am. VI; Const 1963, art 1 §20.

Defense counsel in this case had every reason to move for a mistrial on the grounds of the doctor changing the cause of death, as changing the cause of death was outcome determinative. Further, counsel indirectly admitted that he was not prepared to cross-examine the doctor on his new findings, however, as for brain swelling, he was prepared (III 776-777). Had defense counsel moved the Court for a mistrial, he would have been prepared to rebut Dr. Fain's new opinion. It is very clear that the doctors opinion effected the outcome of the trial. Stanaway, supra.

ISSUE III.A.

**THERE WAS INSUFFICIENT EVIDENCE FOR THE JURY TO FIND INTENT AS REQUIRED FOR THE CRIME OF SECOND DEGREE MURDER.**

**STANDARD OF REVIEW.** Sufficiency of the evidence is viewed in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. Hampton, infra

Unlike claims that a verdict is contrary to the great weight of the evidence, which must first be raised at the trial level, challenges to the sufficiency of evidence may be raised for the first time on appeal. People v Wright, 44 Mich App 111 (1972); People v Patterson, 428 Mich 502 (1987).

When reviewing the sufficiency of evidence, the Court "must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." People v Jaffray, 445 Mich 287,

296; 519 NW2d 108 (1994); People v Hampton, 407 Mich 354, 368 (1979).

Second degree murder requires one of three intents, that is the intent to kill, the intent to do great bodily harm or the intent to create a very high risk of death or serious bodily injury. People v Aaron, 409 Mich 672, 209 NW2d 304 (1980).

For purposes of this issue, appellant contends that there was not sufficient showing of an intent to kill, or an intent to create a very high risk of death or serious bodily injury sufficient to support a conviction of second degree murder. The facts in this case however indicate that there was circumstantial evidence that the defendant's son was injured while in his care, the intent to kill or create a very high risk of death or serious bodily injury is in dispute. Also in dispute is the fact that the prosecutor did not prove beyond a reasonable doubt that the child would have died despite any medical treatment.

In Defendant's second trial the prosecutor's theory that he argued in his opening statement was that the Defendant struck and beat David resulting in death (I 233). At the end of the second trial however, in his closing statement, his theory was that David died as a result of brain shear (X 1453, 1463). That theory was completely inconsistent with his first theory of death. Defense counsel also argued in his closing argument that the theory of death changed between trials (X 1484).

In Defendant's second trial, it was determined by the forensic pathologist, Dr. Paluke, that David died from blunt force trauma, which caused diffuse brain swelling (I 333). It was never determined or suggested by Dr. Palutke that David died as a result of shaken baby syndrome, or brain shear. In fact, he never even mentioned it. The issue of retinal hemorrhaging, which could be caused by shaking a child, was said to be caused

By the child falling out of the Defendant's arms, according to Dr. Palutke's testimony (I 308). Furthermore, he also testified that the head injury David received would not be fatal in itself (I 310-311). Although, if it weren't treated properly it could be fatal (I 311). He further stated that in about 90% of cases like this one he would expect edema to be present immediately (I 312).

In the first trial there are doctors admitting to giving this child medication. In the second trial they deny it and point the finger at one another. There is a radiologist misreading Cat scans, and most importantly, we have a doctor changing the cause of death the night before his testimony at the second trial, **nine (9) months** after the death. Additionally, doctors admit that they went over their testimony with one another right before they testified (III 683-684).

Consequently, the testimony of Dr. Fain changing his opinion had a tremendous impact on the jury's verdict. For, there is no medical treatment that would cure such an injury. Therefore, after changing the cause of death, it made all the mistakes the hospital made irrelevant.

The prosecutor suggested that the Defendant intended to kill his child because he didn't have a baby-sitter, and that he wanted to go out and have a few drinks (X 1408-1409, 1411, 1425-1427). The Defendant's father's testimony was that he offered to baby-sit, as he always did. However, upon review of the police report he noticed part of his statement missing (X 1205-1208). According to Officer Hopke, the Defendant's father told him that he wouldn't baby-sit (III 832, 836). This was argued and reargued in Defendant's second trial. Furthermore, during defense counsel's cross-examination of Officer Hopke he asked him if he brought a tape recorder with him when he questioned the Defendant's father (III 824). Officer Hopke testified that he did have

his transmitter on his belt that records the conversations, but it was not turned on; however, he said he did take notes (III 825, 829). Defense counsel requested a copy of those notes. Ironically, Officer Hopke said he shredded them. Id at 829.

For the investigative officer to shred his notes regarding a murder investigation, particularly when he is investigating a possible motive or intent to prove the Defendant guilty of second degree murder, is nothing more than mere incompetence.

The Defendant was denied his right to a fair trial and due process of law when he was convicted based upon insufficient evidence. Hampton, supra. Further, with all of the cumulative circumstantial evidence of medical mistakes, one cannot reasonably say that this child would have died.

In People v Moss, 70 Mich App 18 (1976), Judge Kelly noted:

> In 40 CJS, Homicide, §11 b, pg.854, it is said, "It is not sufficient [to sustain a conviction] that the act of the accused was the cause of a condition or situation affording an opportunity for the compassing of the death by some other unconnected agency." Wharton on Homicide, §28, p 31, as cited in Nelson v State, 58 Ga App 243; 198 SE 305 (1938), states, "To hold a person criminally responsible for a homicide, his act must have been the proximate cause of the death as distinguished from the cause of a condition affording the opportunity for the compassing of the death by some other unconnected agency."

More recently, in People v Daniels, 172 Mich App 374 (1988), the Michigan Court of Appeals adopted Judge Kelly's opinion in Moss, supra, and stated as follows:

> It is well-settled in Michigan that there must be a more direct causal connection between the defendant's acts and a homicide charge in order to hold a defendant criminally responsible for a death that is required to hold the defendant liable in tort. (citation omitted); People v Jeglum, 41 Mich App 247, 250; 199 NW2d 854 (1972). Where the defendant was a participant in the

> events resulting in death, but did not, as in this case, do the homicidal act, the question of criminal responsibility has been resolved under different legal analyses, depending in part on the nature of the offense.
>
> When the offense is involuntary manslaughter based on criminal negligence, the question of who actually caused the death becomes a critical issue, and the standard applied to the issue of proximate causation is whether the resulting death was the natural and necessary result of the act of the defendant. (citation omitted); Jeglum, supra, at 250.

Furthermore, in this case, the doctors who testified for the prosecution and placed the blame on the Defendant and subjected him to criminal liability were not disinterested or impartial as witnesses. People v Young, 418 Mich 1, 19-20 (1983). In the present case, the doctors livelihoods were intimately connected with the outcome of the defendant's case, being, had they corroborated the facts from their previous testimony, there is a reasonable probability that they would have suffered the impact of a long a strenuous civil suit; therefore, subjecting themselves to possible public humiliation.

**RELIEF REQUESTED**

**WHEREFORE**, for these reasons, the Defendant's conviction of second degree murder should be reversed and remanded back to the trial court level for further proceedings, or minimally, enter in a conviction on the lesser included offense of involuntary manslaughter.

Respectfully submitted,

David P. Flick

David P. Flick

Exhibit A ---- Med Records-Flight Records

Exhibit B ---- Fentanyl

Exhibit C --- Versed

Exhibit D ---- Jury Instructions

Exhibit E ---- Med records-morphine

EXHIBIT A

...BER: 98-1193-474-1A11
...DATE: 05-08-1998
...NAME: MCBAIN, DAVID
... OF BIRTH: 09-08-1997 SEX: M AGE: 8 MOS
...AN HOSPITAL: SJM TRAN PHYSICIAN: CARLSON, W.
...CVG HOSPITAL: BMH RCVG PHYSICIAN: TAGETT, M.



Air Care Transport Recor...
Assessment: Page 1 of 5

Check the applicable boxes ① circle the applicable items

...hief Complaint: Fall ē Sz Medical Necessity: Trauma Care, PICU, Neurosurgery

...nset: ~1400 HPI: 3000 ? fall from couch, ø apparent LOC. Was then playing on floor. 2° later when family dog jumped off couch onto pt's abdomen. 15' later ↓ activity noted per Mom's boyfriend. ø resid. sz on EMS arrival. Pt intubated on scene & IO established.

...MH: Unknown 2° to Mom's distress

...eds: ø

...eds Cont: ø Last Meal: Unknown

...lergies: ☒ NKDA ☐ PCN ☐ ASA ☐ Other: ☐ Ca channel blocker: ☐ metformin

...c / Fam Hx: Lives ē Mom & Mom's boyfriend. No known abuse hx. Est. Weight: 11 kg Tobacco: N/A

...ENT: ☐ Airway Clear ☒ ETT ☒ Trachea midline ☐ JVD HOB 30° ☒ Other: Fontanelle closed. Contusion Ⓡ cheek. Mallampati class 1 2 3 4 (N/A)

Other Findings: ...manual C-spine ctrl per staff, pt on KED. Though ø secured, C-spine ctrl maintained → pt moved onto kiddie litter. Movement noted to ext x4. —— RN

...esp: ☒ Lung Sounds Clear / = bilat SpAO2: 98-100 % @ 100 FIO2 ☐ Other:

...CV: ☐ Peripheral Edema ☒ Heart Tones S1 S2 = ⓜ ☒ Skin Warm & Dry ☒ Pink mucous membranes ECG: Capillary refill: <2 Sec. ☐ Other: Sinus rhythm labile, 90s-202.

