# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DAVID PAUL FLICK,

                Petitioner,             Case Number: 2:05-CV-73367

v.                                       HON. MARIANNE O. BATTANI

MILLICENT WARREN,

                Respondent.

_____/

## OPINION AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner David Paul Flick has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights.[1] Petitioner is currently incarcerated at the Thumb Correctional Facility, in Lapeer, Michigan, pursuant to a conviction for second-degree murder. For the reasons set forth below, the Court denies the petition.

## I. Facts

Petitioner's conviction arises from the death of 8-month-old David McBain. Petitioner's conviction was the result of a second trial for this offense, the first ended in a hung jury.

David McBain was the son of Petitioner's live-in girlfriend, Tina McBain. Petitioner and Tina began dating one another when Tina was 3-4 months pregnant. During David's short life, Petitioner provided much of the day-to-day care of David. At the time of his death, Petitioner worked during the day and cared for David at night, while Tina went to work.

---

[1] Petitioner filed his petition *pro se*. The Court subsequently appointed counsel to represent Petitioner.

According to the testimony adduced at trial, on May 8, 1998, Petitioner dropped Tina off at her job at approximately 4:00 p.m., and then took David home with him.  At approximately 8:00 p.m., that evening, Petitioner banged on the door of a neighbor, William Jackson.  Jackson testified that his son, Aaron, answered the door.  Petitioner was holding David in his arms.  David appeared limp and unresponsive.  His breathing was irregular and labored.  Jackson testified that Petitioner asked for help.  Jackson told his son to call 911.  While waiting for paramedics to arrive, Petitioner told Jackson that earlier in the day David had fallen off a waterbed and a dog may have jumped on David.  Petitioner told Jackson that after David fell from the bed he appeared to be fine.  A few hours later, after he had visited his mother and father's house, Petitioner fed David.  After feeding David, David became limp.  Petitioner did not mention anything to Jackson about David falling from his arms or hitting his head on a door.

Brenda Sue Kenreich testified that she is a paramedic and she and her partner, Terry Germain, responded to the 911 call from Jackson's home.  She treated David and attempted to provide him with some oxygen while asking Petitioner questions in an attempt to better assess David's injuries.  Petitioner told her that a large dog had jumped on David's stomach.  After she questioned him about a bump on the baby's head, he then informed her that David also fell from a waterbed.  Kenreich testified that Petitioner never mentioned to her that he had dropped David or banged his head on a door.  David was transported to Lakeland Hospital in St. Joseph, Michigan.

Dr. Wayne Carlson testified that he was working as an emergency room physician at Lakeland Hospital on May 8, 1998, when David arrived by ambulance, at approximately 9:20 p.m.  Dr. Carlson testified that David was in grave condition and had obviously suffered serious

2

head injuries.  In advance of David's arrival at the hospital, arrangements had been made to transport David by helicopter to Bronson Hospital in Kalamazoo, Michigan because of the severity of his injuries.  Dr. Carlson talked to Petitioner in an attempt to discover the cause of David's injuries.  Petitioner informed him that, at approximately 6:00 p.m., David had fallen off a waterbed.  Petitioner stated that a dog had jumped off a couch and landed on David's abdomen.  Dr. Carlson testified that neither a fall from a bed nor being jumped on by a dog was consistent with the severe trauma to the brain that David appeared to have experienced.  Dr. Carlson suspected child abuse and completed a Protective Services Report.

Police Officer Todd Hopke testified that, on May 8, 1998, he responded to a call to investigate suspicious injuries to a baby at Lakeland Hospital.  He testified that he interviewed Petitioner at the hospital.  Petitioner told him that at approximately 6:00 p.m., David fell off a waterbed, but appeared to be fine after the fall.  Later in the day, a dog jumped on the baby's abdomen.  Petitioner stated that, shortly after that, the baby's breathing became labored and Petitioner ran to a neighbor's house for assistance.  Officer Hopke's interview was cut short because the helicopter arrived to transport David to Bronson Hospital.  Officer Hopke later went to Petitioner's house and determined that the waterbed was approximately 18 inches high.

Dr. Mark Tagett, a trauma surgeon, testified that he was working at Bronson Hospital when David arrived.  Dr. Tagett observed that both sides of David's head were swollen, and both of his cheeks were swollen and red.  Dr. Tagett did not believe David's injuries could be caused by a fall from an 18" high waterbed, a dog jumping on his abdomen, a fall from someone's arms, or running into a door.

Dr. Robert Page testified that he is a pediatrician and was working at Bronson Hospital

3

when David was brought to the emergency room.  He ordered a CT scan of David's brain.  The CT scan showed three skull fractures.  Petitioner informed him that the baby had fallen from a waterbed that was approximately 18 inches high and had been jumped upon by a dog.  Dr. Page believed that a fall from a waterbed could not have caused David's injuries.  David was transferred to the pediatric ICU, where he stabilized for a short time.  At approximately 2:15 a.m., David's blood pressure and heart rate elevated and his pupils were unequal and not reacting.  Dr. Page contacted neurosurgeon Mark Meyer, who ordered another CT scan.  The CT scan showed generalized swelling of the brain.  Dr. Page observed retinal hemorrhages, which he testified were indicative of Shaken Baby Syndrome.  He testified that these hemorrhages would not be caused by a fall from a bed or a person's arms.  He also testified that David's skull fractures would not have been caused from a 40-inch fall.

The neurologist, Dr. Meyer testified that David's injuries were the result of being shaken repeatedly and having his head impacted against a hard, flat surface with considerable force several times.  He further testified that David's injuries would not be expected from a fall from an 18-inch high waterbed, running into a door, or from a five-foot fall onto the floor.

Dr. Stephen Higgins, an ophthalmologist, testified that he observed severe bleeding in both David's retina and vitreous humor.  He testified that the most common cause of such extensive hemorrhaging is Shaken Baby Syndrome.  Dr. Higgins would not expect any retinal hemorrhaging in a baby who fell off a waterbed or who was held by someone who ran into a door.  He would have expect to see only a small amount of retinal hemorrhaging in a baby who fell on his head from someone's arms.

Dr. Daniel Fain, a pediatric neurologist, testified that he was consulted on David's case

4

on the morning of May 9, 1998, to determine if David was brain dead and should be removed from life support.  Dr. Fain observed bumps with swelling of the scalp on both sides of David's head.  He also observed bruises on David's face, abdomen, and legs.  Dr. Fain observed extensive retinal hemorrhage.  He determined that David was brain dead.  Dr. Fain testified that David died from severe trauma caused by prolonged, severe shaking, which caused severe shearing.  He testified that the cause of death was not herniation, which occurs when pressure builds up inside the brain and causes compression of the brain stem.[2]

Dr. Waledman A. Palutke, a forensic pathologist, testified that he performed an autopsy on David McBain on May 11, 1998.  Dr. Palutke testified that he saw several bruises of David's right knee, several bruises above the left knee, an abrasion on the right lower front chest wall, several more bruises at the base of the jaw on both sides, a large bruise on the left forehead, several bruises on the right side of David's face, a cluster of bruises on the right side of David's forehead, and large bruises above and under David's right eye.  David's skull was extensively bruised and there were severe, blunt force injuries on both sides of David's head.  Dr. Palutke testified that the cause of death was blunt force injuries of the head and brain.  He testified that the injuries were not consistent with a fall from an 18" high waterbed.  The head injuries also would not have been caused by a dog jumping onto the baby's abdomen.  He testified that the extent of the baby's injuries would not have been caused by the baby falling out of someone's arms or his head being struck on a door.

Tina McBain, David's mother, testified that on the evening of May 8, while at Bronson

---

[2]  Dr. Fain also testified at Petitioner's first trial.  At the first trial, Dr. Fain did not testify that shearing caused David's death.  Inconsistencies between Dr. Fain's testimony in the first and second trials form the basis for several of Petitioner's claims for habeas relief.

Hospital, Petitioner told her that David had fallen off the waterbed, been jumped upon by the dog, and that he accidentally struck David's head on a door as he rushed to reach the next-door-neighbor's house.  On September 10, 1998, Petitioner told her that David had actually fallen from his arms on May 8, and that he had not told her sooner because he was scared.  She testified that she did not believe Petitioner caused David's death.

Marilyn McDonald testified for the defense.  She testified that she is a professional counselor and Tina McBain asked her to see Petitioner after he was arrested.  Initially, he told her that David had fallen off a waterbed, but she sensed Petitioner was not entirely forthcoming.  Eventually, in late June or early July 1998, Petitioner told her that he had dropped David from his arms when he was reaching into a crib to get a rattle.

Petitioner testified in his own defense.  He testified that, while holding David and reaching into David's crib to retrieve a rattle, David fell from his arms, hit his head on the ground and stopped breathing.  Petitioner attempted CPR and David resumed breathing.  David vomited and then stopped breathing again.  Petitioner ran next door to get help.  As he was running next door, he thought that he should not tell anyone that he had dropped the baby.  He was scared to tell the police and McBain that he had dropped David, so he did not tell them.  He testified that the fall was accidental and he had no reason to want to hurt David.