Peripheral Pulses: 1+ WEAK, 2+ NORMAL, 3+ BOUNDING

Dr Carlson stated pt restrained in car seat during "near miss" accident pt sustained ø obvious injuries —— RN

...GU: ☒ Abdomen (Soft) / Non tender ☒ Bowel Sounds Present ☒ Other: Ⓛ flank contusion ☐ Other: ☐ Nausea ☒ N/(OG) To: ☐ low suction ☒ atmosphere ☒ Foley cath to dd ☒ Urine Clear ☐ Rectal Exam PTA

...xt: ☒ No Deformity / Injury ☐ See Anatomical Chart ☒ Other: IO Ⓛ tibia ☐ Pain on hip compression ☐ Back: No deformity / Injury ☒ Unable to assess 2° immobilization ☐ Other:

...euro: ☐ Oriented X3 ☒ PERRL @ 1 mm ☒ Other: decerebrate posturing ☐ Other: Hand Grasp ☐ Strong = bilat ☑ Other: non-purposeful Plantar Flexion ☐ Strong = bilat ☑ Other: non-purposeful ☒ Moves all ext ☒ Spontaneously ☐ To command ☒ Other: Intermittent decerebrate posturing ē disconjugate gaze

...ain: ☐ Denies ☐ Radiation ☐ Yes / Location: N/A Rating ___ / 10 (10 worst) ☐ Chest

...s: 4I > 11/33 < 400

Time: ____ ABG: N/A / / / % @ ____ FIO2:

...y: CXR: ø obvious fxs or hemothorax. ETT tip on carina. Skull: Obvious parietal skull fx. C-spine: ø obvious clear

...us During Transport: Pt sedated & relaxed ē 30 ug fentanyl, 0.5 mg Versed, 1 mg Norcuron. ...t rate very labile during transport. Began spontaneous movement on arrival @ BMH.

...nosis: ① Traumatic head injury ② Skull fx

#2

...cal Crew: [signature] EMT-P Medical Crew: [signature], MD
...cal Crew: [signature] RN Medical Director:

X

Exhibit B

RXMED

FENTANYL CITRATE

Abbott

Narcotic Analgesic

**Action And Clinical Pharmacology:** Fentanyl, although chemically unrelated to morphine, produces pharmacologic effects and degree of analgesia similar to morphine. On a weight basis, however, fentanyl is 50 to 100 times more potent than morphine, but its duration of action is shorter than that of meperidine or morphine. A parenteral dose of 100 µg of fentanyl is approximately equivalent in analgesic activity to 10 mg of morphine or 75 mg of meperidine.

The principal actions of therapeutic value are analgesia and sedation.

Fentanyl has been reported to be a narcotic analgesic with a rapid onset and a short duration of action.

Alterations in respiratory rate and alveolar ventilation, associated with narcotic analgesics, may last longer than the analgesic effect. As the dose of the narcotic is increased, the decrease in pulmonary exchange becomes greater. Large doses may produce apnea. Fentanyl appears to have less emetic activity than other narcotic analgesics. Histamine assays and skin wheal testing in man, as well as in vivo testing in dogs, indicate that clinically significant histamine release rarely occurs with fentanyl. Assays in man demonstrate no clinically significant histamine release in dosages up to 50 µg/kg (1 mL/kg). Fentanyl preserves cardiac stability and at higher doses, inhibits stress-related hormonal changes.

Fentanyl may cause muscle rigidity, particularly involving the muscles of respiration. It may also produce other signs and symptoms characteristic of narcotic analgesics including euphoria, miosis, bradycardia and bronchoconstriction.

The onset of action of fentanyl is almost immediate when the drug is given i.v.; however, the maximal analgesic and respiratory depressant effects may not be noted for several minutes. The usual duration of action of analgesic effect is 30 to 60 minutes after a single i.v. dose of up to 100 µg (2 mL).

Following i.m. administration, onset of action is from 7 to 8 minutes, and the duration of action is 1 to 2 hours.

Following epidural administration, onset of analgesia occurs between 5 and 10 minutes and the duration of action is generally 2 to 5 hours. Analgesia can be maintained with on-demand or continuous epidural administration.

**As with longer acting narcotic analgesics, the duration of respiratory depressant effect may be longer than the analgesic effect. The following observations have been reported concerning altered respiratory response to CO2 stimulation following administration of fentanyl to man:** Diminished sensitivity to CO2 stimulation may persist longer than depression of respiratory rate. Altered sensitivity to CO2 stimulation has been demonstrated for up to 4 hours following a single i.v. dose of 600 µg (0.6 mg; 12 mL) of fentanyl to healthy volunteers. Fentanyl frequently slows the respiratory rate, duration and degree of respiratory depression being dose related. The peak respiratory depressant effect of a single i.v. dose of fentanyl is noted 5 to 15 minutes following injection (see Warnings and Precautions).

Fentanyl, in commonly used clinical doses (less than 10 µg/kg) has little or no effect on myocardial or

...odynamic function except for vagally induced bradycardia.

The effects of low doses of fentanyl (0.07 µg/mL and 0.36 µg/mL) on hemoglobin affinity for oxygen have been studied in comparison to other analgesics. It has been reported that such doses shifted the hemoglobin dissociation curve to the left, but a higher dose (0.71 µg/mL) failed to alter this curve.

In patients scheduled for coronary artery bypass, fentanyl at doses of 37 µg/kg followed by 53 µg/kg i.v., showed instances of hemolysis; however the clinical significance is still to be defined.

The circulatory effects of fentanyl at 5 sequential doses of 1 µg/kg i.v. were studied in conscious and anesthetized subjects. In conscious patients, fentanyl did not affect the pressure or heart rate, while in anesthetized patients, a 20% fall in blood pressure and heart rate was noted.

Fentanyl has been used in 14 neonates undergoing major surgical procedures; doses of 10 µg/kg, 25 µg/kg or 50 µg/kg were given i.v. An extremely prolonged ventilatory depression, 1.5 to 2 times the normal adult value and transient rebounds in plasma levels were noted.

With doses of approximately 3 to 30 µg/kg i.v. in humans, the serum curves could be described in terms of a three-compartment open model.

At all doses, plasma levels have been reported to fall rapidly in the first 5 minutes to approximately 20% of the peak value.

**The elimination half-life is approximately:** from 0.73 to 1.63 minutes for the first distribution phase, from 5.1 to 21 minutes for the second phase, from 86.6 to 346.5 minutes for the third phase. Urinary excretion was very low during the first 2 hours.

The concentration of fentanyl excreted unchanged in the urine is usually about 8 to 10%. The liver is the most important metabolizing organ, whereas extrahepatic metabolism occurs only to a very minor degree in the kidney.

**The metabolites of fentanyl are reported to be:** phenylacetic acid, norfentanyl (4-N-(N-propionyl-3H-anilino)piperidine), propionic acid and despropiofentanyl (1-2 (phenethyl)-4-N-anilinopiperidine).

**Indications And Clinical Uses:** Administered by i.v. or i.m. injection: For analgesic action of short duration during the anesthetic periods of premedication, induction and maintenance, and in the immediate postoperative period (recovery room) as the need arises; for use as a narcotic analgesic supplement in general or regional anesthesia; for administration with a neuroleptic such as droperidol injection as an anesthetic premedication, for induction of anesthesia, and as an adjunct in the maintenance of general and regional anesthesia; and for use as an anesthetic agent with oxygen in selected high risk patients, such as those undergoing open heart surgery or certain complicated neurological or orthopedic procedures. By epidural administration for the post-operative management of pain following general surgical procedures and cesarean sections.

**Contra-Indications:** Known hypersensitivity to the drug. As with other opiates administered epidurally, fentanyl should not be given to patients exhibiting the following: septicemia; severe hemorrhage or shock; local infection at the site of proposed puncture; disturbances in blood morphology and/or anticoagulant therapy or other concomitant drug therapy or medical conditions which could contraindicate the technique of epidural administration.

**Manufacturers' Warnings In Clinical States:** As with other CNS depressants, patients who have received fentanyl should have appropriate surveillance. Resuscitative equipment and a narcotic antagonist such as naloxone should be readily available to manage apnea (see Precautions and Overdose).

If fentanyl is administered with a tranquilizer such as droperidol, the user should familiarize himself with the special properties of each drug, particularly the widely differing durations of action. In addition, when such a combination is used, fluids and other countermeasures to manage hypotension

... with other potent narcotics, the respiratory depressant effect of fentanyl may persist longer than the measured analgesic effects. The total dose of all narcotic analgesics administered should be considered by the practitioner before ordering narcotic analgesics during recovery from anesthesia. It is recommended that narcotics, when required, should be used in reduced doses initially as low as 1/4 to 1/3 those usually recommended.

Fentanyl may cause muscle rigidity, particularly involving the muscles of respiration. The effect is related to the speed of injection and its incidence can be reduced by the use of slow intravenous injection. Once the effect occurs, it is managed by the use of assisted or controlled respiration and, if necessary, by a neuromuscular blocking agent compatible with the patient's conditions.

Where moderate or high doses are used (above 10 µg/kg), there must be adequate facilities for postoperative observation and ventilation, if necessary, of patients who have received fentanyl. It is essential that these facilities be fully equipped to handle all degrees of respiratory depression.

**Head Injuries and Increased Intracranial Pressure:** Fentanyl should be used with caution in patients who may be particularly susceptible to respiratory depression such as comatose patients who may have a head injury, brain tumor, other intracranial lesions, or a pre-existing increase in intracranial pressure. In addition, fentanyl may obscure the clinical course of patients with head injury.

**Acute Abdominal Conditions:** The administration of narcotics may obscure the diagnosis or clinical course of patients with acute abdominal conditions.

**Pregnancy:** The safe use of fentanyl has not been established with respect to possible adverse effects upon fetal development. Therefore, it should not be used in women of childbearing potential unless, in the judgment of the physician, the potential benefits outweigh the possible hazards.

**Precautions:** Vital signs should be monitored routinely. Fentanyl may produce bradycardia, which may be treated with atropine; however, fentanyl should be used with caution in patients with cardiac bradyarrhythmias.

Fentanyl should be administered with caution to patients with liver and kidney dysfunction because of the importance of these organs in the metabolism and excretion of drugs.

**Children:** The safety of fentanyl in children younger than 2 years of age has not been established.

**Obstetrics:** There are insufficient data regarding placental transfer and fetal effects; therefore, safety for the infant in obstetrics has not been established.

**Lactation:** It is not known whether fentanyl is excreted in human milk. Caution should be exercised when fentanyl is administered to a nursing mother.

**Special Risk Patients:** The initial dose of fentanyl should be appropriately reduced in elderly and debilitated patients. The effect of the initial dose should be considered in determining incremental doses.

Nitrous oxide has been reported to produce cardiovascular depression when given with higher doses of fentanyl.