## II.  Procedural History

Following a jury trial in Berrien County Circuit Court, Petitioner was convicted of second-degree murder.  On April 12, 1999, he was sentenced as a fourth habitual offender to 30 to 75 years imprisonment.

Petitioner filed an appeal of right in the Michigan Court of Appeals, presenting the

6

following claims:

I.    Mr. Flick was denied effective assistance of counsel, where, after Dr. Daniel Fain changes his opinion s to cause of death between the first and second trials, defense counsel failed to impeach Fain with prior inconsistent testimony from the first trial which would have rebutted Fain's explanation for his change in opinion.

II.    Mr. Flick was denied his due process right to a properly instructed jury and/or the effective assistance of counsel, where the trial court failed to give the jury any instruction on the defense theory of accident, when it was the central theory of defense and there was evidence presented to support that defense.

III.    Mr. Flick was denied his due process right to a fair trial, where the prosecutor improperly used facts not in evidence to appeal to the emotions and sympathy of the jury, and to ask them to be the only ones to "stand up" for the victim.

IV.    Mr. Flick was denied effective assistance of counsel, where counsel failed to request an instruction on the "intent to injure" form of involuntary manslaughter as a lesser offense.

V.    Mr. Flick's conviction for second-degree murder violated the protection against double jeopardy under state and/or federal constitutions, because there was no manifest necessity for a mistrial where the judge failed to poll the jury as to whether it had unanimously agreed on a partial verdict, on whether defendant was not guilty of second-degree murder before discharging them.

Petitioner raised the following claims in a supplemental brief filed in pro per:

I.    The trial court created a reversible error by abusing its discretion when sentencing defendant. The trial court's decision lacks the principles of proportionality and violated the Eighth Amendment of the Constitution, cruel and unusual punishment.

II.    Appellant was denied his Sixth Amendment right to effective assistance of counsel, where counsel failed to investigate the medications given, where, if properly investigated, would have shown grossly erroneous medical treatment, which ultimately could have rendered a different verdict.

A.    Defense counsel's failure to investigate expert's opinion, which possibly could have provided exculpatory evidence, constituted ineffective assistance of counsel.

III.    Trial counsel's failure to move for a mistrial over Fain's prejudicial and contradicting testimony, constituted ineffective assistance of counsel and denied

7

defendant a fair trial.

      A.     There was insufficient evidence for the jury to find intent as required for the crime of second-degree murder.

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Flick*, No. 219434 (Mich. Ct. App. Aug. 17, 2001).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court presenting the same claims raised before the Michigan Court of Appeals. The Michigan Supreme Court denied leave to appeal. *People v. Flick*, 464 Mich. 964 (Mich. 2002).

Petitioner then filed a motion for relief from judgment in the trial court, raising the following claims:

    I.     Defendant was denied his state and federal constitutional right to the effective assistance of appellate counsel, where counsel fell ill, during which time defendant was not represented by counsel for ten months, thereby prejudicing him to the extent that all meritorious issues were not raised.

    II.    Appellate counsel's failure to request that an evidentiary (Ginther) hearing be held on trial counsel's ineffective representation, denied defendant his Sixth Amendment right to the effective assistance of appellate counsel, and his due process right to a full and fair determination of th issues raised on appeal.

    III.    The absence of appellate counsel constructively denied defendant his Sixth Amendment right to the effective assistance of counsel on appeal.

    IV.    The defendant was denied his Fifth, Sixth, and Fourteenth Amendment rights, where the trial court refused to instruct on accident, when it was the central issue in the trial, resulting in trial by judge, rather than trial by jury.

    V.    Where the Michigan Court of Appeals ruled in this case, on direct appeal, that second-degree murder was a specific intent crime, the court of appeals erroneously reviewed defendant's appeal under the wrong element of second-degree murder, thereby prejudicing the defendant's right to direct review and denying him his due process right to a full and fair hearing, or, in the alternative, rendered his conviction unconstitutional.

    VI.    The defendant was denied his due process right to a fair trial, where the

8

prosecutor withheld material evidence, which related to testimony from its key witness, on a new and different cause of death between trial one and two, thereby prejudicing the defense to adequate preparation.

VII.    Defendant was denied his Sixth Amendment right to effective assistance of counsel where counsel misinformed defendant of the applicable law regarding the assistance of expert testimony for his defense.

VIII.   Defendant was denied his Sixth Amendment right to the effective assistance of counsel, and hi due process right to present a defense where defense counsel failed to request a continuance, and obtain expert testimony when the prosecution's key witness changed his testimony between the first and second trials on the cause of David's death.

Petitioner also moved the trial court to grant an evidentiary hearing to expand the record on the claims raised on direct appeal, in the motion for relief from judgment, and on a claim of newly discovered evidence from a doctor who questioned the official cause of the baby's death. On March 24, 2003 the trial court denied relief.

Petitioner sought leave to appeal the denial of his motion for relief from judgment in the Michigan Court of Appeals and Michigan Supreme Court   Both state appellate courts denied leave to appeal. *People v Flick*, No. 254194, (Mich. Ct. App. August 20, 2004); *People v Flick*, No. 127221, 472 Mich 914 (Mich. 2005)

Petitioner then filed the pending petition for a writ of habeas corpus, raising the following grounds for relief:

I.      Mr. Flick was denied effective assistance of counsel where, after Dr. Daniel Fain changed his opinion as to the cause of death between the first and second trials, defense counsel failed to impeach Fain with prior inconsistent testimony from the first trial which would have rebutted Fain's explanation for his change in opinion.

        A.      Petitioner was denied his sixth amendment right to effective assistance of counsel where defense counsel failed to move for a mistrial over Fain's prejudicial and contradicting testimony.

        B.      Petitioner was denied his sixth amendment right to effective assistance of

9

counsel where counsel failed to investigate expert's opinion, which possibly could have provided exculpatory evidence.

II.     Mr. Flick was denied his due process right to a properly instructed jury and/or the effective assistance of counsel, where the trial court failed to give the jury any instruction on the defense and there was evidence presented to support that defense.

      A.     Petitioner was denied a fair trial by the trial court's refusal to give a requested instruction on the defense of accident.

      B.     The failure to give any instruction on the defense of accident was plain error or the result of ineffective assistance of counsel.

III.    Mr. Flick was denied his due process right to a fair trial, where the prosecutor improperly used facts not in evidence to appeal to the emotions and sympathy of the jury, and to ask them to be the only ones to "stand up" for the victim.

IV.     Mr. Flick was denied effective assistance of counsel, where counsel failed to request an instruction on the "intent to injure" form of involuntary manslaughter as a lesser offense.

V.      Mr. Flick's conviction for second-degree murder violated the protection against double jeopardy under state and/or federal constitutions, because there was no manifest necessity for a mistrial where the judge failed to poll the jury as to whether it had unanimously agreed on a partial verdict, on whether petitioner was not guilty of second-degree murder, before discharging them.

VI.     The writ must be granted where the evidence of intent to murder was constitutionally insufficient to support the conviction in this case, thus denying petitioner due process right under the federal constitution (us cons amends v, vi, xiv) to a jury determination of guilt beyond a reasonable doubt based on sufficient evidence.

VII.    The state courts denied petitioner his due process right to a full and fair hearing where they refused to review petitioner's newly discovered evidence, which offers a "colorable showing" of "actual" and "factual" innocence thereby resulting in a manifest miscarriage of justice.

VIII.   Where appellate counsel was absent for 10 months during a critical stage of petitioner's appeal of right, petitioner was constructively denied the assistance of counsel on appeal.

IX.     Appellate counsel violated petitioner's rights as guaranteed by the U.S. Const.,

10

Am VI; Mich Const 1963, art 1 § 20, where counsel failed to raise several "dead bang winners" on appeal.

X.  Appellate counsel's failure to request an evidentiary hearing on *inter alia*, petitioner's claims of trial counsel's ineffective representation where the record was inadequate for any court to ascertain whether these errors were prejudicial, denied petitioner a full and fair hearing on his appeal of right and denied him the effective assistance of counsel on appeal.

XI.  Petitioner was denied his state and federal constitutional right to the effective assistance of counsel and his due process right to present a defense where defense counsel failed to request a continuance to obtain expert testimony when the prosecution's key witness changed his testimony between the first and second trials on the cause of death.

XII.  Petitioner received ineffective assistance of defense counsel where counsel erroneously informed petitioner that even though petitioner was indigent, he was not entitled to an expert witness at public expense, and that petitioner would have to retain such assistance because his parents, who are financially independent from him, obtained and paid an attorney.

XIII.  Petitioner was denied his due process right where the prosecutor withheld material evidence, which related to its key witness changing the cause of death between the first and second trials, thereby prejudicing the defense to adequate preparation due to unfair surprise.

XIV.  Michigan's post-conviction procedure, to wit, M.C.R. 6.500 et seq, is an inadequate procedure and is contrary to the us constitution violates the supremacy clause, and has resulted in equal protection being denied to petitioner.