Fentanyl should be used with caution in patients with chronic obstructive pulmonary disease, patients with decreased respiratory reserve, and others with potentially compromised respiration. In such patients, narcotics may additionally decrease respiratory drive and increase airway resistance. During anesthesia, this can be managed by assisted or controlled respiration. Respiratory depression caused by narcotic analgesics can be reversed by narcotic antagonist. Appropriate surveillance should be maintained because the duration of respiratory depression of doses of fentanyl employed during anesthesia may be longer than the duration of narcotic antagonist action. Consult individual prescribing information (naloxone) before employing narcotic antagonists.

...tain forms of conduction anesthesia, such as spinal anesthesia and some peridural anesthetics can alter respiration by blocking intercostal nerves. Through other mechanisms, fentanyl can also alter respiration (see Pharmacology). Therefore, when fentanyl is used to supplement these forms of anesthesia, the anesthetist should be familiar with the physiological actions involved, and be prepared to manage them in the patients selected for these forms of anesthesia.

**Dependence Liability:** Fentanyl can produce drug dependence of the morphine type and therefore has the potential of being abused. Psychic dependence, physical dependence, and tolerance may develop upon repeated administration.

**Drug Interactions:** When a neuroleptic such as droperidol is used with fentanyl, pulmonary arterial pressure may decrease. This fact should be considered by those who conduct diagnostic and surgical procedures where interpretation of pulmonary arterial pressure measurements might determine final management of the patient.

When either high doses of anesthetic doses of fentanyl are employed, even relatively small dosages of diazepam may cause cardiovascular depression.

Other CNS depressant drugs (e.g. barbiturates, tranquilizers, narcotics and general anesthetics) will have additive or potentiating effects with fentanyl. When patients have received such drugs, the dose of fentanyl required will be less than usual. Likewise, following the administration of fentanyl, the dose of other CNS depressant drugs should be reduced.

When fentanyl is used with a neuroleptic, such as droperidol, hypotension can occur. If this occurs, the possibility of hypovolemia should also be considered and managed with appropriate parenteral fluid therapy. Repositioning the patient to improve venous return to the heart should be considered when operative conditions permit. Care should be exercised in moving and positioning of patients because of the possibility of orthostatic hypotension. If volume expansion with fluids plus other countermeasures do not correct hypotension, the administration of pressor agents other than epinephrine should be considered. Because of the alpha-adrenergic blocking action of droperidol, epinephrine may paradoxically decrease the blood pressure in patients treated with droperidol.

When droperidol is used with fentanyl and the EEG is used for postoperative monitoring, it may be found that the EEG pattern returns to normal slowly.

Severe and unpredictable potentiation by MAO inhibitors has been reported with narcotic analgesics. Since the safety of fentanyl in this regard has not been established, its use in patients who have received MAO inhibitors within 14 days is not recommended.

**Adverse Reactions:** As with other narcotic analgesics, the most common serious reactions reported to occur with fentanyl are: respiratory depression, apnea, muscle rigidity and bradycardia. If these remain untreated, respiratory arrest, circulatory depression or cardiac arrest could occur.

Pruritus, occurring mainly in the face and chest area, is observed frequently following the administration of fentanyl by epidural route.

**Other adverse reactions that have been reported are:** hypotension, dizziness, blurred vision, nausea, emesis, laryngospasm, diaphoresis, itching, drowsiness and urinary retention.

It has been reported that secondary rebound respiratory depression may occasionally occur postoperatively. Patients should be monitored for this possibility and appropriate countermeasures taken as necessary.

**When a neuroleptic such as droperidol is used with fentanyl, the following adverse reactions can occur:** chills or shivering, restlessness, and postoperative hallucinatory episodes (sometimes associated with transient periods of mental depression); extrapyramidal symptoms (dystonia, akathisia, and oculogyric crisis) have been observed up to 24 hours postoperatively. When they occur,

drowsiness is also frequently reported following the use of droperidol.

Elevated blood pressure, with and without pre-existing hypertension, has been reported following administration of fentanyl combined with droperidol. This might be due to unexplained alterations in sympathetic activity following large doses; however, it is also frequently attributed to anesthetic and surgical stimulation during light anesthesia.

Although fentanyl has been reported to induce grand mal seizures with i.v. administration at a dose of 100 µg, there was no EEG documentation. Some authors suggest that rigidity is a more likely explanation for the myoclonic movements, since none of the patients showed any neurologic disorders after their reported seizures.

**Symptoms And Treatment Of Overdose:** Symptoms: The manifestations of fentanyl overdosage are an extension of its pharmacologic actions.

**Treatment:** In the presence of hypoventilation or apnea, oxygen should be administered and respiration should be assisted or controlled as indicated. A patent airway must be maintained; an oropharyngeal airway or endotracheal tube might be indicated. If depressed respiration is associated with muscular rigidity, an i.v. neuromuscular blocking agent might be required to facilitate assisted or controlled respiration. The patient should be carefully observed for 24 hours, body warmth and adequate fluid intake should be maintained. If hypotension occurs and is severe or persists, the possibility of hypovolemia should be considered and managed with appropriate parenteral fluid therapy. A specific narcotic antagonist such as naloxone should be available for use as indicated to manage respiratory depression. This does not preclude the use of more immediate countermeasures. The duration of respiratory depression following overdosage of fentanyl may be longer than the duration of narcotic antagonist action. Consult the package insert of the individual narcotic antagonists for details about use.

It is not known whether fentanyl is dialyzable.

**Dosage And Administration:** Fentanyl citrate injection is administered only by i.v., i.m. or epidural injection.

**Dosage should be individualized. Some of the factors to be considered in determining the dose are:** age, body weight, physical status, underlying pathological condition, use of other drugs and the surgical procedure involved. Vital signs should be monitored routinely.

**Adults:** Premedication: As premedication (to be appropriately modified in the elderly, debilitated and those who have received other depressant drugs), 0.7 to 1.4 µg/kg (0.014 to 0.028 mL/kg) may be administered i.m. 30 to 60 minutes prior to surgery.

**Adjunct to General Anesthesia:** See Dosage Range.

**Adjunct to Regional Anesthesia:** With regional anesthesia, 0.7 to 1.4 µg/kg (0.014 to 0.028 mL/kg) may be administered i.m. or slowly i.v., over 1 to 2 minutes, when additional analgesia is required.

**As a General Anesthetic:** When attenuation of responses to surgical stress is especially important, fentanyl in doses of 50 to 100 µg/kg (1 to 2 mL/kg) may be administered with oxygen and a muscle relaxant to produce anesthesia without the use of additional anesthetic agents. In certain cases, doses up to 150 µg/kg (3 mL/kg) may be necessary to produce the anesthetic effects.

**Adjunct to General Anesthesia:** See Table I.

Fentanyl has been used for open heart surgery and certain other major surgical procedures in patients for whom protection of the myocardium from excess oxygen demand is indicated, and for certain complicated neurological and orthopedic procedures.

**Post-operative Pain:** For the post-operative management of pain following general surgical

procedures and cesarean sections, fentanyl may be administered by the epidural route at a dose of 100 µg (0.1 mg, 2 mL). The 2 mL fentanyl should be diluted with 8 mL of 0.9% sodium chloride resulting in final concentration of 10 µg/mL. If required, additional boluses of 100 µg on demand or by continuous infusion at the rate of 1 µg/kg/hour. Caution: Such admixtures should be used within 24 hours because of the risk of microbial contamination during preparation.

It is essential that qualified personnel and adequate facilities are available for the management of respiratory distress.

**Children:** For induction and maintenance in children 2 to 12 years of age, a reduced dose as low as 2 to 3 µg/kg (0.04 to 0.06 mL/kg) of body weight is recommended.

The solution contains no bacteriostat, antimicrobial agent or added buffer, and is intended only for use as a single dose injection. When smaller doses are required, the unused portion should be discarded in an appropriate manner.

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration.

Protect from light. Exposure of pharmaceutical products to heat should be minimized. Avoid excessive heat. Protect from freezing. It is recommended that the product be stored at room temperature (25°C); however, brief exposure up to 40°C does not adversely affect the product.

**Availability And Storage:** Each mL of sterile, nonpyrogenic solution contains: fentanyl 50 µg as the citrate in water for injection. The solution may contain sodium hydroxide for pH adjustment. Ampuls of 2, 5, 10 and 20 mL and flip-top vials of 10 and 20 mL.

BACK TO HOME

Exhibit C

About Us · Innovative R&D · Our Products · Health Care Programs & Services · Career Opportunities · Virtual Newsroom

Roche

Product Information · Latest News

*Roche Pharmaceuticals in the U.S.*

*Our Products*

Search
Sitemap
Contact Us

Roche

# VERSED® (midazolam HCl) INJECTION

CIV

This product information is intended for United States residents and on-screen viewing only.
Before prescribing, please refer to printed complete product information.

## Complete Product Information


- WARNING
- DESCRIPTION
- CLINICAL PHARMACOLOGY
- INDICATIONS
- CONTRAINDICATIONS
- WARNINGS
- PRECAUTIONS
- ADVERSE REACTIONS
- DRUG ABUSE AND DEPENDENCE
- OVERDOSAGE
- DOSAGE AND ADMINISTRATION
- HOW SUPPLIED


**WARNING**

*Adults and Pediatrics:* Intravenous VERSED has been associated with respiratory depression and respiratory arrest, especially when used for sedation

promptly and treated effectively, death or hypoxic encephalopathy has resulted. Intravenous VERSED should be used only in hospital or ambulatory care settings, including physicians' and dental offices, that provide for continuous monitoring of respiratory and cardiac function, ie, pulse oximetry. Immediate availability of resuscitative drugs and age- and size-appropriate equipment for bag/valve/mask ventilation and intubation, and personnel trained in their use and skilled in airway management should be assured (see WARNINGS). For deeply sedated pediatric patients, a dedicated individual, other than the practitioner performing the procedure, should monitor the patient throughout the procedure.

The initial intravenous dose for sedation in adult patients may be as little as 1 mg, but should not exceed 2.5 mg in a normal healthy adult. Lower doses are necessary for older (over 60 years) or debilitated patients and in patients receiving concomitant narcotics or other central nervous system (CNS) depressants. The initial dose and all subsequent doses should always be titrated slowly; administer over at least 2 minutes and allow an additional 2 or more minutes to fully evaluate the sedative effect. The use of the 1 mg/mL formulation or dilution of the 1 mg/mL or 5 mg/mL formulation is recommended to facilitate slower injection. Doses of sedative medications in pediatric patients must be calculated on a mg/kg basis, and initial doses and all subsequent doses should always be titrated slowly. The initial pediatric dose of VERSED for sedation/anxiolysis/amnesia is age, procedure, and route dependent (see DOSAGE AND ADMINISTRATION for complete dosing information).