Petitioner also filed a motion for evidentiary hearing.  The Court granted an evidentiary hearing and appointed counsel to represent Petitioner.  The Court held an evidentiary hearing on November 21, 2008.  A single witness testified at the hearing, Dr. Ronald Uscinski.  Dr. Uscinski testified that he reviewed medical records regarding David's treatment and death, including the Emergency Medical Services report, hospital reports, autopsy reports and photographs, and several CT scans.  Based upon his review of these records, Dr. Uscinski concluded that David died as a result of a fall, which resulted in blunt head injury and respiratory

11

arrest.  Further details of Dr. Uscinski's testimony will be discussed below.

Following the evidentiary hearing, the Court concluded further testimony was necessary regarding Petitioner's ineffective assistance of trial and appellate counsel claims.  The Court scheduled an evidentiary hearing for January 6, 2009, and directed Petitioner to present the testimony of his trial and appellate attorneys.  The hearing did not take place because Petitioner was unable to secure the presence of these witnesses, at least one of whom was beyond the Court's subpoena power.  Petitioner's counsel informed the Court that he would attempt to depose both witnesses. Petitioner's counsel scheduled a deposition of trial attorney Robert McDowell for February 27, 2009 and appellate counsel Ronald Steinberg on June 11, 2009.  The parties have filed supplemental briefs addressing the testimony adduced at the evidentiary hearing and the depositions of McDowell and Steinberg.  Petitioner has filed copies of the deposition transcripts.

### III.  Standard of Review

Section 2254(d) of Title 28 U.S.C., imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state court factual

determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."  *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 410-11.

Where a claim is fairly presented in state court, but the state court, although denying the claim, fails to address it, a federal court on habeas review must conduct an independent review of the state court's decision.  *Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000).  This independent review requires the federal court to "review the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented."  Id. at 943.  However, the independent review "is not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA."  *Id.*

### IV.  Discussion

### A.  Ineffective Assistance of Counsel

Petitioner asserts several claims of ineffective assistance of counsel.  First, Petitioner

argues that his attorney's handling of prosecution witness Dr. Daniel Fain's testimony was so seriously flawed as to constitute ineffective assistance of counsel.  He argues that counsel erred in failing to request a mistrial when Dr. Fain's testimony changed, failing to impeach Dr. Fain with his prior inconsistent testimony and failing to request a continuance to retain an expert witness when Dr. Fain's testimony changed.  Second, Petitioner argues that trial and appellate counsel were ineffective in failing to retain an expert to highlight the lack of scientific support for the methods of evaluating and diagnosing Shaken Baby Syndrome.  Third, Petitioner argues that his attorney was ineffective in failing to investigate Dr. Palutke's testimony, which may have supported Petitioner's claim that David's injuries were sustained when David fell from Petitioner's arms rather than from violent shaking.  Fourth, Petitioner argues that counsel was ineffective in failing to request an instruction on the intent to injure form of involuntary manslaughter.  Fifth, Petitioner claims that counsel was ineffective in failing to request the correct accident instruction.  Finally, Petitioner claims counsel was ineffective because he incorrectly informed Petitioner that he was not entitled to an expert witness at public expense.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test for determining whether a habeas petitioner has received ineffective assistance of counsel.  First, a petitioner must prove that counsel's performance was deficient.  This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.* at 687.  Second, a petitioner must show that counsel's deficient performance prejudiced petitioner.  To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability

14

sufficient to undermine confidence in the outcome." *Id.* at 694. A court's review of counsel's

performance must be "highly deferential." *Id.* at 689

### 1. Dr. Fain's Testimony

Dr. Fain is a pediatric neurologist working at Benson Methodist Hospital in Kalamazoo,

Michigan. He testified that he was contacted to consult on David's case on May 9, 1998. He

was called in to determine whether David was brain dead. After conducting a number of

neurological tests, Dr. Fain determined that David was brain dead.

During the first trial, Dr. Fain testified brain swelling produced herniation[3] which led to

David's death. David suffered from a biparietal skull fracture and an occipital skull fracture. He

testified that David's injuries could not have been caused from an accidental fall from a bed or

an accidental fall from someone's arms. Dr. Fain also testified that some of David's injuries

were consistent with Shaken Baby Syndrome.

In the second trial, Dr. Fain testified that David died as a result of brain shearing, caused

by someone shaking him. In contrast to his testimony during the first trial, he now testified that

brain herniation due to edema did not cause the death and that he saw no evidence of herniation.

In his opinion, nothing medically could have been done after the shearing occurred to save David

because the brain tissue was, at that point, damaged beyond repair.[4] Dr. Fain admitted that his

---

[3] Herniation is defined as: "[P]rotrusion of an anatomic structure (*e.g.* intervertebral disk) from its normal anatomic position." *Stedman's Medical Dictionary* 27th ed. 179890 (2000).

[4] Petitioner attributes the change in Dr. Fain's testimony to a medical malpractice lawsuit initiated by David's mother, Tina McBain, after the first trial, but prior to the second. Based upon the information gleaned from the record before the Court, it appears that the medical malpractice lawsuit is based at least in part on the claim that David's death was caused by doctors' failure to swiftly administer medicine to control edema of David's brain. Thus,

testimony as to the cause of death was different at the second trial than at the first.  He attributed this difference to his opportunity to personally examine both CT scans before the second trial (he had only examined the second CT scan prior to the first trial) and that for the first trial he had relied upon another physician's finding regarding herniation in reaching his conclusion that herniation had caused David's death.  Prior to the second trial, he researched the support for herniation and found that it was not supported by the medical evidence.

First, Petitioner argues that his attorney should have impeached Dr. Fain by playing Dr. Fain's videotaped testimony from the first trial.  The Michigan Court of Appeals considered this ineffective assistance of counsel claim against the standard established in *Strickland*.  The state court held that Petitioner failed to show that the videotape portion of Dr. Fain's testimony was such a crucial piece of evidence that had counsel shown the videotape there was a reasonable probability of a different outcome.  The court of appeals held that the videotape would have provided an *additional* basis for impeaching Dr. Fain's testimony, but that Dr. Fain's testimony already had been sufficiently impeached by counsel's cross-examination and other witnesses' testimony.  *Flick*, slip op. at 2.  Thus, the state court concluded counsel was not ineffective in failing to show the videotape or failing to request a mistrial.  *Id.*

Although Dr. Fain's testimony as to the cause of death differed from the first trial to the second, he testified in both trials that the cause of David's injuries could not have been a fall from a bed or a fall from someone's arms.  In addition, Dr. Fain, while not specifically

---

according to Petitioner, it was in the treating physicians' professional interest that Dr. Fain testify shearing caused David's death because, once the shearing occurred, David's death would have be inevitable and any actions or inactions by treating physicians would not have contributed to his death.

attributing David's death to Shaken Baby Syndrome in the first trial, testified in that trial that David's injuries were consistent with Shaken Baby Syndrome.  Defense counsel cross-examined Dr. Fain regarding inconsistencies between his testimony at the first and second trial.  Thus, this Court concludes that the Michigan Court of Appeals decision that counsel was not ineffective in this regard was not contrary to or an unreasonable application of *Strickland*.

Second, Petitioner argues that counsel was ineffective in failing to request a mistrial when Dr. Fain changed his testimony.  The Michigan Court of Appeals held that counsel did not err in declining to move for a mistrial.  The trial court held, in pertinent part:

> Generally, a defendant is not entitled to a new trial where the testimony of a witness is corroborated by other testimony or where impeachment evidence not produced at trial merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.  *People v. Lester*, 232 Mich. App. 262, 283; 591 N.W.2d 267 (1998).

> Here, Dr. Fain's testimony that the victim's condition was irreversibly fatal from the outset corroborated that of Dr. Meyers and Dr. Page.  Moreover, his testimony that retinal hemorrhaging was present, which is an indicator or Shaken Baby Syndrome, was consistent with his testimony at the first trial. . . . Accordingly, defendant has not shown that counsel's failure to move for a mistrial on the basis of Dr. Fain's changed opinion constitutes ineffective assistance of counsel.

*Flick*, slip op. at 2-3.

Petitioner has not shown that the state court's conclusion that he was not entitled to a new trial on the basis of Dr. Fain's change in testimony was incorrect.  Therefore, he cannot show that his attorney was ineffective in failing to make a meritless request for a mistrial.