*Neonates:* VERSED should not be administered by rapid injection in the neonatal population. Severe hypotension and seizures have been reported following rapid IV administration, particularly with concomitant use of fentanyl (see DOSAGE AND ADMINISTRATION for complete information).

**DESCRIPTION:** VERSED is a water-soluble benzodiazepine available as a sterile, nonpyrogenic parenteral dosage form for intravenous or intramuscular injection. Each mL contains midazolam hydrochloride equivalent to 1 mg or 5 mg midazolam compounded with 0.8% sodium chloride and 0.01% edetate disodium, with 1% benzyl alcohol as preservative; the pH is adjusted to approximately 3 with hydrochloric acid and, if necessary, sodium hydroxide.

Midazolam is a white to light yellow crystalline compound, insoluble in water. The hydrochloride salt of midazolam, which is formed *in situ,* is soluble in aqueous solutions. Chemically, midazolam HCl is 8-chloro-6-(2-fluorophenyl)-1-methyl-4*H*-imidazo[1,5-a][1,4]benzodiazepine hydrochloride. Midazolam hydrochloride has the empirical formula $C_{18}H_{13}ClFN_3 \cdot HCl$, a calculated molecular weight of 362.25 and the following structural formula:






Under the acidic conditions required to solubilize midazolam in the product, midazolam is present as an equilibrium mixture (shown below) of the closed ring form shown above and an open-ring structure formed by the acid-catalyzed ring opening of the 4,5-double bond of the diazepine ring. The amount of open-ring form is dependent upon the pH of the solution. At the specified pH of the product, the solution may contain up to about 25% of the open-ring compound. At the physiologic conditions under which the product is absorbed (pH of 5 to 8) into the systemic circulation, any open-ring form present reverts to the physiologically active, lipophilic, closed-ring form (midazolam) and is absorbed as such.




Midazolam Open-ring Form

The following chart plots the percentage of midazolam present as the open-ring form as a function of pH in aqueous solutions. As indicated in the graph, the amount of open-ring compound present in solution is sensitive to changes in pH over the pH range specified for the product: 3.0 to 4.0 for the 1 mg/mL concentration and 3.0 to 3.6 for the 5 mg/mL concentration. Above pH 5, at least 99% of the mixture is present in the closed-ring form.




**CLINICAL PHARMACOLOGY:** VERSED is a short-acting benzodiazepine central nervous system (CNS) depressant.

The effects of VERSED on the CNS are dependent on the dose administered, the route of administration, and the presence or absence of other medications. Onset time of sedative effects after IM administration in adults is 15 minutes, with peak sedation occurring 30 to 60 minutes following injection. In one adult study, when tested the following day, 73% of the patients who received VERSED intramuscularly had no recall of memory cards shown 30 minutes following drug administration; 40% had no recall of the memory cards shown 60 minutes following drug administration. Onset time of sedative effects in the pediatric population begins within 5 minutes and peaks at 15 to 30 minutes depending upon the dose administered. In pediatric patients, up to 85% had no recall of pictures shown after receiving intramuscular VERSED compared with 5% of the placebo controls.

Sedation in adult and pediatric patients is achieved within 3 to 5 minutes after intravenous (IV) injection; the time of onset is affected by total dose administered and the concurrent administration of narcotic premedication. Seventy-one percent of the adult patients in endoscopy studies had no recall of introduction of the endoscope; 82% of the patients had no recall of withdrawal of the endoscope. In one study of pediatric patients undergoing lumbar puncture or bone marrow aspiration, 88% of patients had impaired recall vs 9% of the placebo controls. In another pediatric oncology study, 91% of VERSED treated patients were amnestic compared with 35% of patients who had received fentanyl alone.

When VERSED is given IV as an anesthetic induction agent, induction of anesthesia occurs in approximately 1.5 minutes when narcotic premedication has been administered and in 2 to 2.5 minutes without narcotic premedication or other sedative premedication. Some impairment in a test of memory was noted in 90% of the patients studied. A dose response study of pediatric patients premedicated with 1.0 mg/kg intramuscular (IM) meperidine found that only 4 out of 6 pediatric patients who received 600 µg/kg IV VERSED lost consciousness, with eye closing at 108 ± 140 seconds. This group was compared with pediatric patients who were given thiopental 5 mg/kg IV; 6 out of 6 closed their eyes at 20 ± 3.2 seconds. VERSED did not dependably induce anesthesia at this dose despite concomitant opioid administration in pediatric patients.

VERSED, used as directed, does not delay awakening from general anesthesia in adults. Gross tests of recovery after awakening (orientation, ability to stand and walk, suitability for discharge from the recovery room, return to baseline Trieger competency) usually indicate recovery within 2 hours but recovery may take up to 6 hours in some cases. When compared with patients who received thiopental, patients who received midazolam generally recovered at a slightly slower rate. Recovery from anesthesia or sedation for procedures in pediatric patients depends on the dose of VERSED administered, coadministration of other medications causing CNS depression and duration of the procedure.

In patients without intracranial lesions, induction of general anesthesia with IV VERSED is associated with a moderate decrease in cerebrospinal fluid pressure

thiopental. Preliminary data in neurosurgical patients with normal intracranial pressure but decreased compliance (subarachnoid screw measurements) show comparable elevations of intracranial pressure with VERSED and with thiopental during intubation. No similar studies have been reported in pediatric patients.

The usual recommended intramuscular premedicating doses of VERSED do not depress the ventilatory response to carbon dioxide stimulation to a clinically significant extent in adults. Intravenous induction doses of VERSED depress the ventilatory response to carbon dioxide stimulation for 15 minutes or more beyond the duration of ventilatory depression following administration of thiopental in adults. Impairment of ventilatory response to carbon dioxide is more marked in adult patients with chronic obstructive pulmonary disease (COPD). Sedation with IV VERSED does not adversely affect the mechanics of respiration (resistance, static recoil, most lung volume measurements); total lung capacity and peak expiratory flow decrease significantly but static compliance and maximum expiratory flow at 50% of awake total lung capacity ($V_{max}$) increase. In one study of pediatric patients under general anesthesia, intramuscular VERSED (100 or 200 µg/kg) was shown to depress the response to carbon dioxide in a dose-related manner.

In cardiac hemodynamic studies in adults, IV induction of general anesthesia with VERSED was associated with a slight to moderate decrease in mean arterial pressure, cardiac output, stroke volume and systemic vascular resistance. Slow heart rates (less than 65/minute), particularly in patients taking propranolol for angina, tended to rise slightly; faster heart rates (eg, 85/minute) tended to slow slightly. In pediatric patients, a comparison of IV VERSED (500 µg/kg) with propofol (2.5 mg/kg) revealed a mean 15% decrease in systolic blood pressure in patients who had received IV VERSED vs a mean 25% decrease in systolic blood pressure following propofol.

***Pharmacokinetics:*** Midazolam's activity is primarily due to the parent drug. Elimination of the parent drug takes place via hepatic metabolism of midazolam to hydroxylated metabolites that are conjugated and excreted in the urine. Six single-dose pharmacokinetic studies involving healthy adults yield pharmacokinetic parameters for midazolam in the following ranges: volume of distribution (Vd), 1.0 to 3.1 L/kg; elimination half-life, 1.8 to 6.4 hours (mean approximately 3 hours); total clearance (Cl), 0.25 to 0.54 L/hr/kg. In a parallel group study, there was no difference in the clearance, in subjects administered 0.15 mg/kg (n=4) and 0.30 mg/kg (n=4) IV doses indicating linear kinetics. The clearance was successively reduced by approximately 30% at doses of 0.45 mg/kg (n=4) and 0.6 mg/kg (n=5) indicating non-linear kinetics in this dose range.

*Absorption:* The absolute bioavailability of the intramuscular route was greater than 90% in a crossover study in which healthy subjects (n=17) were administered a 7.5 mg IV or IM dose. The mean peak concentration ($C_{max}$) and time to peak ($T_{max}$) following the IM dose was 90 ng/mL (20% CV) and 0.5

ng/mL ($T_{max}$=1.0 hour).

Following IM administration, $C_{max}$ for midazolam and its 1-hydroxy metabolite were approximately one-half of those achieved after intravenous injection.

*Distribution:* The volume of distribution (Vd) determined from six single-dose pharmacokinetic studies involving healthy adults ranged from 1.0 to 3.1 L/kg. Female gender, old age, and obesity are associated with increased values of midazolam Vd. In humans, midazolam has been shown to cross the placenta and enter into fetal circulation and has been detected in human milk and CSF (see *Special Populations*).

In adults and pediatric patients older than 1 year, midazolam is approximately 97% bound to plasma protein, principally albumin.

*Metabolism:* In vitro studies with human liver microsomes indicate that the biotransformation of midazolam is mediated by cytochrome P450 3A4. This cytochrome also appears to be present in gastrointestinal tract mucosa as well as liver. Sixty to seventy percent of the biotransformation products is 1-hydroxy-midazolam (also termed alpha-hydroxy-midazolam) while 4-hydroxy-midazolam constitutes 5% or less. Small amounts of a dihydroxy derivative have also been detected but not quantified. The principal urinary excretion products are glucuronide conjugates of the hydroxylated derivatives.

Drugs that inhibit the activity of cytochrome P450 3A4 may inhibit midazolam clearance and elevate steady-state midazolam concentrations.

Studies of the intravenous administration of 1-hydroxy-midazolam in humans suggest that 1-hydroxy-midazolam is at least as potent as the parent compound and may contribute to the net pharmacologic activity of midazolam. In vitro studies have demonstrated that the affinities of 1- and 4-hydroxy-midazolam for the benzodiazepine receptor are approximately 20% and 7%, respectively, relative to midazolam.

*Excretion:* Clearance of midazolam is reduced in association with old age, congestive heart failure, liver disease (cirrhosis) or conditions which diminish cardiac output and hepatic blood flow.