Next, Petitioner alleges that counsel was also ineffective in failing to request a continuance or to retain an investigator following the change in Dr. Fain's expert opinion.  Respondent argues that this claim is procedurally defaulted.  The doctrine of procedural default provides:

17

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* 501 U.S. 722, 750 (1991). Such a default may occur if the state prisoner files an untimely appeal, *Coleman*, 501 U.S. at 752, if he fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir. 1994), or if he fails to comply with a state procedural rule that required him to have done something at trial to preserve his claimed error for appellate review, e.g., to make a contemporaneous objection, or file a motion for a directed verdict. *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996). Application of the cause and prejudice test may be excused if a petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust*, 17 F.3d at 162; *see Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Dretke v. Haley*, 541 U.S. 386, 393 (2004).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001), *cert. denied*, 536 U.S. 947 (2002); *see also Warner v. United States*, 975 F.2d 1207, 1213-14 (6th Cir. 1992). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 729-30. "When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground[] only if the state court rendering judgment in the case clearly and

18

expressly stated that its judgment rested on a procedural bar." *Simpson*, 94 F.3d at 202.
Whether the independent state ground is adequate to support the judgment is itself a federal
question. *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

If the last state court from which the petitioner sought review affirmed the conviction
both on the merits and, alternatively, on a procedural ground, the procedural default bar is
invoked and the petitioner must establish cause and prejudice in order for the federal court to
review the petition. *Rust*, 17 F.3d at 161. If the last state court judgment contains no reasoning,
but simply affirms the conviction in a standard order, the federal habeas court must look to the
last reasoned state court judgment rejecting the federal claim and apply a presumption that later
unexplained orders upholding the judgment or rejecting the same claim rested upon the same
ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

"Whether a state court has actually enforced a procedural sanction depends on whether
'the last state court from which the petitioner sought review . . . invoked the stated procedural
rule as a basis for its decision to reject reviewing the petitioner's federal claims.'" *Ivory v.
Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *quoting Abela v. Martin*, 380 F.3d 915, 921 (6th Cir.
2004). Petitioner first properly raised this ineffective assistance of counsel claim during state
collateral proceedings. The Michigan Court of Appeals and the Michigan Supreme Court denied
leave to appeal on the ground that Petitioner failed "to meet the burden of establishing
entitlement to relief under [Michigan Court Rule] 6.508(D)." *People v. Flick*, No. 254194
(Mich. Ct. App. Aug. 20, 2004); *People v. Flick*, No. 127221 (Mich. May 31, 2005). In *Simpson
v. Jones*, 238 F.3d 399, 407-08 (6th Cir. 2000), and in *Burroughs v. Makowski*, 282 F.3d 410,
413-14 (6th Cir. 2002), the Sixth Circuit held that this language invokes a state procedural rule,
which is sufficient to preclude federal habeas review.

19

In contrast, in *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), the Court of Appeals held that denials of leave to appeal by both Michigan appellate courts that were identical to those at issue in *Simpson* and *Borroughs*, did not invoke a state procedural rule sufficient to preclude federal habeas review. These seemingly inconsistent decisions can be resolved by considering the differences in the respective trial court decisions. In *Simpson* and *Burroughs*, the trial court did not address the merits of the petitioner's claims. In contrast, in *Abela*, the lower state court ruled on the merits of the petitioner's claims, but the Michigan Supreme Court denied leave to appeal for failure to establish entitlement to relief under Rule 6.508(D). The Sixth Circuit concluded that, under the circumstances, *Simpson* and *Burroughs* were inapplicable and the petitioner's claims were not procedurally defaulted. See *Abela* 380 F.3d at 922-24. In *Ivory v. Jackson*, 509 F.3d 284, 292-93 (6th Cir. 2007), cert. denied, __ U.S. __, 128 S. Ct. 1897 (2008), the Sixth Circuit resolved the differences between the *Simpson* and *Burroughs* cases and *Abela* by concluding that Ivory's case was more like *Simpson* and *Burroughs* than *Abela* because no state court addressed the merits of Ivory's claims during post-conviction proceedings.

The pending case presents a procedural history similar to that of *Ivory, Simpson,* and *Borroughs*. The trial court specifically invoked Michigan Court Rule 6.508(D)(3) in denying Petitioner's motion for relief from judgment. Mich. Ct. R. 6.508(D)(3) is a firmly established and regularly followed state ground precluding subsequent federal habeas review absent a showing of cause and prejudice. *Luberda v. Trippett,* 211 F.3d 1004, 1007 (6th Cir. 2000), *citing Rogers v. Howes*, 144 F.3d 990 (6th Cir. 1998). Thus, the Court finds that the doctrine of procedural default is invoked.

Petitioner alleges ineffective assistance of appellate counsel as cause to excuse his procedural default. In the alternative, he argues that his actual innocence should excuse the

procedural default.

The Court first considers whether Petitioner's claims of ineffective assistance of appellate counsel excuse his default for this claim. The Supreme Court has held that "cause" under the cause and prejudice standard must be "something *external* to the petitioner, something that cannot be fairly attributed to him." *Coleman*, 501 U.S. at 753. The Court further held that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error' . . . . Attorney error that constitutes ineffective assistance of counsel is cause, however." *Id.* at 753-54 (internal citations omitted).

The Supreme Court has held that a petitioner does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 754 (1983). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). The prejudice standard in the context of an alleged failure to raise issues on appeal requires a showing that there is "a reasonable probability, but for counsel's unreasonable failure . . . he would have prevailed on his appeal." *Smith*, 528 U.S. at 285. The process of "'winnowing out weaker arguments on appeal' " is "the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52). "'[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome.'" *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir.2002) (quoting *Gray v.*

21

*Greer*, 800 F.2d 644, 646 (7th Cir.1986)).  "An appellate advocate may deliver deficient

performance and prejudice a defendant by omitting a 'dead-bang winner,' even though counsel

may have presented strong but unsuccessful claims on appeal."  *U.S. v. Cook*, 45 F.3d 388, 395

(10th Cir. 1995) (*quoting Page v. U.S.*, 884 F.2d 300, 302 (7th Cir. 1989)).  *See also Coddington*

*v. Langley*, 202 F. Supp. 2d 687, 698 (E.D. Mich. 2002) ("A 'dead-bang winner' has been

defined as 'an issue which was obvious from the trial record.'") (*quoting Cook*, 45 F.3d at 395).

　　　Petitioner's appellate attorney was deposed on June 11, 2009, in connection with

Petitioner's habeas petition.  He testified that, in preparing Petitioner's appeal, he focused on

examining the differences between the first trial, which resulted in a hung jury (two jurors would

have voted for acquittal and ten jurors would have voted for involuntary manslaughter), and the

second trial.  Appellate counsel focused on the fact that Dr. Fain's testimony changed from the

first trial to the second.  Appellate counsel explained that he raised a claim that trial counsel was

ineffective in failing to obtain a transcript of the first trial or replay the video testimony which

was available at the time.  Appellate counsel was not asked during the deposition whether he

considered raising a claim on appeal that counsel was ineffective in failing to request a

continuance to retain an expert regarding Dr. Fain's changed testimony.

　　　Correspondence between Petitioner and appellate counsel both before and after the

appellate brief was filed shows that appellate counsel's decision as to which issues to raise on

direct appeal was the result of careful and informed consideration.  Appellate counsel's

deposition testimony shows that he carefully reviewed the record and recognized the importance

of Dr. Fain's testimony.  Petitioner was given an opportunity to develop a factual record in this

Court regarding his ineffective assistance of counsel claims.  He failed to develop a factual

record which would rebut the presumption that his attorney's decision not to raise this claim was

22

a reasoned, strategic one.  *Poindexter v. Mitchell*, 454 F.3d 564, 585 (6th Cir. 2006) (holding that appellate counsel was not ineffective in failing to raise a claim on appeal where petitioner failed to present any facts that would "lend particular importance" to the unraised claim).  Importantly, while Dr. Fain's testimony changed from the first to the second trials, a critical aspect of his testimony was consistent from the first trial to the second.  In the first trial, Dr. Fain testified that David's injuries were consistent with Shaken Baby Syndrome and inconsistent with a fall from an 18-inch bed or a fall from someone's arms.  In the second trial, Dr. Fain also testified that David's injuries were consistent with Shaken Baby Syndrome and inconsistent with the other accidents Petitioner recounted.  Thus, trial counsel's failure to request a continuance to obtain an expert when critical testimony of Dr. Fain's remained consistent, is not an issue that appellate counsel was ineffective in failing to raise.

Accordingly, this claim is barred from federal habeas review unless failure to unless he can establish that a constitutional error resulted in a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298 (1995).

The Supreme Court explicitly has tied the miscarriage of justice exception to procedural default to a petitioner's innocence.  *Id.*.  at 321.  Thus, Petitioner must assert a constitutional error along with a claim of innocence.  To make a showing of actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt."  *Id.* at 327.  The Court further explained this standard as follows:

> The . . . standard is intended to focus the inquiry on actual innocence.  In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial.  Instead, the emphasis on "actual innocence" allows the reviewing tribunal to consider the probative force of relevant evidence that was either excluded or unavailable at

23

> trial. . . . The habeas court must make its determination concerning the
> petitioner's innocence in light of all the evidence, including . . . evidence tenably
> claimed to have been wrongly excluded or to have become available only after
> trial.
>
> . . . .
>
> . . . [A]ctual innocence does not merely require a showing that a reasonable doubt
> exists in the light of the new evidence, but rather that no reasonable juror would
> have found the defendant guilty.  It is not the district court's independent
> judgment as to whether reasonable doubt exists that the standard addresses; rather
> the standard requires the district court to make a probabilistic determination about
> what reasonable, properly instructed jurors would do.  Thus, a petitioner does not
> meet the threshold requirement unless he persuades the district court that, in light
> of the new evidence, no juror, acting reasonably, would have voted to find him
> guilty beyond a reasonable doubt.

*Id.* (internal quotation omitted).