The principal urinary excretion product is 1-hydroxy-midazolam in the form of a glucuronide conjugate; smaller amounts of the glucuronide conjugates of 4-hydroxy- and dihydroxy-midazolam are detected as well. The amount of midazolam excreted unchanged in the urine after a single IV dose is less than 0.5% (n=5). Following a single IV infusion in 5 healthy volunteers, 45% to 57% of the dose was excreted in the urine as 1-hydroxymethyl midazolam conjugate.

*Pharmacokinetics-Continuous Infusion:* The pharmacokinetic profile of midazolam following continuous infusion, based on 282 adult subjects, has been

comparable age, gender, body habitus and health status. However, midazolam can accumulate in peripheral tissues with continuous infusion. The effects of accumulation are greater after long-term infusions than after short-term infusions. The effects of accumulation can be reduced by maintaining the lowest midazolam infusion rate that produces satisfactory sedation.

Infrequent hypotensive episodes have occurred during continuous infusion; however, neither the time to onset nor the duration of the episode appeared to be related to plasma concentrations of midazolam or alpha-hydroxy-midazolam. Further, there does not appear to be an increased chance of occurrence of a hypotensive episode with increased loading doses.

Patients with renal impairment may have longer elimination half-lives for midazolam (see *Special Populations: Renal Failure*).

***Special Populations:*** Changes in the pharmacokinetic profile of midazolam due to drug interactions, physiological variables, etc., may result in changes in the plasma concentration-time profile and pharmacological response to midazolam in these patients. For example, patients with acute renal failure appear to have a longer elimination half-life for midazolam and may experience delayed recovery (see *Special Populations: Renal Failure*). In other groups, the relationship between prolonged half-life and duration of effect has not been established.

*Pediatrics and Neonates:* In pediatric patients aged 1 year and older, the pharmacokinetic properties following a single dose of VERSED reported in 10 separate studies of midazolam are similar to those in adults. Weight-normalized clearance is similar or higher (0.19 to 0.80 L/hr/kg) than in adults and the terminal elimination half-life (0.78 to 3.3 hours) is similar to or shorter than in adults. The pharmacokinetic properties during and following continuous intravenous infusion in pediatric patients in the operating room as an adjunct to general anesthesia and in the intensive care environment are similar to those in adults.

In seriously ill neonates, however, the terminal elimination half-life of midazolam is substantially prolonged (6.5 to 12.0 hours) and the clearance reduced (0.07 to 0.12 L/hr/kg) compared to healthy adults or other groups of pediatric patients. It cannot be determined if these differences are due to age, immature organ function or metabolic pathways, underlying illness or debility.

*Obese:* In a study comparing normals (n=20) and obese patients (n=20) the mean half-life was greater in the obese group (5.9 vs 2.3 hours). This was due to an increase of approximately 50% in the Vd corrected for total body weight. The clearance was not significantly different between groups.

*Geriatric:* In three parallel group studies, the pharmacokinetics of midazolam administered IV or IM were compared in young (mean age 29, n=52) and healthy elderly subjects (mean age 73, n=53). Plasma half-life was approximately two-fold higher in the elderly. The mean Vd based on total body weight increased

approximately 25% in the elderly in two studies and was similar to that of the younger patients in the other.

*Congestive Heart Failure:* In patients suffering from congestive heart failure, there appeared to be a two-fold increase in the elimination half-life, a 25% decrease in the plasma clearance and a 40% increase in the volume of distribution of midazolam.

*Hepatic Insufficiency:* Midazolam pharmacokinetics were studied after an IV single dose (0.075 mg/kg) was administered to 7 patients with biopsy proven alcoholic cirrhosis and 8 control patients. The mean half-life of midazolam increased 2.5-fold in the alcoholic patients. Clearance was reduced by 50% and the Vd increased by 20%. In another study in 21 male patients with cirrhosis, without ascites and with normal kidney function as determined by creatinine clearance, no changes in the pharmacokinetics of midazolam or 1-hydroxy-midazolam were observed when compared to healthy individuals.

*Renal Failure:* Patients with renal impairment may have longer elimination half-lives for midazolam and its metabolites which may result in slower recovery.

Midazolam and 1-hydroxy-midazolam pharmacokinetics in 6 ICU patients who developed acute renal failure (ARF) were compared with a normal renal function control group. Midazolam was administered as an infusion (5 to 15 mg/hr). Midazolam clearance was reduced (1.9 vs 2.8 mL/min/kg) and the half-life was prolonged (7.6 vs 13 hours) in the ARF patients. The renal clearance of the 1-hydroxy-midazolam glucuronide was prolonged in the ARF group (4 vs 136 mL/min) and the half-life was prolonged (12 vs >25 hours). Plasma levels accumulated in all ARF patients to about ten times that of the parent drug. The relationship between accumulating metabolite levels and prolonged sedation is unclear.

In a study of chronic renal failure patients (n=15) receiving a single IV dose, there was a two-fold increase in the clearance and volume of distribution but the half-life remained unchanged. Metabolite levels were not studied.

*Plasma Concentration-Effect Relationship:* Concentration-effect relationships (after an IV dose) have been demonstrated for a variety of pharmacodynamic measures (eg, reaction time, eye movement, sedation) and are associated with extensive intersubject variability. Logistic regression analysis of sedation scores and steady-state plasma concentration indicated that at plasma concentrations greater than 100 ng/mL there was at least a 50% probability that patients would be sedated, but respond to verbal commands (sedation score = 3). At 200 ng/mL there was at least a 50% probability that patients would be asleep, but respond to glabellar tap (sedation score = 4).

*Drug Interactions:* For information concerning pharmacokinetic drug interactions with VERSED (see PRECAUTIONS).

**INDICATIONS:** Injectable VERSED is indicated:

- intramuscularly or intravenously for preoperative sedation/anxiolysis/amnesia;
- intravenously as an agent for sedation/anxiolysis/amnesia prior to or during diagnostic, therapeutic or endoscopic procedures, such as bronchoscopy, gastroscopy, cystoscopy, coronary angiography, cardiac catheterization, oncology procedures, radiologic procedures, suture of lacerations and other procedures either alone or in combination with other CNS depressants;
- intravenously for induction of general anesthesia, before administration of other anesthetic agents. With the use of narcotic premedication, induction of anesthesia can be attained within a relatively narrow dose range and in a short period of time. Intravenous VERSED can also be used as a component of intravenous supplementation of nitrous oxide and oxygen (balanced anesthesia);
- continuous intravenous infusion for sedation of intubated and mechanically ventilated patients as a component of anesthesia or during treatment in a critical care setting.

VERSED is associated with a high incidence of partial or complete impairment of recall for the next several hours (see CLINICAL PHARMACOLOGY).

**CONTRAINDICATIONS:** Injectable VERSED is contraindicated in patients with a known hypersensitivity to the drug. Benzodiazepines are contraindicated in patients with acute narrow-angle glaucoma. Benzodiazepines may be used in patients with open-angle glaucoma only if they are receiving appropriate therapy. Measurements of intraocular pressure in patients without eye disease show a moderate lowering following induction with VERSED; patients with glaucoma have not been studied.

VERSED is not intended for intrathecal or epidural administration due to the presence of the preservative benzyl alcohol in the dosage form.

**WARNINGS: VERSED must never be used without individualization of dosage particularly when used with other medications capable of producing central nervous system depression. Prior to the intravenous administration of VERSED in any dose, the immediate availability of oxygen, resuscitative drugs, age- and size-appropriate equipment for bag/valve/mask ventilation and intubation, and skilled personnel for the maintenance of a patent airway and support of ventilation should be ensured. Patients should be continuously monitored with some means of detection for early signs of hypoventilation, airway obstruction, or apnea, ie, pulse oximetry. Hypoventilation, airway obstruction, and apnea can lead to hypoxia and/or cardiac arrest unless effective countermeasures are taken immediately.** The immediate availability of specific reversal agents (flumazenil) is highly recommended. Vital signs should continue to be monitored during the recovery period. Because intravenous VERSED depresses respiration (see CLINICAL

this depression, VERSED should be administered as an induction agent only by a person trained in general anesthesia and should be used for sedation/anxiolysis/amnesia only in the presence of personnel skilled in early detection of hypoventilation, maintaining a patent airway and supporting ventilation. **When used for sedation/anxiolysis/amnesia, VERSED should always be titrated slowly in adult or pediatric patients.** Adverse hemodynamic events have been reported in pediatric patients with cardiovascular instability; rapid intravenous administration should also be avoided in this population (see DOSAGE AND ADMINISTRATION for complete information).

Serious cardiorespiratory adverse events have occurred after administration of VERSED. These have included respiratory depression, airway obstruction, oxygen desaturation, apnea, respiratory arrest and/or cardiac arrest, sometimes resulting in death or permanent neurologic injury. There have also been rare reports of hypotensive episodes requiring treatment during or after diagnostic or surgical manipulations particularly in adult or pediatric patients with hemodynamic instability. Hypotension occurred more frequently in the sedation studies in patients premedicated with a narcotic.

Reactions such as agitation, involuntary movements (including tonic/clonic movements and muscle tremor), hyperactivity and combativeness have been reported in both adult and pediatric patients. These reactions may be due to inadequate or excessive dosing or improper administration of VERSED; however, consideration should be given to the possibility of cerebral hypoxia or true paradoxical reactions. Should such reactions occur, the response to each dose of VERSED and all other drugs, including local anesthetics, should be evaluated before proceeding. Reversal of such responses with flumazenil has been reported in pediatric patients.

Concomitant use of barbiturates, alcohol or other central nervous system depressants may increase the risk of hypoventilation, airway obstruction, desaturation, or apnea and may contribute to profound and/or prolonged drug effect. Narcotic premedication also depresses the ventilatory response to carbon dioxide stimulation.

Higher risk adult and pediatric surgical patients, elderly patients and debilitated adult and pediatric patients require lower dosages, whether or not concomitant sedating medications have been administered. Adult or pediatric patients with COPD are unusually sensitive to the respiratory depressant effect of VERSED. Pediatric and adult patients undergoing procedures involving the upper airway such as upper endoscopy or dental care, are particularly vulnerable to episodes of desaturation and hypoventilation due to partial airway obstruction. Adult and pediatric patients with chronic renal failure and patients with congestive heart failure eliminate midazolam more slowly (see CLINICAL PHARMACOLOGY). Because elderly patients frequently have inefficient function of one or more organ systems and because dosage requirements have been shown to decrease with age, reduced initial dosage of VERSED is recommended, and the possibility of profound and/or prolonged effect should be considered.