In support of his claim of innocence, Petitioner presents the affidavit and evidentiary

hearing testimony of Dr. Uscinski.  Dr. Uscinski testified that the diagnosis of Shaken Baby

Syndrome is based upon the misinterpretation of experimental work performed over thirty years

ago.  He testified that it is impossible to shake a baby hard enough to give it a head injury.  It is

possible to injure a child by shaking it, but the injuries would be in the nature of a crushed chest

or a neck injury.  Dr. Uscinski testified that David likely died as a result of a fall, from which he

suffered a blunt head injury.  David's CT scan revealed that David suffered a skull fracture that

extended from one side of his head to the other.  The skull fracture was caused by a single

impact to the head.  In his opinion, the impact could have been caused by a fall of forty inches.

Dr. Uscinski's educational and professional experience is impressive.  The Court found

his testimony relevant and his conclusions the result of a careful review of David McBain's

medical record.  There remains, however, considerable evidence implicating Petitioner.

Petitioner's account of what transpired on the day of David's injury changed over time.  Seven

physicians who treated David following this traumatic injury, themselves with impressive educational and professional experience, testified that David's injuries could not have been caused by any of the incidents described by Petitioner.  Dr. Uscinski's exculpatory testimony is simply insufficient in the face of this overwhelming testimony to persuade the Court that, in light of this new evidence, no juror, acting reasonably, would have voted to find Petitioner guilty beyond a reasonable doubt.

Therefore, the Court concludes that this claim is procedurally defaulted.

### 2. Failing to Retain an Expert to Attack the Science Underlying Shaken Baby Syndrome

Petitioner argues that trial counsel was ineffective in failing to seek an expert who would testify regarding the controversy surrounding Shaken Baby Syndrome and that some in the scientific community were questioning doctors' basic understanding of the syndrome and the methods for diagnosing it, and that appellate counsel was ineffective in failing to raise this issue on appeal.  In support of his argument that the controversy was widespread and should have been known by counsel at the time of Petitioner's trial, Petitioner cites Dr. Uscinski's testimony and research, the high-profile murder trial of nanny Louise Woodward for the death of Matthew Eappen, an article appearing in *Discover Magazine* in December 2008 entitled "Does Shaken Baby Syndrome Really Exist?", and an article regarding Shaken Baby Syndrome published in 1999 in *The American Journal of Forensic Medicine and Pathology*.

During his deposition testimony, Petitioner's trial attorney was not asked specifically whether he attempted to locate an expert witness who could testify regarding the controversy surrounding Shaken Baby Syndrome.  The trial attorney testified that he contacted three experts to evaluate Petitioner's case.  He contacted Dr. Laurence Simson by letter dated, July 7, 1998,

25

Dr. Warner Spitz by letter dated, September 15, 1998, and Dr. Chris Sperry, a forensic

pathologist in Georgia.  Trial counsel testified that Dr. Sperry reviewed the case file and

characterized the matter as a "case of flagrant child abuse."  McDowell Deposition,2/27/09 at

102.  Counsel testified that, after consulting these experts, he made a strategic decision not to

call an expert on behalf of the defense.

   With regard to a claim that counsel was ineffective for failing to conduct an adequate

investigation:

> [D]ecisions made by trial counsel after "less than complete investigation," . . .
> "are reasonable precisely to the extent that reasonable professional judgments
> support the limitations on investigation.  In other words, counsel has a duty to
> make reasonable investigations or to make a reasonable decision that makes
> particular investigations unnecessary.  In any ineffectiveness case, a particular
> decision to investigate must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to counsel's judgments."

*Brown v. Smith*, 551 F.3d 424, 430 (6th Cir. 2008), *quoting Strickland*, at 690-91.

   In this case, the Court finds that counsel's decision against continued investigation was a

reasonable one.  Counsel's letters to Drs. Spitz and Simson evidenced an understanding of the

issues presented in the case.  He attempted to obtain an expert who would support the defense's

case.  He discontinued his investigation only after three witnesses failed to provide him with any

analysis favorable to the defense.  The Court also concludes that counsel was not ineffective in

failing to reinitiate his search for an expert after the first trial.  No testimony adduced at the first

trial would necessarily have led defense counsel to conclude that his search for an expert would

suddenly prove fruitful.

   In addition, the Court finds that neither trial nor appellate counsel was ineffective in

failing to specifically seek to obtain an expert able to testify regarding any controversy

surrounding a Shaken Baby Syndrome Diagnosis.  It appears that, between the time of

26

Petitioner's trials and today, the science underlying Shaken Baby Syndrome has been the subject of some controversy. However, Petitioner has not shown that criticism of the science underlying Shaken Baby Syndrome was so widespread or widely known at the time of Petitioner's trial and appeal that counsel should have sought such an expert. Dr. Uscinski's curriculum vitae lists his first publication or presentation addressing Shaken Baby Syndrome as occurring in September 2000. The two articles cited by Petitioner appeared in late 1998 and early 1999. Thus, it was not unreasonable for trial counsel to have been unaware of them.

Appellate counsel testified that he was unaware of any controversy surrounding Shaken Baby Syndrome at the time of Petitioner's appeal to the Michigan Court of Appeals. While the articles cited by Petitioner were published before the Michigan Court of Appeals issued its decision on direct appeal, by citing two articles, Petitioner has not shown that any controversy surrounding Shaken Baby Syndrome was so widespread that appellate counsel was acting outside the wide range of reasonably competent professional assistance in failing to investigate further. Moreover, the author of one of the papers cited by Petitioner, Dr. John Plunkett, in a subsequent author's note, recognized that his paper questioning Shaken Baby Syndrome represented the minority view. The Court will not try to identify a point in time when the minority view had been voiced a sufficient number of times and in a sufficient number of publications so as to require an attorney, acting competently, to, at a minimum, explore its relevance to a defendant's case. The Court does find that such a critical point had not been reached at the time of Petitioner's trial or appeal. Accordingly, trial counsel was not ineffective in failing to discover and explore this minority viewpoint, and appellate counsel was not ineffective in failing to raise this issue on appeal.

### 3. Failing to Investigate Dr. Palutke's Testimony

27

Petitioner argues that counsel was ineffective in failing to recall the medical examiner Dr. Palutke in response to Dr. Fain's change in testimony.  When Dr. Fain changed his testimony, defense counsel indicated to the trial judge that, had he previously been made aware that Dr. Fain would change his testimony, he would have questioned Dr. Palutke about Dr. Fain's conclusion that David died from brain shearing caused by being shaken.  The trial court offered defense counsel the possibility of recalling Dr. Palutke to question him regarding Dr. Fain's conclusion.  The record does not reflect any attempts by defense counsel to recall Dr. Palutke. Petitioner argues that this failure was ineffective assistance.

The Michigan Court of Appeals denied this claim in a summary fashion, stating:

> Counsel's failure to call witnesses or present other evidence can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense, i.e., one that might have made a difference, in the outcome of the trial. . . .We find no deficiency apparent on the record that might have affected the outcome of the trial.

*Flick*, slip op. at 3.

"[W]here the state court decides a claim on the merits but does not articulate the reasons for its decision," a federal court on habeas review is "'obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.'"  *Daniels v. Lafler*, 192 F. App'x 408, 419 (6th Cir.2006) (*quoting Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir.2000)).  This "independent review" is "not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA."  *Harris*, 212 F.3d at 943.

Dr. Palutke testified that David died as a result of blunt force trauma to the brain and

28

head.  Dr. Palutke did not mention brain shearing, nor did he testify that David died as a result of being shaken.  Dr. Palutke's testimony in this regard did not support Dr. Fain's finding of Shaken Baby Syndrome.  Nevertheless, while inconsistent to some extent with Dr. Fain's testimony, Dr. Palutke's testimony was not helpful to Petitioner's defense.  Dr. Palutke testified that David's injuries could not have been caused by David falling from a waterbed, banging his head against a door, or a fall from someone's arms.  Given that Dr. Palutke's testimony clearly did not support Petitioner's version of events, it was not unreasonable for counsel to decide that recalling Dr. Palutke would only serve to confirm to the jury that his expert opinion did not support Petitioner's defense.  Thus, the Court concludes that the result reached by the Michigan Court of Appeals was not contrary to or an unreasonable application of *Strickland*.

### 4.  Jury Instruction

Petitioner next argues that the trial court denied him a fair trial in denying a requested instruction on the defense of accident and that counsel was ineffective in failing to request an instruction on accident under CJI2d 7.1.  Petitioner further alleges that counsel was ineffective in failing to request an instruction on the "intent to injure" form of involuntary manslaughter as a lesser offense.

Counsel request an accident instruction under CJI2d 7.2, which is given where a defendant acknowledges that his act was voluntary but the consequences of the act were unintended.  The trial court judge held that this instruction was unnecessary.  CJI2d 7.1, which was not requested by counsel, is relevant where a defendant alleges that the act itself was entirely accidental and involuntary.