Injectable VERSED should not be administered to adult or pediatric patients in shock or coma, or in acute alcohol intoxication with depression of vital signs. Particular care should be exercised in the use of intravenous VERSED in adult or pediatric patients with uncompensated acute illnesses, such as severe fluid or electrolyte disturbances.

There have been limited reports of intra-arterial injection of VERSED. Adverse events have included local reactions, as well as isolated reports of seizure activity in which no clear causal relationship was established. Precautions against unintended intra-arterial injection should be taken. Extravasation should also be avoided.

The safety and efficacy of VERSED following nonintravenous and nonintramuscular routes of administration have not been established. VERSED should only be administered intramuscularly or intravenously.

The decision as to when patients who have received injectable VERSED, particularly on an outpatient basis, may again engage in activities requiring complete mental alertness, operate hazardous machinery or drive a motor vehicle must be individualized. Gross tests of recovery from the effects of VERSED (see CLINICAL PHARMACOLOGY) cannot be relied upon to predict reaction time under stress. It is recommended that no patient operate hazardous machinery or a motor vehicle until the effects of the drug, such as drowsiness, have subsided or until 1 full day after anesthesia and surgery, whichever is longer. For pediatric patients, particular care should be taken to assure safe ambulation.

***Usage in Pregnancy:*** **An increased risk of congenital malformations associated with the use of benzodiazepine drugs (diazepam and chlordiazepoxide) has been suggested in several studies. If this drug is used during pregnancy, the patient should be apprised of the potential hazard to the fetus.**

Withdrawal symptoms of the barbiturate type have occurred after the discontinuation of benzodiazepines (see DRUG ABUSE AND DEPENDENCE).

***Usage in Preterm Infants and Neonates:*** Rapid injection should be avoided in the neonatal population. VERSED administered rapidly as an intravenous injection (less than 2 minutes) has been associated with severe hypotension in neonates, particularly when the patient has also received fentanyl. Likewise, severe hypotension has been observed in neonates receiving a continuous infusion of midazolam who then receive a rapid intravenous injection of fentanyl. Seizures have been reported in several neonates following rapid intravenous administration.

The neonate also has reduced and/or immature organ function and is also vulnerable to profound and/or prolonged respiratory effects of VERSED.

Exposure to excessive amounts of benzyl alcohol has been associated with

increased incidence of kernicterus, particularly in small preterm infants. There have been rare reports of deaths, primarily in preterm infants, associated with exposure to excessive amounts of benzyl alcohol. The amount of benzyl alcohol from medications is usually considered negligible compared to that received in flush solutions containing benzyl alcohol. Administration of high dosages of medications (including VERSED) containing this preservative must take into account the total amount of benzyl alcohol administered. The recommended dosage range of VERSED for preterm and term infants includes amounts of benzyl alcohol well below that associated with toxicity; however, the amount of benzyl alcohol at which toxicity may occur is not known. If the patient requires more than the recommended dosages or other medications containing this preservative, the practitioner must consider the daily metabolic load of benzyl alcohol from these combined sources.

**PRECAUTIONS:** ***General:*** Intravenous doses of VERSED should be decreased for elderly and for debilitated patients (see WARNINGS and DOSAGE AND ADMINISTRATION). These patients will also probably take longer to recover completely after VERSED administration for the induction of anesthesia.

VERSED does not protect against the increase in intracranial pressure or against the heart rate rise and/or blood pressure rise associated with endotracheal intubation under light general anesthesia.

***Use With Other CNS Depressants:*** The efficacy and safety of VERSED in clinical use are functions of the dose administered, the clinical status of the individual patient, and the use of concomitant medications capable of depressing the CNS. Anticipated effects range from mild sedation to deep levels of sedation virtually equivalent to a state of general anesthesia where the patient may require external support of vital functions. Care must be taken to individualize and carefully titrate the dose of VERSED to the patient's underlying medical/surgical conditions, administer to the desired effect being certain to wait an adequate time for peak CNS effects of both VERSED and concomitant medications, and have the personnel and size-appropriate equipment and facilities available for monitoring and intervention (see Boxed WARNING, WARNINGS and DOSAGE AND ADMINISTRATION). Practitioners administering VERSED must have the skills necessary to manage reasonably foreseeable adverse effects, particularly skills in airway management. For information regarding withdrawal (see DRUG ABUSE AND DEPENDENCE).

***Information for Patients:*** To assure safe and effective use of benzodiazepines, the following information and instructions should be communicated to the patient when appropriate:

1. Inform your physician about any alcohol consumption and medicine you are now taking, especially blood pressure medication and antibiotics, including drugs you buy without a prescription. Alcohol has an increased effect when consumed with benzodiazepines; therefore, caution should be exercised

regarding simultaneous ingestion of alcohol during benzodiazepine treatment.

2. Inform your physician if you are pregnant or are planning to become pregnant.

3. Inform your physician if you are nursing.

4. Patients should be informed of the pharmacological effects of VERSED, such as sedation and amnesia, which in some patients may be profound. The decision as to when patients who have received injectable VERSED, particularly on an outpatient basis, may again engage in activities requiring complete mental alertness, operate hazardous machinery or drive a motor vehicle must be individualized.

5. Patients receiving continuous infusion of midazolam in critical care settings over an extended period of time, may experience symptoms of withdrawal following abrupt discontinuation.

***Drug Interactions:*** The sedative effect of intravenous VERSED is accentuated by any concomitantly administered medication, which depresses the central nervous system, particularly narcotics (eg, morphine, meperidine and fentanyl) and also secobarbital and droperidol. Consequently, the dosage of VERSED should be adjusted according to the type and amount of concomitant medications administered and the desired clinical response (see DOSAGE AND ADMINISTRATION).

Caution is advised when midazolam is administered concomitantly with drugs that are known to inhibit the P450 3A4 enzyme system such as cimetidine (not ranitidine), erythromycin, diltiazem, verapamil, ketoconazole and itraconazole. These drug interactions may result in prolonged sedation due to a decrease in plasma clearance of midazolam.

The effect of single oral doses of 800 mg cimetidine and 300 mg ranitidine on steady-state concentrations of midazolam was examined in a randomized crossover study (n=8). Cimetidine increased the mean midazolam steady-state concentration from 57 to 71 ng/mL. Ranitidine increased the mean steady-state concentration to 62 ng/mL. No change in choice reaction time or sedation index was detected after dosing with the H2 receptor antagonists.

In a placebo-controlled study, erythromycin administered as a 500 mg dose, tid, for 1 week (n=6), reduced the clearance of midazolam following a single 0.5 mg/kg IV dose. The half-life was approximately doubled.

Caution is advised when midazolam is administered to patients receiving erythromycin since this may result in a decrease in the plasma clearance of midazolam.

The effects of diltiazem (60 mg tid) and verapamil (80 mg tid) on the pharmacokinetics and pharmacodynamics of midazolam were investigated in a

7 hours when midazolam was taken in conjunction with verapamil or diltiazem. No interaction was observed in healthy subjects between midazolam and nifedipine.

In a placebo-controlled study, saquinavir administered as a 1200 mg dose, tid, for 5 days (n=12), a 56% reduction in the clearance of midazolam following a single 0.05 mg/kg IV dose was observed. The half-life was approximately doubled.

A moderate reduction in induction dosage requirements of thiopental (about 15%) has been noted following use of intramuscular VERSED for premedication in adults.

The intravenous administration of VERSED decreases the minimum alveolar concentration (MAC) of halothane required for general anesthesia. This decrease correlates with the dose of VERSED administered; no similar studies have been carried out in pediatric patients but there is no scientific reason to expect that pediatric patients would respond differently than adults.

Although the possibility of minor interactive effects has not been fully studied, VERSED and pancuronium have been used together in patients without noting clinically significant changes in dosage, onset or duration in adults. VERSED does not protect against the characteristic circulatory changes noted after administration of succinylcholine or pancuronium and does not protect against the increased intracranial pressure noted following administration of succinylcholine. VERSED does not cause a clinically significant change in dosage, onset or duration of a single intubating dose of succinylcholine; no similar studies have been carried out in pediatric patients but there is no scientific reason to expect that pediatric patients would respond differently than adults.

No significant adverse interactions with commonly used premedications or drugs used during anesthesia and surgery (including atropine, scopolamine, glycopyrrolate, diazepam, hydroxyzine, d-tubocurarine, succinylcholine and other nondepolarizing muscle relaxants) or topical local anesthetics (including lidocaine, dyclonine HCl and Cetacaine) have been observed in adults or pediatric patients. In neonates, however, severe hypotension has been reported with concomitant administration of fentanyl. This effect has been observed in neonates on an infusion of midazolam who received a rapid injection of fentanyl and in patients on an infusion of fentanyl who have received a rapid injection of midazolam.

***Drug/Laboratory Test Interactions:*** Midazolam has not been shown to interfere with results obtained in clinical laboratory tests.

***Carcinogenesis, Mutagenesis and Impairment of Fertility:*** *Carcinogenesis:* Midazolam maleate was administered with diet in mice and rats for 2 years at dosages of 1, 9 and 80 mg/kg/day. In female mice in the highest dose group there was a marked increase in the incidence of hepatic tumors. In high-dose male rats there was a small but statistically significant increase in benign thyroid follicular

dose of 0.35 mg/kg) do not increase the incidence of tumors. The pathogenesis of induction of these tumors is not known. These tumors were found after chronic administration, whereas human use will ordinarily be of single or several doses.

*Mutagenesis:* Midazolam did not have mutagenic activity in *Salmonella typhimurium* (5 bacterial strains), Chinese hamster lung cells (V79), human lymphocytes or in the micronucleus test in mice.

*Impairment of Fertility:* A reproduction study in male and female rats did not show any impairment of fertility at dosages up to 10 times the human IV dose of 0.35 mg/kg.

***Pregnancy:*** *Teratogenic Effects:* Pregnancy Category D (see WARNINGS).

Segment II teratology studies, performed with midazolam maleate injectable in rabbits and rats at 5 and 10 times the human dose of 0.35 mg/kg, did not show evidence of teratogenicity.