The Michigan Court of Appeals held that Petitioner was not denied his right to a properly

29

instructed jury, reasoning, in pertinent part:

> Reviewing the jury instructions in their entirety, *People v. Canales*, 243 Mich. App. 571, 574; 624 N.W.2d 439 (2000), we conclude that the instructions sufficiently protected defendant's rights. The trial court instructed the jury on the crimes of second-degree murder and involuntary manslaughter. Because second-degree murder includes intent as one of its elements, the occurrence of the crime is inconsistent with accident and is excusable if the killing is accidental. . . . In contrast, the crime of involuntary manslaughter, with which the jury in this case was also instructed, is not an intent crime and accident is not a defense to this offense. . . .
>
> The jury was given a clear choice of finding that defendant acted with the specific intent to commit second-degree murder, that he acted with gross negligence – which is more than mere accident – or that neither of these were proven and that defendant was not guilty. The jury rejected the concept of "gross negligence" — as either committed by defendant or by the doctors who treated the victim – and found beyond a reasonable doubt that defendant had the necessary specific intent for second-degree murder. Defendant has not shown that the trial court's failure to issue an instruction on accident resulted in a miscarriage of justice or constituted a plain error that adversely affected defendant's substantial rights, *i.e.*, that defendant was actually innocent or the alleged error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. . . . Defendant's claims of instructional error are without merit.

*Flick*, slip op. at 5.

Generally, a claim that a state trial judge gave erroneous jury instructions is not cognizable in a federal habeas action unless the instruction "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), *quoting Cupp v. Naughten*, 414 U.S. 141, 147 (1973). "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned', but that it violated some [constitutional] right.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle,* 502 U.S. at 72 (1991), *quoting Cupp*, 414 U.S. at 147.

30

In this case, the jury was instructed regarding the elements of second-degree murder, including the malice element, that is that Petitioner "intended to kill, or . . . intended to do great bodily harm to David McBain, or he knowingly created a very high risk of death or great bodily harm knowing death or such harm was the likely result of his actions."  Tr., Vol. III at 1500. Petitioner was not impeded in his ability to present evidence and arguments in support of his contention that the killing was not done with malice, but was accidental.  Thus, the Court concludes that the Michigan Court of Appeals' decision that it was not error to omit an accident instruction was not contrary to or an unreasonable application of Supreme Court precedent.

Moreover, Petitioner cannot show that his attorney was ineffective in not requesting the CJI2d 8.1 accident instruction because Petitioner has not shown that he was prejudiced by the absence of such an instruction.  The jury was not precluded from considering whether David's injuries were accidental.  The jury was instructed on involuntary manslaughter, which required a finding only that Petitioner acted in a grossly negligent manner, and rejected this lesser offense. *Accord Dukes v. Trombley,* No. 07-CV-10549, 2008 WL 5381823, * 5 (E.D. Mich. December 22, 2008) (holding attorney not ineffective in failing to request accident instruction where jury considered and rejected lesser offense of involuntary manslaughter).

Petitioner also claims that counsel was ineffective in failing to request a jury instruction regarding the "intent to injure" form of voluntary manslaughter.  The last state court to issue a reasoned opinion regarding this claim, the Michigan Court of Appeals, stated, in relevant part:

> Defense counsel did not request the instruction on the "intent to injure" theory,
> otherwise known as the "misdemeanor-manslaughter rule."  *See* CJI2d 16.10(4)
> and *People v. Datema*, 448 Mich. 585; 533 N.W.2d 272 (1995).  Under that rule,
> if a defendant commits an assault and battery with a specific intent to inflict
> injury and causes unintended death, the defendant may be found guilty of
> involuntary manslaughter.  *Id.* at 608.

31

> Even assuming that there was evidence presented by the prosecutor to support an instruction on the "intent to injure" version of involuntary manslaughter, this instruction would have conflicted with the theory advanced by the defense – that defendant had no intent to injure the baby and that defendant did not commit an assault and battery on the baby.  The evidence tended to show that the alleged batteries inflicted on the eight-month-old child were extremely forceful and would naturally tend to, and did in fact, cause serious injury.  It was not unreasonable, and clearly not against sound trial strategy, for defense counsel to present only the "gross negligence" theory of involuntary manslaughter that was consistent with defendant's testimony, which did not admit an intent to injure. . . . For defense counsel to then request an involuntary manslaughter instruction that is premised on an intent to injure might have undermined defendant's case.  We will not substitute our judgment for that of counsel regarding matters of trial strategy. . . . And we will not analyze the propriety of defense counsel's possible strategic decision with the benefit of hindsight that counsel's strategy did not work. . . . Defendant has not overcome the strong presumption that his counsel's decision was a matter of sound trial strategy, and he has not shown that he was deprived of the effective assistance of counsel.

*Flick*, slip op. at 3-4.

The Court finds that the state court's decision was not contrary to or an unreasonable application of Supreme Court precedent.  Petitioner testified that he did not intend to harm David.  The jury instructions reflected the intent necessary for a finding of guilty.  Counsel was not ineffective in failing to request an instruction that had little evidentiary support and, as the court of appeals noted, would serve to undermine Petitioner's testimony.  Therefore, the Court denies habeas relief on this claim.

### 5.  Advice Regarding Expert Witness

Finally, Petitioner argues that trial counsel was ineffective in failing to inform him that he was entitled to an expert witness at the state's expense because he is indigent.  Petitioner claims his attorney informed him that he would have to retain an expert at his own expense because he had retained counsel.  Based upon the record before the Court, it is unclear whether the trial court would have appointed an expert.  *See People v. Hodges,* No. 280077, *1 (Mich. Ct.

32

App. Apr. 2, 2009) (holding that trial court did not abuse its discretion in denying an expert

witness where defendant retained his own attorney and his motion for bond suggested the

availability of funds).  Therefore, the Court denies relief on this claim.

### B.  Alleged Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct when he referred to a

medical malpractice lawsuit in his closing argument and appealed to the jury's sympathy for the

victim.  The prosecutor stated:

> Is there nobody to stand up for this kid?  Certainly not the family.  He's nothing
> more than a law suit against the hospital right now.

Tr., Vol. V at 1491.

"Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements

were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a

due process deprivation."  *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999).  "The

touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of

the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The

aim of due process "is not punishment of society for the misdeeds of the prosecutor but

avoidance of an unfair trial to the accused."  *Id.* (citations omitted).  On habeas review, a federal

court considers the following factors when weighing the extent of prosecutorial misconduct:

> (i) the degree to which the misconduct tended to mislead the jury and prejudice
> the accused; (ii) whether the misconduct was isolated or extensive; (iii) whether
> the misconduct was deliberate; and (iv) the strength of the evidence establishing
> the guilt of the accused.

*Givens v. Yukins*, 238 F.3d 420 (Table), 2000 WL 1828484, *6 (6th Cir. 2000), *citing  Angel v.

Overberg*, 682 F.2d 605, 608 (6th 1982).

The Michigan Court of Appeals held that the prosecutor did not engage in misconduct.

The state court held that the prosecutor's remarks were "based on the evidence and reasonable inferences arising from the evidence at trial, and they were in response to defense counsel's arguments." *Flick*, slip op. at 4. The trial court concluded that Petitioner was not denied a fair trial nor did he suffer a miscarriage of justice due to the prosecutor's remarks. *Id.*

The prosecutor's remark regarding the medical malpractice lawsuit was limited and in direct response to defense counsel's closing argument. In closing argument, defense counsel argued that Dr. Fain changed his testimony in an attempted to "bail out" the hospital for its poor treatment of David. Tr., Vol. V, p. 1483. Defense counsel argued that certain prosecution witnesses had a motive to lie to protect the hospital. The prosecutor's rebuttal simply responded to that allegation with a brief mention of the motives defense witnesses might have for testifying. Moreover, the trial court informed the jury that "Sympathy or prejudice must not influence your decision." Tr., Vol. V at 1494. The Court finds that the state court's conclusion that the prosecutor did not engage in misconduct in referencing the medical malpractice lawsuit was not contrary to or an unreasonable application of Supreme Court precedent. *See also Cyars v. Hofbauer*, 383 F.3d 485, 493, (6th Cir. 2004) (recognizing "well-established presumption jurors follow their instructions").

Petitioner also argues that the prosecutor improperly appealed to the jurors' feelings of sympathy toward the victim. "Closing arguments that encourage juror identification with crime victims are improper." *Johnson v. Bell,* 525 F.3d 466, 484 (6th Cir. 2008). A prosecutor acts improperly when he "calls on the jury's emotions and fears – rather than the evidence – to decide the case." *Id.* While the prosecutor's statements may have evoked some sympathy for the victim, the prosecutor did not ask the jury to convict on that basis. Instead, the prosecutor simply asked the jurors not to minimize the killing of David. Even assuming that the

34

prosecutor's isolated statement that the family had not stood up for David was improper, it did not rise to the level of prosecutorial misconduct. Viewed in its entirety, the prosecutor's closing argument reviewed the evidence presented at trial and asked the jury to convict on that basis. The prosecutor's comments regarding the victim of the crime did not deprive Petitioner of a fundamentally fair trial and, therefore, did not constitute prosecutorial misconduct.