*Nonteratogenic Effects:* Studies in rats showed no adverse effects on reproductive parameters during gestation and lactation. Dosages tested were approximately 10 times the human dose of 0.35 mg/kg.

***Labor and Delivery:*** In humans, measurable levels of midazolam were found in maternal venous serum, umbilical venous and arterial serum and amniotic fluid, indicating placental transfer of the drug. Following intramuscular administration of 0.05 mg/kg of midazolam, both the venous and the umbilical arterial serum concentrations were lower than maternal concentrations.

The use of injectable VERSED in obstetrics has not been evaluated in clinical studies. Because midazolam is transferred transplacentally and because other benzodiazepines given in the last weeks of pregnancy have resulted in neonatal CNS depression, VERSED is not recommended for obstetrical use.

***Nursing Mothers:*** Midazolam is excreted in human milk. Caution should be exercised when VERSED is administered to a nursing woman.

***Pediatric Use:*** The safety and efficacy of VERSED for sedation/anxiolysis/amnesia following single dose intramuscular administration, intravenously by intermittent injections and continuous infusion have been established in pediatric and neonatal patients. For specific safety monitoring and dosage guidelines (see Boxed WARNING, CLINICAL PHARMACOLOGY, INDICATIONS, WARNINGS, PRECAUTIONS, ADVERSE REACTIONS, OVERDOSAGE and DOSAGE AND ADMINISTRATION). UNLIKE ADULT PATIENTS, PEDIATRIC PATIENTS GENERALLY RECEIVE INCREMENTS OF VERSED ON A MG/KG BASIS. As a group, pediatric patients generally require higher dosages of VERSED (mg/kg) than do adults. Younger (less than six years) pediatric patients may require higher dosages (mg/kg) than older pediatric patients, and may require closer monitoring. In obese

weight. When VERSED is given in conjunction with opioids or other sedatives, the potential for respiratory depression, airway obstruction, or hypoventilation is increased. The health care practitioner who uses this medication in pediatric patients should be aware of and follow accepted professional guidelines for pediatric sedation appropriate to their situation.

VERSED should not be administered by rapid injection in the neonatal population. Severe hypotension and seizures have been reported following rapid IV administration, particularly, with concomitant use of fentanyl.

*Geriatric Use:* Because geriatric patients may have altered drug distribution and diminished hepatic and/or renal function, reduced doses of VERSED are recommended. Intravenous and intramuscular doses of VERSED should be decreased for elderly and for debilitated patients (see WARNINGS and DOSAGE AND ADMINISTRATION) and subjects over 70 years of age may be particularly sensitive. These patients will also probably take longer to recover completely after VERSED administration for the induction of anesthesia. Administration of IM and IV VERSED to elderly and/or high-risk surgical patients has been associated with rare reports of death under circumstances compatible with cardiorespiratory depression. In most of these cases, the patients also received other central nervous system depressants capable of depressing respiration, especially narcotics (see DOSAGE AND ADMINISTRATION).

Specific dosing and monitoring guidelines for geriatric patients are provided in the DOSAGE AND ADMINISTRATION section for premedicated patients for sedation/anxiolysis/amnesia following IV and IM administration, for induction of anesthesia following IV administration and for continuous infusion.

**ADVERSE REACTIONS: See WARNINGS concerning serious cardiorespiratory events and possible paradoxical reactions.** Fluctuations in vital signs were the most frequently seen findings following parenteral administration of VERSED in adults and included decreased tidal volume and/or respiratory rate decrease (23.3% of patients following IV and 10.8% of patients following IM administration) and apnea (15.4% of patients following IV administration), as well as variations in blood pressure and pulse rate. The majority of serious adverse effects, particularly those associated with oxygenation and ventilation, have been reported when VERSED is administered with other medications capable of depressing the central nervous system. **The incidence of such events is higher in patients undergoing procedures involving the airway without the protective effect of an endotracheal tube (eg, upper endoscopy and dental procedures).**

***Adults:*** The following additional adverse reactions were reported after intramuscular administration:

| | |
|---|---|
| headache (1.3%) | *Local effects at IM Injection site* |

pain (0.4%)
induration (0.5%)
redness (0.5%)
muscle stiffness (0.3%)

Administration of IM VERSED to elderly and/or higher risk surgical patients has been associated with rare reports of death under circumstances compatible with cardiorespiratory depression. In most of these cases, the patients also received other central nervous system depressants capable of depressing respiration, especially narcotics (see DOSAGE AND ADMINISTRATION).

The following additional adverse reactions were reported subsequent to intravenous administration as a single sedative/anxiolytic/amnestic agent in adult patients:

| | *Local effects at the IV site* |
|---|---|
| hiccoughs (3.9%) | |
| nausea (2.8%) | |
| vomiting (2.6%) | tenderness (5.6%) |
| coughing (1.3%) | pain during injection (5.0%) |
| "oversedation" (1.6%) | redness (2.6%) |
| headache (1.5%) | induration (1.7%) |
| drowsiness (1.2%) | phlebitis (0.4%) |

***Pediatric Patients:*** The following adverse events related to the use of IV VERSED in pediatric patients were reported in the medical literature: desaturation 4.6%, apnea 2.8%, hypotension 2.7%, paradoxical reactions 2.0%, hiccough 1.2%, seizure-like activity 1.1% and nystagmus 1.1%. The majority of airway-related events occurred in patients receiving other CNS depressing medications and in patients where VERSED was not used as a single sedating agent.

***Neonates:*** For information concerning hypotensive episodes and seizures following the administration of VERSED to neonates (see Boxed WARNING, CONTRAINDICATIONS, WARNINGS and PRECAUTIONS).

Other adverse experiences, observed mainly following IV injection as a single sedative/anxiolytic/amnesia agent and occurring at an incidence of <1.0% in adult and pediatric patients, are as follows:

*Respiratory:* Laryngospasm, bronchospasm, dyspnea, hyperventilation, wheezing,

*Cardiovascular:* Bigeminy, premature ventricular contractions, vasovagal episode, bradycardia, tachycardia, nodal rhythm

*Gastrointestinal:* Acid taste, excessive salivation, retching

*CNS/Neuromuscular:* Retrograde amnesia, euphoria, hallucination, confusion, argumentativeness, nervousness, anxiety, grogginess, restlessness, emergence delirium or agitation, prolonged emergence from anesthesia, dreaming during emergence, sleep disturbance, insomnia, nightmares, athetoid movements, seizure-like activity, ataxia, dizziness, dysphoria, slurred speech, dysphonia, paresthesia

*Special Senses:* Blurred vision, diplopia, nystagmus, pinpoint pupils, cyclic movements of eyelids, visual disturbance, difficulty focusing eyes, ears blocked, loss of balance, light-headedness

*Integumentary:* Hive-like elevation at injection site, swelling or feeling of burning, warmth or coldness at injection site

*Hypersensitivity:* Allergic reactions including anaphylactoid reactions, hives, rash, pruritus

*Miscellaneous:* Yawning, lethargy, chills, weakness, toothache, faint feeling, hematoma

**DRUG ABUSE AND DEPENDENCE:** Midazolam is subject to Schedule IV control under the Controlled Substances Act of 1970.

Midazolam was actively self-administered in primate models used to assess the positive reinforcing effects of psychoactive drugs.

Midazolam produced physical dependence of a mild to moderate intensity in cynomolgus monkeys after 5 to 10 weeks of administration. Available data concerning the drug abuse and dependence potential of midazolam suggest that its abuse potential is at least equivalent to that of diazepam.

Withdrawal symptoms, similar in character to those noted with barbiturates and alcohol (convulsions, hallucinations, tremor, abdominal and muscle cramps, vomiting and sweating), have occurred following abrupt discontinuation of benzodiazepines, including midazolam. Abdominal distention, nausea, vomiting, and tachycardia are prominent symptoms of withdrawal in infants. The more severe withdrawal symptoms have usually been limited to those patients who had received excessive doses over an extended period of time. Generally milder withdrawal symptoms (eg, dysphoria and insomnia) have been reported following abrupt discontinuance of benzodiazepines taken continuously at therapeutic levels for several months. Consequently, after extended therapy, abrupt discontinuation should generally be avoided and a gradual dosage tapering schedule followed.

therefore, practitioners are advised to individualize therapy to meet patient's needs. In some case reports, patients who have had severe withdrawal reactions due to abrupt discontinuation of high-dose long-term midazolam, have been successfully weaned off of midazolam over a period of several days.

**OVERDOSAGE:** The manifestations of VERSED overdosage reported are similar to those observed with other benzodiazepines, including sedation, somnolence, confusion, impaired coordination, diminished reflexes, coma and untoward effects on vital signs. No evidence of specific organ toxicity from VERSED overdosage has been reported.

*Treatment of Overdosage:* Treatment of injectable VERSED overdosage is the same as that followed for overdosage with other benzodiazepines. Respiration, pulse rate and blood pressure should be monitored and general supportive measures should be employed. Attention should be given to the maintenance of a patent airway and support of ventilation, including administration of oxygen. An intravenous infusion should be started. Should hypotension develop, treatment may include intravenous fluid therapy, repositioning, judicious use of vasopressors appropriate to the clinical situation, if indicated, and other appropriate countermeasures. There is no information as to whether peritoneal dialysis, forced diuresis or hemodialysis are of any value in the treatment of midazolam overdosage.

Flumazenil, a specific benzodiazepine-receptor antagonist, is indicated for the complete or partial reversal of the sedative effects of benzodiazepines and may be used in situations when an overdose with a benzodiazepine is known or suspected. There are anecdotal reports of reversal of adverse hemodynamic responses associated with VERSED following administration of flumazenil to pediatric patients. Prior to the administration of flumazenil, necessary measures should be instituted to secure the airway, assure adequate ventilation, and establish adequate intravenous access. Flumazenil is intended as an adjunct to, not as a substitute for, proper management of benzodiazepine overdose. Patients treated with flumazenil should be monitored for resedation, respiratory depression and other residual benzodiazepine effects for an appropriate period after treatment. **Flumazenil will only reverse benzodiazepine-induced effects but will not reverse the effects of other concomitant medications.** The reversal of benzodiazepine effects may be associated with the onset of seizures in certain high-risk patients. **The prescriber should be aware of a risk of seizure in association with flumazenil treatment, particularly in long-term benzodiazepine users and in cyclic antidepressant overdose.** The complete flumazenil package insert, including CONTRAINDICATIONS, WARNINGS and PRECAUTIONS, should be consulted prior to use.