### C. Alleged Double Jeopardy Violation

Petitioner argues that his right to be free from double jeopardy was violated when he was retried after his first trial ended in a hung jury. Petitioner argues that the jury should have been polled to determine if they were unanimous for acquittal of second-degree murder and the deadlock was over complete acquittal or conviction of the lesser offense.

The Double Jeopardy Clause of the Fifth Amendment provides, "No person . . . shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. This clause affords defendants protection against three basic harms: second prosecution for the same offense after acquittal, second prosecution for the same offense after conviction, and multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977). The Supreme Court has held that "absent a motion for mistrial by the defendant, a trial court will trigger the Double Jeopardy Clause by retrying a defendant when a mistrial was granted in the absence of 'manifest necessity'." *Daniels v. Burke*, 83 F.3d 760, 763 (6th Cir. 1996), *quoting Richardson v. U.S.*, 468 U.S. 317, 323-24 (1984).

The Michigan Court of Appeals denied this claim, holding in relevant part:

Defendant argues that there was no manifest necessity demonstrated for granting the mistrial of the first trial because the trial court failed to poll the jurors prior to their discharge regarding whether they unanimously agreed that defendant was not guilty of second-degree murder. We conclude that defendant's claim is without merit.

35

Once a jury is selected and sworn and jeopardy has attached, as in the instant case, if the trial is ended prematurely, a retrial for the offense is prohibited unless the defendant consented to the interruption or a mistrial was declared because of manifest necessity. *People v Mehall*, 454 Mich 1, 4; 557 NW2d 110 (1997). *See* US Const, Am V; Const 1963, art 1, § 15. A deadlocked jury constitutes manifest necessity. *Mehall, supra* at 4; *People v Daniels*, 192 Mich App 658, 662-663; 482 NW2d 176 (1992). In *People v Hickey*, 103 Mich App 350, 353; 303 NW2d 19 (1981), our Court determined, "The protection against double jeopardy does not require a trial court to inquire as to the status of jury deliberations on the included offenses before it declares a mistrial due to a hung jury." *Accord, Daniels, supra*. Defendant presents no compelling reasons to depart from this established rule, other than arguments that have already been presented to and twice rejected by this Court. *Daniels, supra; Hickey, supra*. We continue to adhere to the rule in *Hickey* and hold that defendant's right against being twice placed in jeopardy for the same offense was not violated.

*Flick*, slip op. at 1-2.

In *Daniels v. Burke*, 83 F.3d 760 (6th Cir. 1996), a habeas petition raised the same double jeopardy claim raised in this case. The Sixth Circuit Court of Appeals affirmed the district court's denial of this claim, holding that no existing precedent required the polling of a jury in such circumstances and that *Teague v. Lane*, 489 U.S. 288 (1989), barred the application of a new rule on collateral proceedings. *Id.* at 764-65. Since the Sixth Circuit's decision in *Daniels*, the Supreme Court has not held that a deadlocked jury must be polled before a mistrial can be declared based on manifest necessity. Therefore, the Michigan Court of Appeals' decision was not contrary to or an unreasonable application of Supreme Court precedent.

### D. Sufficiency of the Evidence

Petitioner argues that insufficient evidence was presented at trial to sustain his conviction for second-degree murder.

The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilty beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).

> [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at trial established guilty beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318-19 (internal citation and footnote omitted). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

The last state court to issue a reasoned opinion regarding this claim, the Michigan Court of Appeals, held:

> Defendant argues that there was insufficient evidence to sustain his conviction of second-degree murder because the prosecution failed to establish the requisite intent. When reviewing a claim of insufficient evidence, this Court views the evidence in light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v Hunter*, 209 Mich App 280, 282; 530 NW2d 174 (1995). There was testimony and evidence to support a conclusion of the requisite intent where the doctors and medical reports indicated that the infant died of blunt force trauma sustained while in defendant's care. Any concerns defendant raises regarding witness bias and disputed evidence were matters of the weight of the evidence and the credibility of witnesses, which were within the province of the jury. *People v. Wolfe*, 440 Mich. 508, 514-15; 489 N.W.2d 478, amended 441 Mich 1201 (1992); *People v Terry*, 224 Mich App 447, 452; 569 NW2d 641 (1997).

*Flick*, slip op. at 5.

The Michigan Court of Appeals, although not citing *Jackson*, cited case law which clearly incorporated the *Jackson* standard. Petitioner has not presented any evidence to show that the state court's findings of fact were erroneous. Under Michigan law, the elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998).

The malice element is satisfied "by showing that the defendant possessed the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with the knowledge that death or great bodily harm would be the probable result. . . . Malice can be inferred from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v. Djordjevic*, 584 N.W.2d 610, 612 (Mich. Ct. App. 1998) (internal citation omitted).

When assessing a sufficiency of the evidence claim on habeas review, the Court may not re-weigh evidence or redetermine witness credibility. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296-97 (1992).  According the state court's findings of fact a presumption of correctness, this Court concludes that the Michigan Court of Appeals' decision that sufficient evidence was presented for a finding of guilty of second-degree murder did not "result[] in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1). Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

### E.  Trial Court's Failure to Conduct Evidentiary Hearing Regarding Newly Discovered Evidence

In his seventh habeas claim, Petitioner argues that the state courts violated his right to due process when they refused to conduct an evidentiary hearing regarding Dr. Uscinski's affidavit.  Petitioner argues that the trial court's failure to conduct the hearing was contrary to state court rules and *Schlup v. Delo*, 513 U.S. 298 (1995).

38

Petitioner's claim that the state court's denial of an evidentiary hearing was contrary to state law and rules is not cognizable on federal habeas review. *Wilson v. McMacken,* 786 F.2d 216, 221 (6th Cir. 1986) ("In a federal habeas corpus proceeding . . . [the federal court does] not sit as a 'super' state supreme court to judge whether the judge erred under state law.'"). In addition, *Schlup* is inapposite as *Schlup* addresses a habeas petitioner's ability to achieve review of a procedurally defaulted claim on federal habeas review, not in state court.

### F. Alleged Ineffective Assistance of Appellate Counsel

Petitioner argues that he received ineffective assistance of appellate counsel. First, he argues that he was constructively denied the assistance of appellate counsel because counsel was absent for 10 months during a critical stage of Petitioner's appeal of right. Second, he argues appellate counsel was ineffective in failing to request an evidentiary hearing regarding his ineffective assistance of trial counsel claims. Third, Petitioner claims that counsel was ineffective in failing to raise several "dead bang" winners on direct appeal.

### 1. Absence of Counsel

Petitioner states that an attorney from the State Appellate Defender Office (SADO), Ronald E. Steinberg, was appointed to represent him on direct appeal. He argues that sometime after filing an appellate brief on June 16, 2000, counsel was unavailable to him for approximately 10 months because he took a medical leave of absence.

A criminal defendant has a constitutional right to effective assistance of counsel in his first appeal. See *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985). In *Penson v. Ohio*, the Supreme Court distinguished between two types of claims effective assistance of appellate counsel. First, where a petitioner argues that counsel failed to assert or fully brief a particular claim, he must show that his attorney's performance was both deficient and prejudicial. *Penson*, 488 U.S. at 84,

39

(*citing Strickland v. Washington*, 466 U.S. 668, 689-94 (1984)).  Second, where the complained-of performance constitutes a complete actual or constructive denial of the assistance of counsel, prejudice is presumed. See id., 488 U.S. at 88-89 ("[T]he actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.") (citation omitted).  The Court distinguished "denial of counsel altogether on appeal, which warrants a presumption of prejudice, from mere ineffective assistance of counsel on appeal, which does not."  *Smith v. Robbins*, 528 U.S. 259, 286 (2000).

In *Penson*, the petitioner's appellate counsel filed a motion stating that the appeal lacked merit and requesting permission to withdraw as appellate counsel. 488 U.S. at 77-78.  The state appellate court granted counsel's motion to withdraw, but later, after reviewing the case, the state appellate court found that the record supported several arguably meritorious grounds for reversal of the petitioner's conviction.  *Id.* at 81.  Upon making this determination, the state appellate court failed to appoint new counsel.  *Id.*  The Supreme Court held that the state appellate court erred when it failed to appoint new counsel after determining that the record supported several arguable claims.  *Id.* at 83-84.  The state court's error left the petitioner "entirely without the assistance of counsel on appeal," and the Supreme Court presumed prejudice.  *Id.* at 88- 89.

Courts have presumed prejudice where appellate counsel fails to file any appeal.  *See Castellanos v. United States*, 26 F.3d 717, 718 (7th Cir.1994) (presumption of prejudice where counsel "dropped the ball" in failing to take an appeal);  *Bonneau v. United States*, 961 F.2d 17, 23 (1st Cir.1992) (requiring no showing of prejudice when the defendant's appeal was dismissed due to his lawyer's failure to file a brief);  *Williams v. Lockhart*, 849 F.2d 1134, 1137 n. 3 (8th Cir.1988) (finding prejudice *per se* in attorney's failure to bring appeal after promising to do so).  But, many courts have declined to apply *Cronic* to appellate counsel errors which, although

40

serious, do not deprive a defendant of his right to appeal.  *See e.g.*, *Hollenback v. United States*, 987 F.2d 1272, 1276 & n. 1 (7th Cir. 1993) (finding no *per se* prejudice in appellate counsel's citation to wrong provision of money-laundering statute); *United States v. Birtle*, 792 F.2d 846, 847-48 (9th Cir. 1986) (finding no per se prejudice when defendant's appellate counsel failed to appear at oral argument or file a reply brief).