**DOSAGE AND ADMINISTRATION: VERSED is a potent sedative agent that requires slow administration and individualization of dosage. Clinical experience has shown VERSED to be 3 to 4 times as potent per mg as diazepam. BECAUSE SERIOUS AND LIFE-THREATENING CARDIORESPIRATORY ADVERSE EVENTS HAVE BEEN**

**CORRECTION OF THESE REACTIONS MUST BE MADE FOR EVERY PATIENT TO WHOM VERSED INJECTION IS ADMINISTERED, REGARDLESS OF AGE OR HEALTH STATUS. Excessive single doses or rapid intravenous administration may result in respiratory depression, airway obstruction and/or arrest. The potential for these latter effects is increased in debilitated patients, those receiving concomitant medications capable of depressing the CNS, and patients without an endotracheal tube but undergoing a procedure involving the upper airway such as endoscopy or dental (see Boxed WARNING and WARNINGS).**

Reactions such as agitation, involuntary movements, hyperactivity and combativeness have been reported in adult and pediatric patients. Should such reactions occur, caution should be exercised before continuing administration of VERSED (see WARNINGS).

VERSED should only be administered IM or IV (see WARNINGS).

Care should be taken to avoid intra-arterial injection or extravasation (see WARNINGS).

VERSED Injection may be mixed in the same syringe with the following frequently used premedications: morphine sulfate, meperidine, atropine sulfate or scopolamine. VERSED, at a concentration of 0.5 mg/mL, is compatible with 5% dextrose in water and 0.9% sodium chloride for up to 24 hours and with lactated Ringer's solution for up to 4 hours. Both the 1 mg/mL and 5 mg/mL formulations of VERSED may be diluted with 0.9% sodium chloride or 5% dextrose in water.

***MONITORING:*** Patient response to sedative agents, and resultant respiratory status, is variable. Regardless of the intended level of sedation or route of administration, sedation is a continuum; a patient may move easily from light to deep sedation, with potential loss of protective reflexes. This is especially true in pediatric patients. Sedative doses should be individually titrated, taking into account patient age, clinical status and concomitant use of other CNS depressants. Continuous monitoring of respiratory and cardiac function is required (ie, pulse oximetry).

*Adults and Pediatrics:* Sedation guidelines recommend a careful presedation history to determine how a patient's underlying medical conditions or concomitant medications might affect their response to sedation/analgesia as well as a physical examination including a focused examination of the airway for abnormalities. Further recommendations include appropriate presedation fasting.

Titration to effect with multiple small doses is essential for safe administration. It should be noted that adequate time to achieve peak central nervous system effect (3 to 5 minutes) for midazolam should be allowed between doses to minimize the potential for oversedation. Sufficient time must elapse between doses of concomitant sedative medications to allow the effect of each dose to be assessed before subsequent drug administration. This is an important consideration for all

Immediate availability of resuscitative drugs and *age- and size-appropriate* equipment and personnel trained in their use and skilled in airway management should be assured (see WARNINGS).

*Pediatrics:* For deeply sedated pediatric patients a dedicated individual, other than the practitioner performing the procedure, should monitor the patient throughout the procedure.

Intravenous access is not thought to be necessary for all pediatric patients sedated for a diagnostic or therapeutic procedure because in some cases the difficulty of gaining IV access would defeat the purpose of sedating the child; rather, emphasis should be placed upon having the intravenous equipment available and a practitioner skilled in establishing vascular access in pediatric patients immediately available.

**USUAL ADULT DOSE**

INTRAMUSCULARLY

| | |
|---|---|
| For preoperative sedation/anxiolysis/amnesia (induction of sleepiness or drowsiness and relief of apprehension and to impair memory of perioperative events).<br><br>For intramuscular use, VERSED should be injected deep in a large muscle mass. | The recommended premedication dose of VERSED for good risk (ASA Physical Status I & II) adult patients below the age of 60 years is 0.07 to 0.08 mg/kg IM (approximately 5 mg IM) administered up to 1 hour before surgery.<br><br>The dose must be individualized and reduced when IM VERSED is administered to patients with chronic obstructive pulmonary disease, other higher risk surgical patients, patients 60 or more years of age, and patients who have received concomitant narcotics or other CNS depressants (see ADVERSE REACTIONS). In a study of patients 60 years or older, who did not receive concomitant administration of narcotics, 2 to 3 mg (0.02 to 0.05 mg/kg) of VERSED produced adequate sedation during the preoperative period. The dose of 1 mg IM VERSED may suffice for some older patients if the anticipated intensity and duration of sedation is less critical. As with any potential respiratory depressant, these patients require observation for signs of cardiorespiratory depression after receiving IM VERSED.<br><br>Onset is within 15 minutes, peaking at 30 to 60 minutes. It can be administered concomitantly with atropine sulfate or scopolamine hydrochloride and reduced doses of narcotics. |

INTRAVENOUSLY

| | |
|---|---|
| Sedation/anxiolysis/amnesia for procedures (see INDICATIONS): Narcotic premedication results in less variability in patient response and a reduction in dosage of VERSED. For peroral procedures, the use of an appropriate topical anesthetic is recommended. For bronchoscopic procedures, the use of narcotic premedication is recommended. | When used for sedation/anxiolysis/amnesia for a procedure, dosage must be individualized and titrated. VERSED should always be titrated slowly; administer over at least 2 minutes and allow an additional 2 or more minutes to fully evaluate the sedative effect. Individual response will vary with age, physical status and concomitant medications, but may also vary independent of these factors (see WARNINGS concerning cardiac/respiratory arrest/airway obstruction/hypoventilation). |
| VERSED 1 mg/mL formulation is recommended for sedation/anxiolysis/ amnesia for procedures to facilitate slower injection. Both the 1 mg/mL and the 5 mg/mL formulations may be diluted with 0.9% sodium chloride or 5% dextrose in water. | 1. *Healthy Adults Below the Age of 60:* Titrate slowly to the desired effect (eg, the initiation of slurred speech). Some patients may respond to as little as 1 mg. No more than 2.5 mg should be given over a period of at least 2 minutes. Wait an additional 2 or more minutes to fully evaluate the sedative effect. If further titration is necessary, continue to titrate, using small increments, to the appropriate level of sedation. Wait an additional 2 or more minutes after each increment to fully evaluate the sedative effect. A total dose greater than 5 mg is not usually necessary to reach the desired endpoint.<br><br>If narcotic premedication or other CNS depressants are used, patients will require approximately 30% less VERSED than unpremedicated patients.<br><br>2. *Patients Age 60 or Older, and Debilitated or Chronically Ill Patients:* Because the danger of hypoventilation, airway obstruction, or apnea is greater in elderly patients and those with chronic disease states |

effect may take longer in these patients, increments should be smaller and the rate of injection slower.

Titrate slowly to the desired effect (eg, the initiation of slurred speech). Some patients may respond to as little as 1 mg. No more than 1.5 mg should be given over a period of no less than 2 minutes. Wait an additional 2 or more minutes to fully evaluate the sedative effect. If additional titration is necessary, it should be given at a rate of no more than 1 mg over a period of 2 minutes, waiting an additional 2 or more minutes each time to fully evaluate the sedative effect. Total doses greater than 3.5 mg are not usually necessary.

If concomitant CNS depressant premedications are used in these patients, they will require at least 50% less VERSED than healthy young unpremedicated patients.

3. *Maintenance Dose:* Additional doses to maintain the desired level of sedation may be given in increments of 25% of the dose used to first reach the sedative endpoint, but again only by slow titration, especially in the elderly and chronically ill or debilitated patient. These additional doses should be given only after a thorough clinical evaluation clearly indicates the need for additional sedation.

Induction of Anesthesia:

For induction of general anesthesia, before administration of other anesthetic agents.

Individual response to the drug is variable, particularly when a narcotic premedication is not used. The dosage should be titrated to the desired effect according to the patient's age and clinical status.

When VERSED is used before other intravenous agents for induction of anesthesia, the initial dose of each agent may be significantly reduced, at times to as low as 25% of the usual initial dose of the individual agents.

*Unpremedicated Patients:* In the absence of premedication, an average adult under the age of 55 years will usually require an initial dose of 0.3 to 0.35 mg/kg for induction, administered over 20 to 30 seconds and allowing 2 minutes for effect. If needed to complete induction, increments of approximately 25% of the patient's initial dose may be used; induction may instead be completed with inhalational anesthetics. In

for induction, but such larger doses may prolong recovery.

Unpremedicated patients over the age of 55 years usually require less VERSED for induction; an initial dose of 0.3 mg/kg is recommended. Unpremedicated patients with severe systemic disease or other debilitation usually require less VERSED for induction. An initial dose of 0.2 to 0.25 mg/kg will usually suffice; in some cases, as little as 0.15 mg/kg may suffice.

*Premedicated Patients:* When the patient has received sedative or narcotic premedication, particularly narcotic premedication, the range of recommended doses is 0.15 to 0.35 mg/kg.

In average adults below the age of 55 years, a dose of 0.25 mg/kg, administered over 20 to 30 seconds and allowing 2 minutes for effect, will usually suffice.

The initial dose of 0.2 mg/kg is recommended for good risk (ASA I & II) surgical patients over the age of 55 years.

In some patients with severe systemic disease or debilitation, as little as 0.15 mg/kg may suffice.

Narcotic premedication frequently used during clinical trials included fentanyl (1.5 to 2 µg/kg IV, administered 5 minutes before induction), morphine (dosage individualized, up to 0.15 mg/kg IM), and meperidine (dosage individualized, up to 1 mg/kg IM). Sedative premedications were hydroxyzine pamoate (100 mg orally) and sodium secobarbital (200 mg orally). Except for intravenous fentanyl, administered 5 minutes before induction, all other premedications should be administered approximately 1 hour prior to the time anticipated for VERSED induction.

| | |
|---|---|
| Injectable VERSED can also be used during maintenance of anesthesia, for surgical procedures, as a component of balanced | Incremental injections of approximately 25% of the induction dose should be given in response to signs of lightening of anesthesia and repeated as necessary. |