The Court first reviews the timeline of events related to appellate counsel Steinberg's representation.  On May 25, 2000, Petitioner sent a letter to Steinberg detailing the issues he thought should be included in the appellate brief.[5]  Steinberg filed a brief on appeal on June 16, 2000.  On that same date, Steinberg sent a letter to Petitioner explaining why he declined to include in the appellate brief certain of the issues raised in Petitioner's letter.  Steinberg also advised Petitioner that while Steinberg determined the claims lacked merit, Petitioner was free to file a *pro per* supplemental brief.  Petitioner sent a letter to Steinberg dated June 23, 2000, raising additional questions.  Steinberg responded by letter dated June 28, 2000, and explained that his office would assist Petitioner in filing a motion for permission to file a *pro per* supplemental brief if he so desired.  The record shows that Steinberg again responded to a letter from Petitioner on July 7, 2000.  Petitioner states that he sent several more letters to Steinberg over a period of several months (none of these letters is included in the appendix), but failed to receive any response until he was finally advised by letter dated October 26, 2000, that Steinberg had fallen ill and would not return for approximately six months.  The record shows that Petitioner wrote several more letters to SADO addressing various matters, including whether

---

[5]  Copies of the letters referenced herein are included in the Appendix filed by Petitioner with the petition for a writ of habeas corpus.  They are also included in the state court record related to Petitoner's collateral appeal.

and when substitute counsel would be appointed, whether oral argument would be held, and whether the prosecutor had filed a responsive pleading.  On June 20, 2001, Debra Gutierrez-McGuire, an assistant defender for SADO, filed a Motion for Oral Argument in the Michigan Court of Appeals.  That motion was denied.  On July 2, 2001, Gutierrez-McGuire filed a motion for leave to file Petitioner's *pro per* supplemental brief on appeal.  The motion was granted and the supplemental brief was accepted for filing.  *People v. Flick*, No. 219434 (Mich. Ct. App. July 24, 2001).

This timeline of events establishes that Petitioner's representation by appellate counsel did not amount to the constructive absence of counsel.  Appellate counsel Steinberg timely filed a substantial brief on appeal.  His letters to Petitioner evidence thoughtful consideration of the claims presented on appeal.  Although Petitioner was frustrated that he was not immediately assigned to another SADO attorney when Steinberg fell ill, the record shows no pressing appellate matters which were neglected during Steinberg's illness.  In Steinberg's absence, Gutierrez-McGuire filed a motion for oral argument and a motion to file a *pro per* supplemental brief.  The Court concludes that Petitioner was not constructively denied counsel.

## 2.  Evidentiary Hearing

Petitioner argues appellate counsel was ineffective in failing to request a hearing pursuant to *People v. Ginther*, 390 Mich. 436 (1973).  However, no specific evidence or testimony was adduced at the deposition of trial counsel which would have supported his claims.  *Thomson v. Trombley,* 2008 WL 4427790, *27 (E.D. Mich. Sept. 30, 2008) (denying claim that appellate counsel was ineffective in failing to request state court evidentiary hearing where Petitioner failed on habeas review to reference specific facts to support his claim which could have been adduced at an evidentiary hearing), *citing Harris v. Johnson*, 81 F.3d 535, 540 (5th Cir.1996) (to

42

establish entitlement to an evidentiary hearing in federal court, a habeas petitioner "must make sufficiently specific factual allegations; conclusory allegations will not suffice to mandate either discovery or a hearing.").  Appellate counsel testified that he did not think an evidentiary hearing was necessary in this matter because, in his opinion, the record fully supported his claim that trial  counsel failed to adequately impeach Dr. Fain.  The record shows that appellate counsel considered requesting an evidentiary hearing and concluded that the record adequately supported his claim, rendering an evidentiary hearing unnecessary.  The Court concludes that Petitioner has failed to overcome the presumption that his attorney's decision not to request an evidentiary hearing was a reasonable, strategic decision.

### 3.  Failure to Raise Claims on Direct Appeal

Petitioner also alleges that appellate counsel was ineffective for failing to raise the claims Petitioner raised in his motion for relief from judgment on direct review.  In the discussion *supra* regarding Petitioner's ineffective assistance of counsel claims, the Court addressed Petitioner's claim that appellate counsel was ineffective for not raising the continuance-related ineffective assistance of trial claim.  With respect to the remaining claims Petitioner argues appellate counsel failed to raise on direct review, Petitioner has failed to show that any of these claims were meritorious.  Therefore, he has not shown that he was prejudiced by appellate counsel's failure to raise them.

### G.  Alleged *Brady* Violation

Petitioner argues that  he is entitled to habeas corpus relief because the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), when he failed to inform the defense that Dr. Fain had changed his testimony.  Respondent argues that this claim is procedurally defaulted. "[F]ederal courts are not required to address a procedural-default issue before deciding against

the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003), *citing Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of this claim.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court established that a prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "[I]t is well settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011-12 (6th Cir. 1999). *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose. *United States v. Word*, 806 F.2d 658, 665 (6th Cir.1986), *cert. denied*, 480 U.S. 922 (1987). "Delay only violates *Brady* when the delay itself causes prejudice." *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir.1992), *vacated and remanded on other grounds*, 507 U.S. 956 (1993).

Dr. Fain's change in testimony was disclosed on the day of trial. Therefore, the relevant question is whether a delay in disclosing the change in testimony prejudiced the defense. Dr. Fain testified that he told the prosecutor about his change in testimony at approximately 10:30

44

a.m. on the day of his testimony.  The record shows that Dr. Fain was sworn in as a witness at

11:04 a.m., and the testimony that was inconsistent with his prior testimony was given shortly

after his testimony commenced.  There is no indication that the prosecutor had any advance

notice of the change.  *Brady* does not require the instantaneous disclosure of exculpatory and

material information.  It is, thus, not clear that there was any meaningful delay in disclosing the

change in testimony to the defense.  Moreover, Petitioner has not shown that he was prejudiced

by the delay.  Accordingly, Petitioner has failed to establish a *Brady* violation.

### H.  State Court's Post-Conviction Procedure

Finally, Petitioner argues that Michigan's post-conviction procedures violate the

Supremacy Clause and the Equal Protection Clause.

Federal habeas corpus relief is available only to persons being held in state custody "in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  It is

not a remedy for an alleged violation of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

States "have no obligation to provide" post-conviction review under the Constitution.

*Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) (citation omitted).  Since states are not

required to provide such review, federal courts have held that challenges to a state's post-

conviction procedures are not cognizable as independent claims in habeas corpus proceedings,

because such claims "address collateral matters and not the underlying state conviction giving

rise to the prisoner's incarceration."  *Kirby v. Dutton*, 794 F.2d 245, 247, 248 (6th Cir. 1986).

*See also Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir.2007) ("[E]rrors in post-conviction

proceedings are outside the scope of federal habeas corpus review."); *Vail v. Procunier*, 747 F.2d

277, 277 (5th Cir.1984) (holding that "[i]nfirmities in state habeas corpus proceedings do not

constitute grounds for federal habeas relief.").

Therefore, Petitioner's claim challenging procedures related to Michigan Court Rule

6.500 *et.seq.* is not cognizable on federal habeas review.

## V.  Certificate of Appealability

A district court, in its discretion, may decide whether to issue a certificate of appealability ("COA") at the time the court rules on a petition for a writ of habeas corpus or it may wait until a notice of appeal is filed to make such a determination.  *Castro v. United States,* 310 F.3d 900, 903 (6th Cir. 2002).  In deciding to deny the habeas petition, the court has, of course, studied the case record and the relevant law, and concludes that it is presently in the best position to decide whether to issue a COA.  *See Id.* at 90 (*quoting, Lyons v. Ohio Adult Parole Auth.,* 105 F.3d 1063, 1072 (6th Cir. 1997) ("[Because] 'a district judge who has just denied a habeas petition . . .  will have an intimate knowledge of both the record and the relevant law,' the district judge is, at that point, often best able to determine whether to issue the COA.") (overruled on other grounds).

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).  A petitioner must "show . . . that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted).

The Court finds that jurists of reason could find its resolution of Petitioner's ineffective assistance of trial and appellate counsel claims to be debatable or wrong.  Accordingly, the Court will grant a certificate of appealability on Petitioner's ineffective assistance of trial and appellate counsel claims.  The Court denies a certificate of appealability on Petitioner's remaining claims.

**VI.  Conclusion**

Petitioner has not established that he is in the State of Michigan's custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** on the issues of ineffective assistance of trial and appellate counsel and **DENIED** as to all other issues.

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Dated: November 5, 2009

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon the petitioner, David Paul Flick, counsel Andrew Wise,  and counsel Laura A. Cook.

s/Bernadette M. Thebolt
Case Manager

